C.D. Michel – SBN 144258
Joshua Robert Dale – SBN 209942
Alexander A. Frank – SBN 311718
Konstadinos T. Moros – SBN 306610
cmichel@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| LANCE BOLAND, an individual; MARIO SANTELLAN, an individual; RENO MAY, an individual; JEROME SCHAMMEL, an individual; and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>ROBERT BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,<br><br>Defendants. | CASE NO.:<br><br>**COMPLAINT FOR DAMAGES, DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**42 U.S.C. §§ 1983 & 1988** |

Plaintiffs Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Incorporated, through their counsel, bring this action against Defendant Attorney General Robert Bonta, in his official capacity, and make the following allegations.

## INTRODUCTION

1.  Despite the plain text of the Second Amendment to the United States Constitution that prohibits infringement of the people's right to keep and bear arms, California has the some of the most onerous firearms restrictions of any state in the

1

union. One of these restrictions is the product of California's Unsafe Handgun Act ("UHA") statutes, California Penal Code sections 31900 through 32110.

2.      The UHA requires that handguns be drop-tested to determine whether they are safe from accidental discharges and be equipped with certain "safety" features to be sold in California. Any handgun that does not undergo these tests <u>and</u> lacks these features is "unsafe," and cannot be sold.

3.      However, because there are no handguns available for sale in the entire nation that have the three core "safety" features that the UHA requires, the only handguns available for sale in California are those that were "grandfathered" in over time that lack the purportedly necessary safety features. And as manufacturers redesign handgun models to improve their safety and efficacy, every year the UHA list of approved handguns gets smaller as manufacturers refuse to continue to sell the older grandfathered models.

4.      No handgun released to the broader US market since May of 2013 is available for retail sale to a California resident in the primary market for handguns. The UHA thus severely limits Californians' access to America's most popular category of constitutionally protected firearms: handguns.

5.      But the UHA is also not truly about ensuring handguns are safe for all. It has exceptions for sworn members of several government agencies and law enforcement departments.[1] CAL. PENAL CODE § 32000 (Deering 2022). They can buy purportedly "unsafe" handguns available to residents of all other states even though those handguns have not undergone any DOJ safety testing required under the UHA.

6.      Plaintiffs challenge the UHA because the UHA prohibits Californians from acquiring the most popular and newest versions of handguns that are owned by

---

[1] *See* "State Exemptions for Authorized Peace Officers," <<u>https://oag.ca.gov/firearms/exemptpo</u>> (as of July 27, 2022).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Americans in every other state, by the millions, for self-defense. This is a direct infringement of Californians' right to keep and bear firearms because handguns, particularly semiautomatic handguns, are "the most popular weapon chosen by Americans for self-defense in the home." *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008). Americans lawfully possess them by the millions, and the nation has recently experienced a breathtaking demand for them (due to the pandemic and social unrest) that lacks historical parallel.

7.     Indeed, Americans today are exercising their Second Amendment right to keep and bear handguns in record numbers that demonstrate the immutability of the fundamental human right to self-defense, the ubiquity of the handgun as the quintessential self-defense weapon, and the unsettling and increasingly commonplace failure and even unwillingness of the authorities to suppress civil unrest, respond to active threats, and maintain order.

8.     But while the general market for handguns throughout the Nation is quite large and has thousands of distinct offerings from hundreds of manufacturers, the opposite is true in California due to the UHA. Because of the UHA, California has essentially frozen the number of options for handguns that ordinary residents may purchase at roughly 800.[2]

9.     And because the UHA recognizes different color finishes of otherwise identical models of firearms as distinct models, the true number of genuinely distinct models available for purchase in California is much lower. CAL. PENAL CODE § 32020 (Deering 2022).

10.     California's UHA also makes it very easy for approved models to lose their approved status, which happens frequently.

11.     Effectively, not a single genuinely new-to-market firearm introduced to the

---

[2] As of July 19, 2022. This figure is subject to decrease and likely will decrease as it has over the past nine years.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

broader national civilian market for semi-automatic handguns later than May 17, 2013, is available for sale to the general public, in new condition, in the retail market because of the UHA. Far from ensuring that handguns sold in California are "safe," all the UHA accomplishes is ensuring that older and increasingly less desirable handgun models proliferate *ad infinitum*, while newer, more reliable, more ergonomic, more affordable, and more desirable choices remain out of reach.

12.    California's UHA thus denies Californians access to thousands of variants of handguns—the "quintessential" self-defense weapon—in clear violation of the Second Amendment. Without a doubt, because the UHA arbitrarily prohibits thousands of variants of arms that are "in common use . . . for lawful purposes like self-defense," the prohibition "cannot stand." *Heller,* 554 U.S. at 624, 636.

13.    Plainly and simply, California's requirement that handguns, semiautomatics especially, be equipped with specific technological features that no manufacturer offers is an unconstitutional infringement of Plaintiffs' Second Amendment rights.

14.    In addition to violating the Second Amendment, the UHA also violates the Dormant Commerce Clause. The federal legislature's exclusive power to regulate interstate commerce pursuant to the Commerce Clause of the United States Constitution prohibits states from enacting laws that pose undue burdens on interstate economic activities and that discriminate against interstate commerce. *South Dakota v. Wayfair, Inc.*, 585 U.S. ___, 138 S. Ct. 2080, 2090-91 (2018).

15.    California's UHA discriminates against interstate commerce because prohibiting primary market acquisition of all "unsafe" firearms but allowing acquisition of them via private party secondary market transactions favors wholly intrastate sales while discriminating against interstate commerce in identical handguns.

16.    Desiring to acquire, possess, use, and/or transfer these UHA banned, yet constitutionally protected semiautomatic handguns for lawful purposes including self-defense, Plaintiffs respectfully request that this Court: (1) declare that California Penal Code sections 31900 through 32110, and any of them, infringe upon Plaintiffs'

4

constitutional rights; and (2) permanently enjoin Defendants from enforcing these statutes to the extent they prevent law-abiding Californians, like Plaintiffs, from acquiring, possessing, or using constitutionally protected arms for self-defense.

**CALIFORNIA'S "UNSAFE HANDGUN ACT" IN DETAIL**

17.     In some key respects, the market for handguns in the United States is no different than the market for any other type of durable consumer good. New and old manufacturers are constantly innovating, refining, receiving consumer feedback, and introducing new and updated products that feature new materials and manufacturing processes into a competitive marketplace for civilian, military, and law enforcement customers.

18.     However, ordinary Californians essentially have no real ability to choose from any of the newer handgun models available in the California primary retail market. Indeed, no semiautomatic pistol brought to market since May 17, 2013, is available to the general public in California because of the UHA.

19.     In 1999, the Legislature enacted the UHA to purportedly establish safety standards for all handguns manufactured, imported, or otherwise sold in the state.

20.     Under the UHA, a handgun cannot lawfully be sold in the primary market to ordinary civilians if it meets the definition of an "unsafe" handgun. CAL. PENAL CODE §§ 32000 & 31910 (Deering 2022). A handgun is "unsafe" if it lacks certain features. This prohibition does not apply to law enforcement, nor to an ever-expanding list of other quasi-law enforcement type government agency personnel such as the Department of Motor Vehicles, harbor or port districts, and the investigation division of the Department of Consumer Affairs. *Id*. § 32000(b)(6).

21.     All handguns that are eligible for sale under the UHA in California are added to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

an official list known as the roster of handguns certified for sale (the "Roster"). [3] *Id.* § 32015. But placement of a handgun on the Roster is a UHA safe-harbor and not an element used to determine whether a handgun is an "unsafe handgun" under the UHA. *Id.* § 31910.

22.     The California Department of Justice maintains the Roster "listing all of the pistols, revolvers, and other firearms capable of being concealed upon the person that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this part." *Id.* § 32015.

23.     Admission to the Roster is not permanent. It is valid for only one year and must be renewed prior to expiration via notice and payment of a $200 fee. *See* CAL. CODE REGS. tit. 11, §§ 4070(a)-(b) & 4072(b) (2022).

24.     Over time, the legislature has amended the UHA statutes that mandate what features a handgun must have to be "safe" for different categories of handguns, (semiautomatic pistols, revolvers, and rimfire semiautomatics) and has typically "grandfathered" those handguns that are on the Roster but would otherwise meet the definition of an "unsafe" firearm under the new requirements. That is, as long as these older firearms were already on the Roster before the new Roster-eligibility rules take effect, they can stay on the Roster and be sold in unlimited quantity in California despite no longer satisfying the operative definition of "safe."

25.     The UHA imposes the most burdensome technological requirements on centerfire semiautomatic pistols, but also imposes requirements on rimfire semiautomatic pistols and revolvers that suppress the availability of newer, more popular models of those categories of handguns too. [4] The UHA thus imposes slightly different requirements

---

[3] *See* "Handguns Certified for Sale," <https://oag.ca.gov/firearms/certified-handguns/search> (as of July 27, 2022).

[4] "Centerfire" is an ammunition cartridge which features a centrally placed primer/ignition system, in contrast to a "rimfire" ignition system. Virtually all popular

on all three categories of handguns, but regardless, suppresses the primary market availability of modern handgun models popular throughout the nation.

26.     As of 2007, for a new-to-market semiautomatic centerfire handgun to avoid the "unsafe" classification and therefore be eligible for primary market sale, the handgun needed to have both a chamber load indicator ("CLI") and a magazine disconnect mechanism ("MDM"), in addition to passing a drop safety test and passing a firing reliability test. CAL. PENAL CODE §§ 31910(b)(5), 31900, & 31905 (Deering 2022). A CLI is visual/tactile indicator on the exterior of the handgun that will indicate that the firearm has a cartridge in the chamber (i.e., ready to be discharged upon pull of the trigger). An MDM prevents a semi-automatic handgun from firing the cartridge in the chamber unless the magazine is fully inserted into the firearm.

27.     A revolver is considered "unsafe" if "it does not have a safety device that, either automatically in the case of a double-action firing mechanism, or by manual operation in the case of a single-action firing mechanism, causes the hammer to retract to a point where the firing pin does not rest upon the primer of the cartridge," and it fails to meet firing and drop safety requirements. *Id*. § 31910.

28.     As of 2006, a rimfire semiautomatic pistol is considered "unsafe" and therefore not eligible for admission to the Roster if it is equipped with a detachable magazine and lacks a magazine safety disconnect mechanism. *Id*.

29.     Semiautomatic handguns that were on the Roster prior to 2007, despite not having a CLI or MDM, were allowed to remain on the Roster and continue to be sold to the general civilian public in the primary market, as long as they comply with the formalities of Roster admission.

30.     As of May 17, 2013, semiautomatic handguns must be equipped with the

---

modern semiautomatic handguns are chambered in centerfire calibers such as 9mm, .45 ACP, .380 ACP, and 40 S&W. The most popular and common rimfire cartridge is the .22 LR.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

technology to stamp a microscopic identification mark on the shell casing of an expended round of ammunition in two locations to be eligible for the Roster. But semiautomatic handguns that were on the Roster between January 1, 2007, and May 17, 2013[5], that have CLI and MDM, but lack two-location microstamping capability are allowed to remain on the Roster ("grandfathered") and may continue to be sold. As are semiautomatic handguns on the Roster prior to 2007, which lack either a CLI or MDM.

31.    To summarize, from May 17, 2013, and until the present, in order to avoid the "unsafe" classification and therefore be eligible for the Roster, a semiautomatic handgun must have three features: CLI, a MDM, and two-location microstamping. Without those three features, the UHA would deem any firearm proposed for inclusion on the list "unsafe" and therefore ineligible for the Roster.

32.    As such, as of July of 2022, the Roster has roughly 800 total listings. It has nearly 500 semiautomatic handguns, but the real number of distinct offerings is far fewer because cosmetic differences between otherwise identical handgun models are treated as distinct models. *Id.*, § 32020. Regardless, none of the currently rostered semiautomatic handguns would meet today's operative definition of a safe handgun because not a single one of them has all three features: CLI, MDM, and microstamping.

33.    To clarify: there is not a single handgun currently on the Roster available for sale to the general public in the primary market in California, that has all three features (CLI, MDM, and microstamping) the UHA requires; every single semiautomatic handgun

---

[5] California Penal Code section 31910(b)(7)(a) originally provided for Jan. 1, 2010 as the deadline for pistols to comply with this requirement. However, it did so contingent on the California Department of Justice certifying that the "technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions. *Id*. The DOJ did not make that certification (BOF No.:2013-BOF-03) until May 17, 2013. *See* "Information Bulletin: Certification of Microstamping pursuant to Penal Code section 31910, subdivision (b)(7)(A)," (May 17, 2013) <https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/infobuls/2013-BOF-03.pdf> (as of July 20, 2022).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

on the Roster is a "grandfathered" handgun.

34.     Some of the semiautomatic handguns on the Roster have a CLI and an MDM, but these models are rare. The reasons why are that these features are simply not desirable, they increase manufacturing costs, increase the mechanical complication and potential for failure to function, increase research and design costs, and are bizarre departures from the normal suite of features that comprise the modern semiautomatic handgun. These features are essentially adulterations that no one other than the California legislature deems necessary or desirable on a pistol.

35.     Nor does a CLI make any firearm intrinsically safer.  The responsibility of ensuring that a firearm is safe and is not discharged negligently cannot truly be enhanced mechanically; gun safety is the responsibility of the firearm handler.

36.     Nor does an MDM enhance safety. Indeed, not only does an MDM not make a firearm safer, but it can directly compromise the usability of a firearm in a life-or-death situation. Firearm magazines are very often the weak link in the functionality chain; they are delicate and slight defects (such as dirt, grime, rust, bent feed lips or weakened springs) can and often do cause malfunctions. It is not desirable to possess a firearm that can only fire with the magazine inserted because that makes it impossible to use the firearm if the magazine is causing the firearm to malfunction and needs to be ejected to cycle the firearm's action, or is ejected from the firearm by accident is and not recoverable.

37.     Thus, although microstamping is the most abjectly misguided of the three "safety" features, the CLI and the MDM are nearly as ill-conceived. That is why these features are absent on virtually all firearms in the broader national and global marketplace, but for those handful of semiautomatic firearms that a handful of manufacturers modified in order to comply with the UHA so they could sell to the California market.

38.     Handguns that are not on the Roster are generally known as "Off-Roster" handguns. While Off-Roster handguns are not legal to sell and acquire in the retail

market for nearly all Californians, anyone can lawfully purchase Off-Roster handguns in secondary market "private party" transfer transactions. This is possible because there are various avenues for exempt classes of persons—primarily law enforcement (CAL. PENAL CODE § 32000(b)(4)) or people moving into California (CAL. PENAL CODE § 27560)—to acquire or import an Off-Roster handgun into California, and then lawfully sell it via private party transaction at a licensed dealer. *Id*. §§ 28050 & 32110(a) (Deering 2022).

## HISTORY OF MICROSTAMPING AND RECENT DEVELOPMENTS

39.     The reason why California's microstamping requirement began on May 17, 2013, is because that is the day the DOJ issued the certification stating that the microstamping technology was available and not encumbered by patent restrictions, as required under the version of California Penal Code section 31910(b)(7)(a) then operative.

40.     However, despite issuing that certification, the California Department of Justice later admitted in litigation that the certification is not a representation that the technology is truly available. *See, e.g., NSSF v. Nat'l Shooting Sports Found., Inc. v. State of Cal.,* 5 Cal. 5th 428, 432 (2018) (Section 31910(b)(7)(a) was not void under a statutorily imposed doctrine of impossibility notwithstanding plaintiffs presented evidence that no manufacturer could provide microstamping on their handguns). And indeed, it is not commercially available.

41.     In September of 2020, Governor Newsom signed Assembly Bill 2847 into law, which changed the micro-stamping requirement effective July 1, 2022.

42.     Assembly Bill 2847 amended the UHA's two-location microstamping requirement to require an imprint in only one location on the cartridge. As such, admission onto the Roster now requires, *inter alia*, the ability to imprint in one location rather than two locations. However, this makes no difference because microstamping of any kind—whether in two or one locations—is not commercially available. No manufacturer offers microstamping of any type on any handgun.

43.     AB 2847 also imposes an additional amendment to the UHA: for every

10

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

semiautomatic handgun that satisfies the new one location microstamping requirement (in addition to having CLI and MDM) and is therefore added to the Roster, the State must remove three (3) grandfathered semiautomatic handguns from the Roster, in reverse order of addition. However, this has not yet occurred because microstamping technology does not actually exist in any commercially available application on a handgun.

44.     The UHA's microstamping requirement is the most problematic of the three core requirements because microstamping is simply not commercially available or adaptable. But moreover, microstamping is pointless.

45.     Microstamping is not actually a safety measure. The theoretical benefit it proposes is to aid law enforcement in investigating crime. The theoretical function of microstamping is to imprint the serial number of the firearm onto an expended cartridge casing, which would be recoverable at a crime scene, assuming the criminal did not attempt to retrieve the expended brass before fleeing. That information on the cartridge would then theoretically permit authorities to determine who the last registered transferee of the firearm is. However, this is only useful if one assumes that criminals discharging firearms at crime scenes are using firearms they have lawfully acquired and are thus traceable to them—which is obviously not the case. There is a surfeit of stolen firearms in the black market, and it is this surfeit of stolen firearms that are overwhelmingly used for criminal purposes.[6] Furthermore, any criminal using a theoretical firearm equipped with microstamping technology could file off, remove, or otherwise disable the stamping mechanism of the handgun's action.

## JURISDICTION AND VENUE

46.     The Court has original jurisdiction of this civil action under 28 U.S.C. section 1331, because the action arises under the Constitution and laws of the United States, thus

---

[6] *See* Mariel Alper and Lauren Glaze, "U.S. DOJ Special Report, Source and Use of Firearms Involved in Crimes: Survey of Prison Inmates, 2016," (January 2019) at Table 5 <https://bjs.ojp.gov/content/pub/pdf/suficspi16.pdf> (as of July 27, 2022).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

raising federal questions. The Court also has jurisdiction under 28 U.S.C. section 1343(a)(3) and 42 U.S.C. section 1983 since this action seeks to redress the deprivation, under color of the laws, statutes, ordinances, regulations, customs and usages of the State of California and political subdivisions thereof, of rights, privileges or immunities secured by the United States Constitution and by Acts of Congress.

47.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. sections 2201 and 2202, respectively, and their claim for attorneys' fees is authorized by 42 U.S.C. section 1988.

48.     Venue in this judicial district is proper under 28 U.S.C. section 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.  Further, all but one of the Plaintiffs reside in the Central District's Southern Division.

## PARTIES

### [Plaintiffs]

49.     Plaintiff Lance Boland is a resident of Orange County, California, and a law-abiding citizen of the United States. Plaintiff is a certified firearms trainer in Orange County and has as much if not more experience and training in the safe handling of handguns than various exempted persons identified in California Penal Code section 32000(b)(6).  Plaintiff does not currently own a semi-automatic firearm that is unavailable for purchase in California due to the UHA. Plaintiff Boland would attempt to buy one in the retail market but for the fact that the attempt to do so would be futile because it is unlawful for a dealer to sell an Off-Roster handgun to him because he is not eligible for any of the exemptions. If he could legally do so, he would attempt to purchase from a retail dealer Off-Roster semi-automatic firearms such as a Gen5 ("fifth generation") Glock 19 and to keep it in his home for self-defense and use for other lawful purposes such as recreational target shooting and firearms training.

50.     Plaintiff Mario Santellan is a resident of Orange County, California, and a law-abiding citizen of the United States. Plaintiff Santellan does not currently own a semi-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

automatic firearm that is unavailable for purchase in California due to the UHA. Plaintiff Santellan would attempt to buy one in the retail market but for the fact that the attempt to do so would be futile because it is unlawful for a dealer to sell an Off-Roster handgun to him because he is not eligible for any of the exemptions. If he could legally do so, he would attempt to purchase at a retail dealer "Off-Roster" semi-automatic firearms such as a Gen5 Glock 17 and Sig Sauer P365 and to keep those firearms in his home for self-defense and use for other lawful purposes such as recreational target shooting.

51.     Plaintiff Reno May is a resident of Sonoma County, California, and a law-abiding citizen of the United States. Plaintiff May has purchased Off-Roster pistols in the secondary market at significant markups and wishes to purchase more Off-Roster models. Plaintiff May would attempt to buy one in the retail market but for the fact that the attempt to do so would be futile because it is unlawful for a dealer to sell an Off-Roster handgun to him because he is not eligible for any of the exemptions. If he could legally do so, he would attempt to purchase at a retail dealer "Off-Roster" semi-automatic firearms such as a Gen 5 Glock 19, Sig Sauer P365, Ruger LCP Max, Smith & Wesson Shield Plus, and Staccato P, and to keep those firearms in his home for self-defense and use for other lawful purposes such as recreational target shooting.

52.     Plaintiff Jerome Schammel is a resident of Orange County, California, and a law-abiding citizen of the United States. Plaintiff Schammel does not currently own a semi-automatic firearm that is unavailable for purchase in California due to the UHA. Plaintiff Schammel would attempt to buy one in the retail market but for the fact that the attempt to do so would be futile because it is unlawful for a dealer to sell an Off-Roster handgun to him because he is not eligible for any of the exemptions. If he could legally do so, he would attempt to purchase at a retail dealer "Off-Roster" semi-automatic firearms such as a Glock 17 Gen5 and Sig Sauer P320 XCompact and to keep those firearms in his home for self-defense and use for other lawful purposes such as recreational target shooting.

53.     Each of the individual Plaintiffs identified above seeks to keep, acquire, and/or

possess semiautomatic handguns currently banned due to the UHA for lawful purposes, including in-home self-defense, as is their right under the Second Amendment to the United States Constitution. Each of them is eligible under the laws of the United States and of the State of California to receive and possess firearms.

54.    Plaintiff California Rifle & Pistol Association, Incorporated ("CRPA"), is a nonprofit membership and donor-support organization qualified as tax-exempt under 26 U.S.C. section 501(c)(4) with its headquarters in the City of Fullerton, Orange County, California. Founded in 1875, CRPA seeks to defend the civil rights of all law-abiding individuals, including the fundamental right to acquire and possess commonly owned firearms.

55.    CRPA regularly provides guidance to California gun owners regarding their legal rights and responsibilities. In addition, CRPA is dedicated to promoting the shooting sports and providing education, training, and organized competition for adult and junior shooters. CRPA members include law enforcement officers, prosecutors, professionals, firearm experts, and the public.

56.    In this suit, CRPA represents the interests of the tens of thousands of its members who reside in the state of California, including in Orange County, and who are too numerous to conveniently bring this action individually. Specifically, CRPA represents the interests of those who are affected by California's UHA restrictions that prevent purchase of many popular semiautomatic handguns. But for California's UHA restrictions, CRPA members would seek to acquire, keep, possess and/or transfer such unavailable semiautomatic handguns for in-home self-defense and other lawful purposes.

### [Defendants]

57.    Defendant Robert Bonta is the Attorney General of California. He is the chief law enforcement officer of California. Defendant Bonta is charged by Article V, Section 13 of the California Constitution with the duty to see that the laws of California are uniformly and adequately enforced. Defendant Bonta also has direct supervision over every district attorney and sheriff in all matters pertaining to the duties of their respective

14

officers. Defendant Bonta's duties also include informing the public, local prosecutors, and law enforcement regarding the meaning of the laws of California, including restrictions on firearms prohibited for sale under the UHA. He is sued in his official capacity.

58.     The true names or capacities—whether individual, corporate, associate, or otherwise—of the Defendants named herein as Does 1 through 10, are presently unknown to Plaintiffs, and are therefore sued by these fictitious names. Plaintiffs pray for leave to amend this Complaint to show the true names or capacities of these Defendants if and when they have been determined.

59.     Defendants Bonta and Does 1-10 are responsible for formulating, executing, and administering California's restrictions on UHA-banned semi-automatic firearms, and they are in fact presently enforcing them.

60.     Defendants enforce California restrictions on UHA banned semi-automatics against Plaintiffs and other California citizens under color of state law within the meaning of 42 U.S.C. section 1983.

## GENERAL ALLEGATIONS
### [Right to Keep and Bear Arms]

61.     In 2008, the United States Supreme Court held that the Second Amendment protects an individual right, that is not dependent on service in a militia or other associative entity, to own an operable handgun in the home for self-defense. *District of Columbia v. Heller*, 554 U.S. 570 (2008). The *Heller* court described the right to self-defense as the "central component" of the Second Amendment right. *Id*. at 628.

62.     Two years later, the Supreme Court deemed this right *fundamental*, and incorporated against the state governments under the Fourteenth Amendment. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

63.     The *Heller* court also held that the Second Amendment protects the right to keep and bear arms "typically possessed by law-abiding citizens for lawful purposes," and found that the handgun is the "quintessential self-defense" weapon. 554 U.S. at 624-

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

25.

64.    Most critically, the *Heller* court established a "text, history, and tradition" framework for analyzing scope of the Second Amendment questions. The court then assessed historical evidence to determine the prevailing understanding of the Second Amendment at the time of its ratification in 1791, and thereafter. Based on that assessment, the Court concluded that the District of Columbia statute which prohibited possession of the most commonplace type of firearm in the nation (the handgun) lacked a revolutionary era analog, did not comport with the historical understanding of the scope of the right, and therefore violated the core Second Amendment right.

65.    The *Heller* court also held that "a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society" is per se unconstitutional, especially when that prohibition extends "to the home, where the need for defense of self, family, and property is most acute." 554 U.S. at 628.

66.    In June of 2022, the Supreme Court reiterated the validity of the historical understanding approach for analyzing scope of the Second Amendment questions and recognized that the Second Amendment protects the right to armed self-defense in public just as much as in the home. *N.Y. State Rifle & Pistol Association v. Bruen,* 597 U.S. at __, 142 S. Ct. 2111 (2022) ("*Bruen*").

67.    The *Bruen* court reiterated that courts may not apply a "means-ends" "interest-balancing" test akin to "intermediate scrutiny" in scope of the Second Amendment cases. Instead, courts must inspect the historical records of the ratification era and then apply analogical analysis to determine whether the modern-day restriction infringes the Second Amendment right. *See id.* at 2129-30.

68.    The *Bruen* court clarified in crystal-clear language how proper Second Amendment analysis shall be applied: "We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the

16

Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'." *See id.* at 2126.

69.    The *Bruen* court further stated the "test that we set forth in *Heller* and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id.* at 2131.

70.    The *Bruen* court also acknowledged that "while the historical analogies here and in *Heller* are relatively simple to draw, other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Id.* at 2132.

71.    The *Bruen* court declined to "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," but noted that *Heller* and *McDonald* "point toward at least two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 2132-33.

72.    And critically, the "<u>the government must affirmatively prove</u> that its firearms regulation is part of the historical tradition that delimits outer bounds of the right to keep and bear arms." *Id.* at 2127 (emphasis added).

73.    Here, Plaintiffs present a question very close to the question posed to the Supreme Court in *Heller*: what is the scope of the government's ability to regulate the possession of handguns—the "quintessential" choice—for self-defense? More specifically, does the Second Amendment allow the state to significantly restrict the specific models of the "quintessential self-defense" weapon available to eligible citizens (i.e., the handgun)?

74.    The short answer is "no." The UHA prohibits California's general public from acquiring a significant number of popular and common models of handguns that Americans own nationwide for the purpose of lawful self-defense. There is no legitimate and genuine historical analogue for the UHA. The UHA therefore unconstitutionally infringes Plaintiffs' Second Amendment right to keep and bear arms.

75.     Moreover, because the handguns that have been allowed to remain on the Roster despite not having the full suite of features required to make them "safe" continue to be sold in unlimited numbers, and because a number of government employees who work for an ever-expanding list of government agencies may purchase so-called "unsafe" handguns, the UHA fails to materially achieve any purported public safety objective.

76.     Because there is not a single commercially available firearm in the United States, or even globally, that has microstamping technology as of the filing of this complaint, California's hypothesis that the UHA would foment a technological revolution in firearm microstamping technology and widespread adoption of the technology has proven incorrect.

77.     The only measurable result of California's experiment is the artificial constriction of the marketplace for the quintessential Second Amendment protected firearm, which leaves California's handgun marketplace in a time warp that in some respects, already resembles Cuba's automobile market.

**[Commerce Clause]**

78.     The Commerce Clause of the United States Constitution assigns the entire, plenary power to regulate interstate commerce to the Federal government. U.S. CONST, art. 1, §8, cl. 3.

79.     The Commerce Clause prohibits state regulations that pose undue burdens on interstate activities. *South Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2090-91 (2018).

80.     The Commerce Clause also prohibits discrimination against interstate commerce. *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 390 (1994).

81.      California's UHA both unduly burdens and discriminates against interstate commerce because it allows intrastate private party transfer of an Off-Roster handgun but prohibits an out of state private party possessor of an Off-Roster handgun from transferring that firearm into the state to a California resident who wants to acquire it.

82.     Were it not for the UHA, out of state possessors of Off-Roster firearms would be able to sell their firearms to California residents and then ship those firearms to

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

California licensed dealers to lawfully process the transaction just like the purchase of an on-roster handgun.

## DAMAGES ALLEGATIONS

83.     Plaintiffs, and each of them, have suffered monetary damages as a result of their inability to have access to, possess, or purchase Off-Roster handguns.  The inability to have access to handguns that have safeties, magazine releases, or other features designed for left-handed, disabled, or differently-abled shooters—because such firearms are not on and cannot qualify for the Roster—has injured Plaintiffs in their ability to market their businesses to such users and potential uses of firearms.  As a result of such injuries, Plaintiffs are entitled to at least $1,000 in damages apiece for the injuries resulting from the constitutional violations alleged herein, or in a greater or lesser amount according to proof.

## DECLARATORY JUDGMENT ALLEGATIONS

84.     There is an actual and present controversy between the parties. Plaintiffs contend that California Penal Code sections 31910 through 32110, and each of them and their individual subsections, infringe on Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution, by generally prohibiting commonly possessed models of handguns that it deems "unsafe." Plaintiffs also contend that California Penal Code sections 31910 through 32110, and each of them and their individual subsections, violate the Commerce Clause by burdening interstate commerce. Defendants deny these contentions. Plaintiffs desire a judicial declaration that the California Penal Code sections 31910 through 32110, or any of them, or any of their individual subsections, violates Plaintiffs' constitutional rights.

## INJUNCTIVE RELIEF ALLEGATIONS

85.     Plaintiffs are presently and continuously injured by Defendants' enforcement of California Penal Code sections 31910 through 32110, and each of them, insofar as those provisions violate Plaintiffs' rights under the Second Amendment or the Commerce Clause, without sufficient justification.

86.     If not enjoined by this Court, Defendants will continue to enforce California Penal Code sections 31910 through 32110 in derogation of Plaintiffs' constitutional rights. Plaintiffs have no plain, speedy, and adequate remedy at law. Damages are indeterminate or unascertainable and, in any event, would not fully redress any harm suffered by Plaintiffs because they are unable to engage in constitutionally protected activity due to California's ongoing enforcement of California Penal Code sections 31910 through 32110.

## FIRST CLAIM FOR RELIEF
### Right to Keep and Bear Arms
(U.S. CONST., amends. II and XIV)

87.     Paragraphs 1 through 86 are realleged and incorporated by reference.

88.     California's UHA generally prohibits Californians, including Plaintiffs, from acquiring handguns in the primary market that are "typically possessed by law-abiding citizens for lawful purposes" nationwide and thus protected under the Second Amendment. Specifically, there are a vast number of handguns offered for sale today on the broader national market that do not have an LCI, MDM, or any microstamping capability, that Plaintiffs would seek to acquire in the primary market if they could.

89.     The UHA's restriction on the sale of handguns that are commonly possessed throughout the United States by law-abiding individuals, like Plaintiffs, for lawful purposes infringes on the right of the People of California, including Plaintiffs, to keep and bear protected arms as guaranteed by the Second Amendment of the United States Constitution, and as made applicable to California by the Fourteenth Amendment.

90.     But for California's UHA, law-abiding, responsible adults, including Plaintiffs, would acquire, keep, and possess, for the purpose of self-defense and all other lawful purposes, handguns that do not appear on the Roster because they do not meet the operative definition of "safe." Such handguns include, but are by no means limited to, the most current iterations of popular Glock models, such as the fifth generation Glock 17 and 19 pistols, Sig Sauer's P320 series, Heckler & Koch's VP9 series, FN's 509 series, and CZ's P10 series.

91.     The UHA's prohibitions extend into Plaintiffs' homes, where Second Amendment protections are at their zenith, but also affects lawful and constitutionally protected conduct such as hunting, recreational shooting, and competitive marksmanship. It also impacts Plaintiffs' right to carry a firearm in public where there is also a Second Amendment protected right to self-defense. *Bruen* at 2122.

92.     Because the UHA implicates the plain meaning of the Constitutional text establishing that there is a right to keep and bear arms, the UHA presumptively infringes the Second Amendment unless Defendants can show that there is a genuine ratification era analog to the UHA.

93.     Defendants cannot do so, because there simply is no historically analogous regulation akin to the UHA that shows that such regulations are part of the historical understanding of the scope of the right to keep and bear arms. Defendants therefore cannot satisfy their burden of justifying the UHA's restrictions on the Second Amendment right of the People, including Plaintiffs, to acquire, possess, and use handguns that are in common use by law-abiding adults throughout the United States for the core right of defense of self, in the home and in public, and other lawful purposes.

94.     The UHA therefore effects an unconstitutional infringement of Plaintiffs' right to keep and bear arms under the Second and Fourteenth Amendments.

## SECOND CLAIM FOR RELIEF
### Unconstitutional Discrimination Against Interstate Commerce
(U.S. CONST., Art. I, § 8)

95.     Paragraphs 1 through 94 are realleged and incorporated by reference.

96.     The United States Constitution vests plenary power to regulate commerce among the states in the federal legislature.

97.     State regulations which pose an undue burden on interstate commerce or discriminate against interstate commerce are unconstitutional.

98.     The "so-called 'dormant commerce clause' . . . stands for the principle that state laws are unconstitutional if they place an undue burden on interstate commerce." *Am. Bankers Ass'n v. Lockyer*, 2002 U.S. Dist. LEXIS 19125 (E.D. Cal. June 28, 2002).

21
COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

99.     The "most common" type of discrimination against interstate commerce is "disparate impact: the differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 448 (2019) (citations omitted).

100.     California law allows intrastate transfers of Off-Roster handguns. *See* CAL. PENAL CODE §§ 32110 (Deering 2022) (exempting private party transfers from the UHA). Specifically, it allows handguns that are not on the Roster but were somehow acquired by an owner (often acquired by someone who is exempt from the UHA Roster restriction under Section 32000(b)(6)) to be transferred in a private party transfer, i.e., as a used handgun. However, California does not allow for interstate private party transfers of Off-Roster handguns because the Dealer Entry System ("DES") software that a California dealer must use to facilitate the private party transfer requires the transferor to provide a California driver's license or identification. This prohibits both individuals and licensed dealers located outside of California in other states from lawfully transacting with California residents to transfer Off-Roster handguns. As such California's effective prohibition of interstate private party transfers is discrimination against out of state economic interests.

101.     California firearm dealers must process firearm transactions by entering a DROS ("Dealer Record Of Sale") transaction through the DES. *See* CAL. PENAL CODE § 28205 (Deering 2022); and CAL. CODE REGS. tit. 11, § 4200 (2022). When a dealer processes a private party transaction through the DES, the dealer must submit a DROS for both the transferee and the transferor. The DROS requires the parties to present "clear evidence of the person's identity and age," which means a California issued driver's license or identification.[7] This requirement bars any out of state transferor from being

---

[7] See California Department of Justice Bureau of Firearms DROS Entry System (DES) Firearms Dealership User Guide,

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

able to transfer a handgun to a California resident, unless they have a valid California driver's license or identification.

102.  Additionally, California requires that private party transactions occur in face-to-face transactions at a firearms dealer. This prevents an out of state seller from shipping the firearm to a California licensed dealer, because once that happens, the transfer is no longer a private party transfer; it is a dealer transfer, and it is unlawful for a dealer to transfer an "unsafe" handgun. The only option is for the seller to travel into California for the private party transfer, but only if the seller has a California driver's license or identification that is required for the DROS.

103.  California therefore allows a California resident who was lawfully able to acquire or otherwise bring an Off-Roster handgun into California to sell it via a private party transfer to another California resident but does not allow an out of state seller to sell an Off-Roster handgun to a California resident via a private party transfer unless that out of state seller physically travels to California and has a California driver's license or identification.

104.  The barriers that the UHA imposes to the interstate transfer of an Off-Roster handgun therefore amount to an undue burden and/or disparate impact discrimination against out of state sellers of Off-Roster firearms in violation of the Interstate Commerce Clause.

## PRAYER FOR RELIEF

Plaintiffs pray that the Court:

1.  Enter a declaratory judgment under 28 U.S.C. sections 2201 that California Penal Code sections 31910 through 32110, or any of these sections or any of their subsections, are unconstitutional on their face or, alternatively, to the extent these

---

<https://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/dros_entry_guide.pdfresiden> (as of July 21, 2022).

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

prohibitions apply to law-abiding adults seeking to acquire, use, or possess Off-Roster handguns that are in common use by Plaintiffs and the American public for lawful purposes, because such unlawfully infringes on the right of the People to keep and bear arms in violation of the Second and Fourteenth Amendments to the United States Constitution, and violates the plenary authority of the federal government to regulate interstate commerce in violation of the Commerce Clause.

2.      Issue an injunction enjoining Defendants and their officers, agents, and employees from enforcing statutes that comprise the UHA, including California Penal Code sections 31910 through 32110 in their entirety, or, alternatively, to the extent such can be segregated from the rest of the statute, any provision of section 31910 that prohibits the acquiring in the primary market, using, or possessing of Off-Roster semiautomatic firearms that are in common use by the American public for lawful purposes;

3.      Award damages greater than nominal damages to Plaintiffs, and each of them, in an amount according to proof;

4.      Award remedies available under 42 U.S.C. section 1983 and all reasonable attorneys' fees, costs, and expenses under 42 U.S.C. section 1988, or any other applicable law; and

5.      Grant any such other and further relief as the Court may deem proper.

Respectfully Submitted,

Dated: August 1, 2022                         MICHEL & ASSOCIATES, P.C.


                                              /s/ C.D. Michel
                                              C.D. Michel
                                              *Counsel for Plaintiffs*

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF