1  Rob Bonta
   Attorney General of California
2  Mark R. Beckington
   Supervising Deputy Attorney General
3  Robert L. Meyerhoff, SBN 298196
   Gabrielle D. Boutin, SBN 267308
4   1300 I Street, Suite 125
    P.O. Box 944255
5   Sacramento, CA 94244-2550
    Telephone:  (916) 210-6053
6   Fax:  (916) 324-8835
    E-mail:  Gabrielle.Boutin@doj.ca.gov
7  *Attorneys for Rob Bonta, in his official capacity as*
   *Attorney General of the State of California*

8

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12

13

| | |
|---|---|
| **LANCE BOLAND, et al.,** | Case No. 8:22-cv-01421-DFM |
| Plaintiffs, | **DEFENDANT'S OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION** |
| v. | |
| **ROB BONTA, in his official capacity as Attorney General of the State of California, et al.,** | Date:          January 23, 2023<br>Time:          9:00 a.m.<br>Courtroom:  6B<br>Judge:        Hon. Cormac J. Carney<br>Trial Date:   None set |
| Defendants. | Action Filed: August 3, 2022 |

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Introduction.................................................................................................1

Background................................................................................................2

    I.    California's Unsafe Handgun Act..............................................2

    II.   The Second Amendment and the Supreme Court's Decisions in Heller and McDonald................................................................5

    III.  The Ninth Circuit Upholds the UHA's CLI, MDM, and Microstamping Requirements in Pena v. Lindley .......................7

    IV.  The Supreme Court Decision in Bruen ....................................8

Legal Standard for Preliminary Injunction..............................................11

Argument ................................................................................................12

    I.    Plaintiffs Have Made No Attempt to Show That Most UHA Provisions Are Properly Subject to An Injunction ..........................12

    II.   Plaintiffs Are Not Likely to Succeed on the Merits Because the Plain Text of the Second Amendment Does Not Confer the Right to Purchase Particular Models of Semiautomatic Pistols .........13

    III.  Plaintiff Cannot Establish Irreparable Harm Absent an Injunction Barring Enforcement of the Three Safety Feature Requirements ........................................................................16

    IV.  The Balance of the Equities and Public Interest Weigh Against an Injunction Barring Enforcement of the Three Safety Feature Requirements ........................................................................17

Conclusion ..............................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Boardman v. Pac. Seafood Grp.*
822 F.3d 1011 (9th Cir. 2016) ............................................................................. 11

*California v. Azar*
911 F.3d 558 (9th Cir. 2018) ............................................................................... 12

*Defense Distributed v. Bonta*
2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) .................................................. 14

*Disbar Corp. v. Newsom*
508 F. Supp. 3d 747 (E.D. Cal. 2020) ................................................................ 11

*District of Columbia v. Heller*
554 U.S. 570 (2008) .......................................................................................*passim*

*Drakes Bay Oyster Co. v. Jewell*
747 F.3d 1073 (9th Cir. 2014) ............................................................................. 12

*Fiscal v. City and County of San Francisco*
158 Cal. App. 4th 895 (Cal. Ct. App. 2008) .............................................. 3, 4, 19

*FTC. v. Affordable Media*
179 F.3d 1228 (9th Cir. 1999) ............................................................................. 17

*Hennessy-Waller v. Snyder*
529 F. Supp. 3d 1031 (D. Ariz. 2021) ................................................................ 19

*Kolbe v. Hogan*
849 F.3d 114 (4th Cir. 2017) (en banc) .............................................................. 11

*Maryland v. King*
133 S. Ct. 1 (2012) (Roberts, C.J., in chambers) ............................................... 19

*McDonald v. City of Chicago*
561 U.S. 742 (2010) .......................................................................................*passim*

*Nat'l Shooting Sports Foundation, Inc. v. State of California*
5 Cal.5th 428 (2018), 2017 WL 4541977 ............................................................ 4

ii

1

2

**TABLE OF AUTHORITIES**
**(continued)**

**Page**

3

*New York State Rifle & Pistol Association, Inc., v. Bruen*

4

   __ U.S. __ (2022) ...........................................................................*passim*

5

*Pena v. Lindley*

   898 F.3d 969 (2018) .................................................................*passim*

6

7

*Progressive Democrats for Soc. Just. v. Bonta*

   No. 21-CV-03875-HSG, 2021 WL 6496784 (N.D. Cal. July 16,

8

   2021) ........................................................................................... 19

9

*Winter v. Natural Res. Def. Council, Inc.*

10

   555 U.S. 7 (2008) .........................................................11, 12, 16, 17

11

**STATUTES**

12

California Penal Code

13

   § 31900 ...........................................................................2, 4, 12, 17

14

   § 31905 ..............................................................................4, 12, 17

   § 31910 ...........................................................................3, 4, 12, 17

15

   § 32000 ..........................................................................................2, 3

16

   § 32010 ..................................................................................12, 17

   § 32015 ..................................................................................3, 12

17

   § 32020 ................................................................................... 12

18

   § 32025 ................................................................................... 12

   § 32030 ..................................................................................... 3

19

   § 32100 ..................................................................................... 3

20

   § 32105 ..................................................................................... 3

   § 32110 ..................................................................................... 3

21

22

**CONSTITUTIONAL PROVISIONS**

23

Second Amendment..........................................................................*passim*

24

Fourteenth Amendment ............................................................................. 6

25

**OTHER AUTHORITIES**

26

Assembly Bill No. 2847 (Cal. 2019-2020 Re. Sess), §1(h) ...................... 4

27

Assembly Bill No. 2847 (Cal. 2019–2020 Reg. Sess), § 2 ....................... 4

28

1

**TABLE OF AUTHORITIES**
**(continued)**

2

**Page**

3

Senate Bill No. 15 (Cal. 1999–2000 Reg. Sess.)..........................................................3

4

Senate Bill No. 1080 (Cal. 2009–2010 Reg. Sess.), § 6........................................3, 4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# INTRODUCTION

Plaintiffs are not entitled to the extraordinary remedy of a preliminary injunction barring enforcement of California's Unsafe Handgun Act ("UHA"), a state law that has been in place for over twenty years.  The UHA is not a handgun ban.  Handguns, which include revolvers, non-semiautomatic pistols, and semiautomatic pistols, have long been and continue to be widely available for purchase and possession in California.  Plaintiffs do not allege that they cannot purchase a handgun suitable for self-defense, nor claim that they do not already own such handguns.  Rather, the UHA merely prohibits the manufacture or commercial sale of handguns that do not meet certain safety requirements.

As a threshold matter, although Plaintiffs ask the Court to enjoin enforcement of all statutes in the UHA, they have asserted arguments related to only three particular provisions.  Specifically, Plaintiffs argue that the UHA's requirements that semiautomatic pistols include three safety features—chamber load indicators ("CLIs"), magazine disconnect mechanisms (MDMs), and microstamping capability (*see* Cal. Penal Code § § 31910(b)(4)–(6))—violate the Second Amendment.  However, Plaintiffs have failed to and cannot show that they are entitled to an injunction barring enforcement of these requirements.

Plaintiffs cannot show that they are likely to succeed on their Second Amendment challenge to CLI, MDM, and microstamping requirements because under the plain text analysis required by *New York State Rifle & Pistol Association, Inc., v. Bruen*, __ U.S. __, 142 S.Ct. 2111 (2022), the provisions do not violate Plaintiffs' right to "keep" or "bear" arms.  Although the CLI, MDM, and microstamping requirements mean that not every model of semiautomatic pistol is available for Plaintiffs to purchase in California, that does not mean that the requirements prevent them from "'keep[ing]' firearms in their home, at the ready for self-defense," *id.* at 2135, or from carrying arms on one's person in and outside the home in case of confrontation, *id*. at 2136.  The challenged provisions are

1

therefore entirely different than the total bans on handgun possession and carry that have been struck down by the Supreme Court.  *See District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *Bruen*, 142 S.Ct. 2111.

Plaintiffs have also failed to meet their burden to show that they will suffer irreparable harm absent a preliminary injunction.  Since the challenged provisions do not violate Plaintiffs' Second Amendment rights, they are not currently suffering any harm.  Moreover, because the CLI, MDM, and microstamping requirements constitute less than all of the requirements to make a semiautomatic pistol eligible for sale, an injunction would not have any immediate practical effect, because it would not make any models that are not already ineligible for sale available to be sold pending trial.

Finally, the balance of the equities and the public interest strongly disfavor a preliminary injunction here.  While Plaintiffs do not currently suffer any harm due to the status quo, an injunction would seriously undermine California's considered effort to improve the safety of handguns sold in California.

For these reasons, explained further below, the Court should deny Plaintiffs' motion for preliminary injunction.

## BACKGROUND

### I.   CALIFORNIA'S UNSAFE HANDGUN ACT

The UHA prohibits the manufacture or sale of any "unsafe handgun" in California, making a violation punishable by imprisonment in a county jail for not more than one year.  Cal. Penal Code § 32000(a).[1]  The UHA does not prohibit the mere possession of any handgun or other firearm.  *See* §§ 31900, *et seq.*

California enacted the UHA in 1999 "in response to the proliferation of local ordinances banning low cost, cheaply made handguns known as 'Saturday Night

---

[1] Further statutory references are to the California Penal Code unless otherwise indicated.

2

Specials,' which called to the Legislature's attention the need to address the issue of handguns sales in a more comprehensive manner." *See Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895, 912 (Cal. Ct. App. 2008). The UHA was aimed at reducing handgun crime as well as promoting handgun consumer safety. *Id.* at 913–14. The UHA took effect on January 1, 2001, and has been subsequently amended. *See* Senate Bill No. 15 (Cal. 1999–2000 Reg. Sess.); *see also, e.g.,* Senate Bill No. 1080 (Cal. 2009–2010 Reg. Sess.), § 6 (nonsubstantive reorganization of statutes only); Assem. Bill No. 2847 (Cal. 2019–2020 Reg. Sess.).

The UHA directs that the California Department of Justice ("DOJ") "shall compile, publish, and thereafter maintain a roster listing all of the pistols, revolvers, and other firearms capable of being concealed upon the person that have been tested by a certified testing laboratory, have been determined not to be unsafe handguns, and may be sold in this state pursuant to this title." § 32015(a). The DOJ maintains the roster in accordance with this directive. *See* Declaration of Salvador Gonzalez ("Gonzalez Dec."), ¶¶ 7, 15.[2] A firearm shall be deemed to satisfy the roster requirements if manufacturer's similar firearm is already listed and the differences are "purely cosmetic." § 32030.

Under the UHA, subject to specified exceptions,[3] an unsafe handgun is a revolver, semiautomatic pistol, or non-semiautomatic pistol that fails to meet certain requirements. *See* § 31910; *see also Fiscal*, 158 Cal. App. 4th at 912.

To avoid the "unsafe" designation, revolvers and non-semiautomatic pistols must have safety devices. § 31910(a)(1), (b)(1). They must also meet certain firing

---

[2] The roster is posted at DOJ's website at https://oag.ca.gov/firearms/certified-handguns/search.

[3] Exceptions are set forth in sections 32000(b), 32105, 32110, and 32100. They include firearms sold to law enforcement officials (§ 32000(b)(4), (6), (7)), certain curios or relics (§§ 32000(b)(3), 32110(g)), pistols used in Olympic target shooting (§ 32105), firearms transferred between private parties (§ 32110(a)), and firearms used solely as props in movie and television productions (§ 32110(h)).

and drop safety requirements as determined by an independent testing laboratory. § 31910(a)(2), (3); § 31910(b)(2), (3); §§ 31905(a), 31900.

To avoid the "unsafe" designation, semiautomatic pistols must, in addition to the requirements above, also include three specified features: a chamber load indicator ("CLI"), a magazine disconnect mechanism ("MDM") (if the pistol has a detachable magazine), and microstamping. § 31910(b)(1)–(6). CLIs and MDMs are "safety features designed to limit accidental discharges that occur when someone mistakenly believes no round is in the chamber." *Pena v. Lindley*, 898 F.3d 969, 974 (2018); Gonzalez Dec., ¶¶ 10–14.

Microstamping is the placement of "a microscopic array of characters used to identify the make, model, and serial number of the pistol . . . in one or more places on the interior surface or internal working parts of the pistol, and that are transferred by imprinting on each cartridge case when the firearm is fired." § 31910(b)(6). Microstamping is intended to "provide important investigative leads in solving gun-related crimes by allowing law enforcement personnel to quickly identify information about the handgun from spent cartridge casings found at the crime scene." *Fiscal*, 158 Cal. App. 4th at 914. Although the UHA's initial microstamping requirement mandated two microstamping locations on each round ammunition, in 2020, the Legislature amended the UHA to decrease the microstamping requirement to one location per round. *Compare* Assem. Bill 2847 (Cal. 2019–2020 Reg. Sess), § 2 *with* Sen. Bill 1080 (Cal. 2009–2010 Reg. Sess.), § 6; *see also* § 31910(b)(6)(A). The Legislature noted that while firearm manufacturers claimed that dual-location microstamping was impossible or impractical (a claim that the Legislature expressly "rejected"), the industry had conceded that single-location microstamping, as required in the amended provision, is feasible. AB 2847, §1 (h); *see also* Appellants' Answer Brief on the Merits at 16, *Nat'l Shooting Sports Foundation, Inc. v. State of California*, 5 Cal.5th 428 (2018) (No. S239397), 2017 WL 4541977 ("Microstamped characters that identify

the make, model, and serial number of a semi-automatic pistol (a 'microstamped alpha numeric code') can be etched or imprinted on the tip of the pistol's firing pin").

## II.   THE SECOND AMENDMENT AND THE SUPREME COURT'S DECISIONS IN *HELLER* AND *MCDONALD*

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  In recent years, the Supreme Court has closely examined the Second Amendment in the cases of *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), and, most recently, *New York State Rifle & Pistol Association, Inc., v. Bruen*, __ U.S. __, 142 S.Ct. 2111 (2022).

In *Heller*, a District of Columbia special police officer sued to invalidate a District law completely banning the possession of a handgun in the home and requiring that any other lawfully owned firearm in the home, such as a registered long gun, be disassembled or otherwise rendered inoperable for immediate use. 554 U.S. at 574.

The Court held that the Second Amendment protects an individual right, not a collective one.  *Heller*, 554 U.S. at 595.  But the Court further held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited.  From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Id*. at 626 (citations omitted). Thus, while *Heller* upheld the invalidation of a very strict law of the District of Columbia that generally prohibited the possession of handguns, *id*. at 576, 636, *Heller* also provided an expressly non-exhaustive list of "presumptively lawful regulatory measures," *id*. at 627 n.26, "a variety of tools" that "the Constitution leaves . . . for combating" the problem of firearm violence in the United States.  *Id*.

at 636.  That list includes "longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms," as well as prohibitions on "dangerous and unusual weapons."  *Id*. at 626–27.

Key to *Heller*'s analysis of the District's regulations was the observation that "the law totally bans handgun possession in the home.  It also requires that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable."  *Heller*, 554 U.S. at 628.  In finding the total ban on handguns unconstitutional, the Court explained:

> [T]he inherent right of self-defense has been central to the Second Amendment right. The handgun ban amounts to a prohibition of an entire class of "arms" that is overwhelmingly chosen by American society for that lawful purpose.  The prohibition extends, moreover, to the home, where the need for defense of self, family, and property is most acute.  Under any of the standards of scrutiny that we have applied to enumerated constitutional rights, banning from the home "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family," would fail constitutional muster.

*Id*. at 628–29 (footnote and citation omitted).  Addressing the requirement that firearms in the home be rendered and kept inoperable at all times, the Court similarly explained that the requirement was unconstitutional because "[t]his makes it impossible for citizens to use them for the core lawful purpose of self-defense[.]"  *Id*. at 630.

In *McDonald*, the Supreme Court held that the Second Amendment is fully incorporated against the States via the Fourteenth Amendment.  561 U.S. at 777–78.  But the Court explained that "incorporation does not imperil every law

regulating firearms." *Id*. at 786. In doing so, the Court was careful to re-state the critical language from *Heller*:

> It is important to keep in mind that *Heller*, while striking down a law that prohibited the possession of handguns in the home, recognized that the right to keep and bear arms is not "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." [Citation.] We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." [Citation.] We repeat those assurances here.

*Id*. (italics added).

## III. THE NINTH CIRCUIT UPHOLDS THE UHA'S CLI, MDM, AND MICROSTAMPING REQUIREMENTS IN *PENA V. LINDLEY*

Following *Heller* and *McDonald*, in the 2018 decision of *Pena v. Lindley*, the Ninth Circuit affirmed the constitutionality of the UHA's requirement that semiautomatic pistols sold in California include CLIs, MDMs, and microstamping.[4] *See* 898 F.3d 969, 973 (9th Cir. 2018). In rejecting the plaintiffs' Second Amendment challenge, the court expressly dismissed plaintiffs' assertion "that they have a constitutional right to purchase a particular handgun." *Id.*

The Court's analysis involved a two-step inquiry for Second Amendment challenges that it had adopted following *Heller*. *Id.* at 975. That inquiry asked (1) whether the law "burdens conduct protected by the Second Amendment," and if so, (2) whether the law withstands the appropriate level of scrutiny. *Id.* at 976 (quoting *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014)).

---

[4] *Pena* was decided when the microstamping provision still required pistol to imprint two sets of identifying information on each fired round, rather than one set. *See Pena v. Lindley*, 898 F.3d 969, 974 (2018).

The Ninth Circuit panel opted not to conduct step one of the analysis because it determined that, regardless of whether the UHA burdens Second Amendment conduct, it withstood the applicable level of scrutiny. *Id.* at 976. Before moving to step two, however, the Court recognized that the challenged UHA provisions may not burden protected activity, because they may constitute "laws imposing conditions and qualifications on the commercial sale of arms" that are permissible under *Heller*. *Id.* at 975–76 (quoting *Heller*, 554 U.S. at 626–27).

In step two, the court held that the CLIs, MDMs, and microstamping requirements satisfy intermediate scrutiny. *Id.* at 977-86. In its analysis, the Court concluded that the requirements "place almost no burden on the physical exercise of Second Amendment rights," and that any such burden is lessened by the UHA's exceptions, including for grandfathered semiautomatic pistols on the roster and off-roster semiautomatic pistols in private transactions. *Id.* at 978-79.

## IV. THE SUPREME COURT DECISION IN *BRUEN*

On June 23, 2022, the Supreme Court issued its opinion in *Bruen*, setting forth the current framework for analyzing Second Amendment claims.

In *Bruen*, the Supreme Court addressed the constitutionality of New York's requirement that individuals show "proper cause" as a condition of securing a license to carry a firearm in public. 142 S. Ct. at 2123. New York defined "proper cause" as a showing of "special need for self-protection distinguishable from that of the general community." *Id.* at 2123.

Before turning to the merits, the Court announced a new methodology for analyzing Second Amendment claims. It recognized that lower courts, including the Ninth Circuit, had "coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny." *Id.* at 2125. The Supreme Court in *Bruen* declined to adopt that two-step approach and announced a new standard for analyzing Second Amendment claims that is

"centered on constitutional text and history." *Id.* at 2126, 2128–29.  Under this text-and-history approach,

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Id.* at 2129–30.

Applying that test to the case before it, the Court held that New York's "proper cause" requirement was inconsistent with the Second Amendment's text and history, and therefore unconstitutional.  *Id.* at 2134–56.

The Court began its analysis by considering "whether the plain text of the Second Amendment protects [plaintiffs'] proposed course of conduct—carrying the handguns publicly for self-defense." *Id.* at 2134.  This involved application of the "'textual elements' of the Second Amendment's operative clause— "the right of the people to keep and bear arms shall not be infringed." *Id.* (*citing Heller*, 554 U.S. at 592).  The Court easily concluded that the plaintiffs were part of the "people" protected by the Second Amendment. *Id.*  Turning to the terms "keep" and "bear" arms, the Court concluded that the right to "bear" arms protected the public carry of handguns for self-defense, reasoning that since "self-defense is 'the *central component*' of the [Second Amendment] right itself," and "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135.  The Court explained that the terms "keep" and "bear" mean that the Second Amendment's text protects individuals' rights to "'keep' firearms in their home, at the ready for self-defense," *id.* at 2135, and to carry arms on one's person in and outside the home in case of confrontation, *id.* at 2136.

Because the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the burden then shifted to New York to show that the prohibition was consistent with "the Nation's historical tradition of firearm regulation." *Id.* at 2135. The Court explained that in some cases, this inquiry would be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Bruen*, 142 S. Ct. at 2131. But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—this historical analysis requires a "more nuanced approach." *Id.* at 2132. Governments can justify regulations of that sort by "reasoning by analogy," a process that requires the government to show that its regulation is "'relevantly similar'" to a "well-established and representative historical analogue." *Id.* at 2333 (citation and emphasis omitted). And while the Court did not "provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment," it did identify "two metrics: how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* After conducting a lengthy survey of "the Anglo-American history of public carry," the Court held that New York had failed to make such a showing. *Id.* at 2156.

While *Bruen* announced a new standard for analyzing Second Amendment claims, it also made clear that governments may continue to adopt reasonable gun safety regulations. The Court recognized that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. Nor does it protect a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Indeed, as Justice Alito explained, *Bruen*'s majority opinion did not "decide anything about the kinds of weapons that people may possess." 142 S. Ct. at 2157 (Alito, J., concurring).

1       Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote

2   separately to underscore the "limits of the Court's decision." *Bruen*, 142 S. Ct. at

3   2161 (Kavanaugh, J., concurring).  Justice Kavanaugh reiterated *Heller*'s

4   observation that "the Second Amendment allows a 'variety' of gun regulations."

5   *Id.* at 2162 (quoting *Heller*, 554 U.S. at 636).[5]  In particular, Justice Kavanaugh

6   emphasized that that the "presumptively lawful measures" that *Heller* identified—

7   including laws "imposing conditions and qualifications on the commercial sale of

8   arms," and prohibitions on "dangerous and unusual weapons"—remained

9   constitutional.[6] *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).

10          **LEGAL STANDARD FOR PRELIMINARY INJUNCTION**

11       Injunctive relief is an "extraordinary remedy that may only be awarded upon a

12   clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res.*

13   *Def. Council, Inc.*, 555 U.S. 7, 20 (2008)).  "The purpose of a preliminary

14   injunction is to preserve the status quo ante litem pending a determination of the

15   action on the merits." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1024 (9th

16   Cir. 2016) (internal quotation omitted). Thus, "[i]n cases where the movant seeks to

17   alter the status quo," injunctive relief is "disfavored and a higher level of scrutiny

18   must apply." *Disbar Corp. v. Newsom*, 508 F. Supp. 3d 747, 751 (E.D. Cal. 2020).

19       "A plaintiff seeking a preliminary injunction must establish that he is likely to

20   succeed on the merits, that he is likely to suffer irreparable harm in the absence of

21   preliminary relief, that the balance of equities tips in his favor, and that an

22   injunction is in the public interest." *Winter*, 555 U.S. at 20.  "When the

23

24          [5] These observations are consistent with the Court's assurances that "[s]tate and local experimentation with reasonable firearms regulations will continue under

25   the Second Amendment." *McDonald*, 561 U.S. at 785 (plurality opinion) (quotation marks and citation omitted).

26          [6] As the Fourth Circuit has observed, while *Heller* "invoked Blackstone for

27   the proposition that 'dangerous and unusual' weapons have historically been prohibited, Blackstone referred to the crime of carrying 'dangerous or unusual

28   weapons.'" *Kolbe v. Hogan*, 849 F.3d 114, 131 n.9 (4th Cir. 2017) (en banc) (quoting 4 Blackstone 148-49 (1769)).

government is a party, these last two factors," balance of the equities and public interest, "merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014); *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018) (same). Analysis of the first factor (i.e., likelihood of success on the merits) is a "threshold inquiry," and thus if a movant fails to establish that factor, the court "need not consider the other factors." *Azar*, 911 F.3d at 575.

## ARGUMENT

### I.   PLAINTIFFS HAVE MADE NO ATTEMPT TO SHOW THAT MOST UHA PROVISIONS ARE PROPERLY SUBJECT TO AN INJUNCTION

The Court should deny Plaintiffs' Motion for Preliminary Injunction in large part because Plaintiffs have not even attempted to show that most UHA provisions it seeks to enjoin are properly subject to a preliminary injunction. Plaintiffs ask the Court to preliminarily enjoin enforcement of all UHA statutes in Penal Code section 31900 through 32110. Mtn. for Prelim. Inj., ECF No. 23, at 1–2. These statutes include, for example, statutes governing the maintenance of the roster (§§ 31910(b)(7), 32010, 32015, 32025), statutes related to the requirements that all roster-eligible handguns (revolvers, nonsemiautomatic pistols, and pistols) include a safety device (commonly known as a "safety") (§ 31910(a)(1), (b)(1)) and undergo firing and drop safety testing in a certified laboratory (§ 31900; § 31905; § 31910(a)(2)-(3), (b)(2)-(3); § 32010; § 32020), and the exceptions to handguns deemed "unsafe" (§§ 32100-32110).

Plaintiffs' motion does not include any arguments applying the *Winter* factors for preliminary injunctions to these and most of the other provisions in Penal Code sections 31900 through 32110. Plaintiffs' arguments are instead confined to merely three of the safety features requirements for roster-eligible semiautomatic pistols: the chamberload indicator, magazine disconnect mechanism, and microstamping. *See* Pltfs. Pts. & Auth. at 10–19. Those requirements are encoded in Penal Code section 31910(b)(4)–(6). Plaintiffs have therefore failed to meet their burden to

prove entitlement to an injunction against enforcement of any other statute in the UHA.  Plaintiffs' motion should be denied as to those statutes for this reason alone.

## II.   PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS BECAUSE THE PLAIN TEXT OF THE SECOND AMENDMENT DOES NOT CONFER THE RIGHT TO PURCHASE PARTICULAR MODELS OF SEMIAUTOMATIC PISTOLS

Plaintiff's motion should also be denied because they cannot show a likelihood of success on their claim that the UHA's CLI, MDM, and microstamping requirements violate the Second Amendment.  The plain text of the Second Amendment does not protect Plaintiff's desire to purchase off-roster semiautomatic pistol models without those safety features.

Under *Bruen*, the analysis begins with an assessment of whether the Second Amendment's plain text protects the plaintiffs' "proposed course of conduct." *Bruen*, 142 S. Ct. at 2134.  Here, Plaintiffs' proposed course of conduct—the conduct they allege is prohibited—is to purchase off-roster semiautomatic pistols that do not include a CLI, MDM, or microstamping.  This conduct is not protected by the Second Amendment's protection of individuals' rights to either "keep" or "bear" arms.

As explained in *Bruen*, these terms mean that the Second Amendment text protects individuals' rights to "'keep' firearms in their home, at the ready for self-defense," *id.* at 2135, and to carry arms on one's person in and outside the home in case of confrontation, *id*. at 2136.  Thus, in *Heller*, the challenged law prevented individuals from "keep[ing]" and "bear[ing]" arms because it constituted a total ban on possessing *any* handgun in the home.  *See Heller*, 554 U.S. at 628.  And, in *Bruen*, the challenged law prevented individuals from "bear[ing]" arms because it prevented them from carrying *any* handgun outside the home for self-defense.  *See Bruen* 142 S. Ct. at 2134–35.

In contrast here, the CLI, MDM, or microstamping requirements do not prevent plaintiffs from either keeping handguns in the home or carrying them in

public for self-defense.  As the Ninth Circuit previously concluded, these restrictions 'place almost no burden on the physical exercise of Second Amendment rights." *Pena*, 898 F.3d at 978.  The requirements only apply to the *sales* of certain semiautomatic pistols—ones that lack the required safety features.  They therefore do not prevent Plaintiffs from continuing to possess any firearm or from carrying any firearm in any place.  They also do not prevent Plaintiffs from acquiring new arms suitable for self-defense.  *See* Pltfs. Pts. & Auth. at 13.  The CLI, MDM, and microstamping requirements do not prevent plaintiffs from purchasing any revolver, non-semiautomatic pistol, or any firearm that is not a handgun.  Even within the sub-category of semiautomatic pistols the requirements still provide plaintiffs with hundreds of models to choose from.  Pltfs. Pts & Auth. at 4.  Finally, the challenged safety feature requirements impose no limit to the total number of firearms (or semiautomatic pistols, specifically) that plaintiffs may possess, carry, or obtain for self-defense.  In sum, unlike in *Heller* and *Bruen*, the CLI, MDM, and microstamping requirements do not prevent Plaintiffs from "keep[ing]" or "bear[ing]" arms in the home and in public for self-defense.  The plain text of the Second Amendment therefore does not protect Plaintiffs' desire to purchase off-roster semiautomatic pistols without these safety features.  *See Pena*, 898 F.3d at 978 ("[B]eing unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home."); *see also Defense Distributed v. Bonta*, 2022 WL 15524977, *4, (C.D. Cal. Oct. 21, 2022) (holding that law restricting use of milling machines to federally-licensed manufacturers or importers was plainly outside the text of the Second Amendment, failing the threshold question in *Bruen*).

Plaintiffs appear to argue that the Second Amendment confers an unfettered right for an individual to purchase any and all handgun models of their choosing. *See* Pltfs. Pts. & Auth. at 13.  The legal authorities do not support this proposition. The laws at issue in *Heller* and *Bruen* were struck down for thwarting the Second

Amendment's "core lawful purpose of self-defense" by preventing individuals from keeping or carrying any of the "entire class" of handguns.  *Heller*, 554 U.S. at 628; *Bruen* 142 S. Ct. at 2134–35.   The cases did not purport to provide individuals with unlimited choices regarding which handguns to keep and bear.  To the contrary, *Heller* made clear, and the Supreme Court repeatedly has confirmed, that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 628; *accord McDonald,* 561 U.S. at 786; *accord Bruen*, 142 S. Ct. at 2128.  The CLI, MDM, and microstamping requirements do not ban the possession or carry of any firearm at all, but rather "impos[e] conditions and qualifications on the commercial sale of arms," and are therefore "presumptively lawful."  *Heller*, 554 U.S. at 626–27; *accord McDonald,* 561 U.S. at 786; *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring); *see also Pena*, 898 F.3d at 975–76.

Plaintiffs also appear to suggest that they have the right to purchase the models of semiautomatic pistols that they believe would provide them with the *best* self-defense, as compared to the models on the roster.  Pltfs. Pts. & Auth. at 7–9.  However, Plaintiffs cite no legal authority supporting this proposition.  Plaintiffs also propose no workable standard for determining when the availability of fewer-than-all models of semiautomatic pistols equates to prevention of their ability to "keep" and "bear" arms under *Bruen*'s text-and-history approach to the Second Amendment.

Plaintiffs' challenge to the CLI, MDM, and microstamping requirements therefore fails the plain text inquiry of the applicable text-and-history approach under *Bruen*.  Their claim therefore fails on the merits and this Court need not proceed to step two of the *Bruen* analysis.  *See Bruen*,142 S. Ct. at 2126.  However, even if the Court were to conclude that the text of the Second Amendment applies to the CLI, MDM, and microstamping requirements, Defendant can still defend those requirements by showing that they are "consistent with the Nation's historical

tradition of firearm regulation"—specifically that they impose a "comparable burden on the right of armed self-defense" to the relevant historical analogues and is "comparably justified." *Bruen*, 142 S. Ct. at 2133.  This historical tradition includes, for example, restrictions on the storage of gunpowder in the home, "trap" guns (firearms configured to fire remotely), and the keeping of loaded firearms inside the home.  *See* Defendants' Supplemental Brief in Response to the Court's Order of August 29, 2022 at 53-54, Miller v. Bonta, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. October 13, 2022) (ECF No. 137); Declaration of Saul Cornell at ¶¶ 35-40, Miller v. Bonta, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. October 13, 2022) (ECF No. 137-3).

But as *Bruen* itself acknowledged, the historical inquiry can be complex and difficult.  *Id.* at 2134.  Compilation of the evidence must be undertaken by trained historians through painstaking efforts just to identify the sources available to them in order to answer a particular historical inquiry.  *See* Declaration of Zachary Schrag at 2-5, Miller v. Becerra, No. 3:19-cv-1537-BEN-JLB (S.D. Cal. Aug. 29, 2022), (ECF No. 129-1). Accordingly, if the Court were to conclude that Plaintiffs' claims implicate the text of the Second Amendment (or defer ruling on that question)—and conclude that Plaintiffs have satisfied the other *Winter* factors—the Court should provide the parties with additional time to conduct the research and briefing necessary to perform the historical analysis called for by *Bruen*, before the Court then issues its decision on this motion.

### III.  PLAINTIFF CANNOT ESTABLISH IRREPARABLE HARM ABSENT AN INJUNCTION BARRING ENFORCEMENT OF THE THREE SAFETY FEATURE REQUIREMENTS

Even if Plaintiffs were able to demonstrate a likelihood of success on the merits, Plaintiffs also have not and cannot meet their burden to show that they are likely to suffer irreparable harm absent an injunction.  *See Winter*, 555 U.S. at 22.

Plaintiffs assert that, absent an injunction, the UHA's requirements will continue to violate their Second Amendment rights.  However, as explained above,

the challenged provisions do not violate Plaintiffs' Second Amendment rights, so no such harm will occur. And, explained above, nor could Plaintiffs argue that, as a practical matter, they lack access to handguns sufficient for self-defense purposes.

Moreover, even if Plaintiffs did have the Second Amendment right to purchase off-roster semiautomatic pistols without CLM, MDM, or microstamping features, Plaintiffs have failed to show that an injunction barring enforcement of those requirements would allow them to purchase such pistols prior to trial. This is because all handguns, including semiautomatic pistols, must meet other requirements, including firing and drop testing in an independent laboratory, before they can be legally sold. *See* §§ 31900, 31905, 31910(b)(2)–(3), 32010. A preliminary injunction would therefore not cause off-roster semi-automatic pistols to be immediately available for sale.

Plaintiffs have failed to show that they will suffer irreparable harm absent an injunction.

## IV. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST WEIGH AGAINST AN INJUNCTION BARRING ENFORCEMENT OF THE THREE SAFETY FEATURE REQUIREMENTS

Finally, the balance of the equities (which, where the defendant is a government official, includes analysis of the public interest) weighs against a preliminary injunction here. Courts "pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. When a district court balances the hardships of the public interest against a private interest, "the public interest should receive greater weight." *FTC. v. Affordable Media*, 179 F.3d 1228, 1236 (9th Cir. 1999).

As explained above, Plaintiffs will not be harmed by the Court's denial of injunctive relief. The challenged UHA provisions do not violate their Second Amendment rights. The provisions do not prevent Plaintiffs from continuing to possess the firearms they already own. And, the provisions do not prevent Plaintiffs from purchasing in California an unlimited number of additional

handguns, including hundreds of different models of revolvers, non-semiautomatic pistols, and semiautomatic pistols.  In other words, Plaintiffs will continue to have broad access to handguns to exercise their central, "inherent right to self-defense." *Heller*, 554 U.S. at 628.  Moreover, a preliminary injunction would likely not alleviate any alleged harm to Plaintiffs prior to trial on the merits because semiautomatic pistols would still be subject to other requirements.

On the other hand, an injunction would upset the long-stablished status quo by permitting unsafe handguns to be sold in California prior to trial, creating public safety risks.  As the Ninth Circuit already determined in *Pena*'s intermediate scrutiny analysis, "[t]here is no doubt that the governmental safety interests identified for the CLI and MDM requirements are substantial."  *Pena*, 898 F.3d at 981.  The absence of a CLI or MDM in a semiautomatic pistol increases the risk of accidental discharge and injury to Californians from use of these handguns. Gonzalez Dec., ¶ 14.   The Ninth Circuit has also already rejected Plaintiffs' suggestion here that these devices may decrease safety:

> California does not instruct consumers to disregard CLIs and MDMs. Instead, the regulations simply mean that consumers should not rely entirely on them or assume that just because a magazine is out or the CLI is not popped up, the weapon is incapable of being dangerous. "Treat all guns as if they are loaded," California tells gun-owners. That is just good, old-fashioned common sense.

*Pena*, 898 F.3d at 981.

Similarly, the Ninth Circuit has also already ruled that microstamping promotes the substantial government interests in public safety and crime prevention. *Id.* at 982.

It is true that some of the semiautomatic pistols on the roster have been "grandfathered in," and do not include one or all of the three safety features at issue.  However, Plaintiffs concede that some of the semiautomatic pistols on the

roster *do* include one or more of the features (Pltfs. Mtn. for Prelim. Inj. at 5), and more such models will likely be added to the roster in the future. [7]  An injunction purporting to permit the sales of new handgun models lacking the safety features would therefore likely lead to more sales in California of handguns lacking those features in lieu of handguns that include them (which is, in fact, what Plaintiffs claim they wish to do through this action).  The injunction would thereby undermine California's considered effort to enhance the safety of newly-sold semiautomatic pistols.  *See Fiscal v. City and County of San Francisco*, 158 Cal. App. 4th 895, 912 (Ct. App. 2008).  Indeed, "[a]ny time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) (quotation and citation omitted).

Finally, preliminary relief should also be denied because Plaintiffs effectively seek to litigate the merits of the dispute without a motion for summary judgment or trial.  "[C]ourts generally disfavor preliminary injunctive relief that is identical to the ultimate relief sought in the case." *See Progressive Democrats for Soc. Just. v. Bonta*, No. 21-CV-03875-HSG, 2021 WL 6496784, at *11 (N.D. Cal. July 16, 2021); *see also Hennessy-Waller v. Snyder*, 529 F. Supp. 3d 1031, 1046 (D. Ariz. 2021), *aff'd sub nom. Doe v. Snyder*, 28 F.4th 103 (9th Cir. 2022).  Plaintiffs seek in their motion the same relief they seek to obtain after summary judgment or a trial, weighing heavily against issuance of a preliminary injunction.

---

[7] Although there are currently no semiautomatic pistols on the roster capable of microstamping, the requirement plays an important role in transitioning handgun sales in California toward safer models.  Notably, the single-location microstamping requirement has been the subject of litigation since shortly after its enactment in 2020 (*see* Complaint for Injunctive and Declaratory Relief, Renna v. Bonta, No. 20-cv-2190-DMS-DEB (S.D. Cal) (ECF. No 1)), which has likely disincentivized firearms manufacturers from developing compliant models prior to legal resolution.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' Motion for Preliminary Injunction.

Dated:  December 5, 2022                        Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General


*/s/ Gabrielle D. Boutin*
GABRIELLE D. BOUTIN
Deputy Attorney General
*Attorneys for Rob Bonta, in his official capacity as Attorney General of the State of California*