C.D. Michel – SBN 144258
cmichel@michellawyers.com
Joshua Robert Dale – SBN 209942
jdale@michellawyers.com
Alexander A. Frank – SBN 311718
afrank@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445

Attorneys for Plaintiffs Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Incorporated

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# SOUTHERN DIVISION

| | |
|---|---|
| LANCE BOLAND, an individual; MARIO SANTELLAN, an individual; RENO MAY, an individual; JEROME SCHAMMEL, an individual; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>ROBERT BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,<br><br>　　　　　　Defendants. | Case No. 8:22-cv-01421-CJC(ADSx)<br><br>**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date: January 23, 2023<br>Time: 9:00 a.m.<br>Courtroom: 6B<br>Judge: Honorable Cormac J. Carney |

# REPLY MEMORANDUM

## 1. INTRODUCTION

The State of California is not happy with the standard for reviewing infringements of the Second Amendment right to self defense clarified under *New York State Rifle & Pistol Assn., Inc. v. Bruen*, (2022) 597 U.S. ___, 142 S. Ct. 2111 ("*Bruen*"). Its opposition to Plaintiffs' request for a preliminary injunction steadfastly ignores it, and essentially attempts to recapitulate the two-step, means-ends interest balancing test that was overly deferential to the State's interests and which the Supreme Court expressly declared was untenable in *Bruen*.

Indeed, the State argues that because Californians purportedly have access to plenty of handgun choices notwithstanding the Unsafe Handgun Act ("UHA"), the Second Amendment right to armed self defense remains intact, and the UHA therefore does not implicate the Second Amendment's plain text. This is just another way of saying that because the UHA does not affect a total destruction of Plaintiffs' "core" Second Amendment right to possess a firearm for self defense, the UHA is a constitutional experiment in public safety. This is the wrong analysis. Neither *Heller* nor *Bruen* held that *only* a law that completely destroys the Second Amendment right to armed self defense implicates the Second Amendment.

Next, the State argues that even if it the first part of the *Bruen* test is satisfied and the UHA does implicate the plain text of the Second Amendment, there are sufficient historical analogues to justify it. But the State presents little evidence of this purportedly analogous well-subscribed historical tradition of restricting the market of commonly-used self defense handguns. The State identifies three broad types of regulations, one which *Heller* overruled as a matter of law, and then asks the Court to peruse a declaration filed in another pending Second Amendment case, to support the other two purported categories of analogous laws. Under *Bruen*, this half-hearted effort does not meet the State's burden. Gunpower storage laws, "trap gun" laws, and laws that prevent storing a loaded firearm in a home are nowhere near analogous to the UHA.

1

Thus, the State simply fails to show that Plaintiffs are not entitled to the preliminary injunction they respectfully request from this Court.

## 2. THE STATE'S ARGUMENT THAT THE UHA DOES NOT IMPLICATE THE SECOND AMENDMENT'S PLAIN LANGUAGE IS UNTENABLE

The State contends that "[t]he plain text of the Second Amendment does not protect Plaintiff's desire to purchase off-roster semiautomatic pistol models without those safety features." Defendant's Opposition to Motion for Preliminary Injunction ("Opp.") at 13. The State further contends the UHA does not impact Plaintiffs' right to keep and bear arms because plenty of guns remain on the roster for them to choose from for self defense. *Id*. While the roster indeed has many firearms for Plaintiffs to choose from, that is legally irrelevant. The focus here is not on what crumbs the UHA leaves for Plaintiffs to nibble, the focus is on what the UHA takes away and whether the State has valid legal justification to do so.

But instead of focusing on that, the State interprets the first part of the *Bruen* test—whether the plain text of the Second Amendment covers the activity in question—as an opportunity to slip in the old, rejected interest balancing test which first asked whether the law burdens Second Amendment rights and then directs courts to apply a level of scrutiny based on how close the law strikes at the core self defense right. *See United States v. Chovan*, 735 F.3d 1127, at 1138 (9th Cir. 2013). This is an invalid interpretation of the *Bruen* test's first part.

The first part of the *Bruen* test asks whether the law in question implicates the plain constitutional language providing that the peoples' right to *keep* and *bear* arms shall not be infringed. *Bruen*, 142 S. Ct. at 2129-30. This does not involve assessing the proximity of the law in question to the core right of self defense, as the State argues. It is a borderline rhetorical question that should always elicit a "yes." And under the old pre-*Bruen* standard, courts virtually always assumed that a gun law implicated the Second Amendment, but would almost always uphold firearms laws under intermediate scrutiny citing their lack of impact on the core right of self defense. *See e.g., Bauer v. Becerra,*

858 F.3d 1216, 1221 (9th Cir. 2017); *Worman v. Healey*, 922 F.3d 26, 30 (1st Cir. 2019); *Kolbe v. Hogan*, 813 F.3d 160 (4th Cir. 2016); *Peruta v. Cty. of San Diego*, 742 F.3d 1144, 1191 (9th Cir. 2014); *United States v. Perez*, 6 F.4th 448, 453 (2d Cir. 2021); and *United States v. Larson*, 502 F. App'x 336, 339 (4th Cir. 2013). But now, post-*Bruen*, the State refuses to acknowledge what is obvious, ostensibly due to the difficulty of satisfying *Bruen's* second step. The inquiry into how the law in question impacts the "core" right to self defense may arise in that second part of the test, which is the analogical inquiry. *Bruen,* 142. S. Ct. at 2133. The Supreme Court clearly stated in *Bruen* that analyzing how and why a law impacts the right to self defense might help with the analogical analysis. *Id*. But it does not help with the borderline-rhetorical first question.

 Here, the answer to the first question is quite clear. Because the UHA prohibits retail acquisition of every semi-automatic handgun introduced to the national semiautomatic handgun market since 2013, the plain Second Amendment language is implicated. To argue that the UHA does not implicate the keeping and bearing of arms because plenty of other guns are available is borderline frivolous.

 The State's maximalist interpretation of *Heller* and *Bruen* contends that these cases merely announced that *complete* bans on the activities at issue there[1] are unconstitutional, but if there is no complete ban, then the law in question simply does not implicate the Second Amendment's plain text and the State may therefore chip away at firearms rights in the name of public safety. Opp. at 13. Not so. Neither *Heller* nor *Bruen* say that a law must destroy a Second Amendment related activity for that activity to be protected under the Second Amendment. That is textually unsupported and logically unworkable.

 The State leans on *Heller's* language that the Second Amendment does not protect "a right to keep and carry any weapon whatsoever in any manner whatsoever and for

---

[1] *Heller* involved a complete ban on possessing an operable handgun within the home, and *Bruen* involved a complete ban on covertly possessing any operable handgun in public.

whatever purpose," to justify the UHA, but that language does not mean that only complete destructions of rights violate the Second Amendment and that anything short of a complete destruction is constitutional. *See Heller*, 554 U.S. at 628; and Opp. at 15. This language means that exotic weapons and carrying weapons for purposes not genuinely related to self defense might not be entitled to Second Amendment protection. Nor does *Heller's* dicta that laws that "impos[e] conditions and qualifications on the commercial sale of arms," might be "presumptively lawful" justify the UHA. *Id*, at 626-37; Opp. at 15. This language does not create a safe-harbor from *Bruen* or for all laws that regulate commerce in arms and do not impose total destructions of the right to armed self defense. This dicta is essentially conjectural speculation that can co-exist with *Bruen*, without swallowing it whole, as the State's interpretation would require. Surely there must be some gun laws with sufficient historical analogues to justify their modern-day existence. But the UHA is not one of them.

      Moreover, the argument that the Second Amendment does not protect a right to acquire specific firearm models within an already protected category of arms has a serious logical flaw. The Second Amendment must protect particular models of firearms, otherwise the State could ban as many specific models as it wants, ultimately leaving nothing but one model of firearm for people to acquire for self defense purposes. That is why courts throughout the nation have recognized that the Second Amendment implicitly includes a right to sell and buy arms. *See* Pls.' Mem. P. & A. in Supp. Mot. Prelim. Inj., ECF. No. 23-1 at 13. Prohibiting the retail sale of a vast number of the semiautomatic handguns from the retail market, effectively granting market monopoly to models aging into ergonomic obsolescence, sets the precedent to ban nearly everything and leave a few token models for people who wish to keep a firearm around for self defense. That sounds more like how the failed socialist nations of the Iron Curtain would approach providing an important durable good than how the United States of America, an open-market capitalist democracy with a constitutionally enshrined guarantee that the right to bear arms shall not be infringed, would behave.

### 3. THE STATE'S PURPORTED HISTORICAL ANALOGUES DO NOT SATISFY THE *BRUEN* STANDARD

Although the State insists that the UHA does not implicate Second Amendment protected activity, it argues that even if it does, there is a sufficiently analogous historical regulatory tradition to justify it. Opp. at 15-16. The State identifies three purported historical restrictions, all of which are not valid analogues.

The first purported category of historical laws restricted "the storage of gunpower in the home." Opp. at 16 (citing to briefing and an expert declaration submitted in another pending Second Amendment lawsuit in the Southern District of California). But these colonial era gunpower storage regulations are hardly analogous to the UHA. These laws were enacted to prevent catastrophic explosions and structure fires within town limits or near a powder house.[2] These laws are essentially fire-safety laws that were necessary because of the highly combustible and unstable nature of loose gunpowder, which is not a modern concern. And most importantly, they regulated only the *manner* of storing gunpowder. They did not prohibit possession of any common arm.

These distinctions are critical, because purported historical analogues must be both similar in type and in function. *Bruen*, 142 S. Ct. at 2133. Dissimilar laws are not legitimate analogues rooted in "an enduring American tradition of state regulation" of arms. *Id*. at 2155-56. It is not valid to point to a gunpowder storage law, and point to the UHA, and say that the gunpowder law is a historical analogue for the UHA because both purportedly serve a public safety interest and involve firearms.[3] It is hard to imagine what

---

[2] *See, e.g.*, Thomas Wetmore, Commissioner, The Charter and Ordinances of the City of Boston: Together with the Acts of the Legislature Relating to the City at 142-43 (1834), *available at The Making of Modern Law: Primary Sources* (An Act ... Prudent Storage of Gun Powder within the Town of Boston. Whereas the depositing of loaded arms in the houses of the town of Boston, . . . is dangerous . . . when a fire happens to break out in said town").

[3] A New York District Court's recent reasoning on this very issue is instructive: "First, with regard to which historical statutes constitute analogues, the Court acknowledges [omitted] that a 'historical twin' is not required. However, because the title 'analogue'

gun control law would not survive such a broad analogical standard. That is probably why the Supreme Court established a much narrower standard. *Bruen*, 142 S. Ct. at 2155-56.

The second purported category of laws involves "trap guns," which are "firearms configured to fire remotely." Opp. at 16. Firearms that are equipped to fire remotely obviously bear no similarity or relevance to the features at issue here: LCI, MDM, microstamping. Off-roster firearms that lack these three features are not unusually equipped so that they could be converted into or used as a "trap gun" any more than any firearm on the roster. And again, that such laws existed during the colonial period and were designed to promote public safety does not make them genuine analogues. Nor did these laws ban any class of arms like the UHA does; laws against trap guns just regulated the *manner* which commonly-used firearms could be deployed.

The third purported category is laws involving "the keeping of loaded firearms inside the home." Opp. at 16. The contention that this class of laws is a valid analogue is unavailing, given that this was the very issue before the Supreme Court in *Heller*. The law the Supreme Court struck down in *Heller* prevented Mr. Heller from keeping an assembled and loaded firearm within his home for self defense, which the court held unconstitutional "under any of the standards of scrutiny that [it has] applied to enumerated constitutional rights" because it amounted to a total destruction of the right to keep and bear a firearm for self defense in the home. *Heller*, 554 U.S. at 628. So, as a bright line rule, historical laws banning the keeping of self defense weapons in the home are unconstitutional and therefore cannot serve as valid historical analogues even if such restrictions were analogous in this instance to the restrictions contained in the UHA.

---

generally requires a thing to be so similar to another thing as to be useful for some purpose (such as determination of whether the two things form part of the same tradition, generally, a historical statute cannot earn the title 'analogue' if it is clearly more distinguishable than it is similar to the thing to which it is compared." *Antonyuk v. Hochul*, No. 1:22-CV-0986, 2022 U.S. Dist. LEXIS 182965, at *19-20 (N.D.N.Y. Oct 6, 2022).

And last, the State's reminder that the historical inquiry "can be complex and difficult" and its contention that the "compilation of the evidence" requires "trained historians" does not entitle the State to grant itself an open-ended extension of time to meet its burden under *Bruen* of demonstrating a historical record of such regulation. Opp. at 16. The time for the State to make that showing was in its opposition to Plaintiffs' motion for preliminary injunction. It does not get to test the waters, see which way the winds are blowing, and take another bite at the apple. This is not the only Second Amendment case the State is litigating, and it has all the resources it needs to find the historical laws that would justify the UHA if those laws existed.

### 4.    THE REMAINING FACTORS STILL COUNSEL IN FAVOR OF PRELIMINARY ENJOINMENT

#### A.    Preliminary Relief Would Be Materially Effectual

The State correctly notes that Plaintiffs do not seek to strike down all of the UHA's requirements for admission to the roster. Plaintiffs seek to strike down the microstamping, loaded chamber indicator ("LCI"), and magazine disconnect mechanism ("MDM") provisions that prevent up-to-date pistols from being available to Californians. Striking those down immediately would have no impact on the UHA's requirement that pistols be submitted to a state approved laboratory for drop-safety testing. *See* CAL. PENAL CODE §§ 31905; 31910; 32010 (Deering 2022); CAL. CODE REGS. tit. 11, § 4046, et seq. (2022). So if this Court temporarily declares the LCI, MDM, and microstamping provisions unconstitutional, then firearm manufacturers can submit off-roster firearms to those laboratories to get them tested and admitted to the roster pursuant to what would be the roster's only remaining technical admission requirement. At least some firearms would likely pass the laboratory testing before this case goes to trial many months from now. Declaration of Michael Holley, ¶¶ 5-6. So, the State is wrong that preliminary relief would be ineffectual. Preliminary relief would jump-start the relatively fast process of getting off-roster firearms drop-safety certified and introduced into California's retail commercial market.

### B. The Balance of the Equities Still Favors Plaintiffs

The State argues that the balance of the equities favors the State because the Second Amendment does not extend to the activity in question, so there is no injury, and second, the State's interest in public safety outweighs Plaintiffs' interest. The argument is tautological.

If the Court concluded that the UHA did not implicate the plain text of the Second Amendment, then the Court will have implicitly found that Plaintiffs are unlikely to succeed on the merits of their Second Amendment challenge, and there would be no need for a further inquiry of balancing the equities. But since the UHA does implicate the plain text and violates the Second Amendment because there are no historical analogues, balancing of the equities by weighing the State's interest in public safety is patently not appropriate under *Bruen*. *See Bruen*, 142 S. Ct. at 2133 n.7 ("This does not mean that courts may engage in independent means-end scrutiny under the guise of an analogical inquiry.").

Last, the State argues that Plaintiffs are improperly trying to sneak a merits adjudication into this request for preliminary injunction. This consideration simply does not outweigh the stronger public policy that "the deprivation of constitutional rights 'unquestionably constitutes irreparable injury'." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). Moreover, this would be true every time plaintiffs seeking to vindicate constitutional rights with equitable relief seek preliminary injunctions.

/ / /

/ / /

## CONCLUSION

The State's opposition fails to show that Plaintiffs are unlikely to succeed on the merits of their claims. The UHA clearly implicates the Second Amendment's plain text and the State has failed to marshal evidence of historical analogues. Therefore, Plaintiffs respectfully request the Court enjoin the UHA's enforcement pending the final resolution of this matter.

Dated: December 12, 2022            MICHEL & ASSOCIATES, P.C.


/s/C.D. Michel
C.D. Michel
*Counsel for Plaintiffs*

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Incorporated, certifies that this brief contains 2,967 words, which complies with the word limit of L.R. 11-6.1.

Dated: December 12, 2022                MICHEL & ASSOCIATES, P.C.

/s/C.D. Michel
C.D. Michel
*Counsel for Plaintiffs*

# CERTIFICATE OF SERVICE

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Boland, et al. v. Bonta*

Case No.:   8:22-cv-01421-CJC(ADSx)

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert L. Meyerhoff, Deputy Attorney General
robert.meyerhoff@doj.ca.gov
Gabrielle D. Boutin
Gabrielle.Boutin@doj.ca.gov
Charles J. Sarosy
charles.sarosy@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230

I declare under penalty of perjury that the foregoing is true and correct.

Executed December 12, 2022.

Christina Castron