UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION - SANTA ANA

-oOo-

HONORABLE CORMAC J. CARNEY, UNITED STATES DISTRICT JUDGE

LANCE BOLAND, an individual;
MARIO SANTELLAN, an individual;
RENO MAY, an individual; JEROME
SCHAMMEL, an individual; and
CALIFORNIA RIFLE & PISTOL
ASSOCIATION, INCORPORATED, a
California corporation,

             Plaintiffs,

v.                       No. 8:22-cv-01421-CJC

ROBERT BONTA, in his official
capacity as Attorney General
of the State of California;
and DOES 1-10,

             Defendants.


REPORTER'S TRANSCRIPT OF EVIDENTIARY HEARING - DAY 1

SANTA ANA, CALIFORNIA

JANUARY 23, 2023

_____

SUZANNE M. McKENNON, CRR, RMR
UNITED STATES COURT REPORTER

UNITED STATES COURTHOUSE
350 W 1st STREET, ROOM 3411
LOS ANGELES, CALIFORNIA 90012
(213) 894-3913
suzanne@ears2hands.com

```
 1   APPEARANCES:

 2

 3   On Behalf of the Plaintiff:

 4        JOSHUA R. DALE, Attorney at Law
          SEAN A. BRADY, Attorney at Law
 5        KONSTADINOS T. MOROS, Attorney at Law
          ALEXANDER ASCH FRANK, Attorney at Law
 6             Michel and Associates PC
               180 East Ocean Boulevard, Suite 200
 7             Los Angeles, California 90802

 8

 9   On Behalf of the Defendants:

10        CHARLES JOSEPH SAROSY, Attorney at Law
          MARK R. BECKINGTON, Attorney at Law
11             CAAG - Office of Attorney General
               California Department of Justice
12             300 South Spring Street, Suite 1702
               Los Angeles, California 90013
13

14        SEAN CLINTON WOODS, Attorney at Law
               CAAG - Office of Attorney General of California
15             California Department of Justice
               455 Golden Gate Avenue, Suite 11000
16             San Francisco, California 94102-7004

17

18

19

20

21

22

23

24

25
```

```
1                              INDEX

2


3


4                             WITNESSES

5


6    FOR THE PLAINTIFFS:

7                         Direct | Cross | Redirect | Recross

8    STEPHEN C. HELSLEY
        By Mr. Brady          8
9        By Mr. Woods                  24

10

11   LANCE BOLAND
         By Mr. Frank        27                    46
         By Mr. Sarosy                40                      49
12

13   RENO MAY
         By Mr. Frank        50
14       By Mr. Sarosy                53

15

16   SALAM FATOHI
         By Mr. Brady        59
         By Mr. Sarosy                81
17

18   MICHAEL BEDDOW
         By Mr. Brady        92                   126
19       By Mr. Sarosy               105                     129

20

21   CLAYTON CRAMER
         By Mr. Dale        133

22

23

24

25
```

1                              **INDEX**

2

3

4                    **WITNESSES (CONTINUED)**

5

6    **FOR THE DEFENDANTS:**

7                          Direct | Cross | Redirect | Recross

8    **SALVADOR GONZALEZ**
        By Mr. Sarosy        156                    250
9       By Mr. Brady                    221, 243

10

11   **SAUL CORNELL, Ph.D.**
        By Mr. Woods         255
12      By Mr. Dale                     280

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                              INDEX

 2

 3                            EXHIBITS

 4

 5   PLAINTIFFS' EXHIBITS          RECEIVED              MARKED

 6   Exhibit 1 re Request for Judicial Admission
                                   225
 7   Exhibit 1                     12
     Exhibit 2                     13
 8   Exhibit 3                     24
     Exhibit 4                     65
 9   Exhibit 5                     76
     Exhibit 6                     77
10   Exhibit 7                     80
     Exhibit 8                     139
11

12   DEFENDANT'S EXHIBITS          RECEIVED              MARKED
     Exhibit 1                     162
13   Exhibit 2                     167
     Exhibit 3                     169
14   Exhibit 4                     172
     Exhibit 5                     173
15   Exhibit 6                     174
     Exhibit 7                     175
16   Exhibit 8                     254
     Exhibit 9                     178
17   Exhibit 10                    183
     Exhibit 11                    187
18   Exhibit 12                    201
     Exhibit 15                    213
19   Exhibit 16                    213
     Exhibit 17                    213
20   Exhibit 18                    213
     Exhibit 19                    213
21   Exhibit 20                    219
     Exhibit 21                    219
22   Exhibit 22                    219
     Exhibit 23                    259
23   Exhibit 24                    280
     Exhibit 25                    90
24   Exhibit 26                    111
     Exhibit 27                    125
25
```

1       (Proceedings commenced on January 23, 2023, at 9:11 a.m.)

2              THE COURTROOM DEPUTY:  Please remain seated and come

3    to order.  This United States District Court is now in session.

4    The Honorable Cormac J. Carney presiding.

5              THE COURT:  Good morning.

6       (All replied, "Good morning, Your Honor.")

7              THE COURTROOM DEPUTY:  Calling Item Number 1, SACV

8    22-01421, Lance Boland, et al., versus Robert Bonta.

9       Counsel, please state your appearances.

10             MR. DALE:  Joshua Dale for plaintiffs.

11             MR. BRADY:  Sean Brady for plaintiffs.

12             MR. FRANK:  Alexander Frank for plaintiffs.

13             THE COURTROOM DEPUTY:  Good morning, Your Honor.

14             MR. MOROS:  Konstadinos Moros for plaintiffs.

15             THE COURT:  Good morning, gentlemen.

16             MR. SAROSY:  Good morning.  Charles Sarosy for

17   defendant.

18             THE COURT:  Hello, sir.

19             MR. WOODS:  Good morning, Your Honor.  Clint Woods

20   for defendant.

21             THE COURT:  Hello, sir.

22             MR. BECKINGTON:  And good morning, Your Honor.  Mark

23   Beckington, also for defendants.

24             THE COURT:  Hello, sir.

25       Well, thank you for being here.  The way I envision this

```
 1   is we're going to have what I'll call two phases.  The first is
 2   what I would call the evidentiary hearing, where I would like
 3   to hear witnesses on the important issues in the case.  And
 4   then the second phase is what we'll call the argument phase
 5   where you'd make your arguments and I ask you questions.
 6        So it looks like we have a witness all ready to go.  This
 7   is the first witness on the video?
 8             MR. BRADY:  That's correct, Your Honor.
 9             THE COURT:  Okay.  And who is that?
10             MR. BRADY:  That is Stephen Helsley.
11             THE COURT:  Okay.  And, Rolls, do you want to swear
12   Mr. Helsley in?
13             THE COURTROOM DEPUTY:  Will do, Your Honor.
14             THE COURT:  All right.
15             THE COURTROOM DEPUTY:  Do you solemnly swear that the
16   testimony you shall give in the cause now before this Court
17   shall be the truth, the whole truth, and nothing but truth, so
18   help you God?
19             THE WITNESS:  I do.
20             THE COURT:  Have him state his name for the record.
21             THE COURTROOM DEPUTY:  Please state your name for --
22   please state your name and spell your last name for the record.
23             THE WITNESS:  Yes.  My name is Stephen,
24   S-t-e-p-h-e-n, Craig, Helsley, H-e-l-s-l-e-y.
25             THE COURT:  Please proceed, Counsel.
```

| | |
|---|---|
| 1 |         MR. BRADY:  Thank you, Your Honor. |
| 2 |         **STEPHEN CRAIG HELSLEY,** |
| 3 | **called by and on behalf of Plaintiffs, testified as follows:** |
| 4 |         DIRECT EXAMINATION |
| 5 | BY MR. BRADY: |
| 6 | Q.   Good morning, Mr. Helsley.  Can you hear me? |
| 7 |         THE COURTROOM DEPUTY:  Mute your speaker. |
| 8 |         THE WITNESS:  Yes. |
| 9 | BY MR. BRADY: |
| 10 | Q.   Okay.  Thank you for joining us this morning, Mr. Helsley. |
| 11 | Can you provide the Court with your background, your former |
| 12 | employment with the California Department of Justice and other |
| 13 | related background? |
| 14 | A.   Yes.  I was hired by the California Department of Justice |
| 15 | in June of 1967 as a narcotic agent trainee.  Later, I was |
| 16 | promoted to a supervisor position and then to a manager's |
| 17 | position. |
| 18 |         And then in 1979, the then Attorney General Deukmejian |
| 19 | promoted me to be the Chief of the Bureau of Narcotic |
| 20 | Enforcement. |
| 21 |         Later, Attorney General Van de Kamp transferred me to run |
| 22 | the Bureau of Forensic Services, which is the California crime |
| 23 | laboratory system. |
| 24 |         And then Attorney General Van de Kamp promoted me to be |
| 25 | the Assistant Director of the Division of Law Enforcement, |

1    which in the context of how the department is structured, now

2    the titles of the positions, I would now be the Chief of the

3    Division of Law Enforcement.

4    Q.    Okay.  And in your capacity in any of those roles at the

5    California Department of Justice, did you have any firearms

6    experience?

7    A.    Yes.  I was the Department's firearms instructor for

8    trainings for about ten years.  I went to a variety of range

9    masters schools and firearm classes.

10         And then when the assault weapon debate began, Attorney

11   General Van de Kamp assigned me to be the lead in terms of

12   technical firearm-related things for the Roberti-Roos Assault

13   Weapon Control Act bill.

14   Q.    And you have now since retired from the California

15   Department of Justice?

16   A.    Yes.  I was with the Department for 26 years.

17   Q.    Are you currently employed in any fashion?

18   A.    Well, sort of employed.  I serve as historian for two

19   British gun-making firms, John Rigby & Company and William

20   Powell.  But I can't really say that I'm paid.  I trade my work

21   for information that I need from, say, Powell.  I'm writing a

22   book on Powell, and I need them to do things for me.  So it's

23   sort of a trade situation.

24   Q.    So you author books about firearms?

25   A.    Yes.  I've co-authored five books on firearms.

1  Q.    You have been an expert witness in cases against the

2  California Department of Justice in firearm-related matters on

3  several occasions; is that correct?

4  A.    I have.

5  Q.    Do you recall how many cases?  If you don't know the exact

6  number, an estimate would suffice.

7  A.    Well, I think -- it's getting a little bit vague in my

8  head now with age, but I think I've been deposed by the

9  Department on three occasions.

10 Q.    Okay.  And do you recall for what you were being called as

11 an expert in those other cases?

12 A.    One of them was magazines, the capacity of magazines.

13 That was the Duncan case.

14       One of them was what constituted handgun ammunition.  That

15 was the Parker case.

16       And then -- I'm a little bit vague.  I think I was deposed

17 in the Rupp case, which is assault weapon case.

18 Q.    And as an expert, what were you being offered to testify

19 about in those matters?  What was your expertise that you were

20 being called for the plaintiffs to rely on?

21 A.    Well, the nature of the questioning was how much did I

22 know about ammunition, how much did I know about firearms, what

23 did I know about the history of the process that brought us to

24 the deposition.  The questioning was the full range of

25 firearm-related questions.

1    Q.    So would it be fair to characterize your expertise as in

2    firearm technicalities and the historical background on firearm

3    development?

4    A.    Yes.

5    Q.    In any of those cases, do you recall if the Attorney

6    General's Office ever challenged your expertise as being an

7    expert in any of those fields?

8    A.    They didn't.  As a matter of fact, I think that in one

9    case, there were sort of an informal stipulation that I was an

10   expert.

11   Q.    Got it.  Are you familiar with the term "chamber load

12   indicator"?

13   A.    I am.

14   Q.    And what is a chamber load indicator to you?

15   A.    It's a mechanical device on a firearm that lets the user

16   know that there is a cartridge in the chamber of the gun

17   without opening the gun.

18            MR. BRADY:  Am I unable to share my screen?

19            THE COURTROOM DEPUTY:  Try and see.

20            MR. BRADY:  I just did.  It said "Host disabled

21   participant screen sharing."  I'm just wondering if that is the

22   Court or if that's him, or is it us?

23            THE COURTROOM DEPUTY:  Let me -- I can make you as a

24   co-host and see.

25            MR. BRADY:  I apologize, Your Honor.

1          THE COURT:  No apologies necessary.  Hopefully, we
2    can get it.
3          THE COURTROOM DEPUTY:  I'll try it.
4          MR. BRADY:  There.  I think that -- okay.  That
5    works.  Thank you.
6          THE COURTROOM DEPUTY:  Good?  Okay.
7    BY MR. BRADY:
8    Q.   Mr. Helsley, can you tell me what you see on your screen?
9    A.   First of all, the firearm is a shotgun based on the Powell
10   patent 1163 of 1864.  And that firearm is equipped with a
11   loaded chamber indicator, which is Powell's patent 1055 of
12   1869.
13   Q.   So am I correct in understanding that this is an image of
14   a firearm that has chamber-load-indicator technology that has
15   been around since at least 1869?
16   A.   Correct.
17         MR. BRADY:  I would like to offer Exhibit 1.  This is
18   Exhibit 1 for everybody's reference.
19         THE COURT:  Any objection?
20         MR. WOODS:  No objection.
21         THE COURT:  Exhibit 1 will be received into evidence.
22      (Exhibit 1 was received into evidence.)
23   BY MR. BRADY:
24   Q.   Mr. Helsley, can you take a look at your screen and tell
25   me what you see?

1  A.   Yes.  That's a different view of the same firearm, showing

2  the firing pin is inlaid with platinum, and it says, "loaded."

3  Q.   So this is another example of a chamber load indicator?

4  A.   Yes.

5  Q.   From around -- based on a patent from 1869?

6  A.   Yes.

7          MR. BRADY:  I'd like to offer this as Exhibit 2.

8          THE COURT:  Any objection?

9          MR. WOODS:  No objection.

10         THE COURT:  Exhibit 2 will be received into evidence.

11     (Exhibit 2 was received into evidence.)

12  BY MR. BRADY:

13  Q.   As a historian of firearm development, have you formed any

14  opinions on whether chamber-load-indicator technology has ever

15  been widely adopted by the firearm industry?

16  A.   It has not.  Powell, for instance, when they designed

17  their next firearm and patented it in 1876, the chamber loaded

18  indicator was dropped, never to surface again.

19  Q.   Are you aware, Mr. Helsley, of any semi-automatic handgun

20  models that incorporated chamber-load-indicator technology

21  prior to, say, 1990?

22  A.   Yes.  Walther had one designed for their PP and PPK

23  pistols.  And that would be 1929.

24  Q.   1929 was the year that Walther produced that model with

25  the chamber loaded indicator?

1    A.   That's when they brought it to the market.

2    Q.   Okay.  As a historian, are you familiar with any laws that

3    have required chamber load indicators on firearms to be sold?

4    A.   Obviously, the California law.

5    Q.   Other than that?

6    A.   Massachusetts has sort of a requirement.  And I say, "sort

7    of" because, if the handgun has a 10-pound trigger pull and an

8    external safety, then the indicator is not required.  That is

9    the only state that I know of.

10   Q.   Got it.  Would it be fair to say that your testimony is,

11   that chamber load indicators have been commercially available

12   since at least 1869 but have never enjoyed any popularity in

13   the commercial firearms market?

14             MR. WOODS:  Objection.  Lacks foundation.

15             THE WITNESS:  The authors of the definitive book on,

16   say, British shotguns refer --

17             MR. WOODS:  I'm sorry.  I wanted to interpose an

18   objection -- I apologize -- that the question lacks -- or calls

19   for something that lacks foundation.

20             THE COURT:  Overruled.

21             MR. WOODS:  Thank you.

22             MR. BRADY:  May the witness proceed, Your Honor?

23             THE COURT:  Please do.

24   BY MR. BRADY:

25   Q.   I'm sorry, Mr. Helsley.  The question was, in your

1    knowledge of history of firearms and chamber load indicators,

2    have you formed any opinions on whether the chamber load

3    indicators have been commercially -- have enjoyed commercial

4    success in the firearms marketplace?

5    A.    Very little success.

6    Q.    So they have not been popular?

7    A.    No.

8            THE COURT:  I would be interested to know why.

9    BY MR. BRADY:

10   Q.    Mr. Helsley, do you have any thoughts as to why that would

11   be the case?  Do you have opinions, in your expert opinion?

12   A.    Well, the key here is training and education.  If the

13   person who's going to handle the firearm doesn't know what a

14   loaded chamber indicator is, it will have very little meaning

15   to them.

16       The loaded chamber indicators aren't used on revolvers,

17   they're not used on rifles or shotguns.  To the extent that

18   they're used, they're used on semi-automatic pistols.  And in

19   some cases, they're nothing more than just a little bit of red

20   paint on a small part.

21       So it's -- the user has to assume that all guns are always

22   loaded.  And if you do that, then you're in good shape.  If

23   you're relying on a 12-year-old boy picking up a handgun and

24   knowing what that little red thing means, it's a mistake.

25   Safety is between the ears and not a mechanical device.

1  Q.   Can I ask you, in your experience with firearms, you

2  have -- obviously, you were a trainer for the California

3  Department of Justice, so you have experience with firearms,

4  shooting them and training people with them; correct?

5  A.   Yes.

6  Q.   In your experience, would a chamber load indicator alter

7  the way that you treat a firearm, in any way?

8  A.   No.

9  Q.   And that's because, as you indicated, the rule of firearm

10 safety is you always treat a firearm as if it were loaded;

11 right?

12 A.   Correct.

13 Q.   And if you do that, then a magazine -- or I'm sorry -- a

14 chamber load indicator provides no benefit.

15      Is that fair to say?

16 A.   Correct.  You need to keep your finger out, away from the

17 trigger, and you need to have the barrel pointed in a safe

18 direction.

19 Q.   Are you familiar with magazine disconnect mechanisms?

20 A.   I am.

21           THE COURT:  Before you get to that, I just have one

22 question.

23           MR. BRADY:  Of course,  Your Honor.

24           THE COURT:  Mr. Helsley, am I to then understand

25 that, if you have a CLI, it's really -- well, why -- let me

1   rephrase that question.

2        Is it then just an aesthetic issue, from your standpoint,

3   why manufacturers don't put a chamber load indicator on the

4   weapon?

5            THE WITNESS:  There are reasons.  For instance, some

6   of the devices aren't particularly reliable and can break and

7   cause the firearm to malfunction.  The way it's been described

8   to me is they're viewed as gadgets, and they're a way to help

9   sell a product, but they're not really for safety because

10  there's no training that goes in to tell the user what they

11  are.  And so for whatever the reasons, the industry has just

12  not adopted them all over the last century.

13           THE COURT:  So they're just not needed from the

14  manufacturer's standpoint?

15           THE WITNESS:  Yes.  If there was a need, I am sure

16  they would meet the need.

17           THE COURT:  But they don't impact the structural

18  integrity of the weapon or its ergonomics; is that fair?

19           THE WITNESS:  Correct.

20           THE COURT:  I'm sorry, Counsel.

21           MR. BRADY:  Of course.  Please feel free, Your Honor.

22  Q.   Mr. Helsley, are you familiar with magazine disconnect

23  mechanisms?

24  A.   I am.

25  Q.   Can you explain what your understanding is of a magazine

1  disconnect mechanism?

2  A.   The magazine disconnect disables the firearms if the

3  magazine is not inserted fully.

4  Q.   And what is the purpose, the purported purpose, of that,

5  to your knowledge?

6  A.   Well, the proponents would say that it's a safety feature

7  that you could store the firearm in a different place than the

8  magazine and thus the gun couldn't be fired.

9      In the law enforcement context, some would argue that

10  the -- if you're in a fight with a suspect and the magazine

11  comes out of the gun, then the suspect can't take your gun and

12  shoot you with it.

13  Q.   Is it your understanding that law enforcement officers are

14  exempt from the unsafe handgun requirement?

15  A.   They are.

16  Q.   And in your experience as a law enforcement officer in

17  California, do law enforcement officers, in your experience,

18  tend to carry handguns that are on the roster or are not on the

19  roster?

20  A.   That's difficult to say because guns come and go from the

21  roster.   And departments buy guns, replace guns.   The majority,

22  I believe, of California law enforcement carry one of the

23  Glocks.   There are lots of models of Glocks.   My guess is that

24  80 percent or more of California law enforcement carry Glocks.

25  To the best of my knowledge, there is no Glock with a magazine

1    disconnector.

2    Q.   Do you know, Mr. Helsley, when magazine disconnect

3    mechanism were invented?

4    A.   The first magazine disconnector that I'm aware of was part

5    of the Browning Hi-Power, it was called; or in its military

6    role, the P35.

7    Q.   Is that a handgun?

8    A.   1935.

9    Q.   Is that a handgun?

10   A.   That's a handgun.

11   Q.   A semi-automatic handgun?

12   A.   Yes.

13   Q.   And, obviously, it has a detachable magazine if it has a

14   magazine disconnect mechanism; correct?

15   A.   Yes.

16   Q.   I'm sorry.  What year did you say?  Did you say what year

17   that model of firearm was invented or put on the market?

18   A.   In '35.

19   Q.   1935.  So at least one -- and that Browning Hi-Power is

20   made -- Browning is a fairly large firearm manufacturer;

21   correct?

22   A.   Yes.

23   Q.   Especially at that time?

24   A.   Yes.

25   Q.   So is it fair to say that at least one commercial

1  semi-automatic handgun model available to the public came with

2  a magazine disconnect mechanism back in 1935?

3  A.    Correct.

4  Q.    As a historian of firearm development, have you formed any

5  opinions on whether magazine-disconnect-mechanism technology

6  has ever been widely adopted by the firearm industry.

7  A.    It has not.

8  Q.    Have you ever seen a Browning Hi-Power without a magazine

9  disconnect mechanism?

10 A.    Yes.  The law enforcement officers that I worked with that

11 carried that as a duty firearm, had it removed from the pistol.

12 Q.    Removed?

13 A.    Removed.

14 Q.    So magazine disconnect mechanisms can be removed?

15 A.    Can be easily removed.

16 Q.    Easily.  Can you explain "easily"?  What was more or less

17 the basic process?  Could, for example, I do it?  Or would it

18 take a little bit more like somebody like yourself?

19 A.    If you're familiar with hand tools, it's simple to do.

20 What's involved -- and, of course, you can go onto the Web and

21 get all the instructions you want on this.  You drift out a pin

22 that is in the trigger -- okay.  Back up a step.

23      You would field strip the firearm so that the slide is off

24 the frame, you drift the pin out of the trigger, and then you

25 reach in with a probe of some sort and pull the safety back,

1    and the magazine disconnect device with a spring will come out.

2    You push the safety back into place, you reassemble the gun,

3    and that's it.  It's a three- or four-minute process.

4    Q.    And, Mr. Helsley, why do people remove magazine disconnect

5    mechanisms?  What is the point of doing that?

6    A.    The reasons are two.  First of all, the trigger pull can

7    be enhanced with the magazine disconnector out.  The magazine

8    disconnector, when the trigger is pulled, is pushing against

9    the magazine before it releases the sear, and that causes a

10   rough and inconsistent trigger pull.  More importantly, though,

11   it keeps the magazine from dropping free.

12        So when law enforcement is trained, generally, they

13   want -- for rapid reloading of their handgun, they want to be

14   able to push the magazine release button, have the magazine

15   drop free from the gun, and insert a new one.  The magazine

16   disconnector won't allow that.

17        And also -- and then there is this debate.  Most law

18   enforcement that I know of want to be able to -- if they only

19   have the one round in the chamber of the gun when they're

20   reloading, they want to be able to fire the gun.  And, of

21   course, the magazine disconnector won't allow that.  So it

22   won't allow the firing of one round in the chamber during the

23   reload, it slows down the reload, and it makes for a trigger

24   pull that is not very good.

25   Q.    Got it.

```
 1              THE COURT:  And for those three reasons, Mr. Helsley,
 2   is that why the industry hasn't widely adopted magazine
 3   disconnect mechanisms?
 4              THE WITNESS:  Well, I can only guess on that.
 5              THE COURT:  I wouldn't want you to guess.
 6       Do you know why, then, it isn't widely adopted?
 7              THE WITNESS:  Again, I have to assume that the
 8   customers didn't want it.
 9   BY MR. BRADY:
10   Q.   Mr. Helsley, can you tell me what you see on your screen?
11   A.   This is a newer version of the Browning Hi-Power.
12   Q.   And it looks like this is now made by FN?
13   A.   Yes.  Well, FN and Browning have always had a connection.
14   Q.   Okay.  So there is -- it's still the same manufacturer as
15   the previous Browning Hi-Power?
16   A.   Yeah.  The Browning Hi-Power, quote, unquote, has been
17   made in a variety of places.  It was a military firearm during
18   World War II.  I believe it was made in Canada at that time.
19   But this is the latest one.  The FN -- I assume this is being
20   made in America.
21   Q.   So it's your understanding this is the latest iteration of
22   the Browning Hi-Power?
23   A.   Yes.
24   Q.   On the screen here, the first line on this page of
25   Browning's discussion of its new -- or FN describing the new
```

1    Hi-Power, it says, "Magazine disconnect deleted."

2        What is your understanding of that language?

3    A.    That they redesigned it to eliminate the magazine

4    disconnect function.

5    Q.    So the latest version of the Hi-Power, that always had the

6    magazine disconnect mechanism, no longer has it?

7    A.    Correct.

8    Q.    Are you familiar with any laws, other than -- excuse me --

9    California's Unsafe Handgun Act, that have ever required

10   firearms have magazine disconnect mechanisms?

11   A.    No.

12   Q.    So would it be fair to sum up your testimony on magazine

13   disconnect mechanisms that they have been commercially

14   available since at least 1935 in popular semi-automatic

15   handguns but have never enjoyed popularity in the commercial

16   marketplace?

17   A.    Whatever popularity there was was very limited.

18   Q.    And there were no laws, to your knowledge, that required

19   them?

20   A.    No.

21   Q.    So it wasn't a popular feature among lawmakers?

22   A.    No.

23        MR. BRADY:  I would like to offer this as Exhibit 3,

24   the depiction of the Browning Hi-Power.

25        THE COURT:  Any objection?

1          MR. WOODS:  No objection.

2          THE COURT:  Exhibit 3 will be received into evidence.

3      (Exhibit 3 was received into evidence.)

4  BY MR. BRADY:

5  Q.   Mr. Helsley, are you familiar with the term

6  "microstamping"?

7  A.   I am.

8  Q.   Can you explain to us what your understanding of that is?

9  A.   Microstamping is the -- I assume it's done by laser,

10 putting identifying characteristics on the tip of a firing pin

11 so that, when that firing pin strikes the primer of a

12 cartridge, it will allow for the identification of whether or

13 not that cartridge was fired in a particular firearm.

14 Q.   Are you aware of any commercially sold firearm that has

15 ever been manufactured with microstamping technology?

16 A.   No.

17 Q.   Are you aware of any technology similar to microstamping

18 that have ever been included on commercially manufactured

19 firearms?

20 A.   No.

21          MR. BRADY:  Thank you, Mr. Helsley.  That will be

22 all.

23          THE COURT:  All right.

24                    CROSS-EXAMINATION

25 BY MR. WOODS:

1    Q.   Good morning, Mr. Helsley.

2    A.   Good morning.

3    Q.   My name is Clint Woods.  I'm a Deputy Attorney General for

4    the State of California.  I just have very few questions for

5    you.

6         You retired from the California Department of Justice

7    before the Unsafe Handgun Act was enacted; correct?

8    A.   Correct.

9    Q.   So as part of your duties with the California Department

10   of Justice, you never interacted with the Unsafe Handgun -- the

11   Unsafe Handgun Act or the roster of handguns; is that correct?

12   A.   Not as far as my duties with DOJ is concerned.

13   Q.   Okay.  Are you aware -- you had some testimony about -- we

14   looked at some pictures of shotguns with chamber load

15   indicators.

16        Do you recall that testimony?

17   A.   Yes.

18   Q.   Those really old guns from the 1800's; is that right?

19   A.   I'm sorry.  Say again.

20   Q.   The really old shotguns from the 1800's?

21   A.   Yes.

22   Q.   Okay.  Do you know whether shotguns are required to have

23   chamber load indicators in California?

24   A.   They are not.

25   Q.   Okay.  You testified earlier that it was your guess that

1    around 80 percent of law enforcement used Glocks.

2         Do you recall that testimony?

3    A.   Yes.

4    Q.   Okay.  Have you ever done any kind of formal or informal

5    survey of how many law enforcement agents in California use

6    Glocks?

7    A.   No.  It's just based on visual observation of the police

8    officers I see.  They all seem to have Glocks in their

9    holsters.

10   Q.   Understood.  Do you know if there are any Glocks that are

11   currently on California's roster?

12   A.   There are.

13   Q.   Do you know how many?

14   A.   No.

15             MR. WOODS:  Okay.  All right.  No further questions.

16             THE COURT:  All right.  Anything further?

17             MR. BRADY:  Nothing, Your Honor.

18             THE COURT:  All right.  Thank you, sir.  You are

19   excused.

20        Next witness.

21             MR. FRANK:  Good morning, Your Honor.

22             THE COURT:  Good morning.

23             MR. FRANK:  Plaintiffs' next witness will be

24   Mr. Lance Boland.

25             THE COURT:  All right.  Mr. Boland, if you could,

1    please, come forward, sir.  Stand right by the court reporter
2    for a second, a few seconds.  We're going to administer an oath
3    to you and then have you take the witness stand.
4            THE COURTROOM DEPUTY:  Mr. Boland, right there, sir.
5    Face me.  Raise your right hand.
6        Do you solemnly swear that the testimony you shall give in
7    the cause now before this Court shall be the truth, the whole
8    truth, and nothing but the truth, so help you God?
9            THE WITNESS:  I do.
10           THE COURTROOM DEPUTY:  Please be seated.  Go around,
11   sir.
12           THE WITNESS:  Go around?
13           THE COURTROOM DEPUTY:  Yes, sir.
14       Please state your name and spell your last name for the
15   record.
16           THE WITNESS:  Lance Boland, B-o-l-a-n-d.
17           THE COURT:  Please proceed.
18           MR. FRANK:  Thank you, Your Honor.
19                       **LANCE BOLAND,**
20    **called by and on behalf of Plaintiffs, testified as follows:**
21                       DIRECT EXAMINATION
22   BY MR. FRANK:
23   Q.   Mr. Boland, what is your profession?
24   A.   I am an infrastructure engineer as well as a firearms
25   instructor.

1    Q.    Can you please describe your firearms instructor
2    experience?
3    A.    I have been teaching since about 2009; professionally,
4    since 2013.  My certifications include basic rifle, pistol,
5    shotgun; personal protection inside the home and outside the
6    home; home firearm safety; metallic cartridge reloading --
7         (The court reporter interrupted.)
8            THE WITNESS:  Personal protection inside the home,
9    personal protection outside the home, home firearm safety,
10   metallic cartridge reloading, shotshell reloading.  I'm also a
11   master instructor for the International Association of Law
12   Enforcement Firearms Instructors.  I also have instruction
13   directly from Glock training U.S., both in the Glock operators
14   as well as the Glock Instructor Development workshops.
15   BY MR. FRANK:
16   Q.    And do you have any other accreditations for firearms
17   instruction?
18   A.    Can you rephrase the question?
19   Q.    Sure.  You mentioned that you have -- I believe it's
20   IALEFI.
21   A.    IALEFI?
22   Q.    Yes.
23   A.    Yeah.  That is International Association of Law
24   Enforcement Firearms Instruction.  And I currently hold a
25   master rating with them.

1  Q.   And you operate a firearms training school; is that right?

2  A.   That is correct.

3  Q.   How many rounds of ammo have you fired in your lifetime

4  through a semi-automatic pistol?  Are you able to estimate

5  that?

6  A.   If you estimate, it would be in the -- over the hundreds

7  of thousands, probably closer to a million.

8  Q.   And how many people have come to your training school

9  since -- I believe you said it was 2013 --

10  A.   2013.

11  Q.   -- roughly?

12  A.   7,400, roughly.

13  Q.   And that's on a continuous basis since it opened in 2013?

14  A.   That's correct.

15  Q.   And do you teach people how to safely handle handguns?

16  A.   Yes, we do.

17  Q.   Are you familiar with the rules of gun safety?

18  A.   Yes, sir.  Yes, I am.  There is two different sets that

19  are typically taught.  One through the National Rifle

20  Association.  One that is used -- we refer to them as the

21  Cooper Rules.  And our school teaches the Cooper Rules.

22  Q.   Can you please explain what the Cooper Rules are?

23  A.   Sure.  There is a total of four rules.  As long as any of

24  the rules are going to be followed, typically, we can avoid

25  tragedies.  The rules that we follow are:

1       We treat all guns as if they are loaded at all times.

2       We keep the gun pointed in a safe direction.  "Never point

3  your muzzle at anything you do not intend to destroy or kill"

4  is how we state it.

5       Keep your finger off the trigger until your sights are on

6  target, and you've made the decision to shoot.

7       And the last one that we follow is know your target and

8  what's beyond it.

9  Q.   And everyone who comes to your training school will

10  receive that instruction of those four rules?

11  A.   It's the first hour of our classes.

12  Q.   Do you know what a chamber load indicator is?

13  A.   Yes.

14  Q.   Can you please describe what you know it to be?

15  A.   A chamber load indicator is going to be a mechanical item

16  on a semi-automatic handgun that, when a cartridge is loaded

17  into the chamber, it's going to give some type of visual

18  indication that there is a cartridge that is present inside the

19  gun, in the chamber.

20  Q.   And does the chamber load indicator impact the way that

21  you teach the four Cooper Rules of gun safety?

22  A.   No.

23  Q.   Is that because the rules should be observed regardless of

24  whatever mechanical aspects the firearm might have?

25  A.   Regardless of what the gun may be capable of doing in

1    pertaining to safety.

2    Q.   Now, during your experience, your decade or more of

3    experience of training people and teaching people how to shoot,

4    have you ever seen people bring guns into your training school

5    that have chamber load indicators on them?

6    A.   Yes.

7    Q.   And have you ever seen a chamber load indicator on a

8    firearm fail?

9    A.   Yes.

10   Q.   How many times, roughly, would you say?

11   A.   I've seen it a couple times now.

12   Q.   Are there any particular models of firearm that you've

13   seen it fail on more than others?

14   A.   The Smith & Wesson M&P Shield, the 9mm, specifically.

15   Q.   And To your knowledge, that is a firearm that's on the

16   California roster?

17   A.   That is currently on the California roster, yes.

18   Q.   Do you have any experience of your own shooting that

19   weapon?

20   A.   Yes, I do.

21   Q.   Can you describe your experience using it and what you've

22   observed?

23   A.   Pertaining to the loaded chamber indicator, when you

24   chamber a round in the M&P Shield, the loaded chamber indicator

25   that's painted red on the side, that's facing the shooter,

1    impinges on the sight picture for the gun.  So if you're

2    looking down the sights -- and they typically have what we

3    refer to as a 3 dot sight -- two dots in the rear, one dot on

4    the front sight -- that loaded chamber indicator, that's

5    painted red, comes up in front of that front sight.

6    Q.    Does that mean that the user of that firearm will see an

7    obstruction into what they're looking at through their sights

8    on the firearm?

9    A.    That would be an accurate way of stating that, yes.

10   Q.    And that can compromise your ability to use and shoot the

11   gun safely and accurately; correct?

12   A.    Correct.

13   Q.    Would you ever teach a student to rely on a chamber load

14   indicator?

15   A.    No.

16   Q.    What would be the safest and most foolproof way to verify

17   whether a semi-automatic firearm has a live round of ammunition

18   in the chamber?

19   A.    For civilian students, we teach them to press check; that

20   is, push the slide back on the top of their firearm of maybe 8

21   to 10 millimeters and visually inspect.  There is a piece of

22   brass or a piece of nickel-plated brass in there that indicates

23   that the chamber is loaded.

24   Q.    Do you know what a magazine disconnect mechanism is?

25   A.    Yes.

1   Q.   Can you please describe?

2   A.   Magazine disconnect is going to be a mechanical device

3   inside of the semi-automatic handgun that should prevent the

4   gun from firing if a magazine has been removed and interrupts

5   the firing mechanism.

6   Q.   And does a magazine safety disconnect impact how you teach

7   the four Cooper Rules of gun safety?

8   A.   No, it does not.

9   Q.   And that is -- is that for the same reason that the rules

10  should be followed regardless of --

11  A.   Rules should be followed regardless, yes.

12  Q.   Have you ever observed a MDM mechanism fail on a pistol?

13  A.   Yes.

14  Q.   Could you please describe?

15  A.   I personally -- my personally-owned Sig Sauer P226 MK25

16  had the magazine disconnect fail inside of it.  The most

17  concerning part of that, that I found, is that, once it had

18  failed, it wouldn't allow the gun to fire; second, it wouldn't

19  allow me to put a magazine back in the gun.

20       I do use that gun for defensive purposes.  Had I found

21  myself in a defensive incident, I would not have been able to

22  get my magazine back in my gun to use it.

23  Q.   In your experience teaching the -- I believe you said

24  7,400 or so people that have come to your firearm school over

25  the years, are you able to say what percentage of those people

1    were left-handed?

2    A.    It's estimated about 10 percent.

3    Q.    Is there also a certain percentage of people who come to

4    your school who are maybe not left-handed but who would be

5    better off primarily shooting left-handed?

6    A.    Yes.

7    Q.    And why is that?

8    A.    We discovered that some of the students are

9    cross-dominant, through a very simple test.  Some students may

10   come in, and they're right-handed.  And through a simple -- we

11   refer to it as an eye exam.  It's not, by definition.  But we

12   find that their left eye is dominant, but they are

13   right-handed, meaning they write or handle things with their

14   right hand.

15         We do encourage those students, in the interest of

16   marksmanship, to shoot their firearms left-handed, using their

17   left hand as their strong hand.

18   Q.    Are semi-automatic handguns generally ergonomically

19   configured better for a left-handed shooter or a right-handed

20   shooter?

21   A.    Right-handed shooter.

22   Q.    And why is that?

23   A.    The controls for the firearm, the slide stop, the magazine

24   release, on some, if it has a mechanical safety that can be

25   engaged and disengaged, it's typically done with the thumb on

1    the right hand.  If that gun is used in the left hand, those
2    mechanical controls are going to be covered up by the hand, the
3    strong hand that is now the left hand.
4    Q.    Now, you just mentioned a few of them, but aside from the
5    trigger on a semi-automatic handgun, would the slide release,
6    magazine release, and the external safety switch be the main
7    controls?
8    A.    Yes.
9    Q.    And, virtually, all semi-automatic handguns are going to
10   have those, for the most part?
11   A.    Some approximation of that, correct.  Yes.
12   Q.    What have you observed when left-handed shooters come to
13   your school and begin their process of learning firearms with
14   firearms that are generally more optimized for a right-handed
15   shooter?
16   A.    It's difficult for them.  They struggle.
17   Q.    What types of difficulties and struggles arise?
18   A.    Most of what we see is, whether it's a left-handed shooter
19   or it's someone that we're encouraging to shoot left-handed,
20   the control is being covered up.  Now requires us to take that
21   handgun, sometimes in a loaded condition on the range, and
22   transfer it from the left hand back into the right hand.  So
23   we're adding steps of manipulation to the gun that, if we had
24   an ambidextrous firearm or a left-handed firearm, we wouldn't
25   have to do.  So they do struggle to get the gun unloaded, to

1   get it reloaded, and, ultimately, handling it safely.

2   Q.   In an defensive encounter, is it true that seconds or

3   micro-seconds of time can be the difference between being able

4   to use your firearm successfully, defensively, and potentially

5   losing your life?

6   A.   Yes.

7   Q.   How many different models of semi-automatic handguns have

8   you handled in your lifetime?

9   A.   Incalculable.  Numerous.  Most.  Any adjective we want to

10  add to that.

11  Q.   Would that include pretty much every model that's on the

12  California roster?

13  A.   I would be comfortable in saying that.

14  Q.   Are there ever any off-roster firearms that can allow the

15  main controls to be configured ergonomically for the

16  left-handed shooter?

17  A.   Yes.

18  Q.   And have you ever recommended those to your clients at

19  your shooting school?

20  A.   Often.

21  Q.   What do you tell them about how they might go about trying

22  to acquire one?

23  A.   That they -- with the unsafe Handgun Act being in place in

24  California, they would have to seek an off-roster handgun

25  through a private party transfer.

1  Q.    Do you own any off-roster handguns?

2  A.    I do.

3  Q.    Which models do you own?

4  A.    The Staccato P from STI.  The Glock 43 is another that I

5  own.

6  Q.    And did you acquire that in a private party transfer?

7  A.    Yes.

8  Q.    Do you recall how much you paid for it?

9  A.    For the Staccato, 3,000; and for the 43, a thousand.

10 Q.    And are you familiar with roughly what the manufacturer's

11 suggested retail price is, if you were to walk into a gun store

12 in a state that didn't have a roster, what you would pay for

13 those models of firearms?

14 A.    The Staccato retails, $2,100; the 43 about $450.

15 Q.    So you paid significant price markups?

16 A.    Yes.

17 Q.    And were those firearms in used condition when you

18 acquired them?

19 A.    And they were used when I purchased them, yes.

20 Q.    In your decade-plus of experience of training people, have

21 you trained many state and federal law enforcement officers?

22 A.    I have.

23 Q.    And when they come to your shooting school, they bring

24 their own firearms with them; is that correct?

25 A.    Yes.

```
1   Q.   Have you ever seen a federal state law enforcement officer
2   bring a firearm equipped with a magazine disconnect mechanism
3   to your school?
4   A.   No.
5   Q.   Have you ever spoken with them about their choices of
6   firearms?
7   A.   I have.
8   Q.   And have you spoken with them specifically about the
9   California roster and what it requires of guns?
10  A.   Yes, I have.
11  Q.   And what have cops explained to you about the various
12  problems or issues that they're trying to avoid by not using --
13  A.   For those that I talked to --
14        MR. SAROSY:  Your Honor, I'm sorry.  Objection.
15  Hearsay.
16        THE COURT:  Overruled.
17        THE WITNESS:  The ones that I've talked to, the
18  magazine disconnect has always been a concern, that in a
19  defensive encounter, if they dropped the magazine and still had
20  one in the chamber, what we refer to as a tactical reload, the
21  round in the chamber would be worthless.  It wouldn't be able
22  to be fired.  So they do not want magazine disconnects on their
23  guns.
24        They don't view the loaded chamber indicator as anything
25  of value because of the steps that they take while handling
```

1    their own firearms, where they do their own press checks or

2    they will visually or physically inspect the firearm for if

3    it's loaded or unloaded, whatever the condition may be.

4    BY MR. FRANK:

5    Q.    Have many FBI agents come to your school?

6    A.    Yes.

7    Q.    Are you familiar with what firearms they're issued?

8    A.    Currently, the Glock 17M or the Glock 19M, the M models of

9    those.

10   Q.    Do either of those firearms have a magazine disconnect

11   mechanism?

12   A.    No.

13            MR. FRANK:  Thank you, Mr. Boland.

14       I don't have any further questions, Your Honor.

15            THE COURT:  I just have one, Mr. Boland.

16            THE WITNESS:  Yes, Your Honor.

17            THE COURT:  You said you have some off-roster

18   handguns and you obtained them through a private party

19   transaction.

20       But could you go to a state where they're sold and then

21   bring that firearm back to California?

22            THE WITNESS:  No, Your Honor, I couldn't.

23            THE COURT:  Is there any law in California that

24   prohibits you from doing that?

25            THE WITNESS:  I believe it's the law that is going to

1    prohibit me from not being a resident of that state and

2    purchasing a firearm in that state.

3            THE COURT:  I guess that is my question.  So it would

4    be the state -- if you're going to purchase a firearm in the

5    state, you have to be a resident of that state?

6            THE WITNESS:  Yes, Your Honor.

7            THE COURT:  Gotcha.  Okay.

8        Cross-examination?

9                          CROSS-EXAMINATION

10   BY MR. SAROSY:

11   Q.    Good morning, Mr. Boland.

12   A.    Good morning, Counsel.

13   Q.    My name is Charlie Sarosy.  I'm a Deputy Attorney General,

14   representing the defendant in this case.  Thank you for being

15   here.

16        You were just talking about FBI agents and law enforcement

17   officers who come to your training school; correct?

18   A.    That's correct.

19   Q.    Does the average law enforcement officer receive more

20   training in firearms than the average civilian?  Correct?

21   They're required -- law enforcement officers are required,

22   before becoming a law enforcement officer, to receive firearms

23   training?

24   A.    Through the academy, roughly 40 hours.  The students that

25   I have go through my academy well exceed 40 hours of training.

1    Q.   But students that come to your academy are not required to

2    come to your academy?

3    A.   If they wish to obtain a CCW in the State of California

4    for Orange County, they are required to go to some type of

5    training.  My school does provide that.

6    Q.   Okay.  Understood.  And you currently own firearms, as you

7    said; correct?

8    A.   That's correct.

9    Q.   And you legally purchased those firearms, I'm assuming?

10   A.   I have, yes.

11   Q.   And you store those firearms at your residence or at your

12   training school?

13   A.   Yes.

14   Q.   And how many total firearms do you own, approximately, as

15   of today?

16   A.   60, maybe 70.

17   Q.   And how many would you say of those are handguns?

18   A.   Half.

19   Q.   And of the firearms that you own, are all of them

20   operable, meaning they can shoot, they can fire?

21   A.   Of the ones I am counting, yes.  I do have training aids

22   that I'm not counting.

23   Q.   And of the handguns that you own, are all of them

24   operable, the ones that you mentioned?

25   A.   Yes.

1    Q.    So the other half of guns that you own are long guns, such
2    as rifles and shotguns?
3    A.    That would be correct.
4    Q.    So you have about 30 or so, give or take, rifles or
5    shotguns.
6          And how many of the handguns that you own are
7    semi-automatic pistols?
8    A.    Out of the 30 to 35, I would say 25.
9    Q.    And then how many are revolvers?
10   A.    The other ten.
11   Q.    Okay.  And then how many -- I think you said you have two
12   off-roster semi-automatic pistols; correct?
13   A.    Correct.
14   Q.    And you mentioned the Smith & Wesson M&P 9 Shield.
15   A.    Uh-huh.
16   Q.    Do you -- is that one of the semi-automatic pistols --
17   A.    Yes.
18   Q.    -- that you own?
19         And that firearm is on the roster; correct?
20   A.    It is.
21   Q.    And it has a chamber load indicator and a magazine
22   disconnect?
23   A.    It does.
24   Q.    And you mentioned CCW is a concealed carry weapons permit.
25         Do you have a CCW yourself?

```
 1   A.   I do.
 2   Q.   And that allows you to carry handguns in public --
 3   correct? -- subject to, you know --
 4   A.   Various regulations and laws, yes, sir.
 5   Q.   Right.  And about how many handguns do you have listed on
 6   your CCW that allows you to carry them in public?
 7   A.   I believe 11.
 8   Q.   And you, yourself, are a right-handed shooter; correct?
 9   A.   I am.
10   Q.   And you were talking about right-handed shooters who could
11   be cross-dominant, so that it would be better for them to be
12   left-handed -- or shoot left-handed; correct?
13   A.   Correct.
14   Q.   I mean, the same could be true for left-handed folks who
15   come to your school.  They could also be cross-dominant and
16   shoot right-handed?
17   A.   Be left-eye dominant and right-handed, or right-eye
18   dominant and left-handed.  It goes both ways, yes.
19   Q.   Okay.  And when you train your students, does -- is it --
20   the students that you have, are they the firearm owner
21   themselves?
22   A.   They may be the future firearm owner, meaning that they
23   haven't made a purchase.  They're still deciding if they want
24   to purchase, or they're looking for assistance on the right
25   firearm to purchase.
```

1  Q.    Okay.  But not everyone who will or does have access to a

2  firearm comes to your training; correct?

3  A.    Restate the question.

4  Q.    Sure.  It's only the person who owns a firearm or is going

5  to own a firearm who goes to your training school; correct?

6  A.    I would say the majority would probably fall into that

7  category.

8  Q.    Most people do not -- most of your students do not bring,

9  let's say, other people in their household to your training?

10  A.    That does happen.  That does happen, where you have a head

11  of household that has decided to purchase or looking for a

12  future purchase, that will bring all members of their household

13  because that gun is going to be in their household.  And

14  whether they become the users of it, irrelevant.  They want to

15  make sure that they understand what the safety rules are.  They

16  want training on it regardless if they're going to become a

17  user of that firearm or not.

18  Q.    Would that include children?

19  A.    It does, yes.

20  Q.    And you can't speak to whether a child is actually

21  understanding all of your training; correct?

22  A.    I have children myself.  I have an 8-year-old and a

23  12-year-old son that live with me.

24  Q.    But the children that attend your training, you don't --

25  you can't know for sure whether they're understanding the

1   training that you are providing?

2   A.   Well, I can't -- yeah, I'll agree with that.

3   Q.   And you prefer not to purchase more off-roster firearms

4   via a private party transaction, but, obviously, you are aware

5   that you are legally allowed to do so because you have done so?

6   A.   At great expense, yes.

7   Q.   But you have done so; right?

8   A.   I have done so, yes.

9   Q.   And since this lawsuit was filed on August 1st, have you

10  purchased more semi-automatic pistols from then until now?

11  A.   In the interest of my training school, I have, yes.

12  Q.   But not for yourself defense?

13  A.   Not for anything that I've put on my permit, no.

14          MR. SAROSY:  That's all I have.  Thank you,

15  Mr. Boland.

16          THE COURT:  Thank you, Counsel.

17      Mr. Boland?

18          THE WITNESS:  Your Honor.

19          THE COURT:  Have ever seen a handgun with

20  microstamping capability?

21          THE WITNESS:  I have not, Your Honor, no.

22          THE COURT:  Are you aware of any gun manufacturer

23  that implements a microstamping capability on a firearm?

24          THE WITNESS:  I am not personally aware, Your Honor,

25  no, I'm not.

```
 1              THE COURT:  Do you have any opinion on why that is?
 2              THE WITNESS:  Why they don't include it?  I have an
 3   opinion on it of -- the technology is difficult to implement.
 4   It's unreliable.  I have personal opinion on it where I would
 5   be concerned of taking a firearm to the range to practice or to
 6   train that has microstamping on it in the fear that that brass
 7   that is left behind on the floor of the range or on the ground
 8   of the range may be picked up and used nefariously.  That would
 9   be a concern.
10              THE COURT:  Can you explain that a little bit more?
11              THE WITNESS:  If that was dropped at a crime scene
12   and then law enforcement picks that up, that would be concern
13   that now that serial number comes back to me on a crime scene I
14   was definitely not at.
15         I guess a global concern would be the over-utilization of
16   law enforcement resources tracking people like that down.  I
17   have cohorts that are with LAPD, with homicide, that they
18   already show up on scenes and there's multiple forms of brass
19   that have been thrown down for people involved in shootings
20   that contaminate the crime scene with evidence.  I believe that
21   this would just lend itself to that.
22              THE COURT:  Okay.  Thank you.
23         Any further questions?
24              MR. FRANK:  Yes, Your Honor.  Thank you.
25                        REDIRECT EXAMINATION
```

```
1   BY MR. FRANK:
2   Q.   Mr. Boland, I believe earlier and just now you spoke a
3   little bit about reloading ammunition.
4        Can you describe what that means, to reload ammunition?
5   A.   For reloading ammunition, we pick up expended casings,
6   brass or nickel-plated brass, off of the ground at the range.
7   We bring that back.  It goes through a sorting process to make
8   sure that we have -- for example, we're going to reload 9mm,
9   9X19, that we would take that -- remove the old primer.  I
10  believe the microstamping requirement leaves it on the primer
11  and the case, so there is no way to remove that if that
12  existed.
13       We wash, clean the brass, size it.  Then we put a new
14  primer back in, the new powder back in, place a bullet on top
15  and reseat it, and then check if for quality control.
16  Q.   So you -- when you reload ammo, it sounds like you need
17  multiple different components to do that.  I believe you
18  mentioned --
19  A.   Correct.
20  Q.   -- you need brass, primer, gun powder, and then a
21  projectile, the actual bullet?
22  A.   That's correct.
23       (The court reporter interrupted.)
24  BY MR. FRANK:
25  Q.   What are the components that you need to reload a
```

1  cartridge?

2  A.   You would have a piece of brass, referred to as a casing;

3  a new primer; powder, gun powder, smokeless gun powder,

4  typically; and a projectile, a bullet.

5  Q.   And would you need some tools or some kind of apparatus to

6  actually put those all together?

7  A.   That's correct.

8  Q.   And are those easily obtainable?  Are they expensive?

9  A.   They're -- well, there is a range.  They start from, maybe

10 a hundred to $200 to tens of thousands, when we get to

11 commercial level.

12 Q.   So a basic setup to allow you to reload your own

13 ammunition would cost, maybe, a few hundred dollars?

14 A.   If that, yes.

15 Q.   And you said earlier that you can just pick up brass from

16 a range and then you can process that so that you could reuse

17 it to reload your own ammo?

18 A.   That's correct.

19 Q.   So, theoretically, if there were a microstamped case at a

20 shooting range that had a serial number on it, anyone could

21 pick that up and take it and reload their own ammunition with

22 it; right?

23 A.   Yes.

24        MR. FRANK:  Thank you, Your Honor.

25        THE COURT:  Very well.

1        Anything further?
2                MR. SAROSY:  Just one question, Your Honor.
3                        RECROSS-EXAMINATION
4    BY MR. SAROSY:
5    Q.   Mr. Boland, on the cartridge --
6    A.   Uh-huh.
7    Q.   -- casing issue we were just taking about, your students
8    typically don't go out and pick up their own cartridge cases
9    after firing?
10   A.   I would say several of mine do.
11   Q.   So the one's that are left behind are left by the other
12   students that do not pick them up?
13   A.   Correct.
14               MR. SAROSY:  Okay.  Thank you.
15               THE COURT:  Sir, you may step down.
16               THE WITNESS:  Thank you, Your Honor.
17               THE COURT:  Next witness.
18               MR. FRANK:  Your Honor, the Plaintiffs' next witness
19   is Mr. Reno May.
20               THE COURTROOM DEPUTY:  Face me.  Raise your right
21   hand.
22       Do you solemnly swear that the testimony you shall give in
23   the cause now before this Court shall be the truth, the whole
24   truth, and nothing but the truth, so help you God?
25               THE WITNESS:  Yes, sir.

1          THE COURTROOM DEPUTY:  Please be seated.

2      Please state your name and spell your last name for the

3  record.

4          THE WITNESS:  Reno May.  Last name, M-a-y.

5          THE COURT:  Please proceed.

6          MR. FRANK:  Thank you, Your Honor.

7                          **RENO MAY,**

8   **called by and on behalf of Plaintiffs, testified as follows:**

9                    DIRECT EXAMINATION

10  BY MR. FRANK:

11  Q.    Mr. May, how many firearms do you own, roughly?

12  A.    Fifteen to twenty, I believe.

13  Q.    And how many of those are handguns?

14  A.    I would say, roughly, half of them.

15  Q.    Now, are there any off-roster models of handguns that you

16  have been interested in purchasing but have not been able to?

17  A.    Yes, sir.

18  Q.    Can you please name those?

19  A.    One of them in specific that I would like to acquire would

20  be either a Staccato, either the C or P series, I believe, and

21  then some Atlas firearms, both of which are 2011-style

22  firearms, and then in addition to that, small subcompact

23  firearms that would be more suitable for concealed carry.

24  Q.    What would those models that are more suitable for

25  concealed carry be?

1    A.    Things like the Shield 2.0; the Ruger -- I think it is the
2    LCP MAX; and then the Sig Sauer P365.
3    Q.    And would those be for concealed carry purposes?
4    A.    Correct.
5    Q.    You have a California-issued concealed carry weapons
6    permit?
7    A.    Yes.  I've had a CCW in Sonoma County for approximately
8    four years now.
9    Q.    And what efforts have you undertaken to try to locate
10   these models that you mentioned?
11   A.    Unfortunately, due to the gray market, it is very
12   difficult to find one.  You have to go on popular websites like
13   Cal Guns, possibly Armslist, and find someone who currently
14   owns one in the State of California.  Usually, law enforcement
15   who purchased one.  And when you do find one, it is usually
16   two, potentially three times the asking price of a brand new
17   firearm in another state.
18   Q.    So there is significant price margin markups in the
19   secondary gray market if you are searching for one of these
20   types of pistols?
21   A.    Because of the high demand and the very low supply,
22   usually being supplied by law enforcement or people who move
23   from out of state into this state with one of those firearms,
24   it's hard to come by, and it is very expensive.
25   Q.    In addition to significant price markups, are there other

1  issues that arise at times?

2  A.    There have been times where I found a firearm that I was

3  interested and that I would be interested in purchasing due to

4  the price, but because of the State of California laws, I would

5  have to drive to a store to meet them.  California, sometimes

6  the drive can be eight hours, like the drive that I took to get

7  down here.  Eight hours there, eight hours back.  Ten days

8  later or more, eight hours there, eight hours back.  It can be

9  very difficult to acquire, even if it's not just monetarily.

10 Q.    And of the models that you mentioned that you would likely

11 carry -- I believe you mentioned there was a model from the

12 manufacturer Ruger, another one from Sig Sauer.

13 A.    Uh-huh.

14 Q.    What is it about those particular models that you prefer

15 to -- or rather, what features of those models are desirable to

16 you?

17 A.    A lot of them, they are very reliable from the factory.  I

18 have owned firearms that are on the California handgun roster

19 that fill a similar role, but the triggers are undesirable, and

20 some of the features on them aren't modern that I would like to

21 have on a more modern firearm.  Them being much smaller makes

22 them much more suitable to carry as well.

23 Q.    So would it be fair to say that, due to distance and price

24 and limited availability, you've been unable to locate these

25 models that you would use for personal defense?

```
 1  A.   Correct.
 2           MR. FRANK:  Thank you, Mr. May.
 3       Thank you, Your Honor.  I don't have any further
 4  questions.
 5           THE COURT:  Very well.
 6                     CROSS-EXAMINATION
 7  BY MR. SAROSY:
 8  Q.   Good morning, Mr. May.  My name is Charlie Sarosy.  I'm a
 9  Deputy Attorney General representing the defendant in this
10  case.  Thank you for being here and making the drive.
11  A.   Good morning.
12  Q.   You currently own firearms, as you said; correct?
13  A.   Correct.
14  Q.   And I'm assuming you legally purchased those firearms;
15  correct?
16  A.   Yes, sir.
17  Q.   And do you store those firearms at your residence?
18  A.   Correct.
19  Q.   And I think you said you have about 15 to 20 firearms that
20  you currently own?
21  A.   Correct.
22  Q.   And about how many of those are handguns?
23  A.   I believe about ten of them, about half.
24  Q.   About ten.  Okay.
25       And are all of the firearms that you own operable, meaning
```

1   they can shoot?

2   A.   Some of them are in disassembled states, but they

3   otherwise would function if assembled.

4   Q.   And of the handguns that you own, how many of them are

5   operable, as in not disassembled?

6   A.   I would say all of them are operable.

7   Q.   Okay.  So if they are currently all operable, you could

8   use any one of those to defend yourself, if you needed to?

9   A.   They all do fire bullets, so, yes.

10  Q.   Of the handguns that you own, how many are semi-automatic

11  pistols?

12  A.   I believe six, but I would have to spend more time to,

13  like, make sure that that's -- six, approximately.

14  Q.   And the remaining handguns that you have, are they

15  revolvers or single shot pistols?

16  A.   Some of them are single shot pistols.

17  Q.   Okay.  And of the semi-automatic pistols that you own, how

18  many are off-roster handguns?

19  A.   It's hard to say because I believe some of the firearms

20  that I own were at one point on the roster but are no longer.

21  Q.   Okay.  About you have previously purchased off-roster

22  firearms; correct?

23  A.   Correct.

24  Q.   Through a private party transaction?

25  A.   Correct.

1  Q.    And you mentioned before that you have on-roster handguns

2  that are similar to the off-roster ones you would like to

3  purchase?

4  A.    Correct.

5  Q.    So what are --

6  A.    Or have had.  I have sold them since.

7  Q.    Okay.  What are -- can you -- do you remember what those

8  on-roster handguns are?

9  A.    The one that I sold was the Smith & Wesson Shield, which

10 has the magazine disconnect with the loaded chamber indicator

11 and the physical safety, that is currently on the handgun

12 roster in a 9mm.

13 Q.    The M&P?

14 A.    The M&P Shield, yeah.  I sold that firearm because, at one

15 point, I had the loaded chamber indicator break, and it no

16 longer stuck up anymore because the mechanism that causes it to

17 stick up is a very small sliver --

18 Q.    I'm good.  Thank you.  I appreciate it.

19 A.    Uh-huh.

20 Q.    I just wanted to know which ones.  Were there other ones?

21 A.    My memory on which firearms I may have had and don't have

22 anymore that I sold legally, I'm sorry, I don't --

23 Q.    But you previously did have ones that are similar to the

24 ones that you want to buy?

25 A.    Correct.

1  Q.   And you mentioned that you have a CCW?

2  A.   Correct.

3  Q.   Meaning you can carry a handgun in public, subject to

4  other regulations and laws; correct?

5  A.   Yes, correct.

6  Q.   And about how many handguns do you have listed on your

7  CCW?

8  A.   My county allows three, and I have two that are

9  currently -- well, actually I do have three that are currently

10  on the CCW.

11  Q.   And the two or -- sorry.  You said two or three?

12  A.   I'm allowed three, and I currently have three on my

13  permit.

14  Q.   Okay.  And those three are not -- are they subcompact

15  or --

16  A.   They are a variety of sizes.  Because I was limited to

17  three pistols, I chose a microcompact firearm, a mid-sized

18  firearm, and a much larger firearm that would be suitable for

19  backcountry threats.

20  Q.   And all three are concealable --

21  A.   Correct.

22  Q.   -- because you have them on your CCW?

23  A.   Uh-huh.

24  Q.   And I think you said two of those are not compact;

25  correct?

1   A.   The Glock 19 is advertised and marketed as a compact

2   firearm, so two of them would be considered compact concealed

3   carry firearms.

4   Q.   Okay.  And you are a right-handed shooter; correct?

5   A.   Correct.  I am right-handed, but I am left-eye dominant.

6   Q.   Okay.  And since the lawsuit was filed on August 1, have

7   you purchased any handguns?

8   A.   Yes.

9   Q.   And you have manufactured your own single shot pistols;

10  correct?

11  A.   I have manufactured my own single shot pistols.

12  Q.   And you have received serial numbers for those single shot

13  pistols from the California Department of Justice; correct?

14  A.   After about a year, my --

15  Q.   It's just a "Yes" or "No," Mr. May.

16  A.   Yes.

17  Q.   Thank you.  And I understand you prefer not to purchase

18  more off-roster handguns via a private party transaction, but

19  you have done so in the past; correct?

20  A.   In the past.

21  Q.   Okay.  All right.

22        MR. SAROSY:  That's all I have.  Thank you, Mr. May.

23        THE COURT:  Anything further?

24        MR. FRANK:  No, Your Honor.

25        THE COURT:  Sir, you can step down.  You are excused.

```
 1        Why don't we give our court reporter a break, and we'll
 2   pick back up in ten minutes.
 3        (A brief recess was taken.)
 4             THE COURTROOM DEPUTY:  Please come to order.  This
 5   Court is again in session.
 6             THE COURT:  All right.  Are we ready to for the next
 7   witness?
 8             MR. DALE:  We are, Your Honor.  We were having a
 9   discussion, though, off the record about the possibility of
10   allowing our remote experts to listen into the other expert's
11   testimony, if the Court would be willing to entertain that.
12             THE COURT:  I would.
13             MR. DALE:  Okay.  Thank you, Your Honor.
14             MR. SAROSY:  Thank you.
15             MR. BRADY:  Plaintiffs would like to call Mr. Salam
16   Fatohi.
17             THE COURT:  Very well.
18             THE COURTROOM DEPUTY:  Mr. Fatohi, raise your right
19   hand, sir.
20        Do you solemnly swear that the testimony you shall give in
21   the cause now before this Court shall be the truth, the whole
22   truth, and nothing but the truth, so help you God?
23             THE WITNESS:  I do.
24             THE COURTROOM DEPUTY:  Please state your name and
25   spell your last name for the record.
```

```
 1              THE WITNESS:  Salam Fatohi.  Last name is F, as in
 2   "Frank"; A, as is "apple"; T, as in "Tom"; O, as in "Oscar"; H,
 3   as in "hotel"; I, as in "igloo."
 4              THE COURT:  Please proceed.
 5              MR. BRADY:  Thank you, Your Honor.
 6        If you have any issues understanding what he's saying,
 7   please let me know.  Because it is a little muffled; right?
 8              THE COURT REPORTER:  Yes.
 9              MR. BRADY:  The sound, right.
10              THE WITNESS:  Sorry about that.  I will try to speak
11   up, too.
12              MR. BRADY:  Yeah, there's a little -- I don't know if
13   it's muffled or -- so if you could speak slowly and strongly
14   for the court reporter, we would appreciate that, please.
15              THE WITNESS:  Absolutely.
16                        SALAM FATOHI,
17   called by and on behalf of Plaintiffs, testified as follows:
18                     DIRECT EXAMINATION
19   BY MR. BRADY:
20   Q.   Good morning.  Thank you for joining us, Mr. Fatohi.
21        Can you tell us who your employer is, please?
22   A.   Yes.  I work for the National Shooting Sports Foundation.
23   Q.   The National Shooting Sports Foundation.  Is it also known
24   as NSSF?
25   A.   Yes.  It is a mouthful, so that is it for short.
```

```
 1   Q.   So what is NSSF?
 2   A.   So we are the trade association for the firearm ammunition
 3   industry.
 4   Q.   And what is your job title at NSSF?
 5   A.   I am the manager of research.
 6   Q.   What sort of work do you do as the research manager at
 7   NSSF?
 8   A.   So I follow very closely the firearm ammunition industry
 9   performance and trainings and also keep up-to-date on
10   legislative and policy research.
11   Q.   Are you familiar with California's Unsafe Handgun Act?
12   A.   Yes.  It contains a roster --
13   Q.   I'm sorry.  I was going to -- were you about to say
14   something to my last question or -- my question was:  Are you
15   familiar with California's Unsafe Handgun Act?
16   A.   Yes.  I'm sorry.  Someone started speaking, so I stopped
17   speaking.
18   Q.   Okay.  Was it a, yes, you are familiar with California's
19   Unsafe Handgun Act?
20   A.   Yes.  Yes, I am.
21   Q.   Can you explain, basically, what your understanding is?
22   A.   Yes.  Absolutely.  So from my understanding, California
23   maintains a roster of handguns certified for sale, and those
24   are handguns that are allowed to be commercially sold in the
25   state.  In order to be on the roster, the handgun has to either
```

1    be grandfathered in or have a -- three different

2    characteristics on them which are to be tactile, loaded chamber

3    indicator, magazine disconnect, and microstamping technology.

4    Q.    Okay.  Do you know what a chamber load indicator is?

5    A.    Yes, I do.

6    Q.    Can you explain what your understanding is?

7    A.    Yes.  So a loaded chamber indicator is, when a handgun has

8    a round in the chamber, there will be a mechanical function on

9    the pistol for a feature to designate that there is a round

10   inside that chamber.

11   Q.    Okay.  Do you know what a magazine disconnect mechanism

12   is?

13   A.    Yes.  It's a feature on the handgun that prevents the

14   firearm from firing unless the magazine is seated flush inside

15   the handgun.

16   Q.    Do you know what microstamping is?

17   A.    Yes.

18   Q.    Can you explain, just basic level, what your understanding

19   of microstamping is?

20   A.    Absolutely.  So my understanding of microstamping is that

21   it's a technology implemented into a firearm that, during the

22   firing sequence of that handgun, would leave a marking on the

23   expected or -- I'm sorry -- ejected shell casing of that round

24   that was just fired.

25   Q.    How did you become familiar with the Unsafe Handgun Act?

1  A.   So the NSSF on our website keeps a number of fact sheets
2  up-to-date.  It is my job to keep those fact sheets up-to-date.
3  One of the fact sheets is on microstamping -- one of those fact
4  sheets is a going to be a fact sheet on microstamping.  And in
5  review of not only the history of all the ins and outs of
6  microstamping, we also reviewed the legislative actions that
7  have been done of microstamping, which then brought in the UHA.
8  Q.   So you reviewed the roster as part of your work at NSSF to
9  provide facts about it?  Is that accurate?
10  A.   Yes.
11  Q.   And what sort of facts --
12  A.   In review --
13  Q.   I'm sorry?
14  A.   Go ahead.  I cut you off.  I apologize.
15  Q.   It's okay.  Do you have anything additional to add or --
16  A.   Yes.  So as part of my duties in reviewing that fact sheet
17  to make sure it's up-to-date, we look for any changes that
18  might be available.  And one of those is an annual review of
19  the UHA.  And what I would do is do a thorough analysis of the
20  handguns available for sale in California, just kind of review
21  and try to find a true number of how many handguns are actually
22  on the list.
23  Q.   A true number of how many handguns are on the roster?  Is
24  that what you're saying?
25  A.   Yes.

1  Q.   Can't you just go look at the roster and see the number of
2  them and count them?
3  A.   So it's a little bit more in-depth than that.  So what I
4  will do is, because there isn't an availability to just
5  download a current list, we would go through and manually pull
6  all of the firearms that are on the roster.  I then go through
7  a review process that is reviewed typically by major
8  manufacturers in the industry for logic check to see how many
9  of these are actually on there.

10       The reason why I do that is because the roster has certain
11  rules and regulations surrounding it.  And if there are two
12  identical pistols on the roster but one is featured with a
13  certain cosmetic, you know, setup by a certain cosmetic
14  feature, then it's treated as a totally different handgun.  And
15  so you could have two of the exact same pistols available on
16  the roster, but it's actually just one pistol with two
17  different cosmetic styles.

18       And so that's why I go through it manually to try to find
19  the true number of how many handguns are actually on the roster
20  available for sale.
21  Q.   So in making what you consider to be accurate count of how
22  many handguns are on the roster, you are essentially grouping
23  models that are separate, listed as separate models on the
24  roster, as a single model if they are similar or if they're the
25  same other than cosmetic features.  Is that fair to say?

```
 1   A.   That's correct.  If they differ in any which way
 2   mechanically or by design, say, by a certain barrel length
 3   versus another or different chambering, then they are a
 4   different handgun.  Or if they are the exact same chambering
 5   design, overall length, barrel length, all of those key
 6   features of the design, they only differ based on, say, a
 7   Stericoat, a coloring, applied to one versus the other, then I
 8   would treat those two models as one model in my count.
 9   Q.   And when is the last time you did this assessment of the
10   roster?
11   A.   The last time we had gone through this -- and I'll admit
12   it is a little bit out of date -- I believe is fourth quarter
13   in 2020.
14   Q.   And do you recall how many firearms the roster had listed
15   claimed were separate handgun models at that time?
16   A.   To the best of my knowledge, I believe, it was a little
17   over 900 at the time that were reported on the front page of
18   the website.  But during my analysis, I found that only about
19   half of them were really individual designs.
20   Q.   That was my next question.  So the roster, when you
21   reviewed it, had approximately 900 separate handgun models
22   listed?  And after doing your analysis, where you lumped
23   together models that the roster treated as separately but you
24   determined were, essentially, the same model because they only
25   were different with respect to cosmetic features like color or
```

1  coating, that it was about half that?

2  A.    That's correct.

3  Q.    Mr. Fatohi, can you tell me what see on your screen?

4  A.    Yeah, that is the decertified handgun model list.

5  Q.    And what is your understanding of this list?

6  A.    So these were handguns that were once on the approved

7  handguns-for-sale roster and had subsequently fallen off due to

8  a number of reasons.

9  Q.    Do you know any the reasons why handguns would come off of

10  the roster?

11  A.    So to my knowledge, it can really only be one of three

12  reasons.  First and foremost, the manufacturer cannot certify

13  that the design has not changed in any which way.  Or the

14  manufacturer decides not to recertify and pay the annual fee.

15  I believe it's $200.  Lastly, the State of California can, upon

16  further analysis, declare that the handgun is no longer fit for

17  sale on the handgun-available-for-sale roster.

18          MR. BRADY:  I would like to enter this as Exhibit 4?

19          THE COURT:  Any objection?

20          MR. SAROSY:  No, Your Honor.

21          THE COURT:  Exhibit 4 will be received into evidence.

22      (Exhibit 4 was received into evidence.)

23  BY MR. BRADY:

24  Q.    Mr. Fatohi, you discussed the reasons why handguns fall

25  off the roster; right?  You gave three separate reasons; is

1    that right?

2    A.    Uh-huh.

3    Q.    And are you familiar with any instances of -- recent

4    incidences of firearms falling off the roster for specific

5    reasons?  Do you have any examples of a manufacturer who did

6    not want their firearm to fall off the roster and it did?

7             MR. SAROSY:  Objection, Your Honor.  Lacks

8    foundation.

9             THE COURT:  If you know, sir.

10   BY MR. BRADY:

11   Q.    Do you understand the question, Mr. Fatohi?

12   A.    I'm sorry.  I missed what was said after, and I didn't

13   want to interrupt.

14   Q.    If you understood the question, you can answer it;

15   otherwise, I could restate.

16   A.    Yes, please restate.

17   Q.    Okay.  So the question is:  Are you aware of any

18   manufacturer whose firearm fell off the roster for any specific

19   reason?  Are you aware of the reasons that they actually fell

20   off?

21   A.    So I'm aware of H&K, which had a number of firearms that

22   were removed.  The explicit reason of why, I can only safely

23   assume that there was improvement to manufacturing and safety

24   that then would disqualify that handgun from staying on the

25   roster.  The reason why is because the requirement of the

1    roster is that no changes are made whatsoever to any part,
2    whether it's manufacturing or sourcing or improvement to that
3    design.
4              MR. SAROSY:  Your Honor, I am going to renew my
5    objection.  He said, "I assume."  I am not sure what the
6    foundation is here.
7              THE COURT:  Duly noted.  Overruled.
8    BY MR. BRADY:
9    Q.   So, Mr. Fatohi, have you seen the article that is on your
10   screen?
11   A.   Yes, I have.
12   Q.   And is this what you were referring to when you were
13   saying that H&K had handguns fall off the roster or that it
14   removed models off the roster?
15   A.   Yes.
16   Q.   And it was your testimony, correct, that you do not know
17   why they fell off the roster but you would have no reason to
18   believe that they fell off the roster for any other reason
19   other than they changed some parts?
20   A.   Yes.  The only thing I could really kind of surmise,
21   unless the State decided to -- unless the State decided that,
22   upon further review, they declared them unsafe, which I am not
23   aware of, then the fallback would have to be that H&K had made
24   some sort of manufacturing improvement, which manufacturers
25   routinely do, whether it's for safety or manufacturing

1  efficiency.  A part could have been changed on H&K's line,

2  which then dropped it off of the roster.

3  Q.    Are you aware of any other specific instances of a

4  manufacturer having their firearm removed from the roster

5  without their desire for it to be removed from the roster?  Let

6  me strike that.

7      I shouldn't say "any other," because we concluded that we

8  don't know if that happened with H&K.  But are you aware of any

9  manufacturers where you know the reason that their firearm was

10  removed from the roster involuntarily?

11  A.    So I am aware of an instance with Ruger, which had a

12  model -- their FNP removed.  And in order to be put back on the

13  roster and available for sale, Ruger had to then bring back the

14  original design of that firearm without the manufacturing

15  improvements that were put on to it.

16  Q.    Do you know what those manufacturing improvements were

17  that Ruger made, that made it -- their handgun fall off the

18  roster, get removed from the roster?

19  A.    To be honest, at this time, I'm not aware.

20  Q.    Okay.  So you don't know whether it was -- if it was minor

21  changes, major changes?

22  A.    No.  Because of the design -- it's pretty established.  I

23  would have to assume it was something for manufacturing

24  efficiency and not a major contributor to the overall function

25  and form of the firearm.

1  Q.    And your review -- actually, strike that.

2        I'd like to enter this as Exhibit 5, the article.

3            THE COURT:  Any objection?

4            MR. SAROSY:  Objection, Your Honor.  Hearsay.

5            THE COURT:  Sustained.

6  BY MR. BRADY:

7  Q.    In your work as NSSF, do you stay updated about trends in

8  the national firearm marketplace?

9  A.    Yes, I do.  So I routinely, as part of my duty, look over

10  articles, peer-reviewed articles, magazines related to firearm

11  research, and those publications always have the latest,

12  greatest firearms, whether it's for advertising or a feature on

13  the firearm that is coming out on the market.

14  Q.    So in doing that work, you've gained a knowledge about

15  what handgun models are being offered commercially on a

16  nationwide level; is that correct?

17  A.    Yes.  I have a -- I would say I have a pretty firm grasp

18  on what the latest and greatest is.

19  Q.    Are there any models that you're aware of that are offered

20  commercially on a national level that are not offered in

21  California?

22  A.    Yes.  So, primarily, I would say, probably, one of the

23  most popular pistols out of there are Glocks 5th Generation

24  Offerings.  And to my knowledge, only the 3rd Gen is available

25  for sale in commercial markets in California.

1  Q.    I'm sorry.  Did you say Glock -- what was it?  Gen5?

2  A.    Yes.  The Gen5 is probably the most popular handguns,

3  nationally, right now.

4  Q.    And the Glock Gen5 is not on the California roster?

5  A.    Correct.  Only the Gen3 is available.

6  Q.    Was there a Gen4?

7  A.    Yes.

8  Q.    Was the Gen4 ever on the California roster, to your

9  knowledge?

10  A.    I do not believe it was.

11  Q.    So the Glock Gen3 is on the California roster, but Glock

12  is now making a Gen5 that is available nationally?

13  A.    Yes.  The manufacturer of the Glock has since made

14  improvements in manufacturing efficiency that has led to two

15  newer generations being out now.  So the Gen3 is still only the

16  latest and greatest ending up on the roster, commercially, in

17  California.

18         THE COURT:  Counsel, would you follow up on that,

19  what manufacturing efficiencies or if there is any other

20  improvements besides manufacturing efficiencies from the 3rd

21  Gen to the 5th.

22         THE WITNESS:  I'm sorry.  Say it again.

23         MR. BRADY:  Absolutely, Your Honor.

24  Q.    Did you hear His Honor's question, Mr. Fatohi?

25  A.    Only bits and pieces.  I apologize.

1  Q.   So essentially what he's asking is:  Are you familiar with

2  what improvements -- you called them improvements -- were made

3  from the Gen3 to the Gen5 to cause Glock to make it a newer --

4  a different Gen, if you will?

5  A.   So on the generational differences between the 3, 4, and

6  5, there are external features, but then also the materials

7  used to make various parts internally and externally are

8  continuously updated, which is why Glock makes the generations

9  the way that they do.  As they get better materials, better

10  ways to manufacturer materials, and also external features,

11  that is really what separates the Gens 3, 4, and 5 out.

12  Q.   And what's the reason for change of materials.  You say

13  "better."  Better in what regard?

14  A.   So it's really up to kind of the individual part.  But,

15  typically, it's a durability and efficiency to manufacturer

16  that part.  So if it costs less money, is as durable, more

17  durable, or able to manufacturer that part faster based on the

18  material used, those all go into manufacturing efficiency.

19  Q.   In your experience in reviewing the national handgun

20  marketplace, are chamber load indicators popular on

21  commercially sold handguns outside of California?

22  A.   No, they are not.

23  Q.   Are you aware of any popular handgun models, that are

24  commercially available outside of California, that have a

25  chamber load indicator?

1    A.   So there are some that have a form of -- so, for example,

2    Smith & Wesson M&Ps have a recessed drilled-out hole at the

3    base of the barrel that will allow for visual inspection, but I

4    believe that California calls for a tactile load chamber

5    indicator, which is not popular at all on the national market.

6    Q.   And beyond that, you're essentially saying some

7    manufacturers will have a hole where you can look into the

8    action to see if it's loaded.  Is that accurate?

9    A.   That's correct.

10   Q.   How, in your estimation -- is that the majority of them?

11   Or is that just a few?

12   A.   I would say for the ones that do have any form of loaded

13   chamber indicator, that is the only form that is available

14   right now.

15   Q.   And what I'm asking is, in the universe of all handguns,

16   would it be a majority or a minority that have that hole for

17   you to look into the chamber?

18   A.   A minority.  And even less so for a tactile version.

19           THE COURT:  And why is that, sir?  Why is that not

20   popular?

21           THE WITNESS:  It's simply not something that is

22   desired by the market.

23           THE COURT:  I didn't hear that answer.

24   BY MR. BRADY:

25   Q.   Can you repeat your answer, Mr. Fatohi?

A.    I'm sorry about that.  I said, it is simply not something
that's desired by the market.

THE COURT:  Do you know why it's not desired?

THE WITNESS:  I can only assume, which I don't want
to.  What kind of leads me to my answer is, because it's not
something that is desired by the market, manufacturers will not
spend the time and money and resources to implement those
designs into their manufacturing process for their pistols.

THE COURT:  Am I to assume, then, you are not aware
of any reason as far as the structure, the use, or functioning
of the firearm why that is not included?  If you understand my
question.

THE WITNESS:  I'm sorry.  Could you say that again?

THE COURT:  I am just trying to get an understanding
of why the market or people don't want a CLI on it, and does it
have -- it doesn't sound like it has anything to do with the
functioning of the weapon, to your knowledge, as opposed to --
it sounds like it's just a cost or it's a feature that people
don't care about.

THE WITNESS:  I don't think that it's a feature that
is really utilized on a wide margin.  From my experience and my
exposure in the industry, it's not implemented because the
consumer base just doesn't really use it.  We don't see a
reason for it.

THE COURT:  In any of your dealings or experience,

1  have you heard that the indicator, on occasion, can actually

2  make it difficult for the user of the firearm to focus on the

3  target?

4          THE WITNESS:  With the tactile ones, yes, because it

5  is a physical piece that kind of draws itself up from the top

6  of the slide.  And depending on the design of the pistol, it

7  could obscure or distract the shooter, shooter sights.

8          THE COURT:  Thank you.

9  BY MR. BRADY:

10  Q.   Are magazine disconnect mechanisms popular on handguns

11  commercially sold outside of California, to your knowledge?

12  A.   The only instances of magazine safety, that I'm aware of,

13  are primarily in recreational rimfire handguns.  The vast

14  majority of handguns are, of course, centerfire, and centerfire

15  handguns really do not have that magazine safety implement and

16  other technology.

17  Q.   I'm sorry.  Did you say that in some "rimfire"?  Is that

18  the word you used?

19  A.   Yes.  Rimfire 22 handguns.

20  Q.   Okay.  And, to your knowledge, rimfire handguns and

21  centerfire handguns are treated differently on the roster?  Is

22  that your understanding?

23  A.   I would say that they are treated differently from a

24  manufacturing standpoint.  Primarily, manufacturers, if they do

25  implement a magazine safety, it is almost only for current

1   market and current products only implemented in rimfire

2   handguns, which are largely a recreational product, versus a

3   centerfire product, that is largely duty or self-defense.

4   Q.   So it's fair to say that semi-automatic centerfire

5   handguns that are sold outside of California generally do not

6   come with a magazine disconnect mechanism?

7   A.   That's correct.

8   Q.   Do you see am image of a handgun on your screen,

9   Mr. Fatohi?

10  A.   Yes.  I am looking at the Shield M&P 9.

11  Q.   Okay.

12  A.   I believe this is California-compliant model.

13  Q.   You just answered my next question.  So you are familiar

14  with this handgun model then?

15  A.   Yes.  Yes, I am.

16  Q.   To your knowledge -- and you said -- I'm sorry.  You

17  described it as -- it is the -- what model?

18  A.   That appears to the California-compliant model.

19  Q.   The California-compliant model.

20       Sorry.  I'm trying to zoom in on this here.

21       So under Product Features, it says, "A

22  California-compliant tactile loaded chamber indicator and

23  magazine safety."

24       Is that what you're referring to when you say it's the

25  California-compliant version?

1  A.   Yes, I am.

2  Q.   To your knowledge, is this handgun model, the Smith &

3  Wesson M&P 9 Shield, popular outside of California?

4  A.   The noncompliant ones are.

5  Q.   Is this one that has the chamber load indicator and

6  magazine disconnect mechanism popular outside of California, to

7  your knowledge?

8  A.   No.  This particular one with the tactile loaded chamber

9  indicator in the magazine M&P is not popular outside of

10 California.

11         MR. BRADY:  Okay.  I would like to enter this as

12 Exhibit 6, please.

13         MR. DALE:  Five.

14         MR. BRADY:  Five.  I'm sorry.  Exhibit 5.

15         THE COURT:  Any objection?

16         MR. SAROSY:  No objection, Your Honor.

17         THE COURT:  Exhibit 5 will be received into evidence.

18     (Exhibit 5 was received into evidence.)

19 BY MR. BRADY:

20 Q.   Mr. Fatohi, you mentioned a different version of this

21 pistol, of the pistol we just looked at, the M&P Shield.

22     Is this, on your screen, the model that you were referring

23 to?

24 A.   Yes.  That looks to be the latest M&P Shield that is

25 available across the nation.

1  Q.   And it's called the M2.0.  So it's the updated version of
2  the M&P Shield?
3  A.   Yes.
4  Q.   And, to your knowledge, is this firearm model popular
5  outside of California?
6  A.   Yes, it is.
7        MR. BRADY:  I'd like to enter this as Exhibit 6,
8  please.
9        THE COURT:  Any objection?
10        MR. SAROSY:  No objection, Your Honor.
11        THE COURT:  Exhibit 6 will be received into evidence.
12       (Exhibit 6 was received into evidence.)
13  BY MR. BRADY:
14  Q.   Mr. Fatohi, are you aware of any commercial manufacturer
15  currently producing a handgun with microstamping technology?
16  A.   No, I am not.
17  Q.   Are you familiar with a manufacturer that has ever
18  commercially produced a handgun with microstamping technology?
19  A.   No, I am not.
20  Q.   Do you have any figures on how many handguns are sold
21  nationwide on an annual basis?
22  A.   Yes.  Actually, if we look to the ATF AFMER, which is the
23  production report --
24  Q.   I'm sorry.  Mr. Fatohi, could you slow down and repeat
25  that.  I didn't hear.  Did you say the ATF?

1   A.   Sorry.  I'm sorry about that.  The ATF AFMER, which is the

2   Firearms Manufacturing Export Report produced by the ATF on all

3   domestic firearm production.  And if we looked at that -- I

4   believe the latest is the 2020 version.  They are always a

5   couple of years behind.  And the last time I recall looking at

6   that executive summary, there were somewhere around five and a

7   half million pistols produced in 2020.

8   Q.   And -- correct me if I'm wrong -- it's been your testimony

9   that the majority of those are not on California's roster?

10  A.   That's correct.

11  Q.   In your work at NSSF, have you learned about the size of

12  the California firearms marketplace?

13  A.   So NSSF has never done any targeted firearm market size

14  studies of California.  But I'm in charge of updating our

15  annual economic impact report, which is a national report

16  broken out by state on the economic impact of the firearm and

17  ammunition industry.  And in that report, California is always

18  a top performer in the summarized metrics.

19       There it is right there.

20  Q.   Is this the report that you were just referring to --

21  A.   Yes.

22  Q.   -- on your screen?

23       I would like to enter this as Exhibit 7, please.

24            THE COURT:  Any objection?

25            MR. SAROSY:  Objection.  Hearsay.  Lacks foundation.

1    I don't know where this is from, Your Honor.

2    BY MR. BRADY:

3    Q.    Mr. Fatohi --

4          Sorry about that.

5                THE COURT:  Do you want to lay the foundation and why

6    it's not hearsay.

7    BY MR. BRADY:

8    Q.    Mr. Fatohi, you work for NSSF; correct?

9    A.    That's correct.

10   Q.    And NSSF has produced this report that we're looking at

11   here?

12   A.    So this report, the data that is made from it and included

13   in it is generated from economic data provide by global

14   economics.  And that data is then brought to us, and we make

15   the cosmetic changes to the report, change some of the text in

16   the report, do some of the background math, and then produce

17   the finalized version of the report.

18   Q.    So a third party is conducting the research and generating

19   the content and providing it to you all, and you are packaging

20   it -- NSSF is packaging it in a report?

21   A.    That is exactly right.

22               MR. BRADY:  I renew my submission of this report.

23               THE COURT:  I will allow it, because it sounds to me

24   like it's a summary chart of statistics and information

25   provided by the government, a public record.  But if there are

1   any advocacy or arguments or statements made that are

2   argumentative or hearsay, defense can point that out.  But with

3   that understanding, I'll receive it into evidence.

4           MR. BRADY:  Thank you, Your Honor.

5       (Exhibit 7 was received into evidence.)

6   BY MR. BRADY:

7   Q.   So, Mr. Fatohi, on page 5 of this report, it has tables

8   talking about the economic output, and it breaks down -- it

9   ranks -- why don't you explain page 5, because I think you

10  were --

11  A.   No problem.  Happy to.  So our top ten page -- as you guys

12  can you see here -- we take our metrics that are supplied by

13  that third party, and we rank, based on performance, our

14  various metrics.  And particularly in California, to get back

15  to the original question of the market size for California,

16  conclusions can be drawn from the size of it based on its

17  performance on this top ten page.  Not only is California the

18  number one federal excise tax but also number two in both jobs

19  and economic output for industry activity.

20  Q.   And are we seeing that by looking at the table and seeing

21  California is listed as number two on economic output, total

22  dollars?

23  A.   Uh-huh.

24  Q.   And jobs, California is listed as two.  And that is how

25  you are coming to that conclusion?

1    A.    Yes.

2    Q.    The third table, the excise tax, can you briefly explain

3    it to us.  California is number one; is that correct?

4    A.    That is correct.

5    Q.    Can you explain what the excise tax means?

6    A.    Sorry.  Yes.  So excise tax is paid on the wholesale value

7    of firearms -- I'm sorry.  Not firearms.  But ammunition, long

8    guns, and handguns.

9    Q.    So this is a tax that manufacturers of firearm-related

10   products and ammunition-related products pay to the government

11   based on what they produce?

12   A.    Yes.  When manufacturing firearms for long guns, handguns,

13   or ammunition, there is a requirement to pay a federal excise

14   tax on those products for the wholesale value.

15   Q.    And California is number one in paying that tax?

16   A.    That's correct.  Out of all 50 states.

17   Q.    So is it fair to say, based on this, that California is a

18   fairly large firearm marketplace?

19   A.    It is a huge marketplace.

20         MR. BRADY:  Thank you, Mr. Fatohi.  That's all I

21   have.

22                    CROSS-EXAMINATION

23   BY MR. SAROSY:

24   Q.    Mr. Fatohi, can you hear me?

25   A.    Yes, I can.

1    Q.    All right.  Sorry.  I didn't want to give you seasickness
2    when I moved to the podium.
3         My name is Charlie Sarosy.  I'm a Deputy Attorney General
4    representing the defendant in this case.
5         You were just talking about -- I think it was Exhibit 6
6    and the charts of the federal excise taxes.
7    A.    Uh-huh.
8    Q.    California has the largest population of those states
9    listed; correct?
10   A.    I am not exactly sure.  It might be.  I know it's one of
11   the top ones.
12   Q.    Are you aware of California's current population?
13   A.    Not off the top of my head, sir, no.
14   Q.    Do you know offhand that California has one of the largest
15   populations among the 50 states --
16   A.    Yes.
17   Q.    -- in the United States?
18   A.    It is certainly one of the largest populations, but I
19   could not put a number to it right now.
20   Q.    I think at the beginning of your testimony, you mentioned
21   handgun roster stats from fourth quarter 2020; correct?
22   A.    Yes, correct.
23   Q.    So that's over two years ago; correct?
24   A.    Yes.
25   Q.    And --

```
 1   A.   Those are the fact sheets -- sorry, go ahead.  All the
 2   fact sheets and all the metrics included in them every year,
 3   but sometimes we just don't have the time and bandwidth.
 4   Q.   Understood.  Thank you.
 5        Have you been to the Bureau of Firearms' website before?
 6   A.   The ATF website?
 7   Q.   No.  The California Bureau of Firearms' website?
 8   A.   Oh, yes, I have.
 9   Q.   And have you been to the part of the website where it has
10   searchable boxes for the handgun roster?
11   A.   Yes.
12   Q.   And I know there is a difference between similars and, I
13   guess, tested handguns.  But on the searchable boxes, you can
14   look to see if a handgun is on the roster; correct?
15   A.   Uh-huh.
16   Q.   Is that a "Yes"?
17   A.   Yes.  Sorry, sorry, yes.
18   Q.   Thank you.  And I know you were talking about chamber load
19   indicators not being popular in the firearms industry, but
20   chamber load indicators are something that are feasible;
21   correct?
22   A.   I would say they could be feasible.
23   Q.   Well, there are handguns that are sold in California, that
24   are on the roster that have chamber load indicators; correct?
25   A.   Yes, there are.
```

1    Q.    So that would mean they are feasible; correct?

2    A.    To --

3    Q.    It's feasible for a manufacturer to manufacture a firearm

4    with a chamber load indicator?

5    A.    Yes.

6    Q.    And there are handguns on the roster with a magazine

7    disconnect; correct?

8    A.    I believe there are some.

9    Q.    And there are four manufacturers, I believe, that

10   manufacture firearms with chamber load indicators and magazine

11   disconnects; correct?

12   A.    I am not sure on the specific number of four, but I know

13   there are some.

14   Q.    Which ones do you know?

15   A.    Smith & Wesson, especially the one that -- the model that

16   we just talked about, the Shield.  And I believe Ruger also

17   produces one.

18   Q.    I'm sorry.  What was the second one you said other than

19   the Smith & Wesson?

20   A.    Ruger.  Sturm, Ruger.

21   Q.    Ruger.  Okay.  And does it sound right that Kahr or Kahr

22   Arms -- K-a-h-r -- it's probably Kahr, probably not Care

23   Arms -- manufactures a firearm with a chamber load indicator

24   and magazine disconnect that is on the roster?

25   A.    I am not positive on that.

1  Q.    Are you aware of a handgun manufactured by Sig Sauer that

2  manufactures handguns with the chamber load indicator, magazine

3  disconnect?

4  A.    No, I am not.

5  Q.    And what about FMK Firearms?

6  A.    I am not.

7  Q.    And are you aware that, as of July 1, 2022, microstamping

8  is required in only one internal part of the semi-automatic

9  pistol to comply with the Unsafe Handgun Act?

10  A.    Yeah.  I believe Gavin Newsom signed that September 2020.

11  Q.    And it is currently in effect; correct?

12  A.    Yes.  One instance of microstamping on a handgun.

13  Q.    And you said that you prepare fact sheets for each state

14  in your role as a research manager; correct?

15  A.    No, I do not.  I prepare fact sheets on topics for the

16  industry.

17  Q.    Understood.  I'm sorry.

18  A.    Not each state.

19  Q.    Sure.  And are you aware that the National Shooting Sports

20  Foundation previously sued the State of California regarding

21  the microstamping requirement?

22  A.    I'm aware.

23  Q.    And you're aware that that case made it to the California

24  Supreme Court; correct?

25  A.    Yes, I am.

1   Q.   And are you aware that NSSF filed a brief along with the

2   Sporting Arms and Ammunition Manufacturers' Institute in that

3   case before the California Supreme Court?

4   A.   I am aware that that one was filed, but I am not aware of

5   the details.

6   Q.   So you, yourself, have not reviewed the brief?

7   A.   I could not speak to it in detail right now.

8   Q.   Are you aware that, in that brief NSSF and the Sporting

9   Arms and Ammunition Manufacturers' Institute conceded that

10  microstamping was feasible for the firing pin of a

11  semi-automatic pistol?

12  A.   I am not.

13          MR. BRADY:   Objection.   Misstates -- lacks

14  foundation.

15          THE COURT:   Overruled.

16          MR. BRADY:   What was the question?

17          MR. SAROSY:   Your Honor, I have --

18          THE COURT:   He said he's not aware of it.

19          MR. SAROSY:   Your Honor, I have a copy of those

20  briefs for the Court and Plaintiffs' Counsel, and I can show

21  the witness to point him to those statements, if that would be

22  helpful to the Court.

23          THE COURT:   Well, it's your choice.   I assume you're

24  going to be submitting into evidence those briefs.   They

25  were --

```
 1              MR. SAROSY:  I can.
 2              THE COURT:  -- a matter of public record.
 3         I can receive them into evidence.  If you want to ask him
 4    about it, please feel free to do, but I think your point is
 5    this is what they've said.
 6              MR. SAROSY:  I will at least show the witness the
 7    brief.
 8              THE COURT:  All right.
 9    BY MR. SAROSY:
10    Q.   All right.  Mr. Fatohi, if you will give me one moment.
11         Mr. Paschal, I think you have to add Mr. Woods as a host
12    as well, or co-host.
13              THE COURTROOM DEPUTY:  Try it now.
14    BY MR. SAROSY:
15    Q.   All right.  Mr. Fatohi, can you see this, copy of this
16    brief?
17    A.   Yes.
18    Q.   And do you see the date on there as August 21, 2017?
19    A.   Yes, I do.
20    Q.   And do you see the National Shooting Sports Foundation as
21    the party?
22    A.   Yes.
23    Q.   And do you see that this brief was filed by the NSSF?
24    A.   Yes.
25    Q.   And I'm going to go to page 4, and I'm going to highlight
```

1    the sentence for you.
2         Do you see the sentence -- I will read it.
3    A.    Uh-huh.  Okay.
4    Q.    It says, "Specifically, while appellants acknowledge" --
5    and appellants here are NSSF, and I think SAAMI is the
6    acronym -- "acknowledge that a microstamp imprinted on a firing
7    pin of a semi-automatic pistol will occasionally transfer to
8    the primer located at the rear of a cartridge case upon firing,
9    the record contains uncontroverted expert testimony that it is
10   impossible to imprint a microstamp on any other surface or part
11   of a semi-automatic pistol that will transfer to the cartridge
12   case when the pistol is fired."
13        Do you see that sentence?
14   A.    I do see the sentence.
15   Q.    And that case occurred when microstamps were required on
16   two places within a semi-automatic pistol; is that correct?
17   A.    I believe so.
18   Q.    So is it correct that NSSF admitted in the sentence that
19   microstamping on one place is possible?
20   A.    You know, I believe the sentence says that it's
21   occasional.
22   Q.    Well, occasional is possible; correct?
23   A.    I believe so.
24   Q.    I'm going to go to page 7.  I'm going to highlight the
25   sentence again for you.  And it says, "Microstamped characters

1    that identify the make, model, and serial number of a

2    semi-automatic pistol (a "microstamped alphanumeric code") can

3    be etched or imprinted on the tip of the pistol's firing pin,

4    and such a microstamped alphanumeric code will sometimes

5    transfer onto the primer contained within the cartridge case,

6    which the firing pin strikes during the pistol's firing

7    process."

8         Do you see that sentence?

9    A.   Yes, I do.

10   Q.   And that is, again, NSSF admitting that microstamping on a

11   firing pin is possible.  Regardless of occasional or not, it is

12   possible; correct?

13   A.   I do believe that statement makes it so that the -- what

14   you are saying is, yes, it's possible.

15   Q.   And that brief was filed in August 2017, so five and a

16   half years ago, about?

17   A.   Uh-huh.

18   Q.   Sorry.  I need a "Yes" or a "No," unfortunately.

19   A.   Sorry.  Correct, yes.  Sorry about that.

20   Q.   No problem.  It's an awkward interaction to testify, so I

21   get it.

22        All right.  Your Honor, I would like to move into evidence

23   for Defendant's Exhibit 25.

24            THE COURT:  Is that the brief?

25            MR. SAROSY:  Yes, that's the brief.

1          THE COURT:  Any objection?

2          MR. DALE:  No objection.

3          THE COURT:  That exhibit will be received into

4    evidence.

5        (Exhibit 25 was received into evidence.)

6          MR. SAROSY:  Thank you, Mr. Fatohi.  That's all I

7    have.

8          THE COURT:  Mr. Fatohi, just a couple questions for

9    you.

10       In your opinion, based on your experience, why is

11   microstamping not popular, since you believe it could be done?

12         THE WITNESS:  So while I do think that it could

13   occasionally happen to where microstamping technology works for

14   a one-off instance of supplying a gear code and that then makes

15   a it a possible technology, it is not really a feasible

16   technology based on the studies and also the patent within

17   itself stating, in technical data and studies, that it's not a

18   feasible technology.  The sample size is far too large in a

19   laboratory study for the technology to be reliable; therefore,

20   it is not really a usable crime-solving tool, as it is

21   marketed.

22         THE COURT:  Okay.  Anymore questions?

23         MR. BRADY:  No further questions, Your Honor.

24         THE COURT:  All right.  Okay.  Thank you, sir.

25         THE WITNESS:  Thank you very much.

1          MR. BRADY:  Your Honor, plaintiffs' next witness will

2    be Michael Beddow, and I believe he's awaiting us in the --

3          THE COURT:  Okay.

4      (A discussion was held off the record between Counsel.)

5          THE COURT:  Hello, sir.

6          THE WITNESS:  Hello.

7          THE COURT:  Could you please come forward.  I'm going

8    to have you stand right by our court reporter for a moment.

9    We'll administer an oath to you, and then have you take the

10   witness stand.

11         THE WITNESS:  All the way over?

12         THE COURTROOM DEPUTY:  Sorry.

13     (A discussion was held off the record between Counsel.)

14         THE COURTROOM DEPUTY:  Please raise your right hand.

15   Do you solemnly swear that the testimony you shall give in the

16   cause now before this Court shall be the truth, the whole

17   truth, and nothing but the truth, so you help you God?

18         THE WITNESS:  Yes, I do.

19         THE COURTROOM DEPUTY:  Please be seated.

20     Please state your name and spell your last name for the

21   record.

22         THE WITNESS:  My name is Michael Beddow.  Last name

23   is spelled B-e-d-d-o-w.

24         THE COURT:  Please proceed.

25                        **MICHAEL BEDDOW,**

 1    called by and on behalf of Plaintiffs, testified as follows:

 2                        DIRECT EXAMINATION

 3    BY MR. BRADY:

 4    Q.    Thank you, Mr. Beddow.  Can you explain to us your

 5    background?

 6    A.    Absolutely.  I have a bachelor's degree in chemistry from

 7    Northern Arizona University.  I have a master's degree in

 8    forensic science from the University of California at Davis.

 9    Post graduation, I worked as a laboratory technician for the

10    Sacramento County District Attorney's Crime Lab in Sacramento,

11    California for a short stint, prior to being hired on as a

12    forensic scientist with the City of Phoenix Police Department

13    Crime Laboratory.  I've been there for approximately 15 years.

14    Also, beginning in 2015, my wife and I started a private

15    forensic consulting firm known as Forensic Review and

16    Consulting.

17    Q.    And that last bit, that is the capacity in which you are

18    here testifying today?  Your company?

19    A.    That is correct.

20    Q.    But you are a forensic scientist for the Phoenix Police

21    Department, currently?

22    A.    That is correct.

23    Q.    Does your forensic work ever involve firearms?

24    A.    Yes, it does.

25    Q.    Often?

```
1    A.   All of it.  My title is a forensic firearms examiner.
2    Q.   Okay.  To be a forensic firearms examiner, did you receive
3    any training?
4    A.   Absolutely.  That training involved not only having a
5    degree in a physical science but also extensive on-the-job
6    training by senior members within the forensic community as
7    well as training from firearms manufacturers and other
8    individuals to include academia associated with forensic
9    science.
10   Q.   Did you receive any certifications or anything of that
11   nature, credentials to be a forensic firearms --
12   A.   No.  Only successful completion of the training program
13   within the agencies that I worked for.
14   Q.   Okay.  Outside of the agencies, are you a member of any
15   groups that do firearm examining?
16   A.   Yes.  I'm a member of the Association of Firearm and
17   Toolmark Examiners.  It is a worldwide organization specific to
18   studying firearms and toolmark examination and the science
19   behind it.  And I also am a member of the FBI's technical
20   working group on the application of 3D topographical systems
21   into the firearms community.
22   Q.   Going back to the first one you mentioned, what was it?
23   A.   The Association of Firearm and Toolmark Examiners.
24   Q.   Can you --
25   A.   Also known as AFTE.
```

1   Q.   AFTE.  I'll do that.  Thank you.  A-F-T-E?

2   A.   Yes, sir.

3   Q.   Can you, just briefly, surmise what it is that AFTE does?

4   A.   AFTE is an organization of not only firearms examiners

5   from around the world but also technical advisors from

6   academia, firearms manufacturers, and other disciplines

7   interested in studying and promoting the field of firearm and

8   toolmark examination.

9   Q.   And do they produce any materials?

10   A.   Yes.  We have a scientific journal that is published

11   quarterly as well as we host an annual training conference,

12   that moves around the United States annually, to provide

13   up-to-date training on new ideas and research within our

14   discipline.

15   Q.   Have you ever been published in an AFTE Journal?

16   A.   Yes, I have.

17   Q.   How many times?

18   A.   Twice.

19   Q.   And then you said a second one after AFTE.  Was it FBI?

20   A.   I'm a member of a technical working group that is hosted

21   by the FBI on the application of 3D topographical technologies

22   to firearms and toolmark analysis.

23   Q.   Can you briefly -- most of us probably won't be smart

24   enough to follow you.  I know at least I won't be.  So can you

25   just briefly, 30,000-foot level, explain what that is?

1    A.    Yes.

2    Q.    What you all do?

3    A.    One of the new technologies being deployed within the

4    firearm and toolmark industry on the forensic side is the use

5    of specialized 3D surface scanning instruments.  So these

6    instruments scan the surface and render a three-dimensional

7    image of that surface for us to perform our comparisons in a

8    virtual capacity, so on a computer screen, as opposed to

9    looking at them through a conventional microscope.

10   Q.    Thank you.  Are you familiar with the term

11   "microstamping"?

12   A.    Yes, I am.

13   Q.    And can you explain what your understanding of

14   microstamping is?

15   A.    Microstamping is the application of microscopic

16   characters, typically, laser-engraved or etched onto working

17   surfaces in a firearm for their potential subsequent transfer

18   onto the fire casings.

19   Q.    And how did you learn about microstamping?

20   A.    I learned about microstamping during my tenure as a

21   graduate student at the University of California at Davis.  I

22   was approached by the director of our graduate program to

23   participate in the research project studying microstamping

24   technology.

25   Q.    And when was that?

1  A.   That would have been in 2005.

2  Q.   Okay.  2005.  And what did that study entail, basically?

3  A.   The study -- so the original proposal was written up by

4  one of our -- one of the engineering professors associated with

5  the program as well as the program director.  And funding was

6  received through the California Policy Research Center, which

7  is a division of the University of California.  That funding,

8  and original proposal was to study the concept of microstamping

9  as well as longevity of the characters and their ability to

10 transfer to fired cartridge casings.

11 Q.   And did you conduct a study to determine those questions

12 that were raised?

13 A.   Yes, I did.

14 Q.   Okay.  And it was a written study?

15 A.   Yes.

16 Q.   Was it published?

17 A.   Yes, it was.

18 Q.   By whom?

19 A.   It was published as my thesis, through my master's thesis,

20 through the University of California.  It was also published as

21 a paper written to the California Policy Research Center.  And

22 then, subsequently, I published a version of that in the AFTE

23 Journal.

24 Q.   Was your study ever peer reviewed?

25 A.   Yes, it was.

1  Q.   By whom?

2  A.   At all three levels, it was, indeed, peer reviewed.  My

3  thesis was reviewed by my thesis chair, which would have been

4  the program director, a mechanical engineer with UC Davis, and

5  a criminal justice professor through UC Davis.

6       The paper written for the California Policy Research

7  Center was reviewed by an external private forensic firearms

8  examiner as well as two criminal justice professors from UC

9  Irvine.

10      And then my paper published in the AFTE Journal was peer

11 reviewed by members of the AFTE Editorial Committee -- or AFTE

12 Journal Editorial Committee.

13 Q.   In conducting your study, did you form any opinion on

14 whether the microstamping technology that you evaluated in that

15 study could be successfully implemented to or by -- sorry -- by

16 the commercial handgun industry?

17 A.   Yes, I did.

18 Q.   And what was your opinion?

19 A.   My opinion was the technology, as I evaluated it for this

20 research, was not suitable for mass implementation at that

21 time.

22 Q.   Was not suitable for mass implementation.

23      In other words -- can you explain what you mean "by not

24 suitable for mass implementation"?

25 A.   What I mean by that is that the technology, as I evaluated

1    it, could not be directly implemented into every make and model

2    of new firearms or semi-automatic handguns without additional

3    research to determine if it would work in those firearms.

4    Q.    Okay.  So in other words, is it your testimony that, after

5    your study, it's your opinion that the microstamping technology

6    that you studied is not universally implementable to

7    semi-automatic handguns that are being -- in other words, a

8    manufacturer can't just take the technology as it currently

9    exists and plug it into their firearms?  Is that your position?

10   A.    That is correct.

11   Q.    To your knowledge, is there any other microstamping

12   technology that purports to be viable beyond the one that you

13   evaluated in your study?

14   A.    Not that I'm aware of, no.

15   Q.    Do you have a reason to believe that the microstamping

16   technology that you evaluated in your study has progressed and

17   been made better to address any issues than from when the time

18   you evaluated it in 2005?

19   A.    I have not seen any publications to support that, no.

20   Q.    Based on your conducting the study and seeing the issues

21   that you found with microstamping, whatever they are, as to why

22   it's not implementable universally, do you think it's possible

23   to develop a microstamping technology that can be universally

24   implementable for all handguns?

25   A.    I think it would be very difficult to develop a

1    one-stop-shop technology, if you will, because of the vast

2    differences that exist between the mechanical design of the

3    firearms and the differences in metallurgy of the different

4    brands of ammunition to include finishing processes such as

5    primer, lacquer, things of that nature in combination together.

6    Q.    Can you explain that a little bit.  I'm sorry.  So you are

7    saying that the technology depends on or can be altered by

8    certain factors such as metallurgy?  Is that what I heard you

9    say?

10   A.    Yes.

11   Q.    Can you explain that?  I'm sorry.

12   A.    So a firearm is a mechanical component.  So just like any

13   other mechanical component, there is tolerances within -- or

14   between the inner workings of each of the pieces of that

15   mechanism.  And every firearm has its own mechanical design and

16   tolerances from each manufacturer.  As well as there's

17   variances within the metallurgy that makes the primers, so the

18   type of metal, the hardness of the metal, as well as variations

19   in the metallurgy of the ammunition.  Also, there are

20   variations within the pressures produced by different

21   cartridges of different calibers.  And all of these things can

22   have an effect on how the characters have the ability to

23   transfer.

24   Q.    Did I hear you say that the type of ammunition that is

25   receiving the mark can play a role in whether or how well the

1  mark transfers?

2  A.    That is correct.

3  Q.    Would there be any way in your -- to your knowledge, to

4  account for that variable of ammunition on the firearms side of

5  things -- firearms side of things?  In other words, could there

6  be technology made on the firearms side to address -- to

7  account for the variable of the ammunition?

8  A.    I do not believe so.

9  Q.    In conducting your study, did you form any opinion on

10 whether microstamping technology -- the microstamping

11 technology that you evaluated could be overcome, like, defeated

12 by a person who has that -- possesses the firearm?

13 A.    Yes.

14 Q.    And what was your opinion?

15 A.    As part of my research, I chose two of my firing pins to

16 intentionally deface or attempt to deface those characters that

17 were laser-etched onto the firing pins.  One of the firing

18 pins, I rubbed across the surface of a household sharpening

19 stone for a short period of time.  It was, like, 15 to 30

20 seconds.  I would have to go back and look at the study for the

21 time.  That successfully removed sufficient material off the

22 tip of the firing pin for the alphanumeric code that was on the

23 face to be completely removed.  And then reinstalled that in

24 the firearm.  And I successfully discharged the firearm, so I

25 did not remove enough material to render the firearm

1   inoperable.

2       The second method as opposed -- that I wanted to test, as

3   opposed to physical removal of material, was to damage,

4   physically damage, the characters.  So I took the firing pin

5   and a hammer and went onto the anvil side, or the flat side of

6   a bench vise, and lightly tapped the characters for

7   approximately 15 seconds per set of characters, so the ones

8   that were on the side, known as the radial bar code, and then

9   the one's on the tip, which were the alphanumeric.  And this

10  sufficiently deformed the characters to the point that they

11  were no longer legible.

12  Q.    So you said -- correct me if I'm wrong, you said you

13  removed the firing pins from the handguns?

14  A.    That is correct.

15  Q.    So could you replace -- how difficult was it to remove the

16  firing pin from the handgun?

17  A.    The majority of semi-automatic handguns' firing pins are

18  not extremely difficult, to include some that are very easy, to

19  remove/replace.  There are some that are more difficult than

20  others.  Once again, going back to that design; however, there

21  is sufficient information for most all firearms to figure out

22  how to replace it, as it is a component that can indeed break

23  and need replacing.

24  Q.    So an end-user, the owner of a handgun could, at least in

25  some instances, easily replace a firing pin that does not have

1  microstamping technology on it?

2  A.    That is correct.

3  Q.    Do you have any reason to believe, as you sit here today,

4  that the technology that you evaluated has become more

5  difficult to defeat or overcome since the time you evaluated

6  it?

7  A.    No.

8  Q.    Have you ever seen a firearm with microstamping outside of

9  the study you conducted?

10  A.    No, I have not.

11  Q.    Never in your work as a forensic firearms examiner?

12  A.    No, sir.

13  Q.    How many firearms do you examine on a given week?

14  A.    It really depends on the type of case that I've been

15  assigned.  Typically, most cases only have one to, maybe, five

16  guns associated with them.  So any given week would be a

17  handful.

18  Q.    How many firearms have you examined over the course of

19  your career, if you could probably say a ballpark?

20  A.    Ballpark would be thousands.

21  Q.    And you've never seen any of them with microstamping?

22  A.    That is correct.

23  Q.    Have you ever heard of a firearm with microstamping being

24  used as evidence in a case?

25  A.    No.

```
1   Q.   In a criminal case?  No.
2        Are forensic professionals like yourself trained on
3   identifying microstamping?
4   A.   No, we are not.
5   Q.   So I assume, then, they're not trained to decipher it
6   either?
7   A.   That is correct.
8   Q.   Does somebody need to be trained to decipher microstamping
9   technology, the one that you evaluated?
10  A.   The firing pins that I evaluated possessed three different
11  types of encoding.  One was an alphanumeric code, which was
12  written on the very tip of the firing pin, the second was
13  referred to as a gear code, which was a circular gear-shaped
14  structure that went around those alphanumeric characters, and
15  then a radial barcode which was a series of lines in a barcode
16  format that went around the circumference of the firing pin.
17       As far as alphanumeric, that was fairly straightforward.
18  They're just alphanumeric characters.  But I was not provided
19  by the manufacturer any method or fashion in which to decode
20  the gear code and radial barcode.
21  Q.   So for that version of the microstamping, you were unable
22  to determine whether the microstamping imprint successfully
23  transferred?
24  A.   I could determine whether it -- the features themselves
25  visually transferred, but I could not decipher what the
```

1  characters meant or if any spatial arrangements in that
2  transfer affected their interpretation.
3  Q.   And is it your understanding that the purpose, the
4  theoretical purpose, of microstamping is to leave an imprint on
5  the casing that can be read to connect it to a specific
6  firearm?
7  A.   That is correct.
8  Q.   And so if you were unable to read or decipher that code,
9  that would defeat the purpose of the microstamp?
10 A.   Yes.
11 Q.   Is microstamping considered an actual tool by professional
12 forensic examiners like yourself?
13 A.   No.
14 Q.   Outside of studies like the one you conducted, have you
15 ever heard of a firearm having microstamp technology?
16 A.   Outside of other research, no.
17          MR. BRADY:  Thank you, Mr. Beddow.
18          THE COURT:  I just have one question.  I know it's
19 going to be repetitive of your answer.
20     But in your original study, you indicated it wasn't
21 feasible or possible to implement the microstamping in the
22 industry.  Why?
23          THE WITNESS:  At that time, per communication with
24 the inventor/manufacturer, a process that was referred to me
25 known as "optimization" of those firing pins needed to be

1  completed for every make and model of firearm and design a

2  firing pain.  So basically, some level of research and

3  development had to be conducted for every different shape of

4  firing pin in conjunction with that particular make and model's

5  firing mechanism.

6          THE COURT:  So it couldn't be uniform?

7          THE WITNESS:  So it wasn't a universal application.

8  And that was in my recommendation to the paper I wrote back to

9  the California Policy Research Center, was an additional, a

10 larger scale study needed to be done to determine if such mass

11 implementation could be done or if it was truly still going to

12 be on a make-and-model dependent and with that applied R&D

13 necessary.

14         THE COURT:  And I take it from your testimony, even

15 if you identified one model that you could microstamp, a person

16 could easily obliterate or modify?

17         THE WITNESS:  Knowing the location, yes.

18         THE COURT:  Thank you.

19         MR. BRADY:  Thank you, Mr. Beddow.

20         THE COURT:  Cross-examination?

21                   CROSS-EXAMINATION

22 BY MR. SAROSY:

23 Q.   Good morning.  I think it's still morning.  Is it Beddow?

24 A.   Beddow.

25 Q.   Beddow.  I'm sorry.  Beddow.

1        My name is Charlie Sarosy.  I'm a Deputy Attorney General.
2   I'm representing the defendant in this case.  Thank you for
3   being here.  I have a few questions for you.
4        So microstamping is not required for rifles or shotguns
5   sold in California; correct?
6   A.   To my understanding, correct.
7   Q.   And it is only required -- it's not required for
8   revolvers; correct?
9   A.   To my understanding, yes.
10  Q.   It's required only for semi-automatic pistols?
11  A.   Yes.
12  Q.   And your study was, I think you said, published in 2008;
13  correct?
14  A.   The final publication was 2008, that is correct.
15  Q.   And microstamping was required for handguns to be added to
16  the roster not until 2013; correct?
17  A.   Those dates, I was unaware of.
18  Q.   At the time of your study, microstamping was not a
19  requirement for handguns to be added to the roster; correct?
20  A.   Correct.
21  Q.   Okay.  And are you aware that, as of -- and I understand
22  you're from Phoenix -- or you currently reside in Phoenix.  But
23  are you aware that, as of July 1, 2022, microstamping for
24  handguns out of the roster is required in only one internal
25  mechanism within a semi-automatic pistol?

1  A.   I have been made aware of that, correct.

2  Q.   Okay.  And are you aware that, under California law, the

3  type of microstamp required uses alpha and/or numeric

4  characters?

5  A.   Yes.

6  Q.   And are you aware that is called a Firearm Identification

7  Number, or a FIN?

8  A.   I was unaware of the term that's been given to it.

9  Q.   And are you aware that the FIN is something that would

10 consist of at least eight, but no more than 12, unique alpha

11 and/or numeric characters?

12 A.   I did not know the requirements regarding the number of

13 characters.

14 Q.   Are you aware, based on current California regulations,

15 that the manufacturers -- the intent for microstamping is that

16 manufacturers would report to that Firearm Identification

17 Number, or FIN, to the Department of Justice so that there can

18 be a matching between the FIN and the serial number of the

19 firearm?

20 A.   That was my understanding for the purpose of the

21 microstamping, yes.

22 Q.   Right.  And, obviously, in your study, you said you did

23 not do that.  If you look at an alphanumeric code, you couldn't

24 match what firearm it was; correct?  Because it's not like you

25 had a database of --

1  A.   That is correct.  The firearms that were selected for my

2  research were chosen in conjunction with my thesis advisers and

3  individuals from the California Criminalistics Institute, who

4  were assisting me, as well as providing me access to their

5  firearms library.  That is where the firearms came from.

6      And then firing pins for those firearms were purchased

7  through a secondary vendor.  Those firing pins were shipped to

8  the manufacturer of the microstamping, and it subsequently

9  laser-engraved for my process.

10 Q.   So the study that you did on microstamping was not a

11 full-scale recreation of how microstamping was intended to work

12 in the State of California, meaning there is not -- you didn't

13 have a database of matching pins with serial numbers; correct?

14 A.   That is correct.  It was a very limited scale.

15 Q.   And your name was on the study that you mentioned, in

16 2008; correct?

17 A.   That is correct.

18 Q.   And I believe you said that alphanumeric code was the

19 easiest to read of the three microstamping types you said.  You

20 said alphanumeric, gear, and radial.  The alphanumeric was the

21 easiest; correct?

22 A.   It is the only one, because of it being alphanumeric, that

23 I could decipher.  The others, I had no method in which to

24 determine what those features could be interpreted to mean, so

25 I wasn't provided with any method to decipher.

1   Q.   Right.  So for an alphanumeric code, you don't need a
2   secret -- a decipher or some kind of secret device to
3   understand what the letters and numbers mean; correct?
4   A.   That is correct.
5   Q.   Okay.  And do you recall interviewing with journalists
6   about your microstamping study?
7   A.   To my recollection, during my research and while I was in
8   Davis, I had only met with one journalist through a paper from
9   UC Davis.
10  Q.   Was that newspaper called *The Aggie*?
11  A.   I believe so, yes.
12  Q.   And was that journalist -- do you remember her name? --
13  Wendy Wang?
14  A.   I don't recall the name.
15  Q.   Totally fair.
16       Do you recall saying in that interview that microstamping
17  is feasible?
18  A.   Yes.
19  Q.   Do you recall saying that -- and I can provide you a copy
20  of the article.
21       If that is okay, Your Honor?
22           THE COURT:  Sure.
23  BY MR. SAROSY:
24  Q.   Sorry.  It's double-sided.
25  A.   Thank you.  That's quite all right.

1   Q.   And I'm going to point you to -- admittedly, this is my

2   first time using this, but --

3        Mr. Paschal, how do I adjust the Zoom?

4            THE COURTROOM DEPUTY:  It's right there, plus/minus.

5            MR. SAROSY:  Oh, I see.  Thank you.

6            THE COURTROOM DEPUTY:  You're welcome.

7   BY MR. SAROSY.

8   Q.   Okay.  I assume you can hear me, Mr. Beddow?

9   A.   Yes, sir.

10  Q.   I am looking at this paragraph that starts with "The

11  alphanumeric code," "alphanumerical code."  It's near the

12  bottom of the page.

13  A.   Yes.

14  Q.   Can you read that paragraph for me?

15  A.   "'The alphanumerical code provided the best quality of the

16  numerical codes.  The quality of forgeability of the

17  impressions ranged from firearm to firearm.  Every gun shoots

18  differently and functions different, so the legibility was

19  different,' Beddow said.  'Bottom line is, the technology is

20  feasible; however, it does not function equally.'"

21  Q.   Does that sound like an accurate quote?

22  A.   Yes.

23  Q.   So you don't disagree with that quote; correct?

24  A.   No.

25            MR. SAROSY:  Your Honor, I would like to move that

 1    article into evidence.

 2            THE COURT:  Any objection?

 3            MR. DALE:  No objection.

 4            THE COURT:  The article will be received into

 5    evidence.

 6            MR. SAROSY:  I will mark that as Defendant's

 7    Exhibit 26.

 8        (Exhibit 26 was received into evidence.)

 9            MR. SAROSY:  Mr. Paschal?

10            THE COURTROOM DEPUTY:  Thank you, sir.

11    BY MR. SAROSY:

12    Q.   All right.  And your study was from 2008; correct?

13    A.   The final paper published was in 2008, that is correct.

14    Q.   And that is almost 15 years ago; correct?

15    A.   That is correct.

16    Q.   So almost 15 years ago, you said that microstamping was

17    feasible; correct?

18    A.   That is correct.

19    Q.   And if I handed you a copy of your study, I assume you

20    would recognize it; correct?

21    A.   Yes.

22            MR. SAROSY:  May I approach, Your Honor?

23            THE COURT:  You may.

24    BY MR. SAROSY:

25    Q.   Sorry.  This one is also double-sided.

1      I'm just going to ask you a few questions about some of

2   the findings in your study.

3   A.    Absolutely.

4   Q.    Does that look like an accurate copy of your study?

5   A.    Yes.  This is the paper submitted to the California Policy

6   Research Center.

7   Q.    Okay.  And was this -- is this the published version?

8   A.    This was the one published to the California Policy

9   Research Center.  My thesis, which was just published through

10  the UC system, is very similar to this, outside of format.

11  Q.    So when you say, "Published to the California Policy

12  Research Center," is that a journal?

13  A.    It is a division of the University of California --

14  Q.    Okay.

15  A.    -- that funds research projects that could potentially be

16  associated with or affect policy.  I don't know very much about

17  all of their inner workings.  I just know that they are

18  affiliated with the University of California.

19  Q.    Okay.  And I think you testified something along the lines

20  of -- but correct me if I'm wrong.  But you said microstamping

21  was not commercially feasible.  That was one of the findings of

22  your study?

23  A.    Widespread implementation at a commercial level, I did not

24  deem to be feasible at that time.

25  Q.    Okay.  Can you turn to page --

1      I'm sorry, Your Honor.  I can provide you a copy right

2  now, if that would be helpful.

3           THE COURT:  Thank you.

4           MR. DALE:  Thank you.

5           MR. SAROSY:  Sorry.  Here is the copy of the article.

6      I am sensitive to the time, Your Honor.  So I can keep

7  going, or I can --

8           THE COURT:  How much longer do you anticipate in your

9  examination?

10          MR. SAROSY:  I would say 10 to 15 minutes, perhaps.

11          THE COURT:  All right.  Why don't we keep going, and

12 then we'll just break for lunch a little bit later.

13 BY MR. SAROSY:

14 Q.   Sure.  Can you turn to page 13?

15 A.   Yes.  One moment, please.

16 Q.   And do you see there that it says, under Subsection 4,

17 Heading 4, "Implementation strategies be developed

18 collaboratively"?

19 A.   Yes, sir.

20 Q.   Do you see the first two sentences of that paragraph?

21 A.   Yes.

22 Q.   Can you read those first two sentences, please?

23 A.   "The development of a viable commercial implementation

24 strategy for the technology is a necessity.  This must be

25 completed in collaboration with officials from the State of

1    California, firearms manufacturers, and ID Dynamics."

2    Q.    And you said you are not aware of efforts by firearm

3    manufacturers to work in collaboration with the California

4    Department of Justice?

5    A.    I have no knowledge of that.

6    Q.    Okay.  But you are not aware of manufacturers trying to

7    implement microstamping; correct?

8    A.    That is correct.

9    Q.    I'm sorry to go backwards, but can you go to page 10?  And

10    I'm looking at the last paragraph, second sentence, that begins

11    with "At the current time."

12    A.    Yes.

13    Q.    Can you read that sentence and the following sentence,

14    please?

15    A.    "At the current time, only the alphanumeric and coding

16    format has the potential to reliably transfer information from

17    the firing pin to the cartridge case, thereby facilitating the

18    identification of crime guns outfitted with microstamping

19    technology.  If any numbering system has the future potential

20    to handle a large database and have some survivability, it is

21    the alphanumeric system."

22    Q.    Going back to what I asked you before, the alphanumeric

23    system is what is -- at least as far as you know, what is

24    required -- is the system that would be required in California?

25    A.    It is my understanding, yes.

1   Q.   So based on this quote, you are saying, 14 years ago, that
2   the system that California uses for microstamping is the one --
3   or was the one that has the best chance at being adapted on a
4   widescale; correct?
5   A.   Correct.  Of the three different types of encoding
6   structures that were on the firing pins that I tested.
7   Q.   Correct.  And the other ones were radial and gear?
8   A.   That is correct.
9   Q.   And I believe you talked about the firing pin being able
10  to be defaced; correct?
11  A.   That is correct.
12  Q.   If you look at a semi-automatic pistol, just from the
13  outside, would you know that the firing pin has a microstamp?
14  A.   Not without magnification.
15  Q.   Without firing it or without magnification?
16  A.   Even if you fired it, it would still require magnification
17  to see the potentially transferred characters.
18  Q.   So you would really need a microscope or you would need to
19  know ahead of time that the handgun or the semi-automatic
20  pistol has microstamping in order to know that you need to
21  deface it; correct?
22  A.   That is correct.
23  Q.   And are you aware that defacing a microstamp is a
24  violation of California law?
25  A.   I was not aware of that.

1    Q.    Okay.  And can serial numbers -- I'm assuming you're aware

2    of and familiar with serial numbers of firearms; correct?

3    A.    That is correct.

4    Q.    And can serial numbers also be easily defaced?

5    A.    Yes, they can.

6    Q.    Can they be defaced in the same manner that you described

7    the defacement of microstamps?

8    A.    Yes.

9    Q.    And to do that, to deface a serial number, do you need to

10   disassemble a firearm before doing so?

11   A.    It depends on the location of that serial number, but

12   typically, no.

13   Q.    Because serial numbers are on the external part of the

14   firearm; correct?

15   A.    Yes.

16   Q.    Rather than -- the firing pin is an internal part of the

17   firearm; correct?

18   A.    That is correct.

19   Q.    I'm going to move you to page 18 and just kind of a higher

20   level here, to make sure I understand your study correctly,

21   because I read it and I am not a scientist and I don't have

22   your background, so I just want to be sure I understand

23   correctly.

24         I understand that you tested six Smith & Wesson

25   semi-automatic pistols that were fired by CHP officers, 2,500

1   rounds each; is that correct?

2   A.   That is correct.

3   Q.   And then you also tested, I believe, five semi-automatic

4   pistols in addition to those six Smith & Wesson.  And the five

5   were each from a different manufacturer?

6   A.   Yes.

7   Q.   And one was rimfire, and the other four were centerfire;

8   is that correct?

9   A.   That is correct.

10  Q.   And then you also tested a couple of rifles and a shotgun,

11  I believe; correct?

12  A.   Yes.

13  Q.   I am not going to talk about the rifles or the shotgun

14  because that is not relevant here.

15       So The bottom of page 18, I am looking at the very -- the

16  last paragraph, the last sentence that goes on to the next

17  page, it starts with, "In this test."

18       Do you see that?

19  A.   Yes, sir.

20  Q.   Can you read that sentence?

21  A.   "In this test, only the alphanumeric encoding performed

22  well on the new CHP Smith & Wesson pistols.  The radial

23  barcodes and the dot codes being illegible."

24  Q.   And, again, California has the alphanumeric coding, is

25  your understanding?

1   A.   Correct.  And just for clarification, on these ones, since

2   they had the different type of encoding listed as dot codes,

3   these particular pins provided by the manufacturer, he,

4   apparently, was testing a different coding structure as opposed

5   to the gear code, which was called a dot code, and it was small

6   circles placed in varying positions in the clock orientation

7   from 12:00 to 12:00.  But they were extremely small.  And so I

8   am not sure if that had some reason why he went away from that

9   to the gear code, but those were the only pins that I worked

10  with that had the dot code.

11  Q.   The dot code is not something that is required or is even

12  now envisioned by California's microstamping requirement?

13  A.   To my understanding, correct.

14  Q.   Okay.  And then, I think I said this before, you tested

15  five other semi-automatic pistols of different -- by different

16  manufacturers; correct?

17  A.   Correct.

18  Q.   And for the centerfire, the five centerfire pistols, do

19  you recall the manufacturers?

20  A.   Not off the top of my head, but they're on the following

21  page of my report, on page 20.

22  Q.   Does Seecamp, AMT Backup, Sig Sauer, and Colt 1911 --

23       (The court reporter interrupted.)

24  BY MR. SAROSY:

25  Q.   Does Seecamp, AMT Backup, Sig Sauer, and Colt 1911 sound

1    familiar?

2    A.    Yes.

3    Q.    And I'm going to move you to page 27, directly under the

4    subheading that says, "Seecamp."

5    A.    Yes.

6    Q.    And can you read that first sentence for me?

7    A.    "The alphanumeric characters on the Seecamp firing pin

8    showed negligible degradation over the course of test-firing

9    394 rounds of ammunition."

10   Q.    And I'm going to have you read a couple more sentences.

11   But just to take a step back, these findings are about the

12   condition of the engraved microstamp on the firing pin itself;

13   correct?

14   A.    Just to clarify what section we are in, this one was --

15   this particular section and those statements are not about the

16   legibility of the transferred characters but the durability and

17   legibility of the characters on the firing pins themselves?

18   Q.    All right.  I just want to be sure.

19   A.    Yes.

20   Q.    We'll get to legibility of the transfer momentarily.

21         I am going to take you to the next page, page 28, looking

22   at subheader "AMT Backup."

23         And can you read that entire paragraph, that entire first

24   paragraph, please?

25   A.    Yes.  "The appearance of the alphanumeric characters was

1  softened after firing ten rounds.  Both the A and the 3 showed

2  slight deformation after the completion of test-firing 600

3  rounds of ammunition.  The left side of the A began to collapse

4  toward the center of the character, and the number 3 was

5  slightly flattened and gained in height by approximately 28

6  microns.  Both of these characters were still legible."

7  Q.   So despite the deformation, they were -- like you said in

8  that last sentence, they were still legible; correct?

9  A.   Yes.

10 Q.   And I am going to move you to the next section of the

11 Sig Sauer.

12      Can you read the first two sentences of that section,

13 please?

14 A.   Yes.  "The alphanumeric characters on the Sig Sauer firing

15 pin showed signs of softening after ten rounds of ammunition

16 had been fired.  Throughout the remainder of 1,000 rounds

17 test-fired, no major signs of character degradation or

18 deformation were noticed."

19 Q.   Can I move you to page 29, in the Colt 1911 section?

20 A.   Yes.

21 Q.   And the second paragraph, can you actually read that

22 entire paragraph?

23 A.   Yes.  "The softening of the appearance of the alphanumeric

24 characters on the Colt 1911 firing pin was not noticed until

25 100 rounds of ammunition were fired.  At this point in the

1    test-firing sequence, a large quantity of foreign debris had

2    been deposited around the alphanumeric characters.  By

3    completion of test-firing at 750 rounds fired, no major

4    degradation of the alphanumeric characters was noticed;

5    however, a large quantity of foreign debris was present around

6    the characters, making the number 3 difficult to visualize."

7    Q.    And so despite the softening and the foreign debris, it

8    was -- the firing -- or the microstamp on the firing pin was

9    still legible; correct?

10   A.    That is correct.

11   Q.    And I believe for the rimfire pistol, the Ruger -- sorry.

12   I am going to turn you back to page 26.  I believe that was the

13   rimfire one.

14   A.    Yes.

15   Q.    Does that sound familiar?

16   A.    That is correct.

17   Q.    And I think for that rimfire one, there were signs of

18   degradation; correct?

19   A.    That is correct.

20   Q.    But you also said that the quality of the alphanumeric

21   characters on the firing pin were inferior to those found on

22   the rest of the firing pins tested?

23   A.    Yes.

24   Q.    Is that correct?

25   A.    That is correct.

1  Q.   Okay.   I want to be sure I can get this done in five

2  minutes.  I think I can.

3       But we can take a break, Your Honor.

4            THE COURT:  No.  Let's complete this witness before

5  we take our lunch break.

6  BY MR. SAROSY:

7  Q.   Okay.  So we talked about the firing pins themselves.  I

8  am going to talk about the part of your study that looked at

9  the legibility of the microstamp when it was transferred to the

10  cartridge case.  That was also part of your study; correct?

11  A.   That is correct.

12  Q.   And I want to look at page 23 -- well, I'll just ask you,

13  actually.  For something to be counted as a positive transfer

14  from the firing pin to the cartridge case, it had to be fully

15  legible; is that correct?

16  A.   Yes.

17  Q.   That was your criteria or your method, right, --

18  A.   Yes.

19  Q.   -- for determining legibility?

20  A.   My criteria had to be that it looked as the character it

21  was intended to be.

22  Q.   Right.  So an A looked like an A; a C looked like a C?

23  A.   That is correct.

24  Q.   And I am going to turn you to page 32.  And you also

25  looked at the transfer for the six Smith & Wesson pistols;

1  correct?

2  A.   That is correct.

3  Q.   And if you are looking at that section on 32, page 32,

4  that is entitled Smith & Wesson model 4006, can you look at the

5  second paragraph and read those first three sentences, please?

6  A.   Yes, sir.  "The alphanumeric characters for the cartridge

7  cases from all six firing pins showed an average overall

8  transfer rate of 90 percent.  The percent transferred for any

9  one cartridge case ranged from a complete transfer of

10  100 percent to as low as 38 percent transfer.  The crispness of

11  the alphanumeric characters' impressions were diminished

12  through continued firing."

13  Q.   To make sure I understand that, that means that, on

14  average, over 90 percent of the cartridge cases had a legible

15  microstamp on them, based on this?

16  A.   That meant that, if there were, let's just say, ten

17  characters, that, on average, nine of them were legible.  So

18  90 percent of the characters that were present on the firing

19  pin transferred.

20  Q.   Okay.  And is it true that for the other, for the Seecamp,

21  the AMT Backup, the Sig Sauer, and Colt 1911, the overall

22  transfer rate was, at least, 76 percent?  Ballpark, it was 76

23  percent or more for the four centerfire semi-automatic pistols?

24  A.   That is correct.

25  Q.   And for three types of those pistols -- so it was --

1    sorry.  Including the six Smith & Wessons.  So for the six

2    Smith & Wessons, the AMT Backup, and the Sig Sauer, the overall

3    transfer rate was at least 90 percent; correct?

4    A.   That is correct.

5    Q.   And if you can look at page 43 --

6         These will be the last couple questions, Your Honor.

7         And I am looking at the second complete paragraph on that

8    page that starts with "The concept of laser machines."

9    A.   Yes.

10   Q.   Do you see that?

11        Can you read the second sentence of that paragraph, that

12   starts with "Overall"?

13   A.   "Overall the alphanumeric characters and the gear code

14   structures proved to be capable of withstanding repeated

15   firing; however, some degradation of the structures was seen

16   with specific firearms."

17   Q.   And does that finding of some degradation with specific

18   firearms, does that include the rifles and shotguns that you

19   tested?

20   A.   That is correct.  That is an overall statement for the

21   firearms tested within my research.

22   Q.   That statement is not limited to the semi-automatic

23   pistols that you tested; correct?

24   A.   That is correct.

25   Q.   And can you turn to page 44, please.  And I am looking at

1    the last paragraph on that page that starts with the

2    "Alphanumeric encoding."

3    A.   Yes.

4    Q.   Can you read that sentence, please?

5    A.   "The alphanumeric encoding format is currently the only

6    one of the three encoding structures utilized on the 2nd

7    Generation firing pins that will allow for potential

8    identification of a firearm."

9    Q.   And so your study concluded, in 2008, that the

10   microstamping of alphanumeric characters from a firing pin was

11   technologically feasible; is that correct?

12   A.   With the firearms tested, correct.

13   Q.   And you tested, like we said, six Smith & Wessons and then

14   one rimfire semi-automatic pistol and then four centerfire

15   semi-automatic pistols from a few manufacturers; correct?

16   A.   Correct.

17        MR. SAROSY:  Okay.  That's all I have, Your Honor.

18   Actually -- I'm sorry -- I would like to move that study

19   into evidence as well.

20        THE COURT:  Any objection?

21        MR. DALE:  No objection.

22        MR. SAROSY:  I'll put that as Defendant's Exhibit --

23   I think we're at 27.

24        THE COURT:  Very well.  Exhibit 27 will be received

25   into evidence.

1          MR. SAROSY:  Thank you, sir.

2        (Exhibit 27 was received into evidence.)

3          THE COURT:  Redirect?

4          MR. BRADY:  Thank you, Your Honor.

5                    REDIRECT EXAMINATION

6   BY MR. BRADY:

7   Q.    So, Mr. Beddow, you testified that microstamping

8   technology that you studied was, quote, "feasible."  You used

9   that word; right?

10  A.    That is correct, yes.

11  Q.    Is microstamping that be can adopted and implemented by

12  commercial manufacturers of handguns -- is that feasible?  A

13  technology that can right now be taken, like a software that

14  can be downloaded onto any computer, various different types of

15  computers, is there a microstamping technology that is feasibly

16  able to just be taken by a manufacturer today, that you could

17  send it to them, they could drop it into their handgun?

18  A.    I do not believe so without the applied R&D to the

19  specific mechanism for those firearms.  Conceptually, the idea

20  of the transfer works and was proven by my research, but the

21  application to every combination of firearm and mechanism needs

22  to be further looked into or further researched.

23  Q.    So am I understanding that, when you say it's feasible,

24  are you saying that there have been studies, including yours,

25  where a microstamp has successfully transferred to a shell

1   casing, to an ammunition casing.  But that's what you mean by

2   "feasible," that it can be done.

3       That, for example, a car could be made to levitate, right,

4   in a prototype, but are there floating -- elevating cars able,

5   ready to be put out on the market?

6       So my question is:  Are you saying that it's feasible in

7   the sense that it is conceptually feasible to make a microstamp

8   transfer?

9   A.   Yes.

10  Q.   But it is not practically, as we sit here today, a

11  technology that is capable of being taken by a manufacturer and

12  implemented into their handguns right now, without further

13  development for their specific handgun?

14  A.   That is correct.

15  Q.   Does the fact that only one microstamp is now required

16  versus when you -- well, let me ask you this.

17      There was no two-stamp requirement when you performed your

18  study; correct?

19  A.   To my recollection, no.

20  Q.   You were only looking for a single --

21  A.   I only researched the location of the microstamping on the

22  firing pin and no subsequent locations.

23  Q.   So does the fact that California has retracted its

24  two-stamp requirement and now only requires one, does that

25  alter your conclusions that you testified here today in any

1  way?

2  A.    No.  As long as that location is the firing pin, since

3  that's the only area which I performed any research.  That is

4  all I can testify to.

5  Q.    In your study, did you use a single source of ammunition

6  to stay constant with all the firearms you used?

7  A.    No.  I tried varying brands.

8  Q.    You tried varying brands?

9  A.    Yes.

10  Q.    And that made a difference in the legibility?

11  A.    Yes.

12  Q.    So some -- so ammunition can be a factor in whether a

13  microstamp transfers; correct?

14  A.    That is correct.

15  Q.    Other -- of the firearms you evaluated, did you testify

16  that there were issues with wear on the firing pin on some of

17  them?

18  A.    Yes.

19  Q.    And was that firearm-dependent or ammunition-dependent, to

20  your knowledge?  Or did you not control for that?

21  A.    I don't believe there was any way for me to test if the

22  wear that was -- that the firing pins incurred was a result of

23  a mechanism of the firearm or the ammunition.  The wear or

24  softening, as I read in some of the statements previously, that

25  would have only been able to be incurred through the impact

1    with the ammunition.  Whereas the wear that I noticed on the
2    radial barcodes, that was a function of the firing pins
3    impacting the firearm itself.
4    Q.    Okay.  And did the wear happen at different rates on the
5    different firearms?
6    A.    Yes.
7    Q.    Is it accurate that, in your study, the majority of the
8    firearms that you evaluated with microstamping technology did
9    not provide adequate or satisfactory transfer of microstamping?
10   A.    There was no criteria set forth of what was a satisfactory
11   or what would be listed as a successful transfer.  It was
12   purely given in a numerical format of percent of transfer.
13            MR. DALE:  Understood.  Thank you very much.  No
14   more.
15            THE COURT:  Anything further?
16            MR. WOODS:  Your Honor, I have two or three more
17   questions.
18                      RECROSS-EXAMINATION
19   BY MR. SAROSY:
20   Q.    I think I heard a question about flying cars.  Just to be
21   sure I understand correctly, in your study, the firing pins
22   that you tested actually had alphanumeric codes laser-engraved
23   on the firing pins; correct?
24   A.    Yes.
25   Q.    Which then transferred alphanumeric characters to

1    cartridge cases; correct?

2    A.    That is correct.

3    Q.    This is not -- you actually tested microstamping.  This is

4    not a theoretical thing that we are talking about; correct?

5    A.    Correct.

6    Q.    And the firing pins were not provided to you by firearm

7    manufacturers; correct?  They were provided by -- I forget from

8    who.  I guess, who were the firing pins provided to you by?

9    A.    The individual's name was Todd Lizotte.  He, to my

10   understanding, is the co-inventor of the technology through a

11   company known as ID Dynamics, at the time.

12   Q.    Okay.

13   A.    He is the one and his business were those ones who

14   conducted the laser-engraving for me.

15   Q.    Okay.  The microstamp laser-engraved on a firing pin is

16   something that is physically possible; correct?

17   A.    Correct.

18   Q.    And it is physically possible for that microstamp or the

19   alphanumeric characters to be physically transferred to a

20   cartridge case; correct?

21   A.    Correct.

22   Q.    Because you actually saw that in your study?

23   A.    Yes.

24   Q.    Did any firearm manufacturers ever approach you about the

25   findings of your study based on your comment that firearm

1   manufacturers should work collaboratively with the California
2   Department of Justice?
3   A.   No.
4   Q.   Are you aware of any California law saying that the
5   microstamp cannot be placed on the firing pin?
6   A.   No.
7           MR. SAROSY:  All right.  That's all I have.  Thank
8   you.
9           THE COURT:  Sir, you may step down.  You are excused.
10      All right.  It is 12:20.  We'll take an hour lunch break.
11      Can you give me a sense of how much longer you think we're
12   going to need with witnesses?
13          MR. DALE:  We have one more witness.  He's probably
14   going to take about ten minutes on Direct.  I don't know about
15   Cross.  But then he may have a little bit of rebuttal testimony
16   after their two witnesses testify.
17          THE COURT:  All right.  And defense just has two
18   witnesses?
19          MR. SAROSY:  Correct, Your Honor.
20          THE COURT:  How long do you think they'll be?
21          MR. SAROSY:  I think for the first witness, which is
22   Special Agent Supervisor Sal Gonzalez, I would say 30 to 45
23   minutes, perhaps.  He's our roster expert.
24      And then for Dr. Cornell --
25          MR. WOODS:  I would say 10 to 20 minutes.

1           THE COURT:  Okay.  I have another matter at 4:00.
2  You don't think we'll run into any problem with that?
3           MR. DALE:  I don't anticipate that.
4           MR. WOODS:  I don't think so.  I know that Your Honor
5  had mentioned you wanted some argumentation as well.
6           THE COURT:  Well, we'll see where we're at.  Okay.
7  All right.  Sounds good.  Have a nice lunch break, and we'll
8  pick back up at 1:20.
9      (Lunch recess was taken.)
10          THE COURTROOM DEPUTY:  Please come to order.  This
11 Court is again in session.
12          THE COURT:  All right.  I think we're still in the
13 Plaintiffs' case.  Next witness.
14          MR. DALE:  Yes, Your Honor.  We're going to call
15 Clayton Cramer.
16          THE COURT:  Very well.
17          THE COURTROOM DEPUTY:  Mr. Cramer, please raise your
18 right hand.
19     Do you solemnly swear that the testimony you shall give in
20 the cause now before this Court shall be the truth, the whole
21 truth, and nothing but truth, so help you God?
22          THE WITNESS:  I do.
23          THE COURTROOM DEPUTY:  Please state your name and
24 spell your last name for the record.
25          THE WITNESS:  Clayton Carl Cramer.  My last name is

1    spelled C-r-a-m-e-r.

2              THE COURT:  Please proceed.

3                          **CLAYTON CARL CRAMER,**

4     **called by and on behalf of Plaintiffs, testified as follows:**

5                          DIRECT EXAMINATION

6    BY MR. DALE:

7    Q.    Good afternoon, Mr. Cramer.  Thank you for joining us

8    today.

9    A.    Hey.  No problem.

10   Q.    All right.  Can you tell me what is your current

11   profession, sir?

12   A.    I'm retired, but I also teach at Community College of

13   Western Idaho, a community college here in Boise.

14   Q.    And what subjects do you currently teach?

15   A.    I teach American History first semester and World History

16   this semester.  I also have written nine books.  And my work is

17   cited in *D.C. versus Heller* and *McDonald versus Chicago* and a

18   dozen or more decisions by lower courts.

19   Q.    All right.  You said you've written book.  Let's talk

20   about some of those books.

21              Did you write a book called *Lock, Stock, and Barrel*?

22   A.    Yes.

23   Q.    And what's that book about?

24   A.    Well, the book was published several years ago that made

25   claim that guns were pretty much only widespread ownership

1    after Samuel Colt figured out how to make handguns cheap and
2    reliable.  So this is a claim that's been made before, some
3    years -- about 20 years ago, which turned out to be false at
4    the time.
5        And I went through this new book by Pamela Haag, called
6    the *Gunning of America*.  And I eventually checked all of her
7    references and discovered many of her claims turned out not to
8    be true.  Many issues cherry-picking her evidence.  For some
9    reason, you read something on one page and go over on what was
10   on the previous page.
11       But what I was doing was basically how American gun
12   culture developed and all the evidence of which guns were in
13   existence.
14   Q.    So is *Lock, Stock, and Barrel* the only book you've written
15   regarding gun culture?
16   A.    No.
17   Q.    Did you write a book called, *Armed America:  The
18   Remarkable Story of How and Why Guns Became as American as
19   Apple Pie*?
20   A.    Yes, I did.  That was in response to a book called *Arming
21   America*, which was, briefly, a very popular, illusory,
22   well-known book by a guy named Michael Bellesiles, which made
23   the claim that guns were rare in America and Mexico, that
24   Americans did not hunt.  And for the most part, that's been
25   tightly regulated.

1      It was such an astonishing and amazing book, but the fact
2  is that it turned out to be largely fabrication, no one
3  bothered to actually check that except for me and a few other
4  people.  And eventually Mr. Bellesiles lost his position as a
5  member of the faculty at Emory University after they
6  investigated the claim and found that, in fact, he had lied
7  about a lot of stuff in the book.
8      So I also wrote another book called *For the Defense of*
9  *Themselves and the State,* which I examined in detail all of the
10 decisions of the state courts and some of the federal court
11 decisions about the meaning of the right to arm positions in
12 both the Federal Constitution and in the State Constitutions.
13 Q.   Did you write a book called *Concealed Weapon Laws of the*
14 *Early Republic:  Dueling, Southern Violence, and Moral Reform?*
15 A.   Yes.  That was my master's thesis, and it examined in
16 detail exactly why concealed weapon laws first appeared in
17 mostly southern states.
18 Q.   All right.  I am going to show you a document here.  Hang
19 on for a quick second while I figure this out.
20     Thank you.  All right.  Can you see that document,
21 Mr. Cramer?
22 A.   Yes, I can.  It looks like my resume.
23 Q.   Okay.  And just to make this process, hopefully, a little
24 shorter for everybody, I am just going to take you through it
25 really quick.  I want to make sure that this identifies your

1    history in terms of teaching.

2         Does that accurately reflect your history as a teacher?

3    A.   Yes, does.

4    Q.   Okay.

5    A.   The one thing I might add is I taught History of the

6    Fourteenth Amendment a couple sessions back in the College of

7    Western Idaho.

8    Q.   Okay.  And going a little bit further down, we see a list

9    of books.  I'm assuming -- is this a document you prepared,

10   Mr. Cramer?

11   A.   Yes, it is.

12   Q.   Okay.  And this list of books here, does this accurately

13   reflect the books that you've published?

14   A.   Yes, it does.

15   Q.   Okay.  And then below that, in your CV, it lists selected

16   publications.

17        Are these law review articles you've written?

18   A.   Yes.  Those are entirely law review articles.

19   Q.   Okay.  And what topics have you written law review

20   articles on?

21   A.   I've written law review articles about -- well, obviously,

22   the first one about the problem of fraudulent claims being made

23   by some historians who are attempting to revise American

24   history when it doesn't match with the facts.

25        One of these articles was about the problems of mental

1    illness and what are the limits of the right to bear arms with

2    respect to people with mental illness problems.

3        And a little further down, this one is co-authored with

4    Nicholas Johnson and George Mocsary.  This was cited in

5    *McDonald v. Chicago*,  2010.

6    Q.    Go ahead.

7    A.    *McDonald v. Chicago* here we made the argument that the

8    Fourteenth Amendment was intended to impose oppose the Bill of

9    Rights through the privileges and immunities clause of the

10   Fourteenth Amendment on to the states.

11   Q.    And you said it was cited.  Are you talking about the

12   Supreme Court Case, *McDonald v. Chicago*?

13   A.    Correct, yes.

14   Q.    And was it cited in the majority opinion?

15   A.    Yes, the majority opinion, yes.

16   Q.    Has any of your work been cited in any other appellate

17   court opinions that you're aware of?

18   A.    I know it has -- I can pull it up, briefly.  Yeah.  But,

19   yes, my work is cited in quite a few decisions.

20   Q.    Okay.  Well, I don't want you to pull anything up.  Let's

21   just work off the documents we have at hand.

22        But let's go down a little further.  I just want to make

23   sure I have everything.

24        Does this list accurately reflect the law review articles

25   and other articles you've authored?

1    A.    There is probably -- I think there is a couple that are
2    probably not present there.  Basically, I've generally tried to
3    avoid adding too much stuff there, because it makes the CV get
4    too long.
5    Q.    Understood.  Understood.  And below that, you have a
6    section that you wrote called "Conferences and Expert
7    Testimony."  And these were presentations that you gave, at
8    some point?
9    A.    Yes.  As various states were considering -- were
10   discussing revisions of the concealed weapons gun laws.  I
11   went, and I spoke about what my research had found about the --
12   what happened to the murder rate as a result of the states that
13   have adopted shell issues for weapon and gun laws.  And for the
14   most part, murder rates would have fallen, and those states
15   shouldn't have done that.
16   Q.    All right.  And then, finally, you wrote a section that we
17   were just discussing work cited in court decisions.
18         Does this accurately reflect the appellate court decisions
19   in which your writings in one form or another have been cited?
20   A.    Yes.
21   Q.    All right.  And what are the topics upon which your
22   writings have been cited in those appellate court decisions?
23   A.    Well, in many cases, they've been cited to demonstrate
24   that certain categories of prohibitions on possession of
25   firearms are actually Constitutional.  In particular, the --

 1    some of the cases that involved people convicted of domestic

 2    violence misdemeanors.  Courts have heard challenges to those

 3    and cited work by -- I can think to myself -- arguing that

 4    these sort of limitations on possession are not unreasonable.

 5    They're not unconstitutional.  They're consistent with the

 6    values and the laws that were present at the time of the

 7    ratification of the Constitution.

 8             MR. DALE:  All right.  At this time, I would like to

 9    offer and move into evidence Plaintiffs' Exhibit 8.

10             THE COURT:  Any objection?

11             MR. WOODS:  No objection.

12             THE COURT:  All right.  Exhibit 8 will be received

13    into evidence.

14        (Exhibit 8 was received into evidence.)

15    BY MR. DALE:

16    Q.   All right.  Well, thank you for that.

17        Let me ask you just one more question with regards to your

18    background.  Have you ever been designated an expert witness in

19    any other case involving the interpretation of firearms laws?

20    A.   Yes.  *Barrett v. Bonta* in 2021, another District Court

21    case.  And I gave a deposition on an expert declaration in

22    Oregon Firearms Federation last week.

23    Q.   All right.  And in the *Barrett v. Bonta* case, what was

24    your area of expertise you were designated for?

25    A.   Well, it was the history of laws regulating the carrying

1   of firearms.  California had, I guess, recently passed a

2   requirement that you had to have a license to carry openly,

3   which is really quite dramatic changes.  Until 1967, you can

4   carry openly, even in the cities, a loaded firearm.

5   Q.   So let me ask you:  In providing expert testimony, in

6   writing books, in preparing law review journals, where do

7   you -- what training or what experience do you draw upon to

8   create these writings or to give the testimony?

9   A.   Well, my bachelor's degree is in history and my master's

10  degree is in history.  And I have spent, I would say -- from

11  1989 forwards, I've spent just about all of my spare time

12  reading and researching issues related to the history of

13  weapons regulations in America.

14  Q.   Going back how far, sir?

15  A.   To 1989.

16  Q.   No.  I mean, the history of regulation.  How far back have

17  you researched in terms of the history of America?

18  A.   To the settlement of Jamestown in the Plymouth.

19  Q.   All right.  And have you actually researched past laws and

20  various colonies or the early founding states?

21  A.   Absolutely.  I have -- at one point, I someone paid me

22  to -- I might have been done it for free, if he'd asked right.

23  I read through every session law adopted during the

24  Revolutionary and Articles of Confederation period in all the

25  states plus Vermont.

Q.   Have you've used this information as part of forming
opinions that you have put into law review articles?
A.   Yes.
Q.   Okay.
A.   In some cases, my research has led me to throw away
distant hypotheses and come up with an entirely new theory for
why things happened.
Q.   Can you give me an example of that, sir?
A.   Well, I started working on my master's thesis, *Concealed
Weapon Laws of the Early Republic*.  I assumed that, at least
part of why these laws were adopted, when they were largely in
the United States, was related to the issue of slavery and
race.  But the more I got into it, the more I discovered that
it actually had an entirely different origin, and it was tied
to the fact that an honor, culture, and development had
transcended from Scotland into the back hills area of the
South.

     And then, in a fairly complicated way, the attempt to
suppress dueling led to an attempt to ban concealed carry
weapons because, if you got into an argument with someone, if
you knew they were armed, you weren't going to go ahead and
continue to be confrontational.  You don't know if they were
armed.  They might draw a weapon or knife on you.  And so this
led to a big problem with dueling.

     If someone insulted you or took liberties with your wife,

1    or whatever, you might challenge them to a duel.  Of course,

2    dueling was a big problem.  So many states went ahead and

3    made -- required you to swear an oath that you would not duel

4    or be involved in any way or, like, carry out a challenge or

5    something, usually have to think through things.

6         And what would happen is, every few years, someone would

7    get elected to the Legislature, and they would have to revise

8    that day forward, because this guy had -- didn't want to

9    perjure himself about having participated in a duel.

10        And so we had this weird situation where people were more

11   willing to kill someone than to perjure themselves about

12   whether they had participated in dueling or something like

13   that.  As I said, it was completely not what I was expecting to

14   find.

15   Q.   And that caused you to change your opinion on that

16   particular issue?  Is that what you are saying today?

17   A.   Yes.  That particular set of laws, the concealed weapon

18   laws that were adopted before the Civil War, had a different

19   origin than I expected.

20   Q.   All right.  Do you understand what you are here to testify

21   about today?

22   A.   Yes.

23   Q.   And do you understand what the California Unsafe Handgun

24   Act is?

25   A.   I have read a bit about it.  It has a drop-test

1   requirement, and it also has a microstamping requirement with a

2   firing pin, and it also has a loaded chamber indicator

3   requirement on firearms.  And there's this complicated roster

4   scheme, whereby, as I understand it, for every one gun that

5   gets added to the roster, -- and, therefore, it's legal to sell

6   in California -- two have to be taken off.

7   Q.   Okay.  So let's talk about that last part.  Explain to me

8   what you mean by, two have to come off if one is added?

9   A.   My understanding was that, if the manufacturer wanted to

10  have one added to the roster, that two additional ones would

11  have to age off or in some way cease to be on the list.

12  Q.   Would that include new guns on the roster or grandfathered

13  guns?  Do you have any understanding of that?

14  A.   It's been so long since I read the law.  I do not remember

15  the details of how they decided which ones should go away.

16  Q.   Okay.  And in your work, have you ever come to an

17  understanding of the tests for measuring the constitutionality

18  of a law that was identified in the case of *New York State*

19  *Rifle and Pistol Association versus Bruen*?

20  A.   I, of course, have read the Bruen decision.  And

21  generally, the work I've been doing the last few months, I've

22  been looking at what laws were in effect in 1789 when the Bill

23  of Rights was passed by Congress and also what laws were in

24  effect before 1868 when the Fourteenth Amendment was ratified.

25       Basically, the Bruen decision went ahead and, basically,

1  set those magic dates, to a large extent, actually to find

2  whether some law or analogue was constitutional was under the

3  Second Amendment.

4  Q.    All right.  Were you asked by us to determine whether or

5  not there were any laws you could find that were historical

6  analogues to the drop-testing feature -- or the drop-testing

7  requirement of the Unsafe Handgun Act?

8  A.    Well, I would say, the closest to that would probably be

9  the proofing laws, that some states adopted, requiring

10 firearms -- firearm barrels had to be proof verified they were

11 safe before they could be assembled into guns.  Although those

12 are not exactly equivalent.

13 Q.    Well, as part of the work you've done, did you research

14 proofing laws in the various jurisdictions during the founding

15 or thereafter?

16 A.    Well, what I found was, in the 17th century in England,

17 the role of gunmakers, Guttea [sic] chartered to authorize them

18 to, basically, go searching anywhere they wanted to look for

19 guns that had not been proofed.  But they, of course, were in

20 town to make sure that only the guns that they made, which had

21 been tested and stamped with their mark of approval, would be

22 lawful for people to possess or to sell.

23 Q.    And in doing your research, did you ever learn any

24 information or come to any conclusions as to why these laws

25 were enacted?

1    A.    In the case of England, the sensible claim was that it was
2    to make the guns safer.  It's certainly possible, although both
3    throughout the medieval and in the modern period have just
4    released partially a string of associations for the purpose of
5    limiting the competition.
6          There is one case that I ran into.  I was in New York at
7    Colonial Records where shoemakers had a guild in New York City.
8    They were complaining that a new guy is coming into town, He
9    was not a member of the guild, and he was making shoes.  They
10   went to the Governor and said, "You've got to stop this guy."
11         The Governor's response was, "Under our mercantile laws,
12   we're not supposed to be making shoes in America.  We're
13   supposed to be shipping leather to England so they can make
14   shoes and sell them back to us."  And he said, "Do really you
15   want to go ahead and appeal this to London?"
16         And the shoemakers said, "Ah, never mind."
17   Q.    So let me ask you, other than a potential safety analogue
18   for the drop test, are you aware of any other laws that are
19   analogous to the drop-testing requirement based on different
20   factors other than safety?
21   A.    I am not aware of any, no.
22   Q.    Okay.  And then features that show that a firearm is
23   loaded with ammunition, are you aware of any laws that existed
24   back at the founding or up through the adoption of the
25   Fourteenth Amendment that, where a state or a locality required

1    that there be some device on a firearm, that would indicate if
2    there was ammunition in the chamber?
3    A.    I have never seen anything like that.  In the long shot, I
4    think there were people who have enough intelligence to realize
5    you need to check the chamber or check the -- open up the
6    holder on the revolver to see if there is ammunition in there
7    or not.  If someone can't be trusted with that, they probably
8    shouldn't own a gun.  They probably shouldn't, also, be driving
9    a car because I'm not sure I would trust them to make good
10   decisions on that either.
11   Q.    But there is no law or regulation you're aware of that
12   required that in any locality?
13   A.    No.
14   Q.    Are you aware of any law or regulation during that time
15   period that is important in the Bruen test where the law or the
16   regulation required that features be put on a firearm so that
17   it wouldn't fire in certain positions, such as if it didn't
18   have a magazine?
19              MR. WOODS:  Objection, to the extent it goes to the
20   ultimate issue.
21              THE COURT:  Overruled.
22              THE WITNESS:  I have never seen any such law before.
23   Part of it is the magazine disconnectors that were mentioned
24   this morning are a fairly recent innovation, and I would not
25   say a particularly good one.  I can't remember his name, the

1  guy that testified first this morning.  He mentioned about the
2  trigger.
3      I can tell you the Browning Hi-Power that I own, the
4  magazine disconnector uses an eight-and-a-half-pound trigger to
5  a four-and-a-quarter-pound trigger pull, which makes it a
6  vastly more accurate.  As far as I'm concerned, if you are more
7  accurate with the gun, that makes it much safer with that gun
8  for everyone around you.
9  BY MR. DALE:
10  Q.   And when you are talking about trigger pull, you are
11  talking about the amount of pressure that a person needs in
12  order to pull the trigger to get the firing pin to strike the
13  primer; correct?
14  A.   Exactly.
15  Q.   Okay.  And then, in looking at the laws that you've
16  studied from the periods that are important to Bruen, from the
17  founding up through the adoption of the Fourteenth Amendment,
18  did you find any laws that required that a unique registration
19  mark be put on the ammunition of a firearm?
20  A.   No.  And part of it is that I don't think technology at
21  the time would have even made that possible.  These very small
22  numbers that are stamped onto the firing pin, that conform to
23  the microstamping requirement, are actually really tiny.  Try
24  to imagine making it with tools that were readily available in
25  the 19th century.

1  Q.   What about registration marks on the firearm itself?  Were
2  there any laws during that period that required that?
3  A.   No.  I got an e-mail from the Henry Rifle Company.  They
4  are the -- they have -- there is a museum Back East associated
5  with the Henry Rifle Company that made many rifles in the
6  United States in the late 18th to early 19th century.
7        And the curator of the museum told me that serial numbers
8  were fairly uncommon on firearms in the U.S. until the Civil
9  War period and later.
10       If you go onto websites that sell antique guns, you'll see
11 a lot of them marked "NSN," no serial number.
12 Q.   Let me ask you about -- let's go back to registering
13 pieces of ammunition or boxes of ammunition.  Has there ever
14 been a law, other than the current California law regarding
15 ammunition registration, that you're aware of where individual
16 boxes of ammunition would be registered?
17 A.   Well, I can tell you, when I first bought handgun
18 ammunition in Orange County about 1985, at the time there was a
19 still a federal law that required that you had to fill in a
20 disposition slip of some sort at the gun store, where they
21 would identify who you were, what your age was, and that you
22 were buying ammunition of a particular caliber.  But it was not
23 registration.  There was no number on the box.  There was
24 nothing to uniquely identify the ammunition in the box.
25       And I believe that law disappeared, because I have never

1    had to show my ID again after that.  I believe the Firearm

2    Owners' Protection Act of 1986 might have removed that

3    requirement.

4    Q.    Okay.  Do you know when that requirement for registering

5    ammo federally came into effect?

6    A.    I am not exactly sure.

7    Q.    Was it at any period during the founding or up through the

8    adoption of the Fourteenth Amendment?

9    A.    It was most unlikely, because -- I feel like I'm

10   struggling a little.  I had a stroke in 2014, and there are

11   times that it shows.

12        The first federal firearms law that I'm aware of is the

13   Nonmailable Firearms Act of 1927.  I am not aware of any

14   federal law regulating gun ownership or possession or anything

15   of the sort before that Act was passed.

16   Q.    1927?

17   A.    Yes.

18   Q.    Okay.  And, finally, I want to ask you, in doing the task

19   we asked you to do, looking for laws that were potentially

20   historical analogues, did you find any state or local laws that

21   required that features be put on firearms such that residents

22   of one state or locality could not obtain those firearms but

23   the rest of the states or the rest of the colonies, their

24   citizens could get those?

25   A.    Not firearms.  They had the period or issue where some

1    states have banned or in some cases engaged in extraordinarily

2    high taxes to discourage using Arkansas toothpicks, which was

3    two types of fighting knives that were unfortunately a little

4    bit too popular in the period before the Civil War.

5    Q.    So let me ask you:  How many jurisdictions were you aware

6    that put that sort of restriction on, at least, those fighting

7    knives?

8    A.    Six or seven.  If I had to, I could probably think about

9    it for a while and give you a complete list of all of them.

10   These bans were never terribly widespread.

11   Q.    Do you recall reading the outlier language in the Bruen

12   decision?

13   A.    There is the outlier language that indicates that some of

14   these laws were present in a few cities and a few territories

15   that represented a very small percentage of the U.S. population

16   are not terribly indicative of what we should consider to be a

17   prevailing view of what those laws were at the time.  These

18   were a very tiny minority of jurisdictions, and many of these

19   laws did not survive for very long.

20        I can tell you that -- unknown territory had restricted

21   gun-carrying laws, and the territorial period did not survive

22   into statehood.  The United States Supreme Court ended up

23   striking down some of those laws in a case called *In Re*

24   *Brickey*, 1902.

25   Q.    And, for example, you cited Bowie knife laws.  Based on

1  your understanding of the outlier language you just described,

2  have you formed an opinion as to whether the Bowie knife laws

3  that prohibited certain places from their citizens from having

4  Bowie knives but allowed a lot of other places to have them,

5  whether or not that would be considered an outlier, under your

6  understanding of Bruen?

7          MR. WOODS:  Objection.  Goes to the ultimate issue.

8          THE COURT:  Overruled.

9          THE WITNESS:  May I go ahead and answer that?

10          MR. DALE:  Yes.

11          THE COURT:  You may.

12          THE WITNESS:  I don't consider those to be outliers.

13  I mean, this was not -- these were not remote parts of the

14  United States.  These were familiar -- a number of states that

15  had significant populations in them, so they were not ruled the

16  outliers for Bruen.

17  BY MR. DALE:

18  Q.  Let me ask you about some other laws.  We previously

19  provided you some exhibits that were produced to us by the

20  Department of Justice.

21      And do you recall reviewing those exhibits?

22  A.  You mean the ones showing the firing pin?  That one?

23  Q.  No, no, no.  I'm talking specifically about the exhibit

24  they provided that included copies of historical laws.

25  A.  Right, Exhibit 24.  Yeah.  I got it in front of me.

1  Q.   Go ahead and take it off your screen, please, because I

2  don't want you to testify from it yet.

3  A.   Okay.

4  Q.   Thank you.  So one of those laws in there is a powder law.

5       Do you recall that law?

6  A.   Gunpowder storage laws.  There are a number of those,

7  including a number that are not in the exhibits, that I have

8  found.

9  Q.   And would you consider gunpowder storage laws, under your

10  understanding of the Bruen test, to be analogous to any of the

11  requirements of the Unsafe Handgun Act?

12  A.   No.  What's interesting is that many states and localities

13  have gunpowder storage laws not so terribly different from

14  these.  When I lived in California, the northern part, before I

15  purchased ammunition, I wanted to verify with the police

16  department if there was any limitation on the amount that I

17  could have.  The only limitation was I could not have more

18  than -- I think it was 30 pounds of black powder in my house,

19  which I considered an unreasonable amount to have in your house

20  in any case.

21       It turns out that many of the gunpowder storage laws that

22  were adopted in the period immediately before and after the

23  Revolution said you could not have more than, typically, 28 or

24  30 pounds of gunpowder in your home.  It has to be stored in a

25  public magazine because of the safety issues involved.

1  Q.   Well, but wouldn't that be analogous, for example, with

2  the drop-safety test, because there is a safety purpose behind

3  that to protect members of the public.

4       Do you disagree with that?

5  A.   I guess I disagreed because the drop-safety test is one of

6  these things -- there is a more indirect, sort of, risk

7  involved there.  If the gunpowder goes, the risks involving a

8  fire.  And even if you don't drop a gun or do anything like

9  that, the gunpowder will still be extremely a hazard.

10 Q.   All right.  And then there were also -- you previously

11 touched on it, but part of the defendant's exhibits included

12 some laws regarding proofing.

13      Do you believe that those fit the historical analogue

14 test, as you understand it?

15 A.   They're closer, but not quite.  The big difference is

16 that, there is proofing laws to verify the barrels can

17 withstand the fire buildup, usually larger barrel loaded with

18 gunpowder.  Those are primarily for the safety of the person

19 who is going to be purchasing the gun.

20      If a barrel bursts, the person could be hurt, but it is

21 just the person that is actually holding the gun whereas the --

22 a lot of these other requirements that are in the California

23 law are really intended to protect other people as opposed to

24 these proofing laws, which, I said, are primarily to protect

25 the person who is holding the gun.

Q.   All right.

A.   They're similar, but they're not quite the same.

Q.   Based on your research, your review of the history, are you aware of any law that existed at the time of either the founding up through and including the adoption of the Fourteenth Amendment that had the restrictions on firearms ownership that California's Unsafe Handgun Act has?

A.   None that I can think of, no.  There might be out there somewhere, but I have not seen any of them.  I have spent an awful lot of years going through dusty law books at the UC Hastings Law Library.

        MR. DALE:  All right.  Very good.  Thank you for your time today.

    I'll tender the witness.

        MR. WOODS:  I have no questions for this witness.

        THE COURT:  Okay, sir.  Thank you.  You are excused.

        THE WITNESS:  Thank you.

        MR. DALE:  Tell him, if he can stick around, because we will offer him for rebuttal for Professor Cornell's testimony.

        THE COURT:  All right.

        THE COURTROOM DEPUTY:  He left.  Tell him to log back in.

        MR. DALE:  Thank you, Judge.  I appreciate you accommodating all of this today.

```
1            THE COURT:  No problem.
2       Is that the last witness?
3            MR. DALE:  That is our last witness.
4            THE COURT:  Defense.
5            MR. SAROSY:  Yes, Your Honor.  I'll go get --
6            THE COURT:  Great.
7            MR. SAROSY:  I'll get Special Agent Supervisor
8   Gonzalez.
9            THE COURTROOM DEPUTY:  Just as a heads-up, I am
10  muting it for this witness.  Okay?  Or do they need to listen?
11           MR. DALE:  No.  It's fine for this witness.  He just
12  needs to listen to Professor Cornell.
13           THE COURTROOM DEPUTY:  Okay.  So if they reach out to
14  you, just tell them that they can see us, but it's muted.
15           MR. DALE:  All right.  I appreciate that.  Thank you.
16           THE COURTROOM DEPUTY:  You're welcome.
17           THE COURT:  Good afternoon, sir.
18           THE WITNESS:  Good afternoon.
19           THE COURT:  Can you please come forward?  Stand right
20  by our court reporter for a moment.  We're going to administer
21  an oath to you and then have you take the witness stand.
22           THE COURTROOM DEPUTY:  Just right there.
23           THE WITNESS:  Right here?
24           THE COURTROOM DEPUTY:  Raise your right hand.
25       Do you solemnly swear that the testimony you shall give in
```

1  the cause now before this Court shall be the truth, the whole

2  truth, and nothing but truth, so help you God?

3          THE WITNESS:  Yes, I do.

4          THE COURTROOM DEPUTY:  Please be seated.

5          THE WITNESS:  Please state your name and spell your

6  last name for the record.

7          THE WITNESS:  My name is Salvador Gonzalez.  Last

8  name is G-o-n-z-a-l-e-z.

9          THE COURT:  Please proceed.

10                     **SALVADOR GONZALEZ,**

11    **called by and on behalf of Defendant, testified as follows:**

12                    DIRECT EXAMINATION

13  BY MR. SAROSY:

14  Q.   Good afternoon, Mr. Gonzalez.  Thank you for being here.

15       Can you please tell me what your educational background

16  is?

17  A.   Yes.  My education, I have a Bachelor's of Arts in ethic

18  studies, a Bachelor of Science in criminal justice from

19  California State University, Sacramento.

20  Q.   And where are you currently employed?

21  A.   I am currently employed with the Department of Justice.

22  Q.   And how long have you been employed at the Department of

23  Justice?

24  A.   I am going on my ninth year.

25  Q.   And are you at a specific bureau within the Department of

1  Justice?

2  A.    Yes.

3  Q.    And what is that bureau called?

4  A.    The Bureau of Firearms.

5  Q.    And what roles have you -- or how long have you been with

6  the Bureau of Firearms, specifically?

7  A.    I have been with the Bureau of Firearms eight years now.

8  Q.    And what roles have you had at the Bureau of Firearms?

9  A.    I've been a Special Agent with the Bureau of Firearms

10  where we -- through the firearm familiarization, also

11  enforcement firearms, enforcement regarding either noncompliant

12  firearms or prohibited people.

13  Q.    And what is your current role at the Bureau of Firearms?

14  A.    My current role within the last -- what is it? -- four

15  years, going on four years now, I do classes in regards to

16  firearms familiarization, also contact, you know, prohibited

17  people.  I also do -- I also have duties that include -- I'm

18  over the roster of firearms.

19  Q.    And --

20  A.    California handgun roster.

21  Q.    And what is your current title?

22  A.    Special Agent Supervisor.

23  Q.    And are you based in Sacramento?

24  A.    Yes.

25  Q.    And do you cover certain areas, or are you just restricted

1    to Sacramento?

2    A.    I pretty much cover anywhere from Kern County up to the

3    Oregon border.

4    Q.    And as a Special Agent Supervisor, do you have additional

5    duties that other Special Agent Supervisors in the Bureau of

6    Firearms do not have?

7    A.    Yes.

8    Q.    And what are some examples of those duties?

9    A.    I do expert reports for district attorneys, local

10   agencies.  I go over facts regarding firearms, do some

11   familiarization courses for peace officers, property

12   technicians, other agents, other law enforcement.  I've

13   conducted training with local DA's and ATF in regards to

14   privately-made firearms, assault weapons, and other types of

15   firearm familiarization courses.

16   Q.    And do you -- other special agents and other staff in the

17   Bureau of Firearms, do they come to you for expertise as on

18   firearms and whether something is classified as an assault

19   weapon or a machine gun?

20   A.    Correct.

21   Q.    Do other law enforcement agencies also come to you for

22   your expertise on firearms?

23   A.    Correct.

24   Q.    Would you consider yourself a firearms expert for the

25   Bureau of Firearms?

1    A.   Yes.

2    Q.   And I forgot to bring you an exhibit binder, so just give

3    me one second.

4         Your Honor, may I?

5              THE COURT:  You may.

6    BY MR. SAROSY:

7    Q.   We'll get to your CV in a second, or we'll show it in a

8    second.  But your CV, I think, mentions that you've made or

9    assisted in the arrest of over 100 people for illegal weapons

10   possession and participated in over 30 search warrants.

11        Can you estimate how many firearms you've handled during

12   those investigations?

13   A.   Hundreds, over 500 or more.  I mean, it depends.  Some

14   cases that you deal with 100 firearms per case, so it's over,

15   probably, a thousand.

16   Q.   So you are saying, in one search, you could come across

17   100 firearms?

18   A.   Yes, correct.

19   Q.   And I'm assuming that number would include long guns and

20   handguns?

21   A.   Correct.

22   Q.   And you mentioned that you oversee the handgun roster.

23   And as you know, the handgun roster is what is required under

24   the Unsafe Handgun Act.

25        Does that sound right to you?

1  A.    Yes.

2  Q.    And what are your responsibilities in overseeing the

3  handgun roster?

4  A.    Well, when we receive applications from the certified lab

5  indicating that a manufacturer wants to introduce a pistol to

6  the roster, I take a look at the firearm and compare it.  If

7  it's a certain firearm that we just received, they call it,

8  like, a tested firearm, which we just received it, I take a

9  look and make sure we follow requirements.

10         Initially, it'll come, and the compliance report will

11  state and be checked off if it's gone through the drop-safety

12  test; has a positive manual of safety or some type of safety,

13  if it is a revolver; if it has gone, like I said, through 600

14  rounds of firing; if it has a chamber load indicator or

15  magazine disconnect or -- at this time, I guess, there are no

16  microstamping -- firearms with microstamping.  But we just go

17  over all those requirements, if they've been met.

18         If it's similar, of course, if it's similar findings

19  except for -- depending on when the firearm was introduced, if

20  it was introduced prior to the microstamping or -- not the

21  microstamping but the chamber load indicator or magazine

22  disconnect, then we just verify that the new similar matches

23  that tested firearm and make sure that all the parts are

24  identical to the originally submitted firearm.

25         So then after that, we get the application plus the fee,

1    which is a $200 fee, to get the firearm listed.  We then have

2    what's called -- we determine if the firearm meets all the

3    requirements and if it's approved or not.

4    Q.    And in your role in overseeing the handgun roster, how

5    many handguns do you think you've handled in doing those

6    responsibilities?

7    A.    Hundreds.

8    Q.    Do you know how to -- sorry.

9          That number, does that number include -- or what are the

10   types of handguns, I guess, that that would include?

11   A.    There is a single-action revolver, double-action

12   revolvers, semi-automatic pistols, semi-automatic pistols with

13   chamber load indicators, semi-automatic pistols with chamber

14   load indicators and magazine disconnects, single shot firearms

15   or handguns.  I think that's about it.

16   Q.    Do you know how to disassemble all of those different

17   types of firearms and handguns?

18   A.    Yeah.  Well, I've had to learn legally, yes.

19   Q.    So you can identify the parts within all those types of

20   handguns?

21   A.    A lot of the parts.

22   Q.    And have you disassembled semi-automatic pistols with a

23   chamber load indicator and a magazine disconnect?

24   A.    Yes.

25   Q.    And have you fired semi-automatic pistols with a chamber

1    load indicator and a magazine disconnect?

2    A.    Yes.

3    Q.    And are you familiar with how -- you don't need to

4    describe yet how a chamber load indicator works, but are you

5    familiar with how a chamber load indicator works?

6    A.    Yes.

7    Q.    Are you familiar with how a magazine disconnect works?

8    A.    Yes.

9    Q.    And are you familiar with how microstamping is intended to

10   work under California law?

11   A.    Yes.

12   Q.    And if you can turn to Exhibit 1, which is just tab

13   number 1.  Is this an accurate and up-to-date copy of your CV?

14   A.    Yes, it is.

15          MR. SAROSY:  Your Honor, I would like to move Exhibit

16   1 into evidence.

17          THE COURT:  Any objection?

18          MR. DALE:  No objection.

19          THE COURT:  Exhibit 1 will be received into evidence.

20       (Exhibit 1 was received into evidence.)

21          MR. SAROSY:  Thank you.

22   Q.    And does your CV list all of the firearms-related

23   trainings that you have attended?

24   A.    Yes.

25   Q.    I am not going to have you go through all of them but just

1  for our benefit, can you just highlight some of the trainings

2  relating to the identification and use of firearms?

3  A.   I've gone to Colt Armory School provided through Colt.

4  I've gone to the Glock Armory School provided through Glock;

5  also, the Benelli.  Benelli was provided through another -- not

6  the actual manufacturer, but it a Benelli shotgun armory

7  course.  I also had submachine gun classes, where we took apart

8  our firearms just to familiarize ourselves with what we use.

9       I've also been a Range Master, which is the AR-15-type

10  rifles in order to train and shoot and train other people.

11  Q.   And what trainings did you have to do to become a Special

12  Agent at the Bureau of Firearms?  Firearms -- I'm sorry.

13       What firearms training have you had to do to become a

14  Special Agent?

15  A.   Well, I had -- I would have to go through firearms

16  familiarization courses in the past.  I've had to go through,

17  of course, POST -- I had POST through Golden West Academy here

18  in Huntington Beach, also had numerous trainings with our old

19  expert which he conducted certain trainings that I went

20  through.  I went through the private manufactured firearms

21  training with ATF as well.  I think that is a lot of what I

22  remember right now.

23  Q.   When say, "Our old expert," who are you referring to?

24  A.   Blake Graham.

25  Q.   And what was his role at the Bureau of Firearms?

1    A.    He was an expert.  His last role was deputy district --

2    not district.  He was Assistant Director for the Bureau of

3    Firearms.  But he also started as a Special Agent, moved to be

4    an expert over the roster himself.

5    Q.    And he was the Bureau's firearms expert before you?

6    A.    Correct.

7    Q.    And can you estimate how many hours of firearms training

8    you've gone through to date?

9    A.    Probably hundreds.  I don't know exactly.  I never really

10   counted.

11   Q.    Would you say over a thousand?

12   A.    I would say so.

13   Q.    And have you given testimony in court before relating to

14   firearms identification?

15   A.    Yes.

16   Q.    Were those criminal or civil cases?

17   A.    Criminal.

18   Q.    And that would be criminal prosecutions --

19   A.    Correct.

20   Q.    -- by district attorneys?

21         So do you consider your areas of expertise here to be to

22   include firearms identification?

23   A.    Yes.

24   Q.    Do you consider yourself an expert in the handgun roster?

25   A.    Yes.

1    Q.    And do you consider yourself an expert in the requirements

2    of the handgun roster?

3    A.    Yes.

4         MR. SAROSY:  All right.  Your Honor, I would like to

5    offer Special Agent Supervisor Sal Gonzalez as an expert in the

6    areas he just described.

7         THE COURT:  He will be so designated.

8         MR. SAROSY:  Thank you.

9    Q.    We are going to start with talking about how the handgun

10   roster -- what it is and how it works, and then we'll move on

11   to the specific requirements of the roster.

12        And, obviously, Your Honor, if you have follow-up

13   questions, feel free.

14        Can you briefly explain -- I know we've heard testimony

15   about what the handgun roster is, but can you explain, from

16   your perspective, what the handgun roster is?

17   A.    Well, back in -- what was it? -- 1968, the Gun Control Act

18   passed which put kind of a hold on foreign importation of

19   truly-made firearms.  So because of that, there was, like, five

20   distributors out of the Los Angeles area that started making

21   these what they call, "Saturday Night Specials," which is kind

22   of termed "the ring of fire," right, because they were located

23   in kind of a circular area in L.A., the Los Angeles area.

24        So because of that, the roster was started where they

25   tried to get certain safety devices, safety -- bring firearms

Suzanne M. McKennon, CSR, CRR, RMR
United States Court Reporter
suzanne_mckennon@cacd.uscourts.gov    (213) 894-3913

```
 1   up to compliance and make sure that firearms weren't
 2   discharging without, you know, the barrel blowing up or the
 3   firearm blowing up in a user's hand.
 4   Q.   So were those some of the safety issues with the "Saturday
 5   Night Specials"?
 6   A.   Correct.
 7   Q.   Were there other safety issues that you're aware of with
 8   handguns described as "Saturday Night Specials"?
 9   A.   Not that I recall.
10   Q.   And, generally, can a California resident purchase a
11   handgun that is not listed on the roster?
12   A.   A California resident?  No.
13   Q.   And can a California resident possess a handgun that is
14   off-roster?
15   A.   Yes.
16   Q.   And is there -- is the roster publicly available, a copy
17   of the handgun roster?
18   A.   Yes, it's publicly available online.
19   Q.   And is the publicly available list, is that a searchable
20   list, or is it like an Excel spreadsheet?
21   A.   It's a searchable list.
22   Q.   Can you turn to Exhibit 2, or tab 2.
23        Is that an accurate screenshot of the searchable boxes
24   on -- for the handgun roster?
25   A.   Yes.
```

1  Q.   And is this a screenshot of -- I guess, what is this a
2  screenshot of?  Like, which website?
3  A.   It's Office of Attorney General's Handguns Certified for
4  Sale.  It's the roster, what we term the "roster."
5  Q.   And it seems like there -- do you see two searchable boxes
6  here?
7  A.   Yes.
8  Q.   And can you describe how -- do you know how those work,
9  the searchable boxes?
10 A.   Yes.  So the first one where it states -- it just says,
11 "Manufacturer," it's kind of a drop-down menu that lists all
12 the manufacturers in alphabetical order.
13      In the search, you can search by manufacturer and model,
14 Just type it in, and it will pull up the type of manufacturer
15 or firearm that you are looking for.
16          MR. SAROSY:  All right.  Your Honor, I would like to
17 move Exhibit 2 into evidence.
18          THE COURT:  Any objection?
19          MR. DALE:  No objection.
20          THE COURT:  Exhibit 2 will be received into evidence.
21      (Exhibit 2 was received into evidence.)
22 BY MR. SAROSY:
23 Q.   And what are the types of handguns that are on the roster?
24 A.   Handguns, like I said before.  There are revolvers, some
25 semi-automatic pistols.  We have some single shots.  We have

1    semi-automatics with chamber load indicators, semi-automatic

2    with chamber load indicators and magazine disconnect.  That's

3    all we have there on the roster.

4    Q.    And does the Bureau of Firearms keep a sample of every

5    handgun that has been added to the roster?

6    A.    We keep one sample, yes.

7    Q.    And for this case, did you take some photographs of some

8    of those samples --

9    A.    Yes.

10   Q.    -- that were maintained by the Bureau of Firearms?

11         If you can turn to Exhibit 3, is this an accurate picture

12   of a revolver that is currently on the roster?

13   A.    Yes.

14   Q.    What is the model name for this revolver?

15   A.    This is the North American Arms, what they call -- it

16   would be NAA-22MS.

17   Q.    And can you describe what a revolver is and how it

18   operates?  Can you describe what a revolver is and how it

19   fires?

20   A.    So in this one, it's a single shot revolver, so you would

21   have to set the hammer back and then pull the trigger in order

22   for it to discharge a round.

23   Q.    I am just going to show you Exhibit 3, real quick.  This

24   is very bright, but can you see that?

25   A.    Yes.

1    Q.    Can you just circle on the screen where the hammer is,

2    that you were describing?

3    A.    Here (indicating).  This little thing here.

4    Q.    And is this a single-action revolver or a double-action?

5    A.    It's a single-action.

6    Q.    What is the difference between a single-action and a

7    double-action revolver?

8    A.    Well, with the single-action, like I said, you would have

9    to pull the hammer back before you could fire the trigger or

10   put your finger on the trigger before it fired.

11          The double-action, it would happen automatically depending

12   on the type; right?  But the double-action, once you put your

13   finger on the trigger and pull it, it will fire on the first

14   round.  After the second round, it can either go to

15   single-action, where it will fire after the hammer is already

16   cocked back.  So there is differences, little differences.

17          MR. SAROSY:  I will take this off.

18        Your Honor, can I move Exhibit 3 into evidence, please?

19          THE COURT:  Any objection?

20          MR. BRADY:  Is that exhibit going to reflect the mark

21   that the witness just made on it?

22          MR. SAROSY:  I don't believe so, no.

23          MR. DALE:  That's fine.  No objection.

24          THE COURT:  Exhibit 3 will be received into evidence.

25        (Exhibit 3 was received into evidence.)

```
1   BY MR. SAROSY:
2   Q.   And, Mr. Gonzalez, the circle you made, was that of the
3   trigger or the hammer?
4   A.   I made the trigger; right?
5   Q.   No.  Sorry.  I was asking about the hammer.
6   A.   Oh sorry.
7   Q.   No.  I'm sorry.
8   A.   I'm sorry.
9   Q.   Yeah, no worries.
10       Can we do it again?  Can you circle where the hammer is?
11  A.   For some reason I thought "trigger."  But, yeah, here is
12  the trigger.
13  Q.   Is that --
14  A.   Here is the hammer.  Here is the trigger.
15  Q.   So you would have to -- for a single-action revolver using
16  what you're describing right now, can you describe again what
17  you would have to do?
18  A.   So for a single-action, you would have to cock the hammer
19  back, and then you pull the trigger.  And that's the only way
20  to discharge the firearm in this sense.
21  Q.   So you have to pull the hammer back every time?
22  A.   Yes.
23  Q.   Okay.
24  A.   Like you see in the cowboy movies where they use one hand
25  to try to manipulate it to fire faster.
```

1  Q.   Can you turn to Exhibit 4?  Is that an accurate picture of

2  a revolver on the roster?

3  A.   Yes.

4  Q.   And what is the model name for that revolver?

5  A.   This is a KSP-321X.

6  Q.   And who is the manufacturer?

7  A.   It's a Sturm, Ruger.

8  Q.   I am going to show you Exhibit 4.

9       Is this a single-action or a double-action revolver?

10 A.   This is what we call "double-action."

11 Q.   And can a double-action revolver typically be fired faster

12 than a single-action revolver?

13 A.   Yes.

14 Q.   And how many cartridges or bullets does a revolver

15 typically hold?

16 A.   Well, it all depends.  Some can go five to six, depending

17 on the type of revolver it is.

18 Q.   And how does the shooter reload a revolver?

19 A.   You have to open up the cylinder, pull up the pin up out

20 of the cylinder, and load it manually.

21 Q.   Can you circle where the cylinder is just for everyone's

22 benefit?

23 A.   (Witness complies.).

24 Q.   Thank you.

25      Your Honor, I would like to move Exhibit 4 into evidence.

```
 1              THE COURT:  Any objection?
 2              MR. DALE:  No objection.
 3              THE COURT:  Exhibit 4 will be received into evidence.
 4         (Exhibit 4 was received into evidence.)
 5    BY MR. SAROSY:
 6    Q.    Alll right.  Let's talk about semi-automatic pistols.
 7          Can you turn to tab 5.
 8          Is this an accurate picture of a semi-automatic pistol
 9    that is currently on the roster?
10    A.    Yes, it is.
11    Q.    And what is the manufacturer and model for this
12    semi-automatic pistol?
13    A.    The manufacturer is Kahr Arms, model M9098A;
14    Q.    And does this semi-automatic pistol have a chamber load
15    indicator or magazine disconnect?
16    A.    This one does not.
17    Q.    And can you describe what a semi-automatic pistol is and
18    how it operates compared to a revolver?
19    A.    Well, a semi-automatic pistol will have a magazine
20    inserted into the magazine well.  Once you load it, pull the
21    slide back, load the chamber, a round, by pulling the trigger,
22    it automatically will feed another round while the other one
23    extracts -- well, the cartridge extracts, and the bullet goes
24    out.
25              MR. SAROSY:  Okay.  Your Honor, can I move Exhibit 5
```

1    into evidence?

2            THE COURT:  Any objection?

3            MR. DALE:  No objection.

4            THE COURT:  Exhibit 5 will be received into evidence.

5        (Exhibit 5 was received into evidence.)

6    BY MR. SAROSY:

7    Q.   Can you explain how semi-automatic pistols without a

8    chamber load indicator and magazine disconnect are still on the

9    roster after the law required chamber load indicators and

10   magazine disconnects and microstamping?

11   A.   Yes.  Well, these firearms were introduced prior to --

12   what was it? -- 2006 before the chamber load indicator was

13   required.  It was a requirement before the magazine disconnect

14   in 2007 was required.

15       So if they keep these on the roster, if they do the fee,

16   which is an annual fee or maintenance fee for $200, and they

17   keep on renewing it, they remain on the roster.

18   Q.   And can you turn to Exhibit 6, or tab 6.  And this is an

19   accurate picture of a semi-automatic pistol that is currently

20   on the roster?

21   A.   Yes.

22   Q.   And what is the manufacturer and model name for this

23   firearm?

24   A.   This is Smith & Wesson M&P 9 Shield.

25   Q.   And does this pistol have a chamber load indicator and a

1    magazine disconnect?

2    A.    This one does.

3    Q.    I am going to show you Exhibit 6, and we'll talk more

4    specifically about chamber load indicators and magazine

5    disconnects.

6         But can you just circle, using your screen, the general

7    area where the chamber load indicator and the magazine

8    disconnect would be?

9    A.    Well, on a Smith & Wesson, on this model, it be on here.

10   It's kind of flush, so you won't see it.  It's here on the

11   slide, chamber load indicator.

12   Q.    And then the magazine disconnect?

13   A.    The magazine disconnect, it's internal, so it's inside the

14   magazine well.  It's somewhere in here.  It's inside the

15   magazine, so you can't see it with this picture.

16             MR. SAROSY:  All right.  Your Honor, can I move

17   Exhibit 6 into evidence?

18             THE COURT:  Any objection?

19             MR. DALE:  No objection.

20             THE COURT:  Exhibit 6 will be received into evidence.

21        (Exhibit 6 was received into evidence.)

22   BY MR. SAROSY:

23   Q.    Can you turn to tab 7, Mr. Gonzalez?  Do the photos in

24   front of you -- I guess, what do they show?

25   A.    This was a chamber load indicator on the Smith & Wesson.

1  Q.   Is this a close-up of the chamber load indicator from the
2  same Smith & Wesson M&P 9 Shield that we were just looking at?
3  A.   Yes.
4  Q.   And can you briefly describe what a chamber load indicator
5  is?
6  A.   A chamber load indicator is supposed to let the user know,
7  or somebody that comes in contact with the firearm, that there
8  is a round chambered in the barrel.
9  Q.   Actually, I'll hold off for now.
10        Can we move Exhibit 7 into evidence, Your Honor.
11             THE COURT:  Any objection?
12             MR. DALE:  No objection.
13             THE COURT:  Exhibit 7 will be received into evidence.
14        (Exhibit 7 was received into evidence.)
15             MR. SAROSY:  Thank you.
16  Q.   Can you turn to tab 8, Mr. Gonzalez?
17  A.   (Witness complies.).
18  Q.   And what is this a picture of?
19  A.   This is, like, the same, a firearm, Smith & Wesson M&P 9.
20  It shows -- well, one thing when the chamber load indicator is
21  down.  It also shows the magazine disconnect mechanism.  If you
22  look at toward the center, you see a little silver blade or tab
23  towards the center, and that's the magazine disconnect.
24  Q.   And what is the -- we'll get more into magazine
25  disconnects mechanisms in a second.  But what is the function

1    of the magazine disconnect?

2    A.    So when the magazine disconnect -- when the magazine is

3    out of the weapon, it won't allow a round to be fired, even

4    there's a live round in the chamber.

5    Q.    And, currently, in order for a new handgun, not a similar

6    handgun, in order for a new handgun to be added to the

7    roster -- sorry -- a semi-automatic pistol to be added to the

8    roster, would it need to have a chamber load indicator and a

9    magazine disconnect mechanism?

10   A.    Correct.

11   Q.    Do revolvers need to have a chamber load indicator or

12   magazine disconnect mechanism to be added to the roster?

13   A.    No, they do not.

14   Q.    Can you turn to tab 9?

15   A.    (Witness complies.)

16   Q.    What is this a picture of or photograph of?

17   A.    This is a Franklin Armory CA320.  It's a single shot

18   pistol.

19   Q.    And is this an accurate picture of that single shot

20   pistol?

21   A.    Correct.

22   Q.    And is this pistol on the handgun roster currently?

23   A.    Yes, it is.

24   Q.    And can you describe what a single shot pistol is?

25   A.    A single shot pistol technically needs to be manually

1    loaded every time you let off a round.  So you shoot one round,
2    the slide remains open load, and you load another round and
3    then go ahead and shoot.  It has to be manually loaded every
4    single time.
5    Q.   The manual reload, is that the main difference between a
6    semi-automatic pistol and a single shot pistol?
7    A.   Correct.
8    Q.   When you fire a semi-automatic pistol, how does a
9    semi-automatic pistol typically reload?
10   A.   Well, essentially, you fire from a semi-automatic pistol,
11   but like I said, you have to have -- you have a magazine inside
12   the pistol.  It would -- the magazine would cause the next
13   round to go up into the chamber and fire.  It lets you fire
14   again while the other cartridge ejects.
15   Q.   So with the pull and then the release of the trigger, does
16   it fire and then reload in that one action?
17   A.   So when you pull the trigger, it will fire.  The slide
18   goes back.  Then, it causes it to extract, the cartridge to
19   extract.  Another round will go up, slide up and reload the
20   firearm.
21   Q.   And are there single shot pistols on the roster that do
22   not require a manual reload of ammo?
23   A.   Single shot pistols?  Let me think.
24   Q.   I guess -- let me strike that.
25        When you a "manual reload," what is an example of a manual

1  reload?

2  A.   Manually, you would get it with your hands and pick it up.

3  The slide would be open.  You lay it on the inside of the --

4  where the extractor is at; right?  You lay it in there, and let

5  the rack -- the slide go forward, and then you would go ahead

6  and pull the trigger, and the round would go off.

7  Q.   And do single shot pistols need to have a chamber load

8  indicator or magazine disconnect?

9  A.   No, they do not.

10       MR. SAROSY:  Okay.  Your Honor, can I move Exhibit 9

11  into evidence?

12       THE COURT:  Any objection?

13       MR. DALE:  No objection.

14       THE COURT:  Exhibit 9 will be received into evidence.

15    (Exhibit 9 was received into evidence.)

16  BY MR. SAROSY:

17  Q.   Let's talk about how many handguns are currently on the

18  roster.  Do you know how many total handguns are currently on

19  the roster, approximately?

20  A.   As of January 1st, there's 829 on the roster.

21  Q.   And of those 829, do you know about how many revolvers?

22  A.   Approximately, like, 314.

23  Q.   And about how many single shot pistols are on the roster?

24  A.   Single shot pistols, there is 60.

25  Q.   And about how many semi-automatic pistols are currently on

1  the roster?

2  A.    There is 499.

3  Q.    And of those 499, how many of those are similar or similar

4  to semi-automatic pistols?

5  A.    Similar to 499?  I am trying to remember.  It's about 300,

6  approximately 300.  I cannot recall.

7  Q.    Are similars, or are new?

8  A.    I cannot recall.  I cannot tell you.  I cannot recall.

9  Q.    And about how many total semi-automatic pistols are on the

10  roster with the chamber load indicator and a magazine

11  disconnect?

12  A.    There is 32.

13  Q.    And are there any semi-automatic pistols on the roster

14  with microstamping?

15  A.    No, there are not.

16  Q.    And in the past five years, so, I guess, since about 2018,

17  has the number of handguns on the roster gone below 800?

18  A.    In the past five years, no.

19  Q.    And are you aware of the law that would require any time a

20  new handgun -- a new semi-automatic pistol is added to the

21  roster that three must be removed from the roster?

22  A.    Yes.  If a new handgun was added, I believe, with

23  microstamping, then one handgun model would be removed.

24  Correct?  Is that way you phrased it?

25  Q.    All right.  Is it three that would be need to be removed

1    or one?

2    A.    It was -- actually, yeah, it's three.  Three that would be

3    removed, but it was of the similar, I believe, model.  Or it

4    goes by expiration dates.

5    Q.    And have any handguns to date been removed from the roster

6    because of that provision?

7    A.    No.

8    Q.    And I think you talked about this generally in the

9    beginning but -- actually, I'll skip it, because you actually

10   talked about the process for getting a handgun added to the

11   roster.

12        And that -- the process you described for getting a

13   handgun added to the roster, that was for a new handgun?

14   A.    Correct.

15   Q.    Was that for a new handgun?

16   A.    Correct.  I could reemphasize or restate how similar it

17   would be added.

18   Q.    Actually, can you walk us through the process again, just

19   generally how, starting from the lab?

20   A.    Yeah.  So, like I said, the manufacturer would send three

21   samples to the lab.  The lab would then make sure it would meet

22   certain requirements such as it would have to have -- if it's

23   semi-automatic, it would have to have positive safety, which is

24   something that could be a trigger, a trigger blade, a manual

25   thumb safety, a firing pin block.  They check that off seeing

1    it does have one.

2         And then it would have to have -- pass certain

3    drop-testing, which is six tests in all.  They have some kind

4    of little -- like a rate that they have that they would -- when

5    they place the firearms to fall in certain directions and

6    there's discharges.

7         It would have to go through 600 rounds of firing.  If it

8    fails within the first 20 rounds, then they consider it

9    failing.  Or if it fails between anywhere -- in more than the

10   six rounds or six malfunctions within those 600, then it fails

11   as well.

12        But if they all pass, it passes all of these tests, then

13   one of the firearms that are part of the samples gets sent back

14   to the Department of Justice along with certified lab test

15   report and a check for $200.

16   Q.   And what is generally the process for a similar handgun to

17   be added to the roster?

18   A.   Similar handguns, basically the same thing.  The same

19   amount is charged, $200.  The only difference is, when it's

20   tested, there is a sample we could refer back to which we have

21   in our vault in Sacramento.  So we take a similar, look at the

22   tested model, make sure that there had been no physical mark

23   and internal changes.  If we notice that there has been some

24   type of internal change with some type of mechanism, some type

25   of part, then we basically -- I'll review it and then decide if

1  it's going to pass or not.  If it's an external change,

2  something cosmetic, we also go through the same process,

3  depending on what the change is.  We decide if it's going to

4  pass or not.

5       When it's more of a physical change, then it's more likely

6  that it won't pass because we don't know, because of that

7  physical change, if a drop test or something else would cause

8  it to misfire, so that would -- a physical change would require

9  to go get it retested.

10  Q.   A similar handgun is not sent to a lab; right?

11  A.   Correct.

12  Q.   And when you talk about cosmetic differences, what are

13  examples of cosmetic differences?

14  A.   They'll change, like, stripling on the grip.  They'll say

15  that they put, maybe, like a rail or something on the frame.

16  They make some type of -- they change their font.  Little

17  changes that, if they notify us, they tell us, "Hey, we did

18  this type of change on the external side that is not going to

19  the impact the workings, internal workings, of the firearm,"

20  then that is when it gets reviewed.  And that is when a

21  decision is made if it's going to go through or not.

22  Q.   And when a manufacturer sends a firearm to be added that

23  is similar, do they sign a statement under oath stating that

24  the only differences are cosmetic differences?

25  A.   Correct.  They'll send us something.  If there are

1  changes, they'll let us know ahead of time, these are the

2  changes, external changes.  And if we have further questions,

3  we talk back to them and ask them, "Does this in any way affect

4  the workings of the firearm?"

5      They'll give us a brief explanation, if we need more.  And

6  then we make our decision based on the explanation.

7  Q.   And can you look at tab 10, please?  And can you describe

8  what that is photograph of?

9  A.   Yes.  This is Smith & Wesson M&P Shield.  It's the Robin's

10  Egg Blue, like Tiffany Blue.

11  Q.   Is this an accurate photo of a handgun that's on the

12  roster?

13  A.   Correct.

14  Q.   And is this a similar handgun?

15  A.   Yes.

16  Q.   And what is it a similar handgun of?

17  A.   Of the one we saw prior, the black M&P Shield.

18  Q.   Would that be Exhibit 6?

19  A.   I believe -- yes.

20      MR. SAROSY:  Your Honor, can I move Exhibit 10 into

21  evidence.

22      THE COURT:  Any objection?

23      MR. DALE:  No objection.

24      THE COURT:  Exhibit 10 will be received into

25  evidence.

1          (Exhibit 10 was received into evidence.)

2    BY MR. SAROSY:

3    Q.    And you were talking earlier about firing tests that a lab

4    does.

5          Can you describe what -- you know, what labs conduct these

6    tests?

7    A.    Yeah.  There is currently two labs that conduct the tests.

8    There is one in -- was is it? -- Baltimore, Maryland area;

9    another one, I believe, in Illinois.  I haven't been to the

10   second lab.  I've only been to the first lab.

11         Like I said, you go there.  They have the three samples.

12   They run the tests.  They -- based on, like I said, 600 rounds,

13   if there is a malfunction within the first 20, then they'll

14   fail the firearm.  As long as -- they make sure that it's

15   not -- it doesn't have anything to do with ammunition or the

16   cartridge, so they take that into consideration.  They'll

17   change out the magazines, and they'll use different ammunition.

18         And if that is the case, they proceed to retest it and

19   fire it again, and then they'll proceed.  But if it has a total

20   of six or more malfunctions within those 600 rounds, then they

21   kill it, the firearm.

22   Q.    What you described is that the firing test?

23   A.    Correct.

24   Q.    What kind of malfunction is the lab looking for during the

25   firing test?

1  A.   It's able to -- it doesn't discharge.  Typically, just not

2  discharging, not firing off a round.

3  Q.   So what is the importance of making sure there is no

4  malfunction during a firing test?

5  A.   Well, if you purchase a firearm, you want to make sure it

6  works.

7  Q.   And if a firearm failed a firing test, what are some of

8  the things that could happen to it if you continued to fire it?

9  A.   Sometimes it will cause the barrel to either get damaged

10 or either the handgun to, basically, blow up in your hand by

11 missing the two rounds at the same time.  Just different things

12 could happen.

13 Q.   And if a handgun malfunctioned during a lab test, could it

14 also malfunction outside of a lab?

15 A.   Correct.

16 Q.   And what is the public safety benefit of doing the firing

17 test?

18 A.   Well, you know you have a good product that has been

19 tested.

20 Q.   And the two labs that you've described, do they have to go

21 through any kind of certification process?

22 A.   Yes.

23 Q.   And can you briefly just describe what that certification

24 process is?

25 A.   Yes.  So you'll have people that go out there.  They go

1    over the test.  They just follow through what their testing is.

2    They make sure that the process is followed.  They review the

3    drop-testing.  They'll review the firing test.  And they make

4    sure that they have all the proper documentation, the documents

5    and everything has been gone through.  They go through over the

6    compliance test report with them as well.

7    Q.   And I think you mentioned earlier about something called

8    the drop test.  And what is involved in the drop test?

9    A.   Well, the drop test, they'll take what they have -- it's

10   kind of like a little sling, which is manipulated to place the

11   firearm in different positions.  Maybe once when it faces to

12   the rear.  So they drop it with the slide facing backwards to

13   the ground.

14       Another one where they'll drop it from the front, which is

15   the barrel facing forward.  They'll drop it from different

16   angles.  So it's different -- six different types of drops.

17   Q.   What is the lab looking for when it conducts a drop test?

18   A.   They want to make sure that the firearm does not cause a

19   discharge, an accidental discharge.

20   Q.   And if a handgun fired during a drop test in a lab, could

21   it fire if it was dropped in real life as well, outside of a

22   laboratory?

23   A.   Yes.

24   Q.   What do you see as the public safety benefit of the drop

25   test?

1   A.   Well, like I said, it's just to make sure that the firearm

2   you are receiving does not accidentally discharge when there is

3   improper handling of a firearm.

4   Q.   And if a handgun -- or once a lab considers that a handgun

5   has passed the test, what does the lab send to the Bureau of

6   Firearms?

7   A.   They send one of the samples, one of the three samples

8   will be sent to the Department of Justice along with the test

9   results, and then -- along with a fee of $200.

10  Q.   Are those test results reported in a certain type of form?

11  A.   Yes.

12  Q.   And what is that form called?

13  A.   It's Compliance -- what's it called?  I always forget.

14  It's a Compliance Report.  Department of Justice Compliance

15  Report.

16  Q.   Can you turn to tab 11.  Is that an accurate copy of a

17  blank Compliance Test Report?

18  A.   Yes.

19          MR. SAROSY:  Your Honor, I'd like to move Exhibit 11

20  into evidence.

21          THE COURT:  Any objection?

22          MR. DALE:  No objection.

23          THE COURT:  Exhibit 11 will be received into

24  evidence.

25      (Exhibit 11 was received into evidence.)

BY MR. SAROSY:

Q.   Let's talk about chamber load indicators more specifically.  If you can turn to tab 7, which I believe are close-up photos of the chamber load indicator.

Now, does every handgun that has a chamber load indicator on the roster -- do they put the chamber load indicators in all the same place?

A.   No, they do not.

Q.   So is Exhibit 7 just one example of where a chamber load indicator could be?

A.   Yes.

Q.   And for this Smith & Wesson M&P 9 Shield, can you describe the location of the chamber load indicator on this handgun?

A.   Yes.  It's on the slide, on top of the slide, right behind where the extractor -- or the barrel and the slide meet.

Q.   And are there specific requirements for what a chamber load indicator must look like?

A.   Yes.  It has to be seen from as close distance as far away as 24 inches, so a minimum of 24 inches.  It has to be contrasting in color.  If it has any wording, it has to say either in plain English -- you know, has to say that it's loaded or have a pictorial diagram indicating to a reasonable person that they would understand it's loaded.

Q.   Is this the -- and I think you said already this is not the only way, then, to do a chamber load indicator?

1   A.   Correct.

2   Q.   I am going to show you the next page of Exhibit 7.  It

3   shows up pretty poorly on this, I think.

4            THE COURTROOM DEPUTY:  Counsel, press the light.

5            MR. SAROSY:  Brightness?

6            THE COURTROOM DEPUTY:  No.

7        (A discussion was held off the record.)

8   BY MR. SAROSY:

9   Q.   What is this a photo of?

10  A.   This is a top view of the slide.  It shows the chamber

11  load indicator towards the center.

12  Q.   Is this the view of a chamber load indicator from a

13  shooter's perspective?

14  A.   No.  It would have to be higher, in a sense.  To get that

15  accurate line of sight, it would have to be centered, a little

16  bit centered.

17       So lift it up higher.  This is a little off.

18  Q.   Okay.  In your opinion, does a chamber load indicator --

19  does this chamber load indicator disrupt the shooter's sight in

20  any way?

21  A.   Based -- you know, I know that seeing -- people state

22  that, because of the white lettering, it kind of impedes their

23  line of sight.  It does fall -- it still does fall below the

24  dot on -- towards the front.  It does fall below.  So if you

25  had a similar position with your firearm, you would know where

1    your line of sight was.

2        So I don't think it impedes or stops you from having a

3    good aim or correct aim.  But I know there is arguments out

4    there.

5    Q.    And does the lab or does the Department of Justice

6    determine whether a semi-automatic pistol has a chamber load

7    indicator?

8    A.    The Department of Justice suggests that it should have a

9    chamber load indicator.

10   Q.    And what is the benefit of a chamber load indicator -- I

11   guess, what is the public safety benefits of a chamber load

12   indicator?

13   A.    Well, for anybody that is unfamiliar with a firearm, comes

14   into contact with a firearm, they know that a round is present.

15   Also, for people that either tend to forget that they, you

16   know, either release the magazine from the magazine well or

17   forgot to rack the slide, it'll let, you know, hey, there's

18   still a round present.

19   Q.    And if the owner of a handgun is trained in how to use

20   their handgun, is that training enough to prevent an accidental

21   discharge?

22   A.    This is not meant to be -- to take over certain training.

23   It's more to help you along, assist you.  There is other ways

24   to press check what mostly trained people will do.  They'll do

25   a press check.  They'll rack -- you know, pull the slide back a

1  little bit.  They'll see a little silver -- something silver

2  shining or something.  They'll know that there is a round in

3  the chamber.

4      But this is not only to help along -- just like a camera

5  in a vehicle; right?  The rearview camera helps you.  I mean,

6  you still are required to look behind you at your blind spots.

7  You just don't rely solely on the rearview camera.

8  Q.    Is the chamber load indicator supposed to be relied upon

9  instead of one's training, or is it a complement to one's

10  training?

11  A.    It's more of a complement.

12  Q.    And if someone who is not trained in using the firearm

13  gets ahold of the gun, what is the benefit of the chamber load

14  indicator?

15  A.    I'm sorry.  What was your question?

16  Q.    So if someone who is not the owner of the firearm, say a

17  child, were to get their hands on the gun, what is the benefit

18  of a chamber load indicator?

19  A.    Well, they would be able to read, if they were capable of

20  reading -- right? -- either by looking at what it said -- it

21  said, "Loaded."  Or if there was a pictorial -- a picture, they

22  would be able to decipher the picture.  Or even look at the

23  color of it, even if it's a contrasting color like that.  Well,

24  here is, like, a bright orange or red and get a sense maybe

25  that's not a good thing to do.

1  Q.   Have you encountered a situation where reliance on a
2  chamber load indicator caused an accidental discharge?
3  A.   No, I have not.
4  Q.   And can a chamber load indicator be useful for somebody
5  who is using a firearm to engage in self-defense?
6  A.   Yes.
7  Q.   Can you explain how?
8  A.   Well, if you use it during self-defense, you go, and
9  you're basically firing your weapon -- sometimes when you are
10 firing a weapon, you kind of lose track of how many rounds are
11 out there.  So by simply either looking or sliding your hands
12 over the slide, you'll know, okay, there is still a round
13 remaining.  That would be one instance.
14 Q.   And let's talk about magazine disconnect mechanisms.  Go
15 to -- if you can turn to tab 8, back to tab 8.  You already
16 described that the purpose of the magazine disconnect mechanism
17 is -- can you, using Exhibit 8, kind of describe internal -- or
18 how a magazine disconnect works in this photograph?
19 A.   Yes.  If you look at the top towards the center, the
20 little -- like I said, the little blade that is sticking out.
21 When it's down this way, that means it won't allow a round to
22 go off.  It basically connects to a little tab which impedes
23 this little lever that stretches out from the trigger to the
24 firing pin.  It kind of blocks it off so it won't allow a round
25 to go off if you do pull the trigger.

1      The other one is a little darker, but once you started
2   inserting the magazine, that magazine disconnect mechanism
3   starts lifting up towards the back of the firearm, which then
4   allows you to fire off a round.
5   Q.   Does the third picture help?  Is there anything in this
6   third picture that --
7   A.   Yes.  You can see it a little bit better.  You can see it
8   kind of lifting up.  It's not fully inserted yet, but you can
9   still see the movement.  I don't know if I can show you, too.
10  It kind of lifts up.
11  Q.   It's the insertion of the magazine that pushes up?
12  A.   Correct.
13  Q.   The magazine disconnect mechanism?
14  A.   Correct.
15  Q.   What is the benefit of a pistol having a magazine
16  disconnect mechanism?
17  A.   Well, when you have a magazine disconnect -- and,
18  typically, manufacturers, even Smith & Wesson, has it all over
19  their pamphlet, the recommendation -- even with the NRA --
20  is that you should store your firearm unloaded and in separate
21  locations.  But a lot of people that get these firearms use
22  them for protection, and they seem to always store them loaded.
23      So if you were to unload it and have the magazine release
24  without a magazine -- the magazine, even if you kept a round in
25  the chamber, by having the magazine out, you wouldn't be able

1    to fire off a round.  If you forgot, you know -- it's been so
2    long that you held onto your weapon or you put it down and
3    forgot to rack the slide or tried to do some kind of, like, dry
4    firing, which is training, to try to train your finger to --
5    you know how the trigger mechanism knows the weight of the
6    trigger.  And you can accidentally do an accidental discharge.
7         If you have the magazine out of the magazine well, then
8    the magazine disconnect would help you avoid an accidental
9    discharge.
10   Q.    And is the magazine disconnect mechanism intended to be
11   relied upon instead of one's training?
12   A.    It's -- like I said, it's only a complement to somebody's
13   training.  It's not always -- you are not always going to rely
14   on the internal mechanism.  It is always the owner's
15   responsibility to check if there is a round in the chamber.
16   Q.    And if someone were to get a hand on the firearm, say, a
17   child again, what is the benefit of a magazine disconnect
18   mechanism?
19   A.    Like I said, it would not allow them to fire off a round
20   if they were to place their finger on the trigger.
21   Q.    If the magazine was --
22   A.    If the magazine was out.
23   Q.    -- out of the gun?
24   A.    Yes.
25   Q.    Have you encountered a situation where reliance on a

1    magazine disconnect mechanism caused an accidental discharge?

2    A.    No.

3    Q.    And is it possible for one to -- for a semi-automatic

4    pistol without a magazine disconnect mechanism -- is it common

5    or -- let me rephrase that.

6         Can a shooter for a semi-automatic pistol without a

7    magazine disconnect mechanism fire the gun while discharging

8    the magazine and inserting a new magazine?

9    A.    Yes.  What we typically call kind, like, a tactical

10   reload.

11   Q.    And what would be a situation when they would do that?

12   A.    Well, same thing.  When you're either -- well, for law

13   enforcement, right, you're out shooting, either to train -- you

14   are out at the range and you are training, you fire off all of

15   your rounds.  Like I said, you lose count.  You drop the

16   magazine.  Well, you don't drop that during the tactical

17   reload, but what you do is you hold onto the magazine while you

18   are replacing it with another magazine you have on yourself,

19   put in another magazine, and you can still continue to fire,

20   even though the magazine had been released.

21   Q.    And that would happen in a situation where you fired all

22   of the rounds in the first magazine?

23   A.    Well, technically, you don't have to fire all the rounds,

24   because you sometimes lose track.  Either you lose track of the

25   rounds, and you want to make sure you still have enough to stay

1    in the fight; right?  Or if your magazine happens to
2    malfunction, there is a jam, you pull the magazine out.  You
3    want to put a fresh one in there just to make sure that the
4    last one is not -- you know, might possibly be damaged, so you
5    want to replace it with a good magazine.
6    Q.    How many rounds are typically in a magazine versus
7    semi-automatic pistol in California?
8    A.    For California, for the roster, the firearms, there would
9    be 10.
10   Q.    And can a magazine disconnect mechanism be useful for
11   somebody who is engaging in self-defense?
12   A.    It could be useful, yes.
13   Q.    Do you know of any situations where it could be useful?
14   A.    Yes.  I spoke to a CHP officer that indicated, a few years
15   ago, that they were out conducting a traffic stop.  He got into
16   an altercation.  The person tried to reach for his firearm.  He
17   went ahead and disconnected the firearm from the magazine well.
18   It came out.  So the suspect could not go ahead fire it and
19   shoot the officer.
20   Q.    And have you ever tried to remove a magazine disconnect
21   mechanism from a firearm?
22   A.    I have not.
23   Q.    And would removing a magazine disconnect mechanism from a
24   roster handgun -- would that be a violation of the Unsafe
25   Handgun Act?

A.    Technically, if you consider the manufacturer, it would be 3200 -- Penal Code Violation 32000, 32,000.

Q.    And, in your opinion, do chamber load indicators and magazine disconnects enhance public safety by preventing -- or helping to prevent accidental discharge?

A.    Yes.

Q.    And do you believe that firearms training alone is enough to provide the same level of benefit as a chamber load indicator and a magazine disconnect?

A.    Do I what -- can I have that question again?

Q.    Sure.  Is firearms training alone enough to provide the same level of benefit provided by chamber load indicators and magazine disconnect mechanisms?

A.    I would think they're the same if it was a good training that focused on, like I said, if the people stuck with, you know, keep your firearm away from your ammunition in a separate location and people follow through in that sense, training would be good enough.  But also, like I said, this complements that training as well because it's an improvement in the sense that it makes guns a little safer.

      Much like older cars are to newer cars; right?  You have the accident avoidance.  And you have, like, the rearview camera, so it's more of -- to help you and complement what you already know.

Q.    And you mentioned earlier that you made or assisted in the

1   arrest of over 100 people.  Of those arrests, did you come

2   across firearms that were safely secured in those residences?

3   A.   I came across at lot of firearms that weren't safely

4   secured.

5   Q.   And in those -- where those firearms were not safely

6   secured, were there minors residing in that same residence?

7   A.   Yes.

8   Q.   And were those firearms easily accessible --

9   A.   Yes.

10   Q.   -- to anyone in that residence?

11   A.   Well, yeah.  We came across minors and prohibited people,

12   mostly, who had access to these firearms.

13   Q.   And are you aware of any studies regarding accidental

14   firearm shootings?

15   A.   Yes.

16   Q.   Did you review those studies?

17   A.   Yes.

18   Q.   And did you rely on those studies in forming your expert

19   opinion?

20   A.   Yes.

21   Q.   And, in general, what would you say those studies show?

22   A.   It shows an increase in unintentional death and injuries

23   as a result of having one, two, three of these safeties placed

24   in a firearm or a handgun.

25   Q.   Increase or a decrease?

1   A.   Increase.

2   Q.   Increase in accidental --

3   A.   No.  I mean, decrease.  Yeah.  Decrease in accidental and

4   deaths.

5   Q.   Okay.  So, generally, the studies show a decrease in

6   accidental deaths because of these safety devices?

7   A.   Correct.

8   Q.   Can you look at exhibit -- or tab 12.

9        And is this one of the studies you reviewed, the column,

10  "Accidental Shootings, Many Deaths and Injuries Caused by

11  Firearms Could be Prevented"?

12  A.   Correct.

13  Q.   Is this an accurate copy of the study?

14  A.   Yes.  It appears to be.

15  Q.   And was this study part of a report given to Congress?

16  A.   Yes.

17  Q.   And you don't have to describe the methodology, but does

18  the study describe how it reached its conclusions?

19  A.   Yes.

20  Q.   And are there any findings from this study that support

21  your opinion that chamber load indicators enhance public

22  safety?

23  A.   Yes.

24  Q.   And what would one of those findings be?

25  A.   They say that -- I believe in this case it was that

1   23 percent of -- what was it? -- chamber load indicators

2   decreased the amount of accidental shootings and deaths.

3   Q.    Can I turn you to the bottom -- let's see, page 3.  Where,

4   I guess, it just says, "Page 3."

5   A.    Yes.

6                MR. SAROSY:  And, Your Honor, under Federal Rules of

7   Evidence 803(18), for statements and treatises, periodicals,

8   pamphlets, statements can be read into evidence; that the

9   studies themselves cannot be admitted, so long as certain

10  requirements are met.  And I believe we've met those

11  requirements.

12               THE COURT:  I am looking at the rule.  Why isn't it

13  803(8)?

14               MR. SAROSY:  Sorry, Your Honor.  Let me take a look

15  at that rule as well.

16               THE COURT:  Take your time.  The concern I am having

17  is 803(18) usually deals with treatises.

18               MR. SAROSY:  Right.  I'm sorry.  This one

19  specifically could fall under 803(8) as well.  Because the next

20  two, I don't think --

21               THE COURT:  They call it a report.

22               MR. SAROSY:  I would be happy to move that under

23  803(8).

24               THE COURT:  All right.  Any objection?  803(8)?

25               MR. DALE:  No objection.

```
1              THE COURT:  The report will be received in evidence.
2              MR. SAROSY:  Thank you, Your Honor.
3          (Exhibit 12 was received into evidence.)
4              MR. SAROSY:  Thank you, Your Honor.
5    Q.    Mr. Gonzalez, on the bottom of page 3, can you read the
6    last sentence of that page?
7    A.    Yes.  This states, "A safety device that indicates whether
8    a firearm is loaded could have prevented another 28 percent of
9    the deaths."
10   Q.    And, sorry, can you read the next sentence?
11   A.    Yeah.  "Many accidental deaths caused by firearms, other
12   than those affecting children, involve uncertainty about
13   whether the weapon is loaded."
14   Q.    And then can you go to -- actually that's fine.
15         And do you remember some of the examples that were
16   discussed in the shooting when a death resulted from an
17   accidental discharge?
18   A.    If this one is the one where -- there was one where, I
19   believe, a brother took a firearm that he believed was unloaded
20   and shot his sister.
21         Is that this one?
22   Q.    If that is what you recall from reading this study.
23         All right.  I am going to move on to tab 13.
24         Is this one of the studies that you reviewed?
25   A.    Yes, it is.
```

1  Q.   Is it called "Unintended Shootings in a Large Metropolitan

2  area:  An Incident Based Analysis"?

3  A.   Yes.

4  Q.   And do you know if this study was published in a journal?

5  A.   This one was published in a journal.

6  Q.   And do the authors of the study have either a medical

7  degree or a master's in public health?

8  A.   These are doctors that have medical degrees.

9  Q.   And does this appear to be an accurate copy of the study?

10  A.   Yes.

11  Q.   And does the study describe how it reached its

12  conclusions?

13  A.   Yes.

14  Q.   And are there any findings from the study that support

15  your opinion that chamber load indicators and magazine

16  disconnects enhance public safety?

17  A.   Yes.

18  Q.   And do you recall what one of those findings is?

19  A.   It says that approximately one third of all unintended

20  shootings could be reduced by having magazine disconnect,

21  chamber load indicator, or a firing pin block.

22        MR. SAROSY:  And, Your Honor, I would ask to move

23  this into evidence under Federal Rule of Evidence 803(18) and

24  have Mr. Gonzalez read a specific statement -- or, I guess,

25  read a specific statement into evidence, not move the study

1    itself.

2            THE COURT:  Any objection to that?

3            MR. DALE:  No.

4            THE COURT:  You may do so.

5    BY MR. SAROSY:

6    Q.   Can you turn to page 15 of the study?  I think it's on the

7    left-hand column, and it is, let's see, the bottom of page 15.

8    And it's the paragraph that says, "We found evidence"?

9    A.   Yes.

10   Q.   Can you read that sentence, please?

11   A.   "We found evidence that loaded chamber indicators,

12   magazine safeties, and firing pin blocks might have prevented

13   as many as one third of the unintended shootings in our

14   series."

15   Q.   Do you remember what set of shootings this study looked

16   at?

17   A.   This one, I believe, was Atlanta Metropolitan area.

18   Q.   Can you turn to tab 14?

19        Is this another one of the studies that you reviewed?

20   A.   Yes.

21   Q.   And is this study called, "Unintentional and Undetermined

22   Firearm-related Deaths:  A Preventable Death Analysis for Three

23   Safety Devices"?

24   A.   Correct.

25   Q.   And was this study published in a journal?

1  A.   Yes.

2  Q.   And are the authors of this study affiliated with a public

3  health school or medical school?

4  A.   Yes, they are public health officials.

5  Q.   And does this appear to be an accurate copy of the study?

6  A.   Yes.

7  Q.   And does the study describe how it reached its

8  conclusions?

9  A.   Yes, yes.

10  Q.   And are there any findings from the study that support

11  your opinion --

12  A.   Yes.

13  Q.   -- about chamber load indicators and magazine disconnect

14  mechanisms?

15  A.   Yes.

16  Q.   And what is one -- or what are those findings?

17  A.   That it would be a decrease by 20 percent with a chamber

18  load indicator of unintentional or accidental shootings and a

19  4 percent decrease with magazine disconnects.

20          MR. SAROSY:  And, Your Honor, I would like to take

21  the same approach with this exhibit as I did with Exhibit 13.

22          THE COURT:  Any objection?

23          MR. DALE:  No objection.

24          THE COURT:  You may do so.

25  BY MR. SAROSY:

1    Q.    Mr. Gonzalez, can you read on the front page -- I think

2    there is -- in the summary, there's the "Results" paragraph.

3         Do you see that?

4    A.    Yes.

5    Q.    And can you just read that first sentence, please -- or

6    I'm sorry.  Can you read the first two sentences?

7    A.    "There were a total of 117 firearm-related deaths in our

8    sample.  95, which is 81 percent, involving handguns; 43

9    deaths, which is 37 percent, were classified as preventable by

10   personalized guns; 23, which is 20 percent, by a loaded chamber

11   indicator; and 5, which is 4 percent, by magazine safety."

12   Q.    And in reading this study, do you believe that a magazine

13   safety is the same as a magazine disconnect mechanism?

14   A.    Yes.

15   Q.    All right.  Let's move to microstamping?

16   A.    Yes.

17   Q.    Can you describe what microstamping is?

18   A.    Yes, microstamping is a process where, with California,

19   alphanumeric or numerals are embedded, the way that California

20   is going, from a firing pin into a cartridge.

21   Q.    And I believe in the -- well, I'm going to show a

22   demonstrative exhibit to help you explain that.

23        Do you recognize this?

24   A.    Yes.

25   Q.    This page or these diagrams?

1  A.   Yes.

2  Q.   And so, using these diagrams, can you walk us through how

3  a microstamp would be placed on a cartridge?

4  A.   So, like, a shooter would pull on the trigger, slide goes

5  back -- well, before that, the shooter would pull on the

6  trigger, and it would cause the firing pin to go forward.  It

7  would imprint the casing on the round, which would be either --

8  if it's centerfire, it would imprint it on the primer itself in

9  the center.  If it's a rimfire, it would imprint towards the

10  edge of the round or the cartridge.  And then it goes off.  And

11  then it would extract the cartridge onto anywhere in the scene

12  and then later on be collected.

13       The way California is going, what they call this is a

14  Firearm Identification Number would be imprinted or embedded

15  into the cartridge.  The FIN, that would be our system, which

16  is the automated firearm system, which would also have the

17  listing of what the Firearm Identification Number an who --

18  what firearm it would be tied to, in order to track and trace

19  the owner of that firearm.

20  Q.   And I'm going to show you another demonstrative exhibit.

21  Do you recognize these photographs?

22  A.   Yes.

23  Q.   And can you describe what that they show?

24  A.   The top photograph is the tip of a firing pin.  It has

25  protruding alphanumeric and numerals here, in there, and the

1    center.  And the bottom is a separate type of -- where it's

2    embedded on to the actual cartridge.  It is just an exploded

3    view of the center here.

4    Q.    And is the cartridge case something that a shooter

5    typically would pick up after shooting?

6    A.    I wouldn't think so.  I mean, there is not enough time if

7    it's a crime.  They're not going to stick around to pick up the

8    cartridges.

9    Q.    Is it easy to tell where your cartridges drop after

10   firing?

11   A.    Not typically, no.

12   Q.    And how is a microstamp different from the firearm serial

13   number?

14   A.    For California, what -- the intention is to have kind of,

15   like, you look at a frame of a vehicle, you know, they have a

16   cross-reference number.  So the cross-reference number would be

17   the make, which would be part of the FIN, the Firearm

18   Identification Number, along with a serialized number at the

19   end.

20        So it's only, I believe, 10 to 12 numbers that are -- that

21   are going to imprint on the firing pin, because they, I guess,

22   estimated that's the most clear way to -- or the most amount of

23   numbers you could do to clearly see when you put it under a

24   microscope.  It would, like I said, have a link and partial

25   serial number in the actual Firearm Identification Number.

1  Q.   So is the intent to have a database -- I guess, the intent
2  to have a database where the Firearm Identification Numbers can
3  be matched to the serial numbers?
4  A.   Correct.
5  Q.   And what is the intended purpose of placing a microstamp
6  on a cartridge?
7  A.   It would help law enforcement get quicker results, and it
8  will go straight directly to the owner of the firearm.
9       Currently, I know the practice is to look at unintentional
10 markings.  But with unintentional markings, in order to tie it
11 to a shooter, you have to --- you actually have to locate the
12 actual firearm.  In this case, you wouldn't have to locate the
13 firearm because the serial number would be imprinted on that
14 cartridge.
15 Q.   And if the owner of a firearm was not involved in the
16 shooting, in your opinion, would it be helpful in an
17 investigation to know which firearm was involved in the
18 shooting, even if the owner was not the shooter?
19 A.   Yes, because it gives you another lead.  So it kind of
20 closes the gap in between where the location might be, where
21 the person might be.  It might give you a lead into if the
22 firearm was lost and never reported.  I could tell you, "Okay.
23 This is the person that has been around my house that I suspect
24 had the firearm."  I mean, it can go many ways.  It's just an
25 extra tool.

1  Q.   Do you know of any examples of shootings where
2  microstamping could have helped identify a shooter sooner?
3  A.   Yes.  Recently, there was a Stockton shooting, a serial
4  shooting.  Stockton PD contacted me.  They asked -- well, they
5  told me that, based on the cartridges that were collected from
6  different scenes, they knew or suspected that the same firearm
7  was used in all of the shootings.  So if microstamping -- and I
8  know what they called the ghost gun that he used, a
9  private-made firearm, but if there was a pin with markings or
10 microstamping on that, it would have probably stopped more
11 deaths from occurring, if it tied it that closer to -- if there
12 was a more definite finding.
13 Q.   Is it possible to remove a microstamp from a firing pin?
14 A.   Yes.
15 Q.   Is it possible to remove a firearm serial number?
16 A.   Yes.
17 Q.   And is it -- are there criminal penalties for removing a
18 firearm serial number?
19 A.   Yes.
20 Q.   Are there criminal penalties for removing a microstamp?
21 A.   Yes.
22 Q.   And what would be the criminal penalty for doing so?
23 A.   It's Penal Code for obliterated serial number.  It follows
24 the same -- it would follow the same code.
25 Q.   Is that a felony or a misdemeanor?

```
 1  A.    That is a felony.  I believe, yeah.
 2  Q.    And, in your opinion, can microstamping enhance public
 3  safety by helping law enforcement?
 4  A.    Microstamping, yes.
 5  Q.    Plaintiffs had talked about left-handed shooters being
 6  disadvantaged by the handguns on the roster.
 7        Do you, yourself, shoot left-handed?
 8  A.    No, I do not.
 9  Q.    Have you spoken with people who do shoot left-handed?
10  A.    Yes.
11  Q.    And from your experience, are handguns typically designed
12  for right-handed shooters or left-handed shooters?
13  A.    Typically, like anything else, unfortunately, it's
14  right-handed.
15  Q.    Does that include handguns?
16  A.    Correct.
17  Q.    Does that also include long guns such as rifles and
18  shotguns?
19  A.    Correct.
20  Q.    And from your understanding, how do left-handed shooters
21  handle the practice of firearms typically being designed for
22  right-handed shooters?
23  A.    They have to train for the manipulation of either the
24  slide stop, the magazine release in order to -- or the safety
25  in order to get it to work the way they want it to.  So it's
```

1   based on training and manipulation of the firearm.

2   Q.   So do you think that left-handed shooters can use handguns

3   on the roster to defend themselves that are designed for

4   right-handed shooters?

5   A.   Yes.

6   Q.   And are there semi-automatic pistols on the roster that

7   actually can be adapted for left-handed shooters?

8   A.   Yes.

9   Q.   And what are some of the ways that they can be adapted for

10  left-handed shooters?

11  A.   There are some that come with an ambidextrous safety.

12  There are some that come with a magazine release which can be

13  switched from one side to the other or already come with that

14  magazine release on both sides.

15  Q.   And from your conversations from -- with left-handed

16  shooters, which ambidextrous feature do they view as most

17  important, the safety or the mag. release?

18  A.   The magazine release, typically, because that, in a sense,

19  will bother or kind of hurt their finger where the index finger

20  connects to your palm.   It kind of rubs up on it.   It's a

21  little nuisance, in a sense.

22       Plus for reloading, it would be faster if you would have

23  it on the opposite end.

24  Q.   And are there semi-automatic pistols on the roster that

25  have that ambidextrous magazine release?

1  A.   Yes.

2  Q.   Can you turn to tab -- we'll look through tab 16 through

3  19.  Can you -- for tab 16, 17, 18, and 19, can you tell us the

4  manufacturer and the model for each of those?

5  A.   Yes.  So the first one is a Heckler & Koch or H&K P2000

6  SK-V3.  And the magazine release, it's right to the rear of the

7  trigger guard.

8  Q.   Let me put it up for you.  Can draw it on there, please?

9  A.   You can see it here or here.

10  Q.   And then, Exhibit 17, can you tell us what the make and

11  model of that is?

12  A.   So the 17, it's a Springfield Armory, model XD9162.  And

13  the magazine disconnect --

14  Q.   With a mag. release?

15  A.   I'm sorry.  Mag. Release is here.

16  Q.   Okay.  Just for the sake of time, can you just tell us the

17  make and model of the -- of Exhibits 18 and 19.

18  A.   Model, it's a make:  Sig Sauer, model P229.  And the next

19  one is a Fabrique Nationale, FN five-seven.

20  Q.   Now, do all four of these semi-automatic pistols have

21  ambidextrous mag -- magazine releases?

22  A.   Yes.

23          MR. SAROSY:  Your Honor, I would like to --

24          THE WITNESS:  For capability of reversing them.

25          MR. SAROSY:  Your Honor, I would like to move

1    Exhibits 16, 17, 18, and 19 into evidence.

2              THE COURT:  Any objection?

3              MR. DALE:  No objection.

4              THE COURT:  Those exhibits will be received into

5    evidence.

6         (Exhibits 16, 17, 18, and 19 were received into evidence.)

7    BY MR. SAROSY:

8    Q.   And are there semi-automatic pistols on the roster with

9    ambidextrous external safety?

10   A.   Yes.

11   A.   Can you turn to tab 15?  Is this an example of a

12   semi-automatic pistol with an ambidextrous safety, external

13   safety?

14   A.   Yes.

15   Q.   Can you point us to where on this firearm there is an

16   ambidextrous external safety?

17   A.   Here (indicating), the little lever there on the top.

18   Q.   And what is the make and model this?

19   A.   This is a Wilson Combat Tactical Elite.

20             MR. SAROSY:  Okay.  Your Honor, I would like to move

21   Exhibit 15 into evidence.

22             THE COURT:  Any objection?

23             MR. DALE:  No objection.

24             THE COURT:  Exhibit 15 will be received into

25   evidence.

1          (Exhibit 15 was received into evidence.)

2     BY MR. SAROSY:

3     Q.   And are there semi-automatic pistols on the roster that

4     have an internal safety?

5     A.   Yes.

6     Q.   If there is an internal safety, does that impact a

7     left-handed shooter in any way?

8     A.   No, it does not.

9     Q.   And do you believe that handguns that are currently on the

10    roster disadvantage left-handed shooters?

11    A.   Do I believe?  Well, they don't have as much selection as

12    right-handed shooters, and that is an impact.

13    Q.   And do you know when ambidextrous safeties and magazine

14    releases started to be added to handguns?

15    A.   I do not.

16    Q.   There are a few handguns that some of the plaintiffs have

17    testified that they would like to purchase that are off the

18    roster.

19         Are you familiar with a Glock 19, 5th Generation?

20    A.   Yes.

21    Q.   Are you familiar with a Sig Sauer P365?

22    A.   Yes.

23    Q.   Are you familiar with a Ruger LCP MAX?

24    A.   Yes.

25    Q.   Same question for a Smith & Wesson Shield Plus and a

1    Staccato P?

2    A.    Somewhat familiar; somewhat, yes.

3    Q.    And all of those are off-roster handguns?

4    A.    Correct.

5    Q.    And does Unsafe Handgun Act prevent somebody from

6    possessing those handguns?

7    A.    Because they have not been tested or do not have the

8    chamber load indicators or magazine disconnects, yes.

9    Q.    Possession?  Sorry.

10   A.    Oh, possession.  Oh, no.

11   Q.    Are there pistols, or semi-automatic pistols, on the

12   roster that are generally similar to those five semi-automatic

13   pistols that we just discussed?

14   A.    They are semi-similar in the sense of magazine capacity

15   and rounds that they chamber.

16   Q.    Can you turn to tab 20?  And what is the make and model of

17   this firearm?

18   A.    This is a Glock 19, 9mm pistol.

19   Q.    Is it a 3rd Generation?

20   A.    This is what they would call a 3rd Generation, yes.

21   Q.    And, I guess, can you discuss some of the similarities and

22   differences between the 3rd Generation and the 5th Generation?

23   A.    So with the 5th Generation, they took away the little --

24   the grip.  You see the grip -- you see the little indentations

25   where your fingers would go towards the front of the grip?

1    They took that away on the 5th Generation because some found it
2    bothersome.
3         The backstraps, they added where you can remove the
4    backstrap for people with smaller hands.  They could put a
5    smaller backstrap and be able to handle the firearm a little
6    bit better.
7         The recoil spring on the inside, they changed it, starting
8    with the 4th Generation.  It's a little heftier.
9         The 5th Generation is a little thicker, a little more -- I
10   guess, like I said, heftier in the sense where it's made for --
11   so they changed the slide, the pin that fires the trigger --
12   the trigger weight and pull.  It's just for better handling, I
13   guess, in a sense that they stated.
14        Other than that -- what else did they change?  I think
15   that's about it.  Oh, the magazine release.  They made it a
16   little bigger, and they made it, also, ambidextrous, so you
17   could switch it out and reverse it.
18   Q.   In your opinion, do any of those changes affect -- or, I
19   guess, do they affect the ability of the firearm to shoot?
20   A.   No.
21   Q.   Can you turn to tab 21?  And can you describe just the
22   make and model of tab 21 and then also the make and model of
23   tab 22?
24   A.   Yes.  This is a Glock, model 26, 9mm.
25        And number 22 is Sturm, Ruger LC380CA.

1  Q.    And are these accurate photos of handguns that are on the
2  roster?
3  A.    Yes.
4  Q.    And differences and similarities that you discussed
5  between the Glock 3rd Generation and the Glock 5th Generation,
6  are those similarities and differences about the same between
7  these on-roster handguns and the off-roster handguns?
8  A.    With the Glock 26, I think the comparison was -- there was
9  a comparable firearm; right?  And I believe it was just a
10  little shorter, like, .7 inches longer than the -- I believe it
11  was -- was that the 320?
12  Q.    So the five off-roster ones were the Glock 19 5th
13  Generation, Staccato P, the Sig Sauer P365, the Ruger LCP MAX,
14  and the Smith & Wesson Shield Plus?
15  A.    Okay.
16  Q.    So the differences between the on-roster and off-rooster
17  firearms, would you describe them -- like, I guess, generally,
18  what would you describe them as.
19  A.    They're just slight variations, either in weight or
20  overall length, I guess you could say.
21        What else?  Magazine capacity.  Glock would allow for
22  more -- you could use different types of magazines from
23  different series of firearms where the comparable would only
24  allow to, like I said, 12 rounds, depending on what model it
25  is.

     1          For the LCP, the LC380, it was looks like point -- I
     2     believe it's .7.  It was bigger than the other Rugers but not
     3     too much of a difference overall.  They're all still
     4     concealable firearms.
     5     Q.   And do you believe that public safety would be put at risk
     6     if the handgun roster requirements were not in effect?
     7     A.   Yes.
     8     Q.   And why?
     9     A.   Because like with any product, you want to make sure they
    10     fall under certain safety guidelines.  You don't want to go
    11     back towards a crude, like I said, Saturday Night Special
    12     that's made without any type of testing.
    13     Q.   Do you believe the current handgun roster requirements
    14     help to protect firearm owners and those who reside with
    15     firearm owners?
    16     A.   Yes.
    17     Q.   And do you believe that the handgun roster requirements
    18     made it more difficult for someone to defend themselves?
    19     A.   No, I do not.
    20     Q.   And does a chamber load indicator, magazine disconnect
    21     mechanism, or microstamping make a handgun less useful for
    22     self-defense?
    23     A.   What was that question again?
    24     Q.   Does a chamber load indicator make a handgun less useful
    25     for self-defense?

1  A.   I mean, there can be occasions, like I said, during a
2  tactical reload, where it might impede it.
3  Q.   For a chamber load indicator?
4  A.   Oh, not for a chamber load indicator.
5       For a chamber load indicator, I don't see an issue in it
6  being an issue.
7  Q.   And then, do you think a magazine disconnect mechanism, in
8  most circumstances, impede somebody's ability to defend
9  themselves?
10 A.   I do not believe so.  It would just impede maybe a few
11 seconds if you had to reload.  But I don't see it being a big
12 major safety issue.
13 Q.   Does microstamping make a handgun less useful for
14 self-defense?
15 A.   No, it does not.
16           MR. SAROSY:  Your Honor, I would like to move
17 Exhibits 20 to 22 into evidence.
18           THE COURT:  Any objection?
19           MR. DALE:  No objection.
20           THE COURT:  Those exhibits will be received into
21 evidence.
22      (Exhibits 20, 21, and 22 were received into evidence.)
23           MR. SAROSY:  All right.  That's all I have, Your
24 Honor.
25           THE COURT:  It's 3:30.  We need to give our court

1   reporter a break.

2       How much longer do you anticipate with the witnesses?  I

3   know we have Cross-examination of this one.

4           MR. BRADY:  I would anticipate 20-ish minutes, 15.  I

5   think I can get done -- it might be.  I have quick questions.

6   It depends on the witnesses.

7           THE COURT:  Right, right.  I am trying to get a gauge

8   so I'll be transparent.  Can everybody come back tomorrow?  Or

9   were you hoping to be done today?

10          MR. DALE:  Well, We're always hoping to be done.  I

11  am sure you are as well, Your Honor.  I can certainly be

12  available tomorrow.

13          THE COURT:  I just don't want to rush it, and I don't

14  know how long my 4:00 is going to go.

15          MR. DALE:  Understood.

16          THE COURT:  What is everybody's preference?  Do you

17  want to just quit now and then come back tomorrow?  Or would

18  you rather try to get in a little bit more?  But I really don't

19  feel comfortable staying past 5:30.

20          MR. SAROSY:  I think our preference would be to try

21  to get it done today, because Mr. Gonzalez is in Sacramento and

22  Mr. Woods is in San Francisco.  But I think we can change

23  travel plans if needed.

24          THE COURT:  I'll check with Rolls and our court

25  reporter and see how late that they can go, and then I'll let

```
 1   you know.  Let's take a ten-minute break now, and then we'll
 2   pick back up.
 3            MR. SAROSY:  Thank you, Your Honor.
 4            MR. DALE:  Thank you, Your Honor.
 5            THE COURTROOM DEPUTY:  All rise.  This Court is in
 6   recess.
 7        (A brief recess was taken.)
 8            THE COURTROOM DEPUTY:  Please come to order.  This
 9   Court is again in session.
10            THE COURT:  Okay.  Let's start Cross-examination,
11   please.
12            MR. BRADY:  Thank you, Your Honor.
13                          CROSS-EXAMINATION
14   BY MR. BRADY:
15   Q.   Hello, Special Agent Gonzalez.
16        Do you recognize the document -- can you see this on your
17   screen?
18   A.   Yes.
19   Q.   Do you recognize what that document is?
20   A.   It's probably a handout or past -- looks like a printout
21   of the handguns certified for sale.
22   Q.   A printout of the handgun roster?
23   A.   Correct.
24   Q.   I am going to turn to what is on this page, page 14 of
25   219.
```

1       Is there a way --
2               THE COURTROOM DEPUTY:  If you need to, you might need
3    to turn on the lamp again.
4               MR. BRADY:  This one?
5               THE COURTROOM DEPUTY:  No.  This one right here.  You
6    might need to see if that's better.
7               MR. BRADY:  No.  That works.
8               THE COURTROOM DEPUTY:  It works?  Okay.
9               MR. BRADY:  Thank you.
10   Q.   Okay.  So was it your testimony that they're around 829
11   handgun models currently on the roster?
12   A.   As of January 1, 2023.
13   Q.   Okay.
14   A.   Yes.
15   Q.   Would you agree that there are handgun models listed on
16   the roster that are only cosmetically different from handguns
17   that are listed as separate models on the roster?
18   A.   If I understand your question, if there are -- what they
19   call cosmetically different would be something called a
20   "similar," that we call, to the tested model, which is the
21   original model and they're just cosmetically changed -- is that
22   what you're saying?
23   Q.   If that's your -- let's start with that question.  With
24   that understanding, would there be -- would similars, in that
25   context, be listed differently on the roster as separate

1    models?

2    A.    They would if they came out of a with different scheme --

3    Q.    Okay.  As the model number?

4    A.    As the model number, yeah.

5    Q.    Okay.  So I will try to do this quickly.  Do you see right

6    here, entry -- the Beretta 92 -- I'm sorry, the Beretta 96.

7    A.    Yes.

8    Q.    And it's alloy steel; correct?

9    A.    Uh-huh.

10   Q.    It has a barrel of 4.9 inches?

11   A.    Yes.  And there is the 96 -- the Beretta 96 black Inox

12   stainless steel?

13   A.    Correct.

14   Q.    And 4. -- are these the same gun?

15   A.    Technically, the one would have been -- I don't know if

16   this is technically what happened here, but let's say the black

17   one is the tested, so let's say the original black -- I thought

18   I saw it somewhere.  So if there's a black one.  They would

19   send what we call a "similar" with differences.  They would

20   state, "Okay.  We're going to change the color.  So we're going

21   to change it to" -- like, you saw that Tiffany Blue kind of

22   semi-automatic pistol; right?

23   Q.    Yes.

24   A.    So they just changed the color.  That's like a cosmetic

25   change, so it would be "similar."  We would verify that they

1    are the same on the inside as the tested, and then it would get
2    approved.
3    Q.    And it could be listed as a separate model?
4    A.    Correct.  Based on the color and whatever physical changes
5    on the exterior were, yes.
6    Q.    Okay.  So with that understanding, would it be fair to say
7    that relying on how many handgun models are listed by sheer
8    number on the roster would be an exaggeration of how many
9    actually different models there are?
10   A.    Well, there is -- I didn't remember the number, but there
11   are -- in the 829, there are similars along with those tested
12   models, yes.
13   Q.    Sure.  So do you understand my question?
14   A.    Yes.
15   Q.    These three or four 92s are essentially the same gun;
16   correct?  Beretta 92s that are listed there?
17   A.    So it's similar to, like, a car; right?  So you get a
18   newer -- it's basically a newer gun in the sense that they
19   changed the color, but it still remains the same inner workings
20   as the previous model, like the previous car; right?
21   Q.    Sure.
22   A.    They just changed the exterior look of it somehow.
23   Q.    Okay.  But it's purely exterior that we're dealing with
24   the differences here?  There's nothing different about --
25   A.    Correct.

```
 1          (The court reporter interrupted.)
 2              MR. BRADY:  This, Your Honor, has already been --
 3    this is Exhibit 1 to the Plaintiffs' Request for Judicial
 4    Notice, this document.  I don't know if Your Honor wants us to
 5    enter it as a separate document, for purposes of this hearing,
 6    or just refer to it as that?
 7              THE COURT:  I am not sure I follow your question.
 8    Has it already been received into evidence?
 9              MR. BRADY:  It has been -- well, our Plaintiffs'
10    Request for Judicial Notice hasn't been ruled on by Your Honor
11    yet, I don't believe.
12              THE COURT:  So let's go ahead and -- so I don't have
13    to worry about judicial notices.
14              MR. BRADY:  Sure, sure.
15              THE COURT:  So that's the roster.  I assume there is
16    no objection to the roster?
17              MR. SAROSY:  No, Your Honor.
18              THE COURT:  Exhibit 1 will be received into evidence.
19          (Exhibit 1 was received into evidence.)
20              MR. BRADY:  Thank you, Your Honor.
21    Q.   Have handguns been removed from the roster?
22    A.   Yes.
23    Q.   And are you familiar with the reasons that a handgun would
24    be removed from the roster?
25    A.   Within the last maybe, let's say, three to four years, I
```

1    typically would be.

2    Q.    What are those -- I guess let's start with, like,

3    generally.  What would be the general reasons that a firearm

4    would fall off or be removed from the roster?

5    A.    Well, like, some of these that you noticed on the roster

6    and you see expiration dates, either they expire based on

7    certification.  So either the process of the renewal is in the

8    mail somewhere and they haven't received the application,

9    everything necessary to renew that firearm, that is one thing.

10         Typically, if they fall within the first year of

11   expiration, it will be, like, 1/1/23.  Let's say it expired

12   that day.  That is because either the application is in the

13   mail and hasn't been processed fully.  So that's when they fall

14   off.

15        If it's like an internal change that is noticed, let's

16   say, after the fact, then -- and the manufacturer failed to

17   notify us previously that there was a change made and they have

18   no reasoning or anything that they could tell us why they made

19   that change, then it's decided that they should fall off the

20   roster until they could either go back to the previous way of

21   manufacturing that they manufactured that pistol or have some

22   type of reason to show us that the device basically is the same

23   or works the same way, or the firearm works the same way.

24   Q.    So if I am understanding you correctly, you identified two

25   ways that a firearm would be removed from the roster.  Its

1   certification would expire?

2   A.   Correct.

3   Q.   Or there would be a change to that handgun model that

4   would warrant DOJ making a determination that it's now a

5   different model not worthy of certification; is that correct?

6   A.   Yes.  If they failed to notify us of the changes, yes.

7   Q.   Okay.  Or DOJ hasn't made a determination but has made a

8   determination that manufacturer did not notify DOJ about the

9   changes; is that correct?

10  A.   Correct.  And we noticed those changes, yes.

11  Q.   Okay.  How does a firearm expire off the roster?

12  A.   Well, like I said, there is an annual recertification fee,

13  which they have to pay.  It's, like I said, a $200 maintenance

14  fee, they call it.  So every year they have to reapply and pay

15  that $200 and state that to keep the handgun on the roster.

16  Q.   So if a manufacturer failed to pay the $200 fee, their

17  firearm would be removed from the roster?

18  A.   Until it's received, correct.

19  Q.   Until it's received?

20  A.   Yes.

21  Q.   So if they failed to pay on the date it's due and it gets

22  expired and then they go, "Oh, we made a clerical error," and

23  then submit the $200 later, their gun gets put back on the

24  roster?

25  A.   I would have to get further -- since I don't oversee it, I

1    would to have to speak to the actual what we call the associate

2    gun analyst that actually handles that.  But they would give a

3    certain period to have the firearm placed back on the roster,

4    based upon when we receive it and when they postmark it and

5    everything like that.

6    Q.    Okay.  Are you familiar with the fact that several HK,

7    Heckler Koch, handguns have recently been removed from the

8    roster?

9    A.    Yes.

10   Q.    Do you know the reasons why those handguns were removed?

11   A.    Yes.

12   Q.    Can you explain to this Court?

13   A.    Yes.  In August of 2021, we received -- I believe it was

14   two handguns that were -- I believe they said they were

15   similar.  So similar meaning they just made a few exterior

16   changes, nothing that would internal physically change the

17   firing mechanism or hammer assembly or trigger; right?

18   So these are called -- they stated they were similars.

19        When they received them, I took a look at them side by

20   side, with the tested model.  The tested model was the original

21   that was submitted.  I'll try to remember how long ago it was

22   submitted, but it was already on the roster.

23        So I took a look at it side by side.  I noticed that the

24   hammer assembly had changes, had divots that the original

25   tester did not have.  It had, like, a little hammer -- the axle

1    that the hammer goes on had some changes.  The sear was

2    elongated on one and not the other.  And there was a little cut

3    and divot on the actual sear itself which wasn't on the other.

4    Q.    So those were the -- they were minor changes -- I'm sorry.

5    Strike that.  I don't want to put words in your mouth.

6          There were alterations to the handgun that you personally

7    deemed took it outside of the certification originally?

8    A.    It's not a personal deeming.  I just look at it, and then

9    I tell people my observations, and then the Department will

10   decide if they're going to -- based on the regulations and the

11   code if they are going to have them removed.

12         We did not start there.  We went -- I personally went to

13   dealers to try to get examples of these firearms to see if they

14   were actually being sold in this way.

15         H&K actually contacted us and told us -- it was, like, a

16   two-part story; right?  The originals were denied.  A few

17   months after, H&K came back and contacted us in regards to them

18   stating that they possibly had made changes on other firearms

19   and just wanted to let us know about that situation.

20   Q.    Okay.  What sort of change would warrant a removal from

21   the roster?  Would changing a spring or a screw or a divot on a

22   particular feature?

23   A.    No.  Divots are typically made by manufacturers to tell

24   them exactly, like, what generation slide they have.  So

25   they'll put certain divots inside the slide, and they're able

1    to differentiate, okay, this is a Gen -- I don't how they will

2    call it; right?  But this is a Gen4 slide.  This is a Gen5.

3    And they'll put the little divot.  So that was not -- that's

4    not something we take into consideration.

5         Springs, if they're similar, pretty typical, it doesn't

6    warrant the removal.

7         But when it's almost the whole assembly or close to the

8    whole assembly, where it has not been tested -- the drop test

9    has not then occurred; right?  We don't know if it's going to

10   fire off a round during the drop-safety test.

11   Q.   Sure.

12   A.   That has not been tested.

13   Q.   I understand that.  I guess -- and I think you answered my

14   question with respect to the divots.  You said, if I understood

15   you, the divots basically told you that this wasn't -- that

16   there was something different.  It wasn't the divot that made

17   you say, "Okay.  We've got to take this off the roster."  It

18   was the divot that made you look closer; is that correct?

19   A.   Well, like, in another firearms, right, we've had --

20   depending on the divot, right, there is divots that the

21   manufacturer has placed on the slides.  And we reach out to the

22   manufacturer.  This is how we know; right?

23        Let me state these divots are made because of the

24   generational, so we could tell the difference.

25        When it came to H&K, it was -- you call it, probably --

1  that's why you call it a divot, inside of the hammer, but it

2  looks like a little cutout, a divot in that sense.

3      Plus, the sear, the auto sear got cut off -- auto sear

4  weight.  I didn't go -- I didn't take the firearm fully apart

5  to look inside internally, because I could already tell from

6  the outside that it was changed.

7  Q.   Okay.  The one part I don't think I got an answer to was,

8  what level of change will reach the point where it's now

9  warranted to say, "This is a different gun than the one that

10  was tested"?

11      The changing of screws?  The manufacturing process of a

12  screw on a firearm warrants saying, "Okay.  This needs to be

13  removed from the roster until they change it back"?

14  A.   No.  Screws are not something that we would decline a

15  firearm for.  It's more, like I said, internal parts.  And in

16  this instance, you can tell the part looked different.

17  Q.   Okay.

18  A.   Or the parts.  There were four different parts that we

19  could see from the outside.

20  Q.   You testified that you are familiar with the requirement

21  of the Unsafe Handgun Act that, if a handgun is added because

22  it has microstamping technology, that a certain number of

23  handguns fall off or are removed from the roster.  I don't know

24  if we decided whether it's two or three, but some --

25  A.   It's three.  It as three.

1    Q.    It's three.  So one comes on because it has

2    microstamping, --

3    A.    Uh-huh.

4    Q.    -- and three come off.  Is that accurate?

5    A.    Yes, correct.

6    Q.    How is the decision made which three handguns get removed

7    from the roster?  Do you know?

8    A.    I know that they were still in the talks about that, so I

9    cannot be able to give -- tell you the answer because I know,

10   at one point, it was -- like we were speaking about earlier on

11   the roster, the list you had, if you were to remove one, it

12   wouldn't take off the black one, the blue one, you know, the

13   red one, even though they're technically based off the same

14   model.  It would just take off based on dates.

15        So if the blue one was introduced in 2001, then it would

16   take off the oldest one; the black 2001.  It wouldn't affect

17   the blue 2005, even though it's, technically, a similar model;

18   right?  So it would go based off expiration dates.

19   Q.    Okay.

20   A.    Or initial initiation, like, of the application dates.

21   Q.    Is it starting with the oldest guns on the roster or the

22   newest guns on the roster that are being removed?  Or do they

23   not know yet?

24   A.    Oldest.

25   Q.    The oldest?

1  A.   Oldest, yes.

2  Q.   Are you familiar with any models currently on the roster

3  that have the ability to configure the magazine release, the

4  safety and slide release ambidextrously?  I know you testified

5  about some models that have each of those features.

6       Is there any handgun model on the roster that has all

7  three of those?

8  A.   That I have seen, no.  I haven't, technically, gone

9  through every single one, so -- I haven't had the time, but

10 that I know, no.

11 Q.   I believe you testified that a chamber load indicator

12 complements -- is a complement to safety protocol.  Is that

13 accurate?

14 A.   Correct.

15 Q.   Are you familiar with the four Cooper Rules of firearm

16 safety?

17 A.   Yes.  Always point in a safe direction; make sure you

18 don't -- you know where you're pointing, so, yeah.

19 Q.   What is the first rule of the four Cooper Rules of firearm

20 safety?

21 A.   Like, knowing your firearm.  Basically, know your firearm.

22 If you know it's unloaded, kind of thing, point it in the right

23 direction.  I am trying to remember.

24 Q.   If I can -- is it your understanding that the first rule

25 is that a firearm is always to be treated as if it were loaded?

1  A.    It is loaded, correct.

2  Q.    Even if you know it's unloaded -- or even if you know it's

3  unloaded, you see that it's unloaded, you still treat that

4  firearm as if it's loaded; is that correct?

5  A.    Correct.

6  Q.    That is basic firearm safety training 101; correct?

7  A.    Correct.

8  Q.    Does the presence of a chamber load indicator on a handgun

9  alter how you treat a firearm in any way?

10  A.    Based on my training, of course, it's a helpful thing to

11  see; right?  You are going to come up and see that the flag is

12  up, but I am always going to check to make sure if it's loaded

13  or not.  You don't want to -- like, for example, you don't want

14  to go out on duty and -- let's say, you discharge -- you happen

15  to discharge your weapon, and it won't fire.  Or you got to the

16  training range, and you shoot your handgun, and it doesn't

17  fire.  So you -- you're not always going to rely -- it's more,

18  like I said, a complement.  You want to also visually check

19  yourself.

20  Q.    Sure.  I understand it's your position it's a complement.

21      My question was more along the lines of does it change

22  your behavior in any way when you have a chamber load indicator

23  on the handgun.

24  A.    No, it does not.  Based on my training, no.

25  Q.    And that is because you treat a firearm as if it was

1  loaded at every instance; correct?

2  A.    Correct.

3  Q.    Can you explain -- I believe you testified that you think

4  chamber -- it's your opinion that chamber load indicators are

5  helpful to protect people from themselves or harming others

6  when they obtain a firearm; is that correct?

7  A.    Correct.

8  Q.    How can somebody who has no firearm training be benefited

9  by a chamber load indicator?

10  A.    Well, if they would come up to a firearm and they see that

11  a red flag is up or the wording on it says, "Loaded," or there

12  is a picture saying -- or somehow that states that it's a

13  loaded firearm, it's not going to guarantee they're not going

14  to handle the firearm; right?  But, you know, it kind cautions

15  them to say this is a loaded firearm.

16       It's kind of like coming up to a house, and there's a

17  warning sign, "A dog."  Would you be more cautious if there was

18  a sign that said, "Do not approach.  Caution.  Dog"?  Or would

19  you be more cautious if there was no sign and you couldn't see

20  past beyond the fence; right?

21       Well, it's the same thing.  It's, like, you'd be more

22  cautious if you actually saw the sign that said, "Dog."

23  Q.    If I treated all properties as if there was a rabid dog on

24  there, it wouldn't make a difference; right?

25  A.    But we don't.

1    Q.    But that is -- but people don't -- that's because people

2    don't have the firearm training, right?  The number one rule is

3    to treat firearms as if they're always loaded; right?  That's

4    the concern?  That's the problem; right?

5    A.    Well, it comes along with the training.  I'm sure not

6    everybody has the proper training, correct.

7    Q.    But if somebody doesn't have the proper training about the

8    number one rule of firearm safety, wouldn't it be unreasonable

9    to expect them to have the training and understanding of what a

10   chamber load indicator means?

11   A.    Not exactly.  Because sometimes kids -- right? -- you are

12   already born knowing -- if you see a spider, you are scared of

13   it.  You see certain things.  You kind of draw your attention

14   to say, "I'm not going to touch this."

15        And so by -- we already kind of -- like, with some of

16   these magazine disconnects, we already see some type of bright

17   colorizations, something like that, as danger signs.  So even

18   though it's not going to stop every accidental shooting or

19   death, it might prevent some.

20   Q.    Would you expect a child that is at risk of harming

21   himself or herself or somebody else with a firearm to

22   understand what a chamber load indicator is, in that instance?

23   A.    Yes, depending on the age, yeah.  A chamber load indicator

24   may not -- probably, most likely, will not, depending on the

25   age.  But I couldn't tell you what age.

1   Q.   Would you agree that for young children they pretty much
2   aren't worth much?
3   A.   Yeah, depending on the age.  I couldn't tell you what the
4   age would be, but there are some children that wouldn't
5   understand.
6   Q.   Have you ever witnessed a chamber load indicator fail?
7   A.   I personally have not, no.
8   Q.   Have you heard of any incident where a chamber load
9   indicator has failed?
10  A.   No, I have not.
11  Q.   To your knowledge, are revolvers required to have a
12  chamber load indicator to be on the California roster?
13  A.   No, they're not.
14  Q.   Why not?
15  A.   Because for some reason -- I didn't write the legislative
16  thing, you know.  But -- I wasn't involved in that, but I don't
17  know what the reason is.
18  Q.   We understand that, Special Agent.  I guess my question is
19  would there -- is there a difference, in your firearm
20  expertise, between a semi-automatic handgun and -- a
21  semi-automatic pistol and a revolver as to why one would
22  benefit from a chamber load indicator and the other would not?
23  A.   The only thing I can see is just that the cartridges are
24  round and visible in the revolver where, when it comes to the
25  semi-automatic, it's all enclosed inside.  But other than that,

1    I do not know why.
2        Maybe it's the weight, the weight of the trigger, but I
3    don't see what the difference would be or how they did the
4    chamber load indicator on there.
5    Q.   Is the round that would be in the chamber on a revolver in
6    the cylinder visible?
7    A.   Technically, yeah, it would not be.
8    Q.   It would not be; right?  If it's in the chamber -- the
9    other rounds that are not in the chamber, at least some of them
10   might be visible, but the one that is in the chamber would not
11   be visible on a revolver?
12   A.   Correct, correct.
13   Q.   Do you have any forensics training?
14   A.   No, I do not.
15   Q.   Would you personally be able to determine whether a
16   firearm possesses microstamping technology?
17   A.   No.
18   Q.   Have you been trained on determining the presence of
19   microstamping technology?
20   A.   No, I have not.
21   Q.   To your knowledge, is anybody at the Department of Justice
22   Bureau of Firearms been trained on that?
23   A.   I know they have.  Prior to myself, they were giving
24   presentations, but I don't know exactly to what extent.
25   Q.   Have you ever touched a firearm with microstamping

1  technology?

2  A.    I have.

3  Q.    Does presence of microstamping technology on a handgun

4  make it any safer?

5  A.    Safer in the sense of --

6  Q.    For the user.

7  A.    For the user, no.

8  Q.    Or for anybody around them?  And I'm talking about direct

9  harm.  I understand the safety aspect of microstamping fighting

10 crime, solving a crime.  I get that.  I am talking about the

11 direct harm from the firearm itself.

12 A.    No.  In that sense, no.

13 Q.    Thank you.

14       So what is microstamping's purpose, as you understand it?

15 A.    It's just to cut down on the lead time involving a crime,

16 get to the actual owner, the gun -- not the gun itself but the

17 gun information quicker, faster.

18 Q.    Is it fair to call it a law enforcement aid?

19 A.    Yes.  Law enforcement aid.  And it's a public safety issue

20 as well.  Like I said, if it's some type of guy involved, like

21 a serial killer, in a sense, it would lead to a faster time of

22 figuring out who the person is.  And in that sense, it would be

23 a public safety issue.

24 Q.    In your experience, guns that are used in crimes, are they

25 usually stolen?

1   A.   It all depends.

2   Q.   Let me strike that "usually."

3        Are they oftentimes stolen guns?

4   A.   I couldn't say, "Yes" or "No."  I couldn't say, "Yes" or

5   "No."

6   Q.   Have you ever come across stolen -- a criminal who you

7   arrested and they had in their possession a stolen gun?

8   A.   Yes.

9   Q.   Are stolen guns often used in crimes, to your knowledge?

10  A.   Yes, they're used in -- I am sure they're used in crimes

11  often.

12  Q.   Okay.  And in your experience, as a law enforcement

13  officer, do crime guns change hands fairly frequently, or do

14  bad guys hang onto their guns for an extended period of time?

15  A.   I wouldn't be able to tell you that, yeah.

16  Q.   To your knowledge, has DOJ Bureau of Firearms ever

17  contacted any handgun manufacturer to collaborate on developing

18  microstamping technology?

19  A.   Since I've been there, that I know of, I do not -- no, I

20  have not heard anything.

21  Q.   Are you aware of any study that the California Department

22  of Justice Bureau of Firearms has ever conducted on

23  microstamping?

24  A.   The only thing I know of is a presentation, probably 2014,

25  I believe.  But I don't know if it was an actual study or not.

```
 1   I know they had people that come in and present what
 2   microstamping was and the training aspect of it and what it
 3   involved, but I don't know anything else beyond that.
 4   Q.   So, to your knowledge, you don't know whether DOJ has
 5   performed a study, a field study, discharging firearms to
 6   determine whether microstamping technology works?
 7   A.   No.
 8   Q.   Are you aware of any other government entity that has done
 9   that type of study?
10   A.   No, I do not.  I am not aware.
11   Q.   Do you shoot firearms often?
12   A.   Yes -- well, kind of, yes.
13   Q.   Kind of?
14   A.   Well, quarterly, we do have firearms training.  Like I
15   said, I'm an instructor as well, so I'm out there shooting with
16   other agents.
17   Q.   Okay.  So do you carry a firearm on duty?
18   A.   Yes.
19   Q.   How many rounds do you think you put through your duty
20   weapon?
21   A.   I don't know.  Hundreds, maybe.
22   Q.   Hundreds?
23   A.   Yes.
24   Q.   In your trainings, your quarterly training, how many
25   rounds do you discharge out of your duty weapon?
```

1    A.    At least -- depending on the training, we'll say 300.  I

2    would say average of 300 to 500, depending on the training.

3    Q.    Outside of that training, you don't discharge your duty

4    weapon that often?

5    A.    Just would go to the range, go to the range to practice

6    shooting, but not too many rounds.

7    Q.    What about any personal firearms?  Do you have any

8    personal firearms that you discharge more often than your duty

9    weapon?

10   A.    No.  I have -- I don't know if you are asking me exactly,

11   but no.

12   Q.    Okay.  Are you familiar -- do you know whether there are

13   any devices that can be affixed to handguns to catch the brass

14   as it is being ejected so as to not stay on -- not be left

15   behind?

16   A.    I am sure there are devices of every type around.

17           THE COURT:  Counsel, I probably really need to break

18   for the 4:00 o'clock matter.

19           MR. BRADY:  I'm going to be done in, like -- I mean,

20   I could come back if your Honor wants.  I can stop here, if you

21   want.

22           THE COURT:  Is there going to be Redirect?

23           MR. SAROSY:  It would be very brief, Your Honor.

24           THE COURT:  Okay.  Why don't we break, then?

25           MR. BRADY:  Okay.

1          MR. DALE:  Would you like us to clear our table?

2          THE COURT:  I would, if you could do that.

3       (Adjourned at 4:18 p.m. to hear another matter.)

4          THE COURTROOM DEPUTY:  Please come to order.  This

5    Court is again in session.

6          THE COURT:  All right.  Please proceed.

7          MR. BRADY:  Thank you, Your Honor.

8                      **SALVADOR GONZALEZ,**

9     **previously called by and on behalf of Defendant, testified:**

10                      CROSS-EXAMINATION

11   BY MR. BRADY:

12   Q.   Special Agent Gonzalez, you testified that you carry a

13   handgun for duty use; is that correct?

14   A.   Correct.

15   Q.   Was that handgun issued to you by the California

16   Department of Justice, or did you choose it?

17   A.   By the California Department of Justice.

18   Q.   What model handgun is that?

19   A.   It's a Glock 23 Generation 4.

20   Q.   Glock 23 Generation 4.

21        Is that on the roster?

22   A.   No, it is not.

23   Q.   Does your duty handgun have a chamber load indicator?

24   A.   Well, according to Glock, it does.  According to the State

25   of California, it does not.

1  Q.   Can you explain that for us?

2  A.   So as Glock refers to it, it's called a loaded chamber

3  indicator, which is similar, in the sense, to those that know

4  firearms, right, it's attached to the extractor of the Glock.

5  So when you load a round in the chamber, the extractor comes

6  out just a tiny bit.  Maybe if you have good sensitivity to

7  your fingers, you can feel the difference.  Some don't go by

8  that or it's not -- doesn't fall within the California standard

9  of a chamber load indicator because it does not contain the

10  contrasting colors or wording or design.

11  Q.   Okay.  Thank you.  Does it have a magazine disconnect

12  mechanism?

13  A.   No, it does not.

14  Q.   Does it have microstamping?

15  A.   No, it does not.

16  Q.   Were you able to choose among various models that the DOJ

17  made available to its agents?

18  A.   There was only the Glock 23 or the Glock 22.

19  Q.   And what generation is that Glock 22?

20  A.   I think that's Generation 4 as well.

21  Q.   Generation 4.  So it's not on the roster either?

22  A.   Correct.

23  Q.   And it doesn't have a magazine disconnect mechanisms?

24  A.   Correct.

25  Q.   And it only has the chamber load indicator that you were

1    talking about, that Glock calls the chamber load indicator that

2    is not one under California law?

3    A.    Correct.

4    Q.    And it doesn't have microstamping either?

5    A.    Correct.

6    Q.    So the only model handguns that the California Department

7    of Justice offers its Special Agents for duty use are handguns

8    that are not on the California roster and that possess neither

9    a chamber load indicator, as California defines it, a magazine

10   disconnect mechanism, or microstamping; is that correct?

11   A.    Correct.

12   Q.    Do you carry a handgun off duty?

13   A.    I do not.

14   Q.    This might be redundant.  I apologize.  So are all special

15   agents limited to either one of those two Glock models you just

16   identified, for their carry weapons?

17   A.    As a handgun, yes.

18   Q.    And you've testified earlier, I believe, about the

19   differences between the Gen -- the Glock Gen3 and the Gen5, and

20   you pointed out some differences.

21       Are those the same differences between the Gen4 and the

22   Gen3 as well?

23   A.    No.  The Gen5 is a little bit more -- I guess you could

24   say it's a little heftier, a little thicker.  They still have

25   both -- the Gen4 and the Gen5 both have the backstraps,

1    removable backstraps.  The Gen4 still has indentations on the
2    grip, where, you know, your fingers basically mold into.  It
3    does have -- the Gen4 does have the upgraded recoil spring.
4    The slide is changed a little bit.  But other than that, pretty
5    similar.  I think they also improved a little bit of the
6    trigger pull.
7    Q.    They improved the trigger pull?
8    A.    On the 5, on the 5th one.
9    Q.    What about the barrel?
10   A.    The barrel, on the 5th, on the Generation 5, they -- it's
11   stated that they improved the barrel for a more accurate, I
12   guess, shooting.  This is also based on who states it; right?
13   But that is what they state.
14   Q.    So you are saying it's Glock's position that the Gen5 is a
15   superior firearm to its previous iterations?
16   A.    In regards to, like, the barrels and stuff that, they do
17   state that improvement of technology.  That is what it says,
18   improvement of technology in regards to the Gen3 or Gen4.
19   Q.    Do you share Glock's opinion that its Glock Gen5 is
20   superior to its previous iterations?
21   A.    It's kind of similar to kind of owning a iPhone 13 and an
22   iPhone 14; right?  Sometimes people want the newest model even
23   though the older model still does basically the same thing;
24   right?  It's just a few changes.  Maybe a new lens or whatever,
25   but it still functions the same but just a newer improvement.

1  Q.    Sure.   That makes sense, and I hear you.

2       But are all the changes on the Glock of that nature?

3  Aren't some, as you indicated, increasing accuracy,

4  potentially?  And the removal of backstrap, what does that for?

5  Is that to help ergonomics so that you have a better fit on the

6  gun?

7  A.    According to -- they removed the grip from, like I said,

8  the Glock 4 to the Glock 5 -- which was also on the Glock 3 --

9  the little indentations because people were complaining of the

10  handling of the gun.  I guess you could say it was

11  uncomfortable.

12       They increased the magazine release from the 3 to the 4.

13  They kept it from the 4th to the 5th, the same magazine

14  release.  It's a little bigger.

15       What they call the stripling, they kind of changed it a

16  little bit, made it a little more aggressive, in a sense.

17  Q.    Okay.

18  A.    It's a little bit more grip.  And the backstraps are --

19  were meant to be in case your hand, basically, has, like I

20  said, an ergonomically better fit for smaller hands.  In the

21  case -- like, a Glock 22 is a little bit bigger than a

22  Glock 23, so that is why some people tend, with smaller hands,

23  go with a Glock 23 instead of, like, a Glock 22.

24  Q.    Would you say that there are significant enough

25  differences between the Gen3 Glock and the Gen5 that, to your

1   point about some people like this iPhone versus that, that

2   there would be, in those differences -- those differences would

3   be significant enough that people would basically want to

4   choose?  Like, I want -- that is substantively better for my

5   purposes than this other one?

6   A.    It all depends.  You know, financially, if you are

7   willing -- you want to pay a little bit more for the newer

8   product.  I mean it all depends -- it would all depend.  Like

9   I --

10  Q.    I'm sorry.

11  A.    Like I still have my iPhone 10.  I haven't gone to the

12  latest one based on pricing and things like that; right?

13  Q.    I think I'm still on 8.

14  A.    Yeah.

15  Q.    But my point, I guess, is that there are certain

16  differences between a Gen3 and a Gen5, like the removable

17  backstrap that changes how you can grip it, that is

18  substantively different, that can make a difference to the

19  user?

20  A.    Yes.  There's more options based on, like I said, smaller

21  hands.  People that wouldn't have gone to a 3 based on they

22  couldn't grip it correctly.  It would allow for the smaller

23  hands to basically grip that weapon.  And I am sure the

24  shooting, even though slight differences, it would be something

25  that somebody would want.

1     And the barrel accuracy, that is what it does -- is better

2  accuracy.  It is not like a -- they don't consider it a

3  competition gun, but they state it's better accuracy than the

4  Gen3.

5  Q.  Understood.  Thank you.

6          THE COURT:  Agent, maybe this is obvious, but the

7  Gen5 is not on the roster.

8          THE WITNESS:  Correct.

9          THE COURT:  So if they just paid a fee, it wouldn't

10  get on the roster because of those changes; correct?

11          THE WITNESS:  Correct, because of the changes.

12  BY MR. BRADY:

13  Q.  Do you, Special Agent Gonzalez, know why the California

14  Department of Justice issues its agents, like yourself,

15  handguns that are not on the roster?

16  A.  Well, specifically, I mean, we have an exception on the

17  320000 [sic] Penal Code, which -- Section 4 which states that

18  certain law enforcement have certain exceptions in regards to

19  acquiring and having guns for, like, official duties, stuff

20  like that.  Within our section, like, law enforcement, like,

21  local PDs and sheriffs, they're allowed to have these firearms,

22  as well as section -- what is it 6, 7? -- they have to have

23  certain post requirements and further training in order to

24  acquire these firearms.

25  Q.  Understood that there is an exception -- an exemption for

1    law enforcement officers, but is there a reason that the

2    California Department of Justice decided to take advantage of

3    that exemption and issue its officers only firearms that are

4    not on the roster?

5    A.    I am not aware of the reasoning.

6    Q.    They didn't make an analysis of the benefits of chamber

7    load indicators or magazine disconnects or microstamping on

8    your firearms?

9    A.    That I'm aware of, I don't know.

10          MR. BRADY:  That is all.  Thank you, sir.

11          THE WITNESS:  Thank you.

12          MR. SAROSY:  I'll be brief, Your Honor.

13          THE COURT:  Okay.

14                    REDIRECT EXAMINATION

15   BY MR. SAROSY:

16   Q.    Mr. Gonzalez, similar handguns can be added to the roster

17   without lab testing; is that right?

18   A.    Correct.

19   Q.    And a similar handgun cannot have any changes to internal

20   parts?

21   A.    Correct.

22   Q.    And is the purpose of the lab testing, in your opinion, to

23   see how the internal parts work?

24   A.    Yes.  That would be one of the functions during all of

25   these type of stress tests, the drops, the firing.

1    Q.    Is it easier -- because there is no lab-testing for a
2    "similar," is it easier for a manufacturer to get a similar
3    handgun added to the roster than a new handgun to the roster,
4    let's say, pre-microstamping?
5    A.    Pre-microstamping?  It's easier for a "similar" since it
6    would not have to go through all the testing, correct.
7    Q.    For the H&K USP removal that you were asked about, to your
8    knowledge, were policies and procedures, including the statutes
9    and regulations that applied to that situation, were they
10    followed by the Department of Justice or the Bureau of Firearms
11    in removing those handguns?
12    A.    Yes, they were.
13    Q.    To your knowledge, did H&K admit that the hammer
14    assemblies on the handguns that were removed were different
15    from the ones that were submitted and tested?
16    A.    Yes, they admitted it.
17    Q.    And, to your knowledge, was H&K notified about the reasons
18    for the removal of those handguns from the roster?
19    A.    Yes, they were.
20    Q.    And in preparing for your testimony today, did you go
21    through every semi-automatic pistol on the roster to see if it
22    had an ambidextrous magazine release or ambidextrous external
23    safety?
24    A.    We didn't go through every single firearm.  We went
25    through a lot of firearms.

1   Q.   Okay.  And is it possible for a parent to tell a child

2   that, if a gun has a red pop-up on the gun, that that means

3   it's loaded?

4   A.   Yes, it's possible.

5   Q.   And for a revolver, when you are, I guess, holding a

6   revolver, can you see in the barrel which one has cartridges in

7   it, typically?

8   A.   Like we were talking about earlier, if it's in the

9   cylinder, you can technically see the outer cartridges.  But if

10  it's in the chamber, which is the one that's chambered to be

11  fired off, it's not going to be as visible as the other ones.

12  Q.   Right.  So you can't see the one in the chamber, but you

13  can see the other ones in the barrel?

14  A.   Correct.

15  Q.   For a semi-automatic pistol, you can't see how many

16  cartridges are left in the magazine, can you?

17  A.   You cannot see how many -- the rounds are in the magazine

18  or inside the chamber.

19  Q.   And to be clear, did you make the decision to issue

20  off-roster handguns to Bureau of Firearms special agents?

21  A.   No, I did not.

22  Q.   And do you store your duty gun at home?

23  A.   Yes, I do.

24  Q.   And how do you store it, typically?

25  A.   I pretty much put it in my safe.  I get home, walk up, put

1    it in my little lockbox, take the magazine out, and rack it

2    back, make sure there is no rounds in the chamber.

3              MR. SAROSY:  All right.  Thank you.

4              THE COURT:  Anything further?

5              MR. BRADY:  No, Your Honor.

6              THE COURT:  Sir, you can step down.  Thank you.

7         Okay.  We have another witness, don't we?

8              MR. WOODS:  Your Honor, we have one more witness that

9    we can call Mr. Saul Cornell now, Dr. Saul Cornell.  He's on

10   the East Coast, and it is getting fairly late for him.  We told

11   him that he can come back -- he's willing to come back

12   tomorrow, if that would be better.  I can see if I can get him

13   to testify.

14             THE COURT:  See if we can get him to testify.

15             MR. WOODS:  All right.  Let me try to give him a

16   call.

17             THE COURT:  All right.  Great.  Thank you.

18             MR. WOODS:  I just spoke with him.  He will be back

19   to his computer momentarily.

20             THE COURT:  Perfect.

21             THE COURTROOM DEPUTY:  Okay.  Thank you.

22        (A brief recess was taken.)

23             THE COURTROOM DEPUTY:  Mr. Cramer is back now.

24             THE COURT:  Rolls, you're going to get electronic

25   copies of all the exhibits; right?

1          THE COURTROOM DEPUTY:  Yes, Your Honor.  We discussed
2  it, and they will be filing a stipulation to file the admitted
3  exhibit list and the witness list, Your Honor.
4          MR. SAROSY:  Your Honor, for the last witness,
5  Mr. Gonzalez, I forgot to move into evidence Exhibit 8, which
6  he had spoken about, and I know he just left.
7          THE COURT:  That exhibit is received into evidence.
8          MR. SAROSY:  Thank you.
9          THE COURT:  And, right, you are going to put all of
10  these exhibits into electronic format, too?
11          MR. SAROSY:  Correct.
12      (Exhibit 8 was received into evidence.)
13          MR. SAROSY:  Would you like the demonstrative in
14  electronic format as well?
15          THE COURT:  Sure.
16      (A discussion was held off the record.)
17          THE WITNESS:  Okay.  We're live.  Sorry about that.
18          THE COURTROOM DEPUTY:  Can you hear me, sir?
19          THE WITNESS:  I can.
20          THE COURTROOM DEPUTY:  Perfect.  And you can see the
21  Judge?
22          THE WITNESS:  I can see the Judge.
23          THE COURTROOM DEPUTY:  Perfect.
24      Do you want to call your witness?
25          MR. WOODS:  Oh, yes.  Sorry.  Defendant calls

1    Dr. Saul Cornell to testify.

2            THE COURT:  Very well.  Rolls, do you want to --

3            THE COURTROOM DEPUTY:   Mr. Cornell, please raise

4    your right hand.

5        Do you solemnly swear the testimony you shall give in the

6    cause now before this Court shall be the truth, the whole

7    truth, and nothing but truth, so help you God?

8            THE WITNESS:  Yes, I do.

9            THE COURTROOM DEPUTY:  Please state your name and

10   spell your last name for the record.

11           THE WITNESS:  Sure.  Saul Cornell, C-o-r-n-e-l-l.

12           THE COURT:  Please proceed.

13                          **SAUL CORNELL,**

14      **called by and on behalf of Defendant, testified as follows:**

15                       DIRECT EXAMINATION

16   BY MR. WOODS:

17   Q.   Dr. Cornell, good evening.

18   A.   Good evening.

19   Q.   Thank you for joining us.

20        Where are you currently employed?

21   A.   I'm currently employed at Fordham University where I am

22   the Paul and Diane Guenther Chair in American History and an

23   adjunct professor of law at Fordham Law School.

24   Q.   Great.  I am sharing the screen, and hopefully that works.

25        Is this your -- what looks like an accurate copy of your

1    CV?

2    A.    Yes, it is.

3    Q.    Okay.  Is this a document that you prepared, sir?

4    A.    Yes.

5    Q.    Okay.  Great.  I'm going to ask some general questions

6    about your background.  If you need to refer to your CV, you're

7    welcome to.

8         How long have you been employed by Fordham?

9    A.    So I've been employed by Fordham since 2009.  And before

10   that, I was at Ohio State University for 18 years, and the

11   College of William & Mary for two years.

12   Q.    And in what context were you employed by Fordham and Ohio

13   State and William & Mary?

14   A.    So William & Mary I was both an assistant professor and a

15   fellow at the Omohundro Institute of Early American History &

16   Culture, which is the leading research institute on early

17   American history.

18        And at Ohio State, I was a the professor of history.

19   Began as assistant, was promoted through associate to fellow.

20        I also had an appointment at the John Glenn School of

21   Public Policy.

22        And now I am employed at Fordham University.

23   Q.    And do you -- have you received any fellowships and/or

24   grants?

25   A.    Yes, a whole bunch of them.  I've had fellowships from the

1    National Endowment for the Humanities, the American Council of

2    Learned Societies.  I was a distinguished Fulbright scholar,

3    where I taught at Leiden University in the Netherlands.  I have

4    received fellowship support from the Gilder Lehrman Institute

5    from the Center for the Study of Slavery at Yale University,

6    which is a distinct part of the Gilder Lehrman Institute.  And

7    I have also been a visiting research scholar at Yale Law

8    School, the University of Connecticut Law School, and the

9    Floersheimer Center for Constitutional Democracy at Cardozo Law

10   School.

11   Q.   All right.  That's a lot.  I realize this is, perhaps, a

12   big question, but do you have any particular areas of expertise

13   that you would consider yourself an expert in?

14   A.   Yes.  So I am an early American historian, a

15   constitutional legal historian.  I have written on a variety of

16   areas of American political culture, American political

17   thought, American legal history.  I've authored a popular

18   American history textbook that goes from the Paleolithic era to

19   the present.  I co-authored that.

20       I also co-authored what has become standard history of

21   American constitutional development from the founding era

22   through to the Jacksonian period that was published by

23   Cambridge University Press a few years ago.  And I've published

24   in almost all of the major peer reviewed history journals and

25   many of the top law reviews in the country, including Yale,

1    William & Mary, Northwestern, UCLA, and there are others, but
2    I -- that gives you a basic sense.
3    Q.   Understood.  Can you kind of summarize your scholarship in
4    constitutional law?  I understand you mentioned constitutional
5    legal history.  Is there a particular focus on constitutional
6    law that is part of that?
7    A.   Sure.  My first book was on the anti-federalist, the
8    original opponents of the Constitution.  It's still required on
9    many graduate reading lists.  I know they use it at Cambridge.
10   I know they use it at Princeton.  I know it's assigned in many
11   other places.
12        I've written a book on the Second Amendment.  And I've
13   also written a history -- co-authored a history on American
14   constitutional development from the founding era through the
15   Jacksonian period.
16   Q.   Great.  Have you ever published articles on firearms,
17   legislation in the historical period?
18   A.   So I've published both in peer reviewed history journals
19   and in top law reviews.  The first article I wrote on this, I
20   published in the Fordham Law Review, although I wasn't yet a
21   Fordham faculty member.  And to this day, it is one of the top
22   five most cited and downloaded articles published in the
23   Fordham Law Review, which is, at last, ranking the top 15 law
24   reviews.  I think it's been download almost 50,000 times.
25   Q.   Great.  And have you ever testified in -- or have you ever

1  provided expert testimony in a case before?

2  A.   Yes.  I've provided expert witness reports in something

3  like a dozen cases.  My work has been cited by several dozen

4  federal and state courts.  It's been cited by the Supreme Court

5  on multiple occasions, both in dissent and the majority

6  opinions.

7  Q.   Great.

8          MR. WOODS:  Your Honor, I would like to move Defense

9  Exhibit 23 into evidence.

10          THE COURT:  Any objection?

11          MR. DALE:  No objection.

12          THE COURT:  Exhibit 23 will be received into

13  evidence.

14          MR. WOODS:  Great.

15     (Exhibit 23 was received into evidence.)

16  BY MR. WOODS:

17  Q.   Have you been retained in this case to provide an opinion?

18  A.   Yes.

19  Q.   And what was your task in this case?

20  A.   So my task was to read the complaint and the relevant

21  documentation by provided by the A.G. Office, and to analyze,

22  with the framework provided by the recent Bruen decision in

23  mind, what the history of firearms regulation was, what the

24  context in which firearms regulations were enacted, and what

25  that might tell us about the constitutionality of current

1  firearms law in California.  In this case, you know,

2  regulations affecting the sale of firearms.

3  Q.   Understood.

4        MR. WOODS:  Your Honor, at this time, I would like to

5  tender this witness as an expert firearms historian under Rule

6  702.

7        THE COURT:  He will be so designated.

8  BY MR. WOODS:

9  Q.   So after receiving this task from the Attorney General's

10  office, did you actually form an opinion?

11  A.   I did.  And my opinion, I think, has to be understood in

12  the following manner.  So in order to apply the Bruen

13  framework, which requires that we understand both the history

14  of regulation and what would be suitable analogies to

15  contemporary firearms legislation, we have to not only look at

16  the kind of laws that were passed but we must try and

17  understand what were the circumstances that Americans,

18  particularly in the founding area of 1400s, what were they

19  doing by enacting these laws and what were the concerns and

20  social legalities and problems that would have motivated them

21  to enact laws or would have made the enactment of laws not

22  really possible because, for technological reasons or certain

23  social ills, were not yet manifested in society?  So that is

24  essentially what I was asked to do.

25  Q.   And in forming your opinions, did you look at primary

1    sources?

2    A.    Yes.

3    Q.    From the historical era?

4    A.    Yes.

5    Q.    Sorry.

6    A.    I looked extensively at a variety of primary sources.  I

7    think one has to -- particularly, when one is dealing with the

8    founding era, one has to recognize that early American law was

9    immersed in a common law culture inherited from England.  Not

10   every aspect of England's common law was transferred but many

11   aspects of common law were absorbed into early American law.

12        So my analysis included, not just statutes but also

13   justices of the peace manuals, newspapers, a broad range of

14   sources that would give me insight into both what the

15   legislators were doing but also what the society was

16   experiencing that would lead them to enact certain kinds of

17   regulations.

18   Q.    And did you also look at the text of the Second Amendment?

19   A.    Yes.  Yes.  One of my favorite Amendments.  I would say

20   after the Third, probably, my second favorite.

21   Q.    Sure.  Why not.

22        Did you also look at the text of any other amendments to

23   compare the text of the Second Amendment?

24   A.    Yes.  I think many people often draw a pretty close

25   comparison between language in the First and the Second.  And,

1    of course, what is most clear, when you look at those two

2    texts, is that they are both structured very differently and

3    the language they use is quite distinct.

4         The First Amendment, of course, talks about an abridgement

5    of a right; whereas the Second Amendment talks about

6    infringement.  And in 18th century English and, in particular,

7    in the kind of legal English that was familiar to the kinds of

8    people who would be drafting the statutes and the Second

9    Amendment, that choice of language was quite significant.  The

10   fact that, in one Amendment, they framed the issue in terms of

11   abridgement, and in the another, they framed it in terms of

12   infringement.

13   Q.   Okay.  I want to get into the difference between those two

14   words, as you understand it.  I am showing you on the screen

15   what has been marked as Defendant's Exhibit 24, which is a

16   compendium of sources that I believe that you used in order to

17   form your opinions.

18        Do you have that in front of you, or can you see it?

19   A.   I do.

20   Q.   Great.  Okay.  And so the first source, what do you

21   understand the first source here to be?

22   A.   So the first source is a very typical type of primary

23   source that has become particularly important in light of the

24   Supreme Court's embrace of public meaning originalism,

25   dictionaries.  And this one, probably the most famous

1   dictionary of English in the 18th century, British English, of
2   course, is Daniel Johnson's dictionary.  And it's a text that's
3   widely cited by original scholars and jurists.
4   Q.   Great.  And so this is, as I understand it, the 1755
5   version; is that right?
6   A.   That's right.  This is an edition that would have been
7   fairly widely available for educated and other Americans in the
8   era of the Second Amendment.
9   Q.   And here are some excerpts from the 1755 dictionary that
10  you looked at.  And if you can see right here -- I realize the
11  text is a little bit small, but this is the page with abridge
12  on it?
13  A.   Yes.
14  Q.   And so what do you understand -- or what does this
15  dictionary tell you about the meaning of the word "abridge" in
16  1755?
17  A.   So the choice of using the term "abridge" or "abridgement"
18  signified that the framers, enactors, and the educated lay
19  readers of this text would have understood that the First
20  Amendment, which, of course, in 18th century restriction on
21  Congress -- it hadn't been incorporated the way it is today --
22  would have prevented Congress from diminishing or contracting
23  the scope of the right.
24       So the clear meaning, plain meaning of this text is that
25  Congress can't pass laws that will limit and thereby abridge

1    the freedom protected by the First Amendment.  And, of course,

2    the First Amendment protects multiple freedoms, you know,

3    speech, assembly, et cetera, et cetera.

4    Q.    They can't make the right smaller; is that your

5    understanding?

6    A.    Yes, yes.

7    Q.    I am going to move to the next page where is -- and you

8    can see it -- the entry for "infringe."  Do you have that in

9    front of you?

10   A.    I do.

11   Q.    Okay.  I am pointing to it if you can't see it.  And what

12   do you understand -- or what does that definition there tell

13   you about the meaning of the word "infringe"?

14   A.    Sure.  So by choosing to use the word "infringe," which

15   clearly means to destroy the right, the framers of the Second

16   Amendment clearly distinguished it from the First Amendment

17   that, in the case of the Second Amendment, a different kind of

18   test was hard-wired into the language of the amendment so that

19   one, obviously, could regulate the amendment as long as one did

20   not destroy the right substantiated in the amendment.

21        And that particular reading becomes the dominant reading

22   for most of American history.  And if you look, for instance,

23   at the early cases that are cited by Heller, in *District of*

24   *Columbia v. Heller*, they applied the cutting edge theory -- at

25   least it was cutting edge when John Marshall articulated it in

1   the early Republic -- of the police power.

2       And the police power analysis that Marshall and others

3   employed essentially looked to be the question of is the

4   regulation a legitimate exercise of the police power, and does

5   it infringe or, to say, destroy the right protected by -- in

6   the case of the case law would be state arms-bearing

7   provisions, not federal provisions.

8       So the notion of infringement dovetails nicely with the

9   dominant framework that early American judges used to

10  adjudicate questions about legitimate regulations of firearms.

11  And the issue was:  Does the regulation infringe it or not?

12  You could say does it destroy it or not?

13  Q.   Great.  Okay.  And then, as part of your research for this

14  case, as part your research in other cases, you looked at

15  primary sources; correct?

16  A.   Correct.

17  Q.   We are going to look at a couple of those primary sources.

18  So I have -- it's page 12 on Exhibit 24.

19  A.   Right.

20  Q.   Which is -- what do you understand this printout to be?

21  A.   So this is a law from Massachusetts, from the founding

22  era, which makes it illegal to have a loaded weapon in a

23  domicile in Boston.  And, of course, the concern was that

24  loaded weapons could discharge accidentally, particularly in

25  situations where, you know, if there was a fire.  And so it's

1    both a safe storage law and it's a law that is designed to

2    prevent the harm that can come from a gun accidentally

3    discharging.

4    Q.    And why is that important to you?

5    A.    Well, it suggests that the founding generation understood

6    that firearms and gunpowder were particularly dangerous and

7    that one had to regulate them in a robust manner.  So, you

8    know, it's difficult to try and think of an analogy for a limit

9    on First Amendment freedoms that would be as intrusive as this

10   kind of regulation.

11        And, indeed, when John Marshall does write about the scope

12   of the police power, he uses gunpowder as the locus classicus

13   of what the police power is intended to do.

14   Q.    But Massachusetts wasn't the only state with one such law,

15   was it?

16   A.    There are a variety of different kinds of regulations

17   about gunpowder in virtually every state and every locality.

18   And in many instances, when a new municipality is created, the

19   description of what the scope of police regulation permissible

20   by that entity often uses gunpowder as the illustrative example

21   of what the police power entails.

22   Q.    In fact, if you are looking at the screen here, the

23   demonstrative, which is page 16, is this an example of one such

24   law in New York?

25   A.    Yes, although you've given me the title page?  I would

1    have to now see down.

2    Q.    Here is the next page.

3    A.    Yes.  And one of the interesting things about these

4    gunpowder laws is, 18th century Americans and early 19th

5    century Americans, who were particularly mindful of the abuses

6    of British power and general warrants and things of that sort,

7    nonetheless gave government pretty broad authority to inspect

8    private dwellings for violations of Gunpowder Storage Act

9    because they believed that the threat posed by gunpowder was so

10   important to meet, to remediate that inspectors had fairly

11   broad authority to inspect private dwellings, to make sure that

12   they were in compliance with the law.

13   Q.    When you say, "gunpowder regulations," you are not

14   referring to just simply storage of gunpowder but also

15   gunpowder and how it interacts with privately owned firearms;

16   correct?

17   A.    Sure.  I mean, what is amazing about the gunpowder

18   regulations is they cover virtually everything from the moment

19   of production to sale to transportation to storage.

20   Q.    Okay.  Great.  I am going to shift gears a little bit.

21   And as part of your regulation -- or excuse me.

22         As part of your research, did you also find laws about

23   proofing firearms?

24   A.    Yes.  And, you know, this is -- this particular law -- I

25   was aware of a slightly later version of this law, but I

1  actually only found this law about two weeks ago, which, of

2  course, is an important reminder that this field is fairly

3  young and we're still finding new things all the time and that

4  our research mission has yet to be completed, although we have

5  done a lot of research, at least, in Toulouse Society when

6  there was actually fairly little of this kind of research.

7        And so this is a law that has the preamble -- and, of

8  course, preambles were very important, in the 18th century and

9  in the early 19th century, that government has a right and an

10 obligation to inspect firearms to make sure they are safe and

11 to impose standards on firearms to ensure that they are safe.

12 Q.   And so this law indicates it was enacted in 1805; is that

13 right?

14 A.   Right.

15 Q.   Okay.  And I understand that you've read this law.

16       How do you understand this law to work, to operate?

17 A.   And one thing to keep in mind, by the way, Massachusetts

18 is, perhaps, the key state in terms of producing small arms t

19 this moment.

20       So this is the equivalent of Michigan, in the late 20th

21 century, enacting a safety law pertaining to cars.  So, you

22 know, the Springfield Armory, which becomes one of the most

23 important sites of the production of firearms and pioneers many

24 new techniques in creating them is, obviously, located in

25 Massachusetts as well.

1       So the idea here is that, before firearms can be sold, it
2   must be properly inspected, and the inspector must put a stamp
3   on it so that people who purchase these arms can know that they
4   are safe.
5   Q.   And that's what is meant by "proof" of firearms in this
6   law; is that right?
7   A.   Yes.
8   Q.   The actual --
9   A.   So, essentially, these arms are going to inspected,
10  tested, and then stamped.
11  Q.   Okay.  And what is the purpose of that stamp?
12  A.   So the stamp, in this context, is so that anyone who
13  purchases one of these firearms knows that it has been
14  subjected to the appropriate government scrutiny.
15  Q.   And was it -- is it your understanding that, pursuant to
16  these laws, it was illegal or impermissible to sell firearms in
17  Massachusetts that had not been proofed?
18  A.   Yes.  That's correct.
19  Q.   Okay.  And you said that you were familiar with a later
20  version of this law.  I think I'm going to show it to you.  And
21  it's on page 10 of this -- oh, no.  I apologize.
22  A.   This one is the main version of the law.
23  Q.   Yeah.  That's a main version of the law?
24  A.   Yeah.  We are talking about the Massachusetts version.
25  But Maine, the earlier culture, legal culture of Maine, is very

1    closely tied to Massachusetts.  Maine was originally part of

2    Massachusetts and only was spun-off as a separate state in the

3    period of the 1818's.

4    Q.    Let's go to -- let's see.  Sorry.  Is this the 18 --

5    that's the 1805 version.  And this is the 1814 version.

6    A.    The 1814 version, yes.

7    Q.    Of the same proofing act?

8    A.    Uh-huh.

9    Q.    And collectively, what do you interpret these statutes to

10   mean, as they relate to the regulation of firearms at the

11   founding?

12   A.    So there are a couple of broad principles that we need to

13   keep in mind when trying to understand what these laws all mean

14   when we assemble them together.

15          So government took a very active role in shaping the

16   market for firearms.  And government took a very active role in

17   regulating firearms.  And the idea that somehow regulation is

18   incompatible with the right to keep and bear arms is a very

19   modern and recent idea; that, in fact, in the 18th century,

20   there is no liberty without regulation.

21          And we have, you know, a variety of different commentators

22   who constantly emphasize that.  And it's one of the most

23   important tasks of the historian to sort of divest yourself of

24   modern, contemporary assumptions that we bring to our reading

25   of texts, set them aside, and try and reconstruct the very

1    different world in which these people inhabited.

2         And that is an essential part of the historian's task,

3    which if you just sort of look up old laws and read them, you

4    are likely to misinterpret them because you're not

5    reconstructing -- you're not reading them the way an

6    18th century American would have read them.  You are very

7    likely reading them in the way a modern American would, and

8    this is the sort of classic anachronistic fallacy that we see

9    in so much -- particularly in this area, where people are so

10   emotionally involved in the issue and are so committed to a

11   particular policy agenda today.  It is very easy to smuggle in

12   those kind of assumptions.

13        But the first thing we teach our graduate students is they

14   have to set those aside, to the extent that it's humanly

15   possible, and you have to begin to think like those in the past

16   thought.

17   Q.   So these laws, these sort of gunpowder storage -- and I

18   want to focus on the gunpowder storage laws.  You said that

19   they were fairly common in the colonial period, not just in

20   Massachusetts and New York?

21   A.   You find them everywhere.  And they are ubiquitous and

22   far-reaching in terms of the power they give the state to

23   ensure that this very dangerous product does not cause any

24   unnecessary harm to society.

25   Q.   Was that consistent with the, sort of, general public and

 1  understanding at the time, that firearm regulation was a
 2  function of the state?
 3  A.    Yes.  I mean, there is simply no way to make sense of
 4  early American law without understanding that regulation is not
 5  antithetical to liberty.  It is the absolute, necessary
 6  precondition for the exercise of liberty, because the founding
 7  era had a concept that has gone almost out of use in terms of
 8  contemporary language.  They would describe what they would
 9  have called an excess of liberty as licentiousness and as a
10  threat to what they perceived to be the true goal of the
11  Constitution, which is ordered liberty.
12  Q.    You said, as part of your research in this case, that you
13  read the complaint and some of the other pleadings that were
14  filed.
15        Do you have a general understanding of the unsafe handgun
16  law in California?
17  A.    Yes.  I'm not an expert on modern firearms policy, and I
18  wouldn't claim to be an expert on modern firearms technology.
19  But my understanding is that California is trying to make their
20  population safer, and they are trying to protect liberty in a
21  way that is consistent with constitutionally protected
22  freedoms.  But that effort is obviously deeply rooted in
23  American history where we've been regulating firearms since the
24  first firearms were brought to America from England.
25  Q.    Right.  And in your opinion, are these historical laws

1  that you've mentioned so for, the gunpowder storage laws, the

2  prohibition against keeping loaded firearms, and proofing

3  laws -- are these laws analogous to California's Unsafe Handgun

4  law?

5  A.   Yes.  I mean, the job of judging exactly how good an

6  analogy they are, from the point of view of modern

7  jurisprudence, it's, obviously, not the job of a historian.

8  But the job of the historian in this case, I believe, is to

9  understand what these laws were trying to do, what they were

10  responding to, and what understanding of power and liberty they

11  embodied, and then try and figure out, you know, how close a

12  match it is to contemporary laws, which, of course, is what we

13  have judges for.

14  Q.   Would you agree that there is a long history and tradition

15  of state regulation of firearms for the purpose of making these

16  firearms safe for public ownership and use?

17  A.   Absolutely.  Yes.  I mean, whenever -- I mean, the other

18  thing to keep in mind is that, you know, firearms technology

19  has changed.  And, typically, what we see is, when firearms

20  technology changes, there is a time lag before a new technology

21  is brought to market.  Then there is usually another time lag

22  before it achieves market penetration.  And it's only at that

23  point that we begin to see problems.  And it's at that point

24  that we see legislators trying to do what legislators have

25  traditionally done, which is protect liberty while addressing

1    the necessity of promoting public welfare and safety.

2    Q.    And you've touched on this, but I want to get, you know,

3    sort of like a focused answer, if I can, about why it was

4    important for states in the founding era, specifically states,

5    to ensure that publicly owned firearms were safe to use?

6    A.    Well, firearms in early America have many, many uses, and

7    early America was unquestionably a better armed society than

8    any society in the 18th century world.  And I think, where you

9    have a high level of firearms ownership, you necessarily need a

10   robust and effective regulatory regime, so that any potentially

11   harmful consequences of the widespread ownership and use of

12   firearms does not result in excessive harm to society.

13   Q.    You mentioned -- you testified earlier that Massachusetts,

14   specifically, was kind of the Detroit of firearms back in the

15   day, the main manufacturer.

16        Did other states have a role in sort of encouraging the

17   manufacturer of arms during the founding period?

18   A.    Yes.  My own state of Connecticut, of course, becomes one

19   of the major locations of firearms manufacturing, the

20   Connecticut River Valley.  You know, this is, of course, where

21   Colt and Whitney and several other iconic manufacturers of

22   firearms set up business, in a little bit later period,

23   slightly after the period in which these laws are occurring.

24        Because one thing we need to keep in mind, of course, is

25   that there are hardly any pistols in the founding era.  You

1    know, over 90 percent of the firearms owned by Americans were

2    long guns.  So we don't really see the problems that we

3    associate with handguns until they become cheaper, more

4    reliable, and more available.  And that wouldn't really be the

5    case until, you know -- it's an upward trajectory, but it

6    really takes off, you know, so that by 1848, when Colt perfects

7    its revolver, that is sort of the golden era of handguns in

8    early America.

9         But, essentially, at the time of the Second Amendment, if

10   you are not someone like Alexander Hamilton and buying a

11   dueling pistol, you are not really going to put food on the

12   table with a pair of dueling pistols.

13   Q.   Understood.  But as part of encouraging the manufacturer

14   of arms, did that also include encouraging the regulation of

15   arms?

16   A.   Yes.  One of the things that it's important to understand

17   is that, there is this consistent problem that early Americans

18   face, early American governments face, which is that Americans

19   don't want to buy the guns that are best suited to arm the

20   militia.  They want to buy guns that are more useful for

21   putting food on the table, because it is largely an agrarian

22   society, or guns that are more useful for getting rid of

23   critters that are eating your crops.

24        So really, the entire structure of early American policy

25   is to shape the nature of the market and to intervene, to

1    encourage actors to do what the government believes is in the

2    best interest of American security.

3    Q.    Now, in this role of actively encouraging the manufacturer

4    and the safety of arms, did that role continue into this sort

5    of Civil War and reconstruction era?

6    A.    It does.  One of the amazing things about the period of

7    reconstruction is that the number of firearms regulations

8    explodes.  You see efforts to regulate firearms in a number of

9    areas that were just not perceived to be that important in the

10   earlier period.  For instance, you see the number of laws

11   limiting access of guns to -- limiting access of minors to guns

12   expand enormously in this period.

13        So, you know, there is this idea that somehow the

14   Fourteenth Amendment and Reconstruction was designed to prevent

15   gun regulation, but, in fact, it's very clear that what they

16   were trying to do was to prevent racially targeted

17   disarmaments, the Black codes.

18        The moment that Republicans, who were the great champions

19   of the Fourteenth Amendment -- the moment they got into office

20   they enacted sweeping gun regulations because they were dealing

21   with unprecedented levels of gun violence.  And they had to

22   protect these recently freed slaves and the Republicans who had

23   come to the South to help restore order.

24        So Reconstruction is really a golden era of gun

25   regulation, a legal note from reading some of the more popular

1    discussions of this period.

2    Q.    So you were on Zoom earlier when plaintiffs' expert,

3    Dr. Cramer testified.

4         Do you recall that?

5    A.    Yes.

6    Q.    And do you recall that he testified about sort of a

7    monolithic gun culture.

8         Do you recall that testimony?

9    A.    I do.  And, you know -- and one of the most interesting

10   things that we now know from research is that American gun

11   culture has never been monolithic.  I mean, today, the attitude

12   towards guns that you see in Alaska is very different than the

13   attitude you see towards guns in the Bronx.  And that's been

14   true, really, since the very beginning of American history.

15        Levels of gun ownership, the type of guns owned, the

16   robustness of the regulatory regimes have always varied by

17   region in America.

18        There's a wonderful article called "Firearms Localism" in

19   the law journal that explores some of these issues.  And so,

20   you know, if you think about it, firearms regulation really is

21   the perfect illustration of the founders' genius because it is

22   the great illustration of how the principle of federalism

23   allows America to deal with the very different regional

24   cultures around guns.

25   Q.    All right.  Dr. Cornell, do you recall -- I realize you've

```
 1   been asked or retained in several different cases.  Do you
 2   recall when you were specifically retained in this case?
 3   A.   Oh, gosh.  You know, I must confess that I would have to
 4   look that up, because it does seem like every week I am talking
 5   to a different AG's office.
 6   Q.   Fair enough.
 7   A.   And sometimes I'm talking to your office on different
 8   cases in the same week.
 9   Q.   Understood.  Let me ask this in a different way.
10        How long have you been working on your opinions in this
11   case, if you can recall?
12   A.   So this particular case, of course, came to me rather
13   late, so I've really only been working on this one, I'm
14   guessing, less than two months.  Maybe a month, month and a
15   half.
16   Q.   Okay.  And you formed -- through some research, as you've
17   testified to, you formed some opinions about historically
18   analogous laws or laws that you think are historically analysis
19   to the Unsafe Handgun Law Act; is that correct?
20   A.   That's correct.
21   Q.   Now, in general, and not necessarily just for this
22   particular motion, but how long does it take -- how long would
23   it take you to do sort of full historical analysis, making sure
24   that you've crossed all the t's and dotted all the i's?
25   A.   So depending on how much research I have already done on a
```

1   particular topic, it could take, easily, three to four months,
2   maybe six months, depending on how new the issue is.  I mean,
3   one of the things that you have to do, again, if you are not
4   going to approach this in an antiquarian fashion, if you're not
5   just going to look up old laws and say, you know, "There is no
6   exact law like the one today," end of case, if you are going to
7   do what Bruen really asked us to do, which is to recognize that
8   this analogical process does not require us to find twins and
9   so the processes somehow must steer a course between, you know,
10  the blank check and the straitjacket, as Justice Thomas
11  colorfully phrases it, that means you not only have to dig for
12  these laws but you really need to dig into the social,
13  cultural, economic, military history to sort of see, wow, what
14  does it mean that there is no law?  Is there no law because
15  there is a comparable problem and they choose not to pass the
16  law?  Or are we really dealing with a situation where there is
17  just no comparable problem?
18        And in many cases, given how different firearms technology
19  is and given how different early American society was, in most
20  cases, I think it generally turns out that we're just dealing
21  with different problems.  But in order to be sure about that,
22  you really have to do your homework and really range it widely
23  over all of this history so that you're -- you know, again, the
24  goal is always to read these law as someone in the 18th century
25  would have read them, not as someone in the, you know,

1  21st century would've done.

2  Q.  Understood.

3       MR. WOODS:  Your Honor, I would like to move Defense

4  Exhibit 25 into evidence.  Or is it 24?

5       MR. DALE:  24.

6       MR. WOODS:  Apologies.  24.

7       THE COURT:  Any objection?

8       MR. DALE:  No objection.

9       THE COURT:  Exhibit 24 will be received in evidence.

10     (Exhibit 24 was received into evidence.)

11       MR. WOODS:  All right.  Dr. Cornell, I have no

12  further questions for you at this time.

13       THE WITNESS:  All right.  Thank you very much.

14                  CROSS-EXAMINATION

15  BY MR. DALE:

16  Q.  Good evening, Dr. Cornell.  My name is Joshua Dale.  I'm

17  an attorney for the plaintiffs in this matter.  I appreciate

18  your time tonight and thank you for hanging in there with us.

19  I know it's getting late.  I'll try to make this quick.

20     I am going to go ahead and put Exhibit 24 back up here,

21  really quick.  Figure out how to do it.

22       MR. WOODS:  You might need to get permission.

23  BY MR. DALE:

24  Q.  And this was the exhibit that was just admitted.  You

25  testified that there were -- let me make sure I get your words

1    here correctly -- there were so many gunpowder laws during the
2    founding and through the period of the adoption of the
3    Fourteenth Amendment, that they were ubiquitous; correct?
4    A.    Correct.
5    Q.    Okay.  Let's look at Exhibit 24, because this was your
6    client here, the State's opportunity to present those laws.
7         Can you identify for me in Exhibit 24 how many gunpowder
8    laws are identified?
9    A.    So this is an illustrative example.  This isn't a
10   comprehensive table or list of all gunpowder laws.
11   Q.    Why not?  This was the State's chance.  Why not?
12   A.    Well, had we produced a formal declaration, probably we
13   would have made a decision to do one of two things.  We would
14   have either produced a lengthy appendix with those laws or more
15   likely -- or I hope more likely, because it would have been
16   more economical for the Court, to simply cite to the
17   scholarship that documents them or a very lengthy footnote that
18   would have listed them.
19        So I don't know that I would necessarily conclude anything
20   from the fact that we gave you an example.  It doesn't really
21   speak to the ubiquity at all.
22   Q.    You are aware of scholarship that lists all of these laws
23   that support your testimony that gunpowder laws were
24   ubiquitous?  Is that it?
25   A.    So we have a number of -- particularly since Heller, for

1  instance, there is an excellent article by Professor Spitzer

2  that actually does count the number and types of laws.  I don't

3  have it in front of me, but he clearly documents, if not

4  hundreds, then certainly dozens and dozens of these laws.

5  Q.    All right.  And that article was not included as part of

6  defendant's exhibit today; is that correct?

7  A.    Well, had we done a report, it is an article that I cite

8  with great frequency, but for purposes of this -- I guess

9  it's -- we're in a hearing, not a deposition; right?  We didn't

10 feel it was necessary to do that.

11 Q.    Okay.  And then you've testified about how there were

12 numerous jurisdictions that had proofing laws.  And if I

13 understand that correctly, "proofing" refers to making sure

14 that the firearm is sound; that it's not going to blow up or do

15 something that might injure the user or somebody who is nearby.

16        Is that a fair representation?

17 A.    So, actually, what I said is, the fact that Massachusetts

18 had one was especially significant, because Massachusetts is

19 one of the leading producers of firearms in this period.  So

20 that a single law from Massachusetts would be comparable to a

21 single law from Michigan dealing with car safety in the late

22 20th century.

23        I actually haven't had time, because I've -- like I said,

24 I only just found this 1805 law about two weeks ago, so I

25 actually haven't had time to finish the research to see how

1  ubiquitous those laws were.

2  Q.   Well, let me just make sure I am clear.  And I am being

3  genuine about this.  I count five laws listed in Exhibit 24.

4       Do I have that count right?

5  A.   I suppose I could sit here and count them.  But, yes,

6  these are five illustrative laws, correct.

7  Q.   Understood.  And you understand that part of the Bruen --

8  well, let me -- you've testified that you've read Bruen;

9  correct?

10  A.   Yes.

11  Q.   Yes.  And you understand that part of the Bruen test

12  includes figuring out what are outlier laws and rejecting those

13  to determine if the analogues show some consensus among folks

14  from the founding to the 14th Amendment.

15       Would you agree with that characterization, or would you

16  dispute it?

17  A.   So the question of what constitutes an outlier based on

18  Bruen is pretty much, I think, up for grabs in the courts

19  because the general consensus among commentators, that I've

20  read, is that it's not quite clear because the court seems to

21  change the definition of what constitutes an outlier.

22       So, for instance, in one sense, a single law from

23  Massachusetts might be read as an outlier if the relevant

24  criteria was number of laws.  But if one then, you know,

25  contextualizes the Massachusetts law, recognizing that it would

1    be comparable to a law from Michigan in the 20th century about

2    cars, given that the vast majority of cars are produced in

3    Michigan, then claiming that it's an outlier solely based on,

4    you know, the numerical count would actually misrepresent the

5    historical reality.

6        Would you agree?

7    Q.   Well, I don't know if it's my place to agree.

8        But my question for you is, in terms of Bruen, can you

9    identify anywhere in the language where it says that certain

10   laws from certain states are to be given more weight in

11   determining whether they are historical analogue than laws from

12   other states?

13   A.   Well, it seems to me Bruen very clearly says that some

14   laws from some states are not to be given weight.  It seems to

15   leave open the -- you know, the logical -- it's been such a

16   long time since I've studied logic.  I took a course when I was

17   an undergraduate.

18       So certainly, therefore, the question of whether or not

19   some state having a law, if its population was sufficiently

20   great, if its production of firearms was sufficiently great,

21   that it would not be an outlier, and that is certainly

22   consistent with Bruen.

23   Q.   Well, no.  But Bruen focused specifically on numerosity.

24   In fact, the State of New York cited to them laws in places

25   like Texas and in frontier territories.  And the majority

1  opinion specifically rejected them because they were not

2  indicative of laws across the United States.

3       Isn't that a fair characterization?

4            MR. WOODS:  Objection.  Argumentative.

5            THE COURT:  Overruled.

6            THE WITNESS:  Well, of course, the problem with that

7  is, we have also the Kavanaugh Concurrence, which reaffirms

8  some of Heller's presumptively lawful laws which might not

9  square with the criteria you just laid down, which sort of

10 leaves it a little bit hard to know what to do.

11 BY MR. DALE:

12 Q.   Well, you testified that, in taking on this assignment,

13 you read the Second Amendment.

14 A.   I did.

15 Q.   And you actually provided it, the first part of

16 Exhibit 24, an analysis of the difference between the use of

17 the word "abridgement" and "infringement" as it was understood

18 in English law prior to the founding.

19      Do you recall that testimony?

20 A.   Correct.  Yes.

21 Q.   My question for you is:  Why did you do that?  I don't see

22 that in anywhere in the Bruen opinion.

23 A.   Well, Bruen consistently refers that the text is the

24 ultimate arbiter of constitutional meaning.

25 Q.   Correct.  But it also held a specific test, and that's

1    looking at whether or not a current law impacts the core

2    exercise of the right and then, in turn, to see if there are

3    historical analogues that support that particular regulation.

4        So I guess my question is:  Why are you looking at a

5    definition for something like infringement and discussing

6    obliterating the right when that is not the text that was laid

7    out in Bruen?

8            MR. WOODS:  Objection.  Argumentative.

9            THE COURT:  Overruled.  You don't have to adopt any

10   characterization in the question, Professor.

11           THE WITNESS:  Well, it seems to me, Bruen makes it

12   very clear that tradition does not trump texts; so, therefore,

13   getting the meaning of the text right is at the very core of

14   the enterprise.

15   BY MR. DALE:

16   Q.   Okay.  And then you also testified, as part of assessing

17   whether there were historical analogues, you looked at concerns

18   that society was going through during the relevant period,

19   social realities, and problems.

20        Do you recall that testimony?

21   A.   Yep.

22   Q.   And, again, I would ask you:  Where from the Bruen case is

23   there any language that says that, in looking at historical

24   analogues, you should be looking at societal problems or

25   concerns of society in assessing whether or not a historical

1    analogue exists?

2    A.    Well, Bruen makes it very clear that, if you are going to

3    engage in the process of constructing an analogy, in order to

4    construct an analogy, you have to understand what you're

5    analogizing.  And Bruen, also, very, very clearly states that

6    we are trying to understand what is the burden.  And, also,

7    we're trying to understand whether contemporary law is

8    addressing an issue that was of a similar nature to the -- to

9    problems that the founding era experienced.

10        So if you are going to -- since Bruen says we must

11   understand whether or not, for instance, a contemporary law is

12   addressing a new social problem, that the founding era could

13   not anticipate, or whether or not they are dealing with the

14   same problem, well, that invariably means you have to

15   understand what those problems were.  It seems to me that's

16   indisputable.

17   Q.    So let me ask you -- you've testified that you're an early

18   American historian.  You're a constitutional historian.  You've

19   written a book on the Second Amendment.

20        Would you call yourself an expert in the history of the

21   Second Amendment?

22   A.    Sorry.  Can you repeat the question?

23   Q.    Yeah.  I was asking if you would consider yourself an

24   expert on the history of the Second Amendment?

25   A.    Well, I was asked to write the chapter on the Second

1   Amendment in the Oxford handbook of the U.S. Constitution,

2   which was edited by Sanford Levinson, Mark Tushnet and -- see,

3   I have it here somewhere on my shelf -- and Mark Graber.

4        And actually, I was recently interviewed by the head of

5   the Rothermere Institute at Oxford about the Second Amendment.

6   So I think I am generally regarded as the leading authority on

7   the history of the Second Amendment.

8   Q.   Okay.  But as you sit here today, if I understand your

9   testimony, you need more time in order to be able to perform

10  the tasks that was asked of you by the State to identify

11  historical analogues; is that correct?

12  A.   So in order do the analysis properly, which requires not

13  simply finding laws but trying to understand what were the

14  issues that that society was dealing with that would have

15  impacted firearms, that does require a deep dive that is

16  slightly distinct from the kinds of issues that I've looked at

17  before.

18       And, indeed, almost all of the writing about the Second

19  Amendment, up until Heller, focused on a very, very narrow

20  issue.  The only issue that people seemed to talk about was

21  whether it was an individual or collective right.

22       So we've actually have only had about a decade's worth of

23  serious scholarship moving beyond that question, which Heller

24  obviously solved.  So it is a really young field.

25  Q.   Well, you've been writing about it for more than 20 years,

1    though; correct?

2    A.   Well, I've been writing about certain aspects of it, but I

3    haven't written about every aspect of it.

4    Q.   Well, let me pull up one here.  I want to ask you --

5    because I want to ask you about one of your writings.  Let me

6    pull up Exhibit 9.  I will share this.

7        Do you recall writing an article for the Northern Kentucky

8    Law Review?  And I want to say the date on this was 2002,

9    called "Don't Know Much About History:  The Current Crisis in

10   Second Amendment Scholarship."

11   A.   Yes.

12   Q.   Okay.  And in that you -- well, let me ask you this sort

13   of as a preparatory question.

14       You understand what the individual right theory of the

15   Second Amendment is; correct?

16   A.   I do.

17   Q.   As opposed to, for example, the collective right theory?

18   A.   Correct.

19   Q.   Okay.  And in this particular paper, you argue for a third

20   way, which is, essentially, the civic right argument; correct?

21   A.   Correct.

22   Q.   Okay.  And, in fact -- and let me -- so that folks

23   understand this, I am going to take you page 657.

24       And you write -- I'm going to start with the second

25   sentence -- "The two dominant interpretations of the Second

1  Amendment, the individual rights --

2        (The court reporter interrupted.)

3  BY MR. DALE:

4  Q.   "The two dominant interpretations of the Second Amendment,

5  the individual rights, and the collective rights models, no

6  longer seem capable of accounting for the complexity of the

7  historical evidence about the meaning of the right to bear

8  arms."

9        So this is the introduction where you then go on to talk

10 about how you believe the Second Amendment should be

11 interpreted through this civic right model that you've

12 identified; correct?

13 A.   Correct.

14 Q.   Okay.  And for those historians who adopted a belief that

15 the individual right theory was the correct way to interpret

16 the Second Amendment, you were critical of their work, weren't

17 you?

18 A.   Yes.

19 Q.   And so, for example, if we go to page 661 of this

20 particular document, I believe you use a term that we heard

21 previously.  So we look down at this paragraph here, and it

22 says, "Reynolds" -- and are you referring there to University

23 of Tennessee Professor Glenn Reynolds; correct?

24 A.   Correct.

25 Q.   Right.  And you say, "Reynolds is not the only gun rights

1    advocate to approach the phrase 'right of the people' in an
2    anachronistic fashion."
3        And I think we heard you use "anachronistic" before;
4    right?
5    A.    Correct.
6    Q.    And Reynolds, to your understanding, is a historian who
7    argued for the individual right model, correct?
8    A.    No.  Reynolds has no training in history.
9    Q.    Okay.  So you're saying that you were citing Reynolds,
10   even though he has no training in history?
11   A.    Well, he's a law professor, and he does what, I think, is
12   often described as law office history, but I don't think that
13   is considered to be a serious genre of historical writing.
14   Q.    What is law office history?
15   A.    So law office history is a kind of enterprise where you
16   work backwards from the present instead of working forward from
17   the past, which is the sort of standard approach amongst
18   historians.  It is generally not well-researched.  It is
19   generally not up-to-date in terms of the scholarship.  And it's
20   generally trying to use history to advance a contemporary
21   policy agenda.
22   Q.    And that's what you believe Professor Reynolds was or has
23   engaged in; correct?
24   A.    Correct.
25   Q.    All right.  And you've also been critical of Don Cates and

1  Professor Randy Barnett; correct?

2  A.    Yes.

3  Q.    And they both advocate for the individual right theory of

4  the Second Amendment; correct?

5  A.    Yes.  They're both modern libertarians, and so, therefore,

6  they tend to read 18th century texts as if they were

7  ghost-written by Ayn Rand.

8  Q.    And in assessing their interpretation, you've often used

9  the term "anachronistic"; correct?

10  A.    Yes.

11  Q.    Okay.  And, in fact, you believe the Supreme Court engaged

12  in law office history or law office research, don't you?

13  A.    Well, the term "law office history" was coined to refer to

14  the practices of the U. S. Supreme Court, originally.

15  Q.    But when you've used that term with the Supreme Court, you

16  haven't used it flatteringly; correct?  You've used it

17  critically?

18  A.    I would say "analytically" would probably be the most

19  precise term.

20  Q.    All right.  Let's look at some of that analysis.

21        I am going to bring this up.

22            MR. WOODS:  Counsel, which exhibit?

23            MR. DALE:  We are going now to exhibit -- well, the

24  numbers have changed.

25        (A discussion was held off the record between Counsel.)

```
 1    BY MR. DALE:
 2    Q.   So you wrote an article here, and if we look at the
 3    date -- let me confirm.
 4         This is an article that you wrote that was published
 5    SCOTUSblog; correct?
 6    A.   Correct.
 7    Q.   And it was published on June 27th of last year, which
 8    would be about three days after Bruen was decided?
 9    A.   Just about.
10    Q.   And it was written in response to the Bruen decision;
11    correct?
12    A.   Correct.
13    Q.   And in it, you wrote -- let's look here.  Make sure I have
14    the right parts.  Let's take a look.
15         So the first paragraph you call "The majority opinion
16    invokes the authority of history but presents a version of the
17    past that is little more than an ideological fantasy."
18         Do you recall writing that?
19    A.   We have it right here.
20    Q.   Yeah.  And you said, "Rather than applying the history,
21    text, and tradition, it would most accurate" -- "be more
22    accurate to characterize Justice Thomas's decision as an
23    illustration of the current Supreme Court's new interpretative
24    model -- fiction, fantasy, and mythology."
25         And then paragraph two -- let me see if I can find that.
```

1    You write, "It is hard to dispute Justice Breyer's negative

2    characterization of his colleagues' tendentious, error-filled,

3    and highly-selective culling of evidence to vindicate their gun

4    rights agenda."

5         You wrote that correct, too?

6    A.    Correct.

7    Q.    You said, "Justice Thomas quoted Dred Scott approvingly."

8         Do you recall that?

9    A.    Yes.

10   Q.    And then you also, down in paragraph three, you said that,

11   "To describe the Thomas version of the past as a caricature

12   understates the case in the bizarro constitutional universe

13   inhabited by Thomas.  Shakespeare's England was filled with

14   pistol-packing peasants."

15        (The court reporter interrupted.)

16   BY MR. DALE:

17   Q.    Do you recall writing that?

18   A.    Yes.

19   Q.    And then in the following paragraph, you write that, "It's

20   a license to cherry-pick evidence with reckless abandon if the

21   materials support the ideological agenda of the federalist

22   society."

23        Do you recall writing that?

24   A.    Yes.

25   Q.    Okay.  And then -- I mean, I am going to not belabor the

1   Court with this because there are a lot more quotes in here in
2   which you are -- I think it would be fair to characterize it
3   highly critical of the majority opinion in Bruen; correct?
4   A.    That's fair.
5   Q.    Okay.  And I think you concluded that -- or at least in
6   paragraph 11, you referred to Justice Neil Gorsuch and Justice
7   Amy Coney Barrett as ideological warriors and political hacks.
8         Do you recall that?
9   A.    You'll have to scroll down, because I haven't committed it
10   to memory.
11   Q.    Sure.  If I can find it for you.
12   A.    Yep.  Okay.
13   Q.    So you were somebody who, in multiple publications,
14   championed the civic right theory of the Second Amendment, as
15   you previously testified; right?
16   A.    Yes.
17   Q.    And the Supreme Court rejected that and went with the
18   individual right theory in Heller, didn't it?
19   A.    That's correct.
20   Q.    And you don't agree with them doing that; correct?
21   A.    Well, I guess -- I mean, I am flattered that you read the
22   article, but one of the first things -- you know, one of the
23   fascinating things about teaching both undergraduates, graduate
24   students, and law students is my undergrads have a very, very
25   difficult time understanding how can you criticize something

1    and then apply the law in a decision that you don't agree with.

2         But I say, "Well, if you don't figure that out, you

3    probably ought not to go to law school."

4         So I am not sure what any of this has to do with my

5    ability to apply the framework that was adopted in Bruen to the

6    historical with record.  I mean, if lawyers couldn't make

7    arguments about positions that they didn't agree with, they

8    wouldn't have much work, would they?

9    Q.   But you are asking the Court to accept your opinion as

10   expert and not tainted by biases when you testify about things

11   like ubiquitousness of gunpowder laws, aren't you?

12             MR. WOODS:  Objection.  Argumentative.

13             THE COURT:  Overruled.

14             THE WITNESS:  Well, it seems to me that -- I mean,

15   one simply has to think of the situation that any of the

16   current Supreme Court Justices, when asked during their

17   confirmation, you know -- Amy Coney Barrett, for instance, she

18   wrote law review articles.

19        And people said, well, how could we approve you as a

20   Supreme Court Justice?  You wrote these law review articles

21   that are critical of Supreme Court methodology," because she

22   was a strong supporter originalist.

23        And she said, "Well, you know, I was a professor, and

24   that's what professors do.  As a judge, I apply the law."

25        So, again, I am not really sure that there is any real

1  logical connection between a criticism that you make when you
2  are writing in one role and applying the law in another role.
3  That is what we do every day of our life as professionals.
4  Q.   Okay.  As you sit here today, can you identify for the
5  Court how many jurisdictions had barrel or gun-proofing laws
6  between the founding and the adoption of the Fourteenth
7  Amendment?
8  A.   Well, as I said, since I only found the gun-proofing law
9  about two weeks ago, that is kind of why I need the time to
10  actually figure that one out.
11 Q.   So with regard to gun-proofing, do you have any evidence
12 at this point that it wasn't an outlier similar to the Texas
13 law that was identified in the Bruen case?
14 A.   Well, as we've already discussed, it can't, by definition,
15 be an outlier, if most of the guns in America were subject to
16 it; right?  Because if most of the guns in America at the time
17 were being produced in Massachusetts, subject to this law, that
18 means most of the guns in circulation would have been subject
19 to this law.  So I think you are applying the wrong rule.  You
20 are being overly literal in terms of reading Bruen's
21 methodology.
22     I think Justice Thomas, to his credit, said that we need
23 to be somewhat more sophisticated and nuanced when we're
24 dealing with historical complexity.
25 Q.   Okay.  With regard to your article criticizing the

1    Justices on the majority in the Bruen decision, --

2    A.    Yes.

3    Q.    -- you actually took exception with Thomas rejecting the

4    Texas laws that were cited in that decision; correct?

5    A.    I did.

6    Q.    And, in fact, you said that you the majority was incorrect

7    in treating it as an outlier?

8    A.    That's correct.

9    Q.    And is your opinion that the Supreme Court was incorrect

10   in treating it as an outlier -- did that color the way in which

11   you approached your assignment that the State asked you to do

12   in looking for historical analogues with regard to the Unsafe

13   Handgun Act?

14   A.    No.  It had very little to do with it.  So when I

15   uncovered this law, I thought to myself, as a historian, since

16   the question of how influential, representative, significant a

17   law is, the different ways of describing the outlier

18   question -- since having read Bruen, I knew that that is now an

19   important question.  That is precisely why I went out and I did

20   some research about the early history of gun manufacturing and

21   confirmed what I thought to be true but needed to confirm,

22   which is that Massachusetts was a major center of gun

23   manufacturing.

24        So quite the opposite is the case, precisely because I've

25   read Bruen very, very carefully.  I take the rules laid down by

1  the courts quite seriously and have used them to inform my

2  research for this project.

3  Q.   So let me ask you:  In coming to the conclusion you

4  testified here about today, that Massachusetts was a major

5  gun-producing state, during what period was it a major

6  gun-producing state?

7  A.   During the period that Bruen says is most significant, the

8  year of the Second Amendment.

9  Q.   Bruen also says that the period around the founding -- I'm

10 sorry -- around the adoption of the Fourteenth Amendment is

11 also important; correct?

12 A.   That is correct.  And it would take me some more time to

13 do some more research to fill out that part of the story.

14 Q.   Okay.  And when you say that it was a major gun

15 manufacturer, what percentage of the gun market did

16 Massachusetts have at the founding?

17 A.   I would have to pull something from the scholarly

18 authority -- I've got that -- in order to answer that question.

19 But, essentially, Massachusetts was the major provider of small

20 arms in America prior to the War of 1812.

21 Q.   Well, again, you used that word "major."  I am just trying

22 to figure out what you consider major, since there isn't any

23 documentation that has been provided to support your claim

24 here.

25      Can you identify what you mean by that?

1  A.   Well, again, I would be happy, if it would help the
2  Court -- I guess I don't know -- since we're not in a
3  deposition, I don't know what the appropriate rules are.  I
4  could dig up the citation to the scholarly authority that is
5  the standard account of early gun manufacturing in America that
6  makes that claim.  It was in a book that was published by the
7  University of Penn -- I think it was the University of
8  Pennsylvania Press.
9       Anyway, it was a top-of-the-line academic press,
10 highly  -- well-regarded, well-reviewed academic study of early
11 American gun manufacturing.  It said, unambiguously, that
12 Massachusetts was the leading provider of small arms in the
13 period before the War of 1812.
14 Q.   Any other sources besides this one that you've identified?
15 A.   In the footnotes to that claim, there are references to
16 other authorities, but I haven't committed those to memory.
17 Q.   Have you reviewed those other authorities?
18 A.   Well, I looked at the footnote, and it seems quite chunky
19 and had a lot of impressive citations to it.
20 Q.   So that would be a "No"?
21 A.   Well, I suppose it depends on -- are you asking me did
22 I --
23 Q.   Yeah.  Let me withdraw.  You picked up on an excellent
24 point.
25      Did you review the sources that were cited in the

footnote?

A.    It depends.  What do you mean by "reviewed"?  Did I go out
and check them for accuracy?  Did I pull them off the shelf?
Did I look to see whether or not they seemed like the
appropriate things to cite?  There are sort of different
standards of checking, depending on what level of confidence
you have in the author and the press.

Q.    Well, you previously testified about how people
cherry-pick quotes or pull them out without the context and the
importance of the context.  I am trying to find out, if in
coming up with your opinion today that the majority or -- I'm
sorry.  I should say a major source of arms manufacturing was
Massachusetts, if you relied on just the one source or if you
went and actually looked at the sources that were being cited
to to determine whether, for example, those weren't
cherry-picked citations, that those sources did, in fact,
support the one book's conclusion that Massachusetts was a
major source of firearms?

A.    Well, I mean, I also -- well, actually, I also looked at
an unpublished dissertation on early American gun
manufacturing.  I looked at some of the National Park Services
documentation about the role of the Springfield Armory in
western Massachusetts.

     So, again, if this was a written report, where I would
have had to actually footnote, I would have done even more.

1    But for the purposes of this proceeding, I thought I had done
2    enough.
3    Q.    So let me ask you -- you talked about the gunpowder laws,
4    and you've asked us to take your word that they were
5    ubiquitous.
6        Is there any crime investigation purpose that you're aware
7    of with the gunpowder laws that existed back at the founding?
8    A.    I'm sorry.  Can you repeat the question?
9    Q.    Yeah.  Are you aware of any crime investigation purpose
10    for gunpowder laws?
11    A.    Crime investigation?
12    Q.    Right.
13    A.    So that is an excellent point.  One of the most important,
14    recent contributions to our understanding of early American
15    firearms cultures and gun laws is recent work that makes very a
16    compelling case that there was no comparable gun violence
17    problem in the year of the Second Amendment for a variety of
18    reasons.
19        Flintlock black powder Muzzleloader weapons are quite
20    time-consuming to load; therefore, they're not good for crimes
21    of passion.  Because the black powder used in those guns is
22    corrosive, leaving them loaded is not good for the maintenance
23    of the firearm.  And because the black powder is hygroscopic,
24    it attracts moisture, which makes it unreliable.
25        So the most recent evidence we have about patterns of

1    interpersonal violence suggests that America doesn't really
2    have a gun crime problem until the proliferation of handguns in
3    the early 19th century.
4    Q.    I'm sorry.  I apologize for cutting you off.
5          My question was whether or not you had an understanding
6    that those gunpowder laws had a crime investigation purpose.
7    A.    So I guess what my response is:  The gun crime is not a
8    significant problem here in the Second Amendment we now know.
9    Q.    So that would be "No."
10   A.    So, yes, that would be "No."
11   Q.    And the proofing, the barrel-proofing laws, did those, to
12   your understanding, have any kind of crime investigation
13   purpose, or were those purely for public safety?
14   A.    My understanding is they were primarily for public safety.
15   Q.    All right.  And you also talked about -- and I recall you
16   discussing this with the State's Counsel.  There were early
17   laws that prevented the keeping of loaded firearms.
18         Did you testify that you were aware of those laws?
19   A.    Yes.
20   Q.    And is it your testimony today that a law that would not,
21   to your understanding of Bruen and the Second Amendment and the
22   history and the historical analogues, that a law that prevented
23   you from keeping a loaded firearm in your house for
24   self-defense would be considered constitutional under your
25   understanding of the Second Amendment and the historical

1    analogues?

2    A.    So sorry.  Are you saying:  Did the founders think it was,

3    or is contemporary Second Amendment jurisprudence likely to

4    find such a law constitutional?

5    Q.    I would go with contemporary Second Amendment

6    jurisprudence.

7             MR. BRADY:  Objection.  Lacks foundation.

8             THE COURT:  Overruled.

9             THE WITNESS:  Well, I suppose the standard reading of

10   Heller would be that kind of safe storage law might not pass

11   constitutional muster.  But I seem to recall that there was at

12   least one appellate case that was able to distinguish a safe

13   storage law from the kind of law in the District of Columbia,

14   so I don't know that we have a definitive answer to that

15   question yet.

16   BY MR. DALE:

17   Q.    Do you have an understanding that the Supreme Court's

18   opinions are considered superior to those of lower appellate

19   courts?

20   A.    Yes.  But, of course, the fact pattern has to match in

21   order for the rules to apply, doesn't it?

22   Q.    Yeah.  So if I understand your testimony correctly, is

23   part of identifying historical analogues to the current Unsafe

24   Handgun Act, you have testified to early laws about keeping

25   loaded firearms as evidence of appropriate regulation?

1    A.    Sorry.  Could you restate the question?

2    Q.    Yeah, yeah.  So if I understand your testimony correctly,

3    in identifying the historical analogues that the State is going

4    to rely upon to try to say that the Unsafe Handgun Act is --

5    there are historical analogues to it, you've identified at

6    least one early law that didn't allow you to keep a loaded

7    firearm in the house; is that correct?

8    A.    Yes.

9    Q.    And that law, by the way, is not included in Exhibit 24,

10   is it?

11   A.    I'd have to check Exhibit 24.

12   Q.    Well, let me ask you this:  By your own admission, under

13   contemporary Second Amendment jurisprudence, that sort of law

14   wouldn't be considered something that would pass muster under

15   the Second Amendment; isn't that right?

16   A.    Well, of course, that question sort of forces me to come

17   to a contemporary legal conclusion, which is not something

18   that, as a historian, I could provide expert testimony on.

19   Q.    Understood.  Now, I want to focus you back on your article

20   that was critical of the Bruen decision, and I want you to look

21   at this paragraph here where you are talking about your

22   objection to the majority calling Texas's law an outlier.

23         Do you see that?  And it's right there in the middle of

24   page.

25   A.    Not on this page, but I do remember saying that.

1  Q.   Okay.  Well, let me make this simpler.  You also, in this
2  article, say that another example of a law that promoted
3  regulation of firearms was Georgia's 1868 Arms Bearing
4  Provision in their Constitution.
5       Do you see that part?
6  A.   Yes.
7  Q.   And, in fact, you previously testified that, in your
8  expert opinion, there was a robust trend of regulation of
9  firearms that sprang from the Fourteenth Amendment; correct?
10 A.   Correct.
11 Q.   Okay.  I am going to take you to another exhibit here.
12          THE COURT:  Let me ask you a question, Counsel.  It's
13 almost five to 7:00.
14          MR. DALE:  Yes.
15          THE COURT:  We're not going to get done by 7:00, are
16 we?
17          MR. DALE:  I don't believe we are.
18          THE COURT:  Okay.  So I think, in fairness to the
19 court staff, we should break, then, today and come back
20 tomorrow at 9:00.
21          MR. DALE:  Thank you.
22          MR. BRADY:  Thank you.
23          MR. DALE:  Thank you.  And appreciate the
24 accommodation on this.
25          MR. SAROSY:  Thank you, Your Honor.

1          MR. WOODS:  Thank you, Your Honor.

2          THE COURTROOM DEPUTY:  All rise.

3     (Adjourned at 6:54 p.m.)

4                         -oOo-

5

6

7                  REPORTER'S CERTIFICATE

8

9

10     I certify that the foregoing is a correct transcript of

11  proceedings in the above-entitled matter.

12

13  /s/ Suzanne M. McKennon, CSR, CRR, RMR
    _____     Date:  02/03/2023
14  United States Court Reporter

15

16

17

18

19

20

21

22

23

24

25