ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF, SBN 298196
GABRIELLE D. BOUTIN, SBN 267308
S. CLINTON WOODS, SBN 246054
CHARLES J. SAROSY, SBN 302439
Deputy Attorneys General
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6356
  Fax:  (916) 731-2119
  E-mail:  Charles.Sarosy@doj.ca.gov
*Attorneys for Rob Bonta, in his official capacity as*
*Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LANCE BOLAND, ET AL.,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, ET AL.,**<br><br>Defendants. | Case No. 8:22-cv-01421-CJC-ADS<br><br>**DEFENDANT'S FIRST CLOSING BRIEF FOLLOWING EVIDENTIARY HEARING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Courtroom:    9B<br>Judge:    Hon. Cormac J. Carney<br>Trial Date:    None set<br>Action Filed: August 1, 2022 |

# TABLE OF CONTENTS

**Page**

Introduction ...................................................................................................1

Background....................................................................................................2

Argument ......................................................................................................3

I. *Bruen*'s Text-and-History Standard For Analyzing Second
Amendment Claims ...........................................................................3

    A. The plain text inquiry is a threshold burden that Plaintiffs
must meet, not a "borderline rhetorical question" as
Plaintiffs assert ......................................................................3

    B. *Bruen* Requires a Holistic and Contextualized Analysis of
the Relevant History, Rather than a Single "Dead Ringer"........5

II. Plaintiffs Have Failed To Show They Are Likely To Succeed on
The Merits Under A Proper Application of *Bruen*...............................7

    A. Plaintiffs did not establish that the Second Amendment's
plain text covers their proposed course of conduct...................7

    B. Historical laws regarding firearm and ammunition
inspections, gunpowder storage, and commercial firearm
sales are relevantly similar to the CLI, MDM, and
microstamping requirements ................................................12

III. Plaintiffs Incorrectly Assert They Need Not Establish The Other
*Winter* Factors Weigh In Their Favor And Additionally Fail To
Meet Their Burden On These Factors ...............................................17

    A. Plaintiffs failed to show even a possibility of irreparable
harm.....................................................................................17

    B. Plaintiffs mistakenly assert interest-balancing is not
relevant here and accordingly have failed to meet their
burden..................................................................................18

Conclusion..................................................................................................20

i

# TABLE OF AUTHORITIES

**Page**

Cᴀꜱᴇꜱ

*Baird v. Bonta*
  2022 WL 17542432 (E.D. Cal. Dec. 8, 2022) .......................................5, 17, 18

*Def. Distributed v. Bonta*
  2022 WL 15524977 (C.D. Cal. Oct. 21, 2022)..........................................3, 4, 7

*Dist. of Columbia v. Heller*
  554 U.S. 570 (2008)..................................................................................*passim*

*Doe v. Snyder*
  28 F.4th 103 (9th Cir. 2022)................................................................................17

*Draper v. Healey*
  827 F.3d 1 (1st Cir. 2016) ...................................................................................9

*Draper v. Healey*
  98 F. Supp. 3d 77 (D. Mass. 2015).....................................................................9

*Duncan v. Bonta*
  No. 3:17-cv-01017-BEN-JLB (S.D. Cal. Nov. 10, 2022) ................................12

*Garcia v. Google, Inc.*
  786 F.3d 733 (9th Cir. 2015) (en banc) ......................................................5, 17

*Granata v. Campbell*
  No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 1794480..........................13, 14

*Granata v. Campbell*
  No. 22-1478 (1st Cir. Jan. 30, 2023), 2023 WL 2062850..............................13

*Granata v. Healey*
  603 F. Supp. 3d 8 (D. Mass. 2022).....................................................................9

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
  2022 WL 3083715 (N.D. Cal. Aug. 3, 2022) .................................................3, 4

*New York State Rifle & Pistol Association, Inc., v. Bruen*
  __ U.S. __ (2022)......................................................................................*passim*

1
2

# TABLE OF AUTHORITIES
## (continued)

**Page**

3
4

*Oakland Tactical Supply, LLC v. Howell Twp.*
2023 WL 2074298 (E.D. Mich. Feb. 17, 2023)................................................7, 8

5
6

*Ocean State Tactical, LLC v. State of Rhode Island*
2022 WL 17721175 (D.R.I. Dec. 14, 2022) .....................................................3

7
8

*Or. Firearms Fed'n, Inc. v. Brown*
2022 WL 17454829 (D. Or. Dec. 6, 2022) .........................................................3

9

*Pena v. Lindley*
898 F.3d 969 (9th Cir. 2018)...................................................................*passim*

10

*Teixeira v. Cnty. of Alameda*
873 F.3d 670 (9th Cir. 2017)...........................................................................15

11
12

*Tracy Rifle & Pistol LLC v. Harris*
118 F. Supp. 3d 1182 (E.D. Cal. 2015) .........................................................17

13
14

*United States v. Holton*
2022 WL 16701935 (N.D. Tex. Nov. 3, 2022)...........................................15, 16

15
16

*United States v. Kelly*
2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ........................................5, 6

17
18

*United States v. Perez-Garcia*
2022 WL 17477918 (S.D. Cal. Dec. 6, 2022)....................................................6

19
20

*United States v. Price*
2022 WL 6968457 (S.D. W. Va. Oct. 12, 2022) ...............................................9

21
22

*United States v. Reyna*
2022 WL 17714376 (N.D. Ind. Dec. 15, 2022) .............................................4, 7

23
24

*United States v. Rowson*
2023 WL 431037 (S.D.N.Y. Jan. 26, 2023) ......................................................6

25
26

*Winter v. Natural Res. Def. Council, Inc.*
555 U.S. 7 (2008).....................................................................................*passim*

27
28

1
2

# TABLE OF AUTHORITIES
### (continued)

Page

3

**STATUTES**

4

California Penal Code

5  § 31900 .................................................................................................14
6  § 31905 .................................................................................................14
   § 31910(b) ...................................................................................1, 8, 11
7  § 32000(a) .........................................................................................8, 9
   § 32010 .................................................................................................14
8  § 32015 .................................................................................................10
   § 32030 .................................................................................................10
9  § 32100(a) ..............................................................................................9

10

**REGULATIONS**

11

California Code of Regulations, Title 11

12

   § 4049(j) ...............................................................................................11

13

Massachusetts Code Regulations

14

   § 16.05(3), (4) ........................................................................................9

15

**CONSTITUTIONAL PROVISIONS**

16

United States Constitution

17

   Second Amendment ........................................................................*passim*
18  Fourteenth Amendment ......................................................................13

19

**OTHER AUTHORITIES**

20

California Assembly Bill

21

   Assemb. B. 2847, 2019-2020 Leg. (Cal. 2022) .........................19, 20

22

New Jersey Assembly Bill

23

   A.B. 4368, 2022-2023 Legis. Sess. (N.J. 2022)..............................10

24

New York Senate Bill

25

   S.B. S4116A, 2021-2022 Legis. Sess. (N.Y. 2022).........................10

26

Connecticut House Bill

27

   H.B. 6667, 2023 Gen. Assemb., Reg. Sess. (Conn. 2023) .................9

28

**INTRODUCTION**

After presenting six witnesses and twelve exhibits over the course of a two-day evidentiary hearing, Plaintiffs have failed to meet their high burden of showing they are entitled to the extraordinary remedy of a preliminary injunction, particularly one that would upset the status quo.  Plaintiffs' evidence and legal arguments pertained to only one of the four factors—the likelihood of success on the merits—that must weigh in their favor under *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  Rather than attempt to establish the remaining factors, Plaintiffs treated them as irrelevant under *New York State Rifle & Pistol Association, Inc., v. Bruen*, __ U.S.  __, 142 S. Ct. 2111 (2022).  But *Bruen* did not overrule *Winter*.  Plaintiffs chose to seek a preliminary injunction and thus must meet the legal requirements to justify such a remedy before final judgment.

Plaintiffs failed to do so.  Specifically, Plaintiffs seek to enjoin California's Unsafe Handgun Act ("UHA") requirements that a new semiautomatic pistol must include three public safety features—chamber load indicator ("CLI"), magazine disconnect mechanism ("MDM"), and microstamping capability (*see* Cal. Penal Code § § 31910(b)(4)–(6))—before being added to the Roster of Certified Handguns (the "Roster").  Plaintiffs contend these requirements violate the Second Amendment because they are ineffective, commercially infeasible, and prevent the addition of their preferred models of semiautomatic pistols to the Roster.

The effectiveness and commercial feasibility of these requirements are not relevant to the threshold plain text analysis *Bruen* requires.  The relevant question is whether Plaintiffs' proposed conduct—purchasing off-Roster semiautomatic pistols without these three features—is covered by the plain text of the right to "keep" or "bear" arms.  It is not.  Rather, the CLI, MDM, and microstamping requirements are features that only one type of handgun—semiautomatic pistols—must have before being added to the Roster.  The requirements do not apply to other types of handguns—revolvers and nonsemiautomatic pistols—and they do not prevent

Plaintiffs from purchasing semiautomatic pistols already on the Roster.  Nothing in the UHA states that new semiautomatic pistol models cannot be added to the Roster.  Nor does the UHA prohibit the possession or carrying of semiautomatic pistols; indeed, the two plaintiffs who testified each possess several semiautomatic pistols and can carry them in public.  The requirements thus fall into the presumptively lawful category of laws "imposing conditions and qualifications on the commercial sale of arms."  *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring) (quoting *Dist. of Columbia v. Heller*, 554 U.S. 570, 627, n.26 (2008)).

Even if the Second Amendment's plain text did cover the proposed conduct, the three UHA requirements at issue are consistent with this Nation's historical tradition of firearms regulation.  This tradition includes various relevantly similar historical analogues, such as firearm and ammunition inspection laws, gunpowder storage laws, and laws regulating the commercial sale of firearms.

Because Plaintiffs cannot satisfy the textual or historical analyses required under *Bruen*, they have no likelihood of success on the merits.  And because they failed to present any evidence supporting the other *Winter* factors, Plaintiffs have not met their high burden to show that a preliminary injunction is warranted here.

## BACKGROUND

Pursuant to this Court's order, Plaintiffs presented six witnesses and 12 exhibits while Defendant presented two witnesses and 28 exhibits over the course of a two-day evidentiary hearing.  ECF Nos. 35, 47-48, 52-53.  The witnesses were subject to direct examination, cross examination, and questions from the Court.  Although their complaint appeared to challenge every provision of the UHA, Plaintiffs acknowledged during argument that they seek to enjoin only the CLI, MDM, and microstamping requirements of the UHA.  Prelim. Inj. Hr'g Day 2 Tr. (Jan. 24, 2023), ECF No. 50 ("PI Day2 Tr."), at 96, 98.

**ARGUMENT**

**I.**   ***BRUEN*'S TEXT-AND-HISTORY STANDARD FOR ANALYZING SECOND AMENDMENT CLAIMS**

> **A.   The plain text inquiry is a threshold burden that Plaintiffs must meet, not a "borderline rhetorical question" as Plaintiffs assert**

As a threshold issue, *Bruen* directs courts to assess "whether the plain text of the Second Amendment protects [the individual's] proposed course of conduct, 142 S. Ct. at 2134—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes.  The plaintiff must demonstrate that the plain text covers the proposed course of conduct.  *Bruen*, 142 S. Ct. at 2134; *see also Nat'l Ass'n for Gun Rights*, *Inc. v. City of San Jose*, 2022 WL 3083715, at *8 (N.D. Cal. Aug. 3, 2022) ("*Bruen* conducted a textual analysis of the words 'bear' and 'keep' to determine whether the conduct of publicly carrying a firearm fell within the language of the Second Amendment.")

*Bruen* makes clear that a party challenging a law under the Second Amendment bears this threshold textual burden, and courts applying *Bruen* have held plaintiffs to this requirement.  *Bruen*, 142 S. Ct. at 2134 (noting that the government "d[id] not dispute" that the plain text of the Second Amendment covered the plaintiffs' proposed conduct); *see also Def. Distributed v. Bonta*, 2022 WL 15524977, at *3 (C.D. Cal. Oct. 21, 2022) ("Much as [plaintiff] would like to move history and tradition forward in the course of relevant analysis under *Bruen*, its attempt does not survive a careful, and intellectually-honest, reading of that decision."); *Ocean State Tactical, LLC v. State of Rhode Island*, 2022 WL 17721175, at *12 (D.R.I. Dec. 14, 2022) (plaintiffs failed to meet their plain text burden); *Or. Firearms Fed'n, Inc. v. Brown*, 2022 WL 17454829, at *9 (D. Or. Dec. 6, 2022) (same), *notice of appeal filed*, No. 22-36011 (9th Cir. Dec. 7, 2022). Only once the plaintiff meets this burden does the Second Amendment "presumptively protect[] that conduct."  *Bruen*, 142 S. Ct. at 2126.

Plaintiffs attempt to evade this burden by minimizing the plain text analysis as a "borderline rhetorical question."  PI Day2 Tr. 59, 71.  This is contrary to how post-*Bruen* courts have applied the analysis.  Indeed, courts have outlined the successive stages within the analysis.  "[C]ourts must first identify and delineate the specific course of conduct at issue."  *Def. Distributed*, 2022 WL 15524977, at \*4 (quoting *Nat'l Ass'n for Gun Rights*, 2022 WL 3083715, at \*8).  For the plain text analysis to have any meaning, "the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text." *United States v. Reyna*, 2022 WL 17714376, at \*4 (N.D. Ind. Dec. 15, 2022).  For example, in *Reyna*, the court characterized the proposed course of conduct as "possession of a firearm with an obliterated serial number" and not more generally as "mere possession [of a firearm]," because if the conduct was "mere possession," then "any number of other challenged regulations would similarly boil down to mere possession, then promptly and automatically proceed to" the historical analysis.  *Id.* (noting that neither *Heller* nor *Bruen* "distill[ed] the challenged regulation to so abstract a level as mere possession or mere carrying of a firearm").

Once the proposed course of conduct is defined, then "the court turns its inquiry to whether the Second Amendment's plain text covers that conduct." *Reyna*, 2022 WL 17714376, at \*4.  In other words, is the conduct protected by the Second Amendment's operative clause—"the right of the people to keep and bear Arms, shall not be infringed"—which "guarantee[s] the individual right to possess and carry weapons in case of confrontation"?  *Bruen*, 142 S. Ct. at 2134 (quoting *Heller*, 554 U.S. at 592).  When conducting this inquiry, it must be remembered that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626.  This limitation "comes from the text of the Second Amendment" and thus must be considered in the plain text analysis.  *Reyna*, 2022 WL 17714376, at \*4

(applying this limitation when analyzing whether the plain text covers weapons not typically possessed by law-abiding citizens for lawful purposes).

### B. *Bruen* Requires a Holistic and Contextualized Analysis of the Relevant History, Rather than a Single "Dead Ringer"

If a challenged restriction regulates conduct protected by the "plain text" of the Second Amendment, then *Bruen* directs that the regulation be justified by showing that the law is "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126.[1]  And, while the Court recognized that the historical analysis conducted at the first step of the now-defunct two-step approach was "broadly consistent with *Heller*," it clarified how that analysis should proceed in important respects. *Id.* at 2127.  In some cases, this historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century." *Id.* at 2131.  But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach." *Id.* at 2132.

Under this "more nuanced approach," governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*." *Bruen*, 142 S. Ct. at 2133 (italics in original).  Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster. *Id.*  The historical analysis cannot be limited to the assessment of a single past law or be an "abstract game of spot-the-analogy-across-the-ages." *United States v. Kelly*, 2022 WL 17336578, at *6 (M.D. Tenn. Nov. 16, 2022).  Instead, in evaluating whether a "historical regulation is a proper analogue

---

[1] *Bruen* concerned an appeal of a motion to dismiss, 142 S. Ct. at 2125, and did not address which party bears this burden at the preliminary injunction stage. Plaintiffs have the burden to show here there are no historical analogues because it is their burden to establish the likelihood of success factor, *Winter*, 555 U.S. at 20, and for the injunction they seek must show the law and facts clearly favor their position, *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). *Contra Baird v. Bonta*, 2022 WL 17542432, at *5-6 (E.D. Cal. Dec. 8, 2022).

for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "relevantly similar."  142 S. Ct. at 2132.  The Supreme Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'"  *Id.* (quoting *Heller*, 554 U.S. at 599).  A regulation is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified."  *Id.*  The analysis requires "an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by th[e] historical prohibitions" to determine whether the challenged law is one that *could have existed* consistent with the understanding of the Second or Fourteenth Amendments at the time of ratification.  *Kelly*, 2022 WL 17336578, at \*5, n.7.

*Bruen* emphasized that the Second Amendment is not a "regulatory straightjacket" confining permissible government regulations to only those laws that had been enacted when the Second and Fourteenth Amendments were ratified.  142 S. Ct. at 2133.  And, requiring the government to spot a "near perfect match between a modern-day regulation[] and historical regulations would likely render *Bruen*'s analogical historical reasoning exactly th[e] 'regulatory straight jacket'" that the Second Amendment is not.  *United States v. Perez-Garcia*, 2022 WL 17477918, at \*5 (S.D. Cal. Dec. 6, 2022).  Even an "imperfect match" can provide useful insight into the broader historical traditions that may justify a modern firearm regulation.  *United States v. Rowson*, 2023 WL 431037, at \*24 (S.D.N.Y. Jan. 26, 2023).  The historical analysis is not as simple as seeing if a majority of state legislatures passed analogous laws, as Plaintiffs suggested.  PI Day2 Tr. 91.

## II. PLAINTIFFS HAVE FAILED TO SHOW THEY ARE LIKELY TO SUCCEED ON THE MERITS UNDER A PROPER APPLICATION OF *BRUEN*

### A. Plaintiffs did not establish that the Second Amendment's plain text covers their proposed course of conduct

In delineating the proposed conduct, it would be unhelpful to do so at a general level, such as "purchasing or possessing a handgun," because the UHA prohibits neither. *See Reyna*, 2022 WL 17714376, at *4; *Oakland Tactical Supply, LLC v. Howell Twp.*, 2023 WL 2074298, at *3 (E.D. Mich. Feb. 17, 2023) (rejecting "training with firearms" as the conduct because the law at issue did not prohibit such conduct). Instead, the proposed conduct must be specifically defined and be conduct the challenged law actually prohibits. *Id.* The proposed course of conduct here is to purchase off-Roster semiautomatic pistols without a CLI, MDM, or microstamping that are available for purchase in other states. *See* PI Day2 Tr. 61, 102; ECF No. 30 at 13. Plaintiffs' allegations confirm this is the proposed conduct. ECF No. 17 at ¶¶ 6, 16, 47-50; *Oakland Tactical Supply*, 2023 WL 2074298, at *2-3 (looking to the complaint's allegations to define the conduct).

With the proposed conduct properly defined, a court must next look to whether such conduct is protected by the Second Amendment's operative clause— "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. This plain text simply does not protect Plaintiffs' proposed course of conduct. To "keep Arms" means to have or possess weapons, and to "bear Arms" means to carry weapons for the purpose of confrontation. *Heller*, 554 U.S. at 582-84; *Bruen*, 142 S. Ct. at 2134. The desire to purchase a specific semiautomatic pistol without certain public safety features does not fall into either category. *See Pena v. Lindley*, 898 F.3d 969, 973 (9th Cir. 2018) ("We reject Purchasers' claim that they have a constitutional right to purchase a particular handgun."). To the extent Plaintiffs assert the plain text impliedly covers this conduct, ECF No. 23-1 at 13, Plaintiffs "seemingly perceive[] a penumbra," which is "quite-clearly not a 'plain text' analysis." *Def. Distributed*, 2022 WL 15524977, at *4; *Oakland*

7

1    *Tactical Supply*, 2023 WL 2074298, at \*4 (rejecting the argument that an "ancillary

2    or corollary protection" should be "read into the" Second Amendment's plain text).

3         Plaintiffs repeatedly described semiautomatic pistols as the "quintessential

4    self-defense choice under *Heller*."  PI Day2 Tr. 59, 61, 76.  But this misreads

5    *Heller*, which actually stated that the "American people have considered the

6    *handgun* to be the quintessential self-defense weapon."  *Heller*, 554 U.S. at 629

7    (italics added).  *Heller*'s general reference to handguns, which also include

8    revolvers and nonsemiautomatic pistols, does not establish that any and all

9    semiautomatic pistols—particularly those without public safety features—are

10   covered by the Second Amendment's plain text.  *Id.* at 629.  Rather, *Heller*'s

11   guidepost that the Second Amendment "was not a right to keep and carry any

12   weapon whatsoever," 554 U.S. at 626, which Justice Kavanaugh reiterated in

13   *Bruen*, 142 S. Ct. at 2162 (Kavanaugh, J., concurring), demonstrates that the

14   conduct does not fall within the plain text.

15        Plaintiffs' theory is that the CLI, MDM, and microstamping requirements act

16   together as an indirect ban on the possession of semiautomatic pistols that are

17   available for purchase in other states.  Putting aside the fact that Mr. Boland

18   currently owns two off-Roster semiautomatic pistols and Mr. May has purchased

19   them previously, nothing in the UHA prohibits the possession of off-Roster pistols

20   or the addition of new semiautomatic pistols to the Roster.  Prelim. Inj. Hr'g Day 1

21   Tr. (Jan. 23, 2023), ECF No. 54 ("PI Day1 Tr."), at 42, 54; *Pena*, 898 F.3d at 973

22   ("The California law only regulates commercial sales, not possession.").  Rather,

23   the UHA provisions at issue here merely specify certain features that a

24   semiautomatic pistol must have before it can be manufactured or sold (at a firearm

25   dealer) in California.  *See* Cal. Penal Code §§ 31910(b), 32000(a).  The challenged

26   UHA provisions thus fall within the presumptively lawful category of "laws

27   imposing conditions and qualifications on the commercial sale of arms."  *Bruen*,

28   142 S. Ct. at 2162 (Kavanaugh, J., concurring) (quoting *Heller*, 554 U.S. at 626).

Although *Heller* and *Bruen* failed to define the scope of this category, the UHA clearly falls within it because the challenged provisions "apply only to manufacturers and sellers [and] do not implicate an individual's right of possession." *United States v. Price*, 2022 WL 6968457, at *2-3 (S.D. W. Va. Oct. 12, 2022) (explaining that this category included federal statutes that required manufacturers to place serial numbers on firearms and that prohibited the sale of firearms without a serial number). These are point-of-sale public safety requirements applying to dealers that sell firearms in commerce, not restrictions on possession or private party transactions. Cal. Penal Code §§ 32000, 32100(a). Moreover, the provisions at issue are nowhere close to the extreme hypothetical commercial regulations highlighted by Plaintiffs, PI Day2 Tr. 58, and Judge Bybee in *Pena*, 898 F.3d at 1008 (Bybee, J., concurring in part).

The indirect ban theory fails for the additional reason that the CLI and MDM requirements have not operated to prohibit the addition of semiautomatic pistols to the Roster.[2] Between the time when the CLI and MDM requirements took effect and when the microstamping requirement took effect in May 2013, five manufacturers added 28 tested semiautomatic pistols to the Roster with CLIs and MDMs. Decl. of Salvador Gonzalez Supporting Closing Brief ("Gonzalez Decl.") ¶¶ 5-6, 8-9, 11. An additional six such pistols were added as a "similar" under Penal Code section 32030 before May 2013.[3] *Id.* ¶¶ 6, 8, 11. And, in 2019 and

---

[2] To answer the Court's question as to whether other states have CLI or MDM requirements, PI Day2 Tr. 108, Massachusetts requires that any semiautomatic pistol sold by a licensed dealer have a CLI or MDM. 940 Mass. Code Regs. § 16.05(3), (4). In effect since 1997, this regulatory requirement has survived two Second Amendment challenges. *Granata v. Healey*, 603 F. Supp. 3d 8, 16-17 (D. Mass. 2022), *appeal docketed*, No. 22-1478 (1st Cir. June 22, 2022); *Draper v. Healey*, 827 F.3d 1, 3-5 (1st Cir. 2016); *see also Draper v. Healey*, 98 F. Supp. 3d 77, 84-85 (D. Mass. 2015). Connecticut's legislature is currently considering a gun violence prevention bill that would, among other things, prohibit the sale or transfer of semiautomatic pistols manufactured after January 1, 2024 that lack a CLI and MDM. H.B. 6667, 2023 Gen. Assemb., Reg. Sess. (Conn. 2023).

[3] The addition of this many semiautomatic pistols undercuts Plaintiffs' theory that CLIs and MDMs were not commercially popular. PI Day1 Tr. 15, 23.

2022, one manufacturer added 15 such pistols to the Roster as a "similar." *Id.* ¶ 7. Presently, 32 semiautomatic pistols with a CLI and MDM from four manufacturers remain on the Roster, and the pistols with a CLI and MDM that are no longer on the Roster were dropped because the manufacturers elected not to pay the annual Roster fee. *Id.* ¶¶ 5, 8-11; Cal. Penal Code § 32015.

With respect to microstamping, the UHA "does not ban possession or use of guns manufactured without microstamping features."[4]   *Pena*, 898 F.3d at 985.  And even with respect to sales, the Ninth Circuit rejected the argument that microstamping imposes a "de facto ban" on the addition of new semiautomatic pistols to the Roster because the "reality is not that manufacturers cannot meet the standard but rather that they have chosen not to." *Id.* at 982.  The Ninth Circuit further explained it was not "enough that [firearm] manufacturers say that they will not and 'cannot' comply," and observed that "protests about technical ability to comply" may instead "reflect a reluctance to comply." *Id.* at 983, & n.11.  Those observations apply with equal force to Plaintiffs' assertion that microstamping is not "feasible" or commercially feasible.  PI Day1 Tr. 90, 97, 112, 126-27.

In fact, Plaintiffs' microstamping witness, Michael Beddow, admitted that, based on his 2008 study, microstamping alphanumeric characters from a firing pin to a cartridge case was "feasible" and "physically possible."  PI Day1 Tr. 88-89, 110-11; *see also* Def.'s Ex. 26; Def.'s Ex. 27 at 10, 18, 23, 27-29, 32, 43-44.  Not only was it feasible, but microstamping with alphanumeric codes—the method

---

[4] To answer the Court's question as to whether other states have a microstamping requirement, PI Day2 Tr. 108, New York and New Jersey recently adopted such a requirement.  The New York law requires the state's Division of Criminal Justice Services to certify that microstamping-enabled pistols are technologically viable and, if certified, the state has four years from the certification date to promulgate relevant regulations, after which the sale by a firearm dealer of any newly manufactured semiautomatic pistol without microstamping capabilities would be prohibited.  S.B. S4116A, 2021-2022 Legis. Sess. (N.Y. 2022).  The New Jersey law requires the state Attorney General to certify the technological viability and commercial availability of microstamping-enabled firearms and, once certified, would require all firearm dealers to sell such firearms and would give a 10 percent instant rebate on the purchase of any such firearm.  A.B. 4368, 2022-2023 Legis. Sess. (N.J. 2022).

contemplated under California law, Cal. Code Regs., tit. 11, section 4049(j)—"has the potential to reliably transfer information from the firing pin to the cartridge case," "proved to be capable of withstanding repeated firing," and had the best chance at being adapted on a widescale. PI Day1 Tr. 114-15, 124. The study tested microstamping in six Smith & Wesson pistols that fired 2,500 rounds each, in which the alphanumeric coding "performed well" and had an average overall transfer rate of 90 percent. *Id.* at 117-124. Microstamping was also tested in four centerfire pistols from different manufacturers that fired hundreds of rounds each, in which the alphanumeric characters remained legible on the firing pin and had an average overall transfer rate of at least 76 percent. *Id.* Mr. Beddow never stated that adapting microstamping for the wider commercial market was undoable. *Id.* at 98, 105, 126. Rather, he explained that his study identified the need for more research and collaboration between firearm manufacturers and the Department of Justice to develop a "viable commercial implementation strategy," but he was unaware of manufacturers seeking such collaboration and no manufacturer approached him about his study's findings. *Id.* at 113-14, 130-31.

The fact that firearm manufacturers have failed for the past 15 years to heed the findings of Plaintiffs' own witness, in addition to Plaintiffs' inability to produce any studies from a manufacturer demonstrating commercial infeasibility, underscores the Ninth Circuit's view in *Pena* that the challenged UHA requirements are not impossible or difficult to meet.[5] The manufacturers' reluctance to adopt microstamping, not the requirement itself, is the cause for tested semiautomatic pistols not being added to the Roster since May 2013.

---

[5] Nor have Plaintiffs submitted evidence showing an attempt by manufacturers to comply with the microstamping requirement through "a method of equal or greater reliability and effectiveness" that could be approved by Defendant. *See* Cal. Penal Code § 31910(b)(6)(B).

1

2

**B.    Historical laws regarding firearm and ammunition inspections, gunpowder storage, and commercial firearm sales are relevantly similar to the CLI, MDM, and microstamping requirements**

3    Even if the Second Amendment protected plaintiffs' desired conduct, a

4    historical tradition of regulation supports the challenged UHA requirements.  A

5    "more nuanced approach" is required for the historical analysis here because the

6    CLI, MDM, and microstamping requirements address "unprecedented societal

7    concerns" and "dramatic technological changes."  *Bruen*, 142 S. Ct. at 2131-32.

8    When the Second Amendment was adopted, "over 90% of the weapons owned by

9    Americans were long guns, not pistols," and such pistols were muzzle-loading, not

10   semiautomatic.  Decl. of Saul Cornell Supporting Closing Brief ("Cornell Decl.")

11   ¶ 27.  Semiautomatic weapons were not even developed until the early 1900s.

12   Decl. of Brenan Rivas at ¶¶ 29-32, *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB

13   (S.D. Cal. Nov. 10, 2022) (ECF No. 118-7).  So while there is a long history of

14   enacting firearm regulations to protect the public from defective or poorly

15   manufactured firearms, Cornell Decl. ¶¶ 23, 31, the dangers posed by an accidental

16   discharge from a semiautomatic pistol that the user did not know was loaded—the

17   dangers addressed by CLIs and MDMs—is a more recent phenomenon.  As to

18   microstamping, gun violence and homicides were not a nationwide problem at the

19   time of the Second Amendment as they are today, in part because muzzle-loading

20   weapons took too long to load and often were not kept loaded due to the corrosive

21   nature of black powder.  *Id.* ¶¶ 25-29.  Plaintiffs' own historical expert

22   acknowledged that mass murders were not common until well after the Founding

23   and that microstamping was not a feasible technology when the Second and

24   Fourteenth Amendments were adopted.  PI Day1 Tr. 147; PI Day2 Tr. 47.

25   Accordingly, a "historical twin" need not be identified.  *Bruen*, 142 S. Ct. at

26   2133.  Rather, "a well-established and representative historical *analogue*" is

27   sufficient.  *Id.* (italics in original).  Numerous laws from the adoption of the Second

28   Amendment to the adoption of the Fourteenth Amendment are proper analogues

1    supporting the CLI and MDM requirements because these historical laws are

2    "relevantly similar" to such requirements.[6]  *Id.* at 2132.  Specifically, these

3    historical laws authorized state governments to inspect and test firearms and

4    ammunition to ensure they were safe for consumers.  *See generally* Br. of

5    Defendants-Appellees, *Granata v. Campbell*, No. 22-1478 (1st Cir. Jan. 30, 2023),

6    2023 WL 1794480, at *37-51 (collecting historical analogues for Massachusetts'

7    unsafe handgun law); Br. of Giffords Law Center to Prevent Gun Violence as

8    Amicus Curiae Supporting Defendants-Appellees, *Granata v. Campbell*, No. 22-

9    1478 (1st Cir. Jan. 30, 2023), 2023 WL 2062850, at *21-28 (same).

10   One category of such laws was those in Massachusetts and Maine requiring

11   the inspection or "proving" of firearms before they could be sold to the public.

12   Cornell Decl. ¶¶ 32-33.  The Massachusetts law, enacted in 1805, required that a

13   government inspector test and inspect all musket and pistol barrels.  *Id.*  The

14   inspector would examine the barrel, ensure the barrel did not explode upon firing,

15   and test the firing distance.  *Id.*  Only if the firearm passed such inspection, and was

16   stamped with the inspector's initials and year of inspection, could the firearm be

17   sold to the public.  *Id.*  The sale of a firearm without a stamp was subject to a fine.

18   *Id.*  Maine adopted a similar inspection law in 1821, and both laws lasted

19   throughout the nineteenth century.  *Id.*

20   Similar inspection laws were adopted by Massachusetts and four other

21   states—Rhode Island, New Jersey, New Hampshire, and Pennsylvania—for

22   gunpowder.  Cornell Decl. ¶ 48.  Specifically, in 1809, Massachusetts adopted a

23   law requiring government inspectors to inspect gunpowder to ensure it met certain

24   quality standards.  *Id.*  If the gunpowder passed such inspection, then it was placed

25   in a cask marked with the inspector's initials and, only then, was made available for

26   sale.  *Id.*  The presence and enforcement of these inspection laws in Massachusetts

27

28   ───────────────────
     [6] Mr. Cramer conceded that laws from around the adoption of the Fourteenth
     Amendment are relevant to the historical analysis.  PI Day2 Tr. 49-50.

is especially important because the state was the "leading small arms producer in America on the eve of the War of 1812," due in part to the presence of the federal Springfield armory in the state.  Cornell Decl. ¶ 34; *see also* Br. of Defendants-Appellees, 2023 WL 1794480, at *40.

In addition to these inspection laws, several laws regulated the storage of weapons and gunpowder to reduce harm to the public and decrease the risks of fire, accidental discharge, and explosion arising from the corrosive nature of gunpowder. Cornell Decl. ¶¶ 27, 43-47, 52; *see also* Br. of Defendants-Appellees, 2023 WL 1794480, at *43-46.  For example, a 1783 Massachusetts law prohibited the storage of a weapon loaded with gunpowder in a Boston home, and a 1792 New York City law and 1821 Maine law allowed government officials to search for gunpowder in any building.  Cornell Decl. ¶ 44, 52; PI Day1 Tr. 265-67.  Several other state and local governments enacted laws regulating how gunpowder was stored and sold. Cornell Decl. ¶¶ 45-47; PI Day1 Tr. 266-67.

These three categories of historical laws share the same "how" (imposing conditions on commercial gun sales) and the same "why" (ensuring the safety and functionality of commercially sold firearms) as the CLI and MDM requirements. Moreover, the burden on the right of armed self-defense from these historical laws is greater than the burden imposed by the CLI and MDM requirements.  The firearm and ammunition inspection laws required an inspection and stamp for *every* firearm and *every* cask of ammunition, whereas the UHA requires that only three handguns be tested by a laboratory and one of those three be sent to the Department of Justice before being added to the Roster.  Cal. Penal Code §§ 31900, 31905, 32010.  Thus, handgun purchasers do not need to wait for a handgun to pass an inspection so long as the handgun is already on the Roster.  The gunpowder storage laws permitted government officials to search a gun owner's home, whereas the UHA in no way regulates possession of handguns or ammunition.  In contrast, the Ninth Circuit held that the CLI and MDM requirements "place almost no burden on

1    the physical exercise of Second Amendment rights." *Pena*, 898 F.3d at 978. *Pena*

2    emphasized there was "no evidence that CLIs . . . interfere[] with the functioning of

3    any arms," *id.*, and Plaintiffs have failed to fill this gap with anything beyond

4    unsupported anecdotes. Defendant's evidence supports *Pena*'s conclusion. PI Day1

5    Tr. 189-90; Def.'s Ex. 7. *Pena* noted the possibility that an MDM "might prevent a

6    gun from firing at will," but explained it would be "likely a rare occurrence." 898

7    F.3d at 978. The historical laws and CLI and MDM requirements are comparably

8    justified because they all seek to reduce the dangers arising from firearms and

9    ammunition that do not function or are not used in line with their intended purpose.

10       As to microstamping, the Ninth Circuit held that it "is an extension of

11   identification methods long used in imprinting serial numbers on guns," and that

12   the "California legislature considered microstamping to be a modification on the

13   federal serial number law." *Pena*, 898 F.3d at 985. Accordingly, historical

14   analogues sufficient to support the federal law prohibiting the possession of a

15   firearm with an obliterated serial number are sufficient to support the

16   microstamping requirement, particularly because the UHA "does not ban

17   possession or use of guns manufactured without microstamping features." *Id.* In

18   *United States v. Holton*, a court held that laws regulating the registration and sale of

19   firearms were sufficient historical analogues to support the federal prohibition on

20   firearms with obliterated serial numbers. 2022 WL 16701935, at *4-*5 (N.D. Tex.

21   Nov. 3, 2022). Specifically, *Holton* highlighted commercial firearm regulations

22   relating to the conditions of the firearms trade, the government's storage of guns,

23   and the locations where individuals could sell guns. *Id.* (citing *Teixeira v. Cnty. of*

24   *Alameda*, 873 F.3d 670, 685 (9th Cir. 2017) (reviewing historical laws that

25   regulated a commercial actor's ability to enter the firearms market)). *Holton* also

26   pointed to registration and taxation requirements that applied to gun owners,

27   including taxes on personally held firearms. *Id.* *Holton* concluded these historical

28   analogues addressed similar goals to the modern serial number requirement, that is,

to control and trace the sale of firearms and to ensure dangerous individuals did not obtain firearms.[7]  *Id.*  The serial number law "was intended to assist law enforcement in tracing and identifying the owner and source of firearms used in crimes."  *Id.*  That is true for microstamping.  And, like the serial number requirement, microstamping places no burden on the right of armed self-defense. *Compare Holton*, 2022 WL 16701935, at *5 *with Pena*, 898 F.3d at 978.

At the hearing, Plaintiffs argued that the CLI, MDM, and microstamping requirements impose a heavy burden in practical effect because the requirements limit access to their preferred semiautomatic pistols.  For example, Plaintiffs highlighted the availability in other states of semiautomatic pistols with, as they described, "primarily ergonomic[]" enhancements.  PI Day2 Tr. 77.  But they failed to produce evidence showing ergonomically enhanced pistols improve the effectiveness of such pistols.  *See also* PI Day1 Tr. 246 (Defendant's witness testifying that the difference between the on-Roster and off-Roster models is similar to the difference between cellphone models).  Plaintiffs also asserted the Roster lacks sufficient ambidextrous options for left-handed shooters.  Putting aside the fact that neither Mr. Boland nor Mr. May are left-handed shooters, PI Day1 Tr. 43, 57, there are semiautomatic pistols on the Roster with an ambidextrous safety and an ambidextrous magazine release.  *Id.* at 211-214; Def.'s Exs. 15-19; *see also Pena*, 898 F.3d at 978, n.8 (rejecting a similar argument).  Thus, like in *Pena*, Plaintiffs "have adduced little evidence that the handguns unavailable for purchase in California are materially more effective for self-defense than handguns currently for sale in the state."  *Id.* at 978.  The CLI, MDM, and microstamping requirements impose a minimal, if any, burden on the right of armed self-defense, and they are consistent with this Nation's historical tradition of firearms regulation.

_____

[7] Also of note is that, in 1776, George Washington ordered all Continental Army firearms be stamped with an alphanumeric insignia, "U.S.XIII," to prevent illegal trafficking of military firearms.  Cornell Decl. ¶ 34.  Although not a unique identifier, the insignia was an early effort to trace firearms with numbers and letters.

**III. PLAINTIFFS INCORRECTLY ASSERT THEY NEED NOT ESTABLISH THE OTHER *WINTER* FACTORS WEIGH IN THEIR FAVOR AND ADDITIONALLY FAIL TO MEET THEIR BURDEN ON THESE FACTORS**

Plaintiffs asserted at the hearing they are required to establish only the first *Winter* factor for a Second Amendment claim. PI Day2 Tr. 155. But that conflicts with *Winter*, 555 U.S. at 20, and runs counter to the principle that a plaintiff must meet a demanding burden when a "plaintiff asks to change the status quo rather than preserve it," *Baird*, 2022 WL 17542432, at *4, because such an injunction "has the character of a mandatory injunction," *Tracy Rifle & Pistol LLC v. Harris*, 118 F. Supp. 3d 1182, 1194 (E.D. Cal. 2015). Under that standard, Plaintiffs fail to show the "law and facts clearly favor" their position and "extreme or very serious damage will result" from the lack of an injunction. *Garcia*, 786 F.3d at 740; *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022).

**A. Plaintiffs failed to show even a possibility of irreparable harm**

Plaintiffs must show that "irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (italics in original), but made no effort to meet this burden.[8] At most, they assert irreparable harm is possible from an alleged constitutional violation. ECF No. 23-1 at 16. But the possibility of such harm is insufficient. *Winter*, 555 U.S. at 22. Moreover, Mr. Boland[9] and Mr. May[10] each testified to having at least a dozen firearms and several semiautomatic pistols. PI Day1 Tr. 41-42, 53-54. That evidence clearly demonstrates these Plaintiffs have ample means to defend themselves at home and in public while the case is pending.

---

[8] Plaintiffs admitted the "bulk" of their evidence concerned the effectiveness of the UHA requirements while also admitting that such an inquiry was not relevant here. PI Day2 Tr. 71, 160.

[9] Mr. Boland testified that he owned approximately 60 to 70 operable firearms, of which 25 were semiautomatic pistols, including two off-Roster. PI Day1 Tr. 41-42. He stores these firearms at his residence and he has a license to carry concealed at least one of eleven handguns in public. *Id.* at 41-43.

[10] Mr. May testified that he owned approximately 15 to 20 operable firearms, about half of which were handguns, and six of such handguns were semiautomatic pistols. PI Day1 Tr. 53-54. He stores these firearms at his residence and has a license to carry concealed at least one of three handguns in public. *Id.* at 53, 56-57. Mr. May has also manufactured nonsemiautomatic pistols. *Id.* at 57.

Neither Plaintiff testified that the firearms they currently own are inadequate for self-defense and Mr. May testified he could use any one of his handguns to defend himself. *Id.* at 54. Plaintiffs have thus failed to identify how they would likely be irreparably harmed in the time between now and final judgment. *See Baird*, 2022 WL 17542432, *6 (declining to find irreparable harm when the plaintiffs would "not be without a means to defend themselves with handguns in public while the case is pending"). Instead, an injunction that enjoins enforcement of statutory requirements which have been in effect for at least a decade would harm the State and public. *Id.* at *8 (citing *Maryland v. King*, 567 U.S. 1301, 1303 (2012)).

**B.   Plaintiffs mistakenly assert interest-balancing is not relevant here and accordingly have failed to meet their burden**

Plaintiffs likewise fail to meet another burden: showing the balance of equities, including the public interest, weigh in favor of a preliminary injunction. Instead of trying to meet this burden at the hearing, Plaintiffs repeatedly asserted that interest-balancing is off the table for Second Amendment claims pursuant to *Bruen*. PI Day2 Tr. 87, 97-98, 165. But *Bruen* did not overrule *Winter* or the standards governing interim equitable relief. Plaintiffs chose to seek a preliminary injunction and are bound by the *Winter* requirements to obtain such a remedy, regardless of the nature of their claims. *See, e.g.*, *Baird*, 2022 WL 17542432, at *8 (denying a preliminary injunction and rejecting the argument that *Bruen* precludes the consideration of public safety concerns when seeking an injunction for a Second Amendment claim). Plaintiffs have not met that burden, particularly in view of their claim that no such burden exists.[11]

In contrast, Defendant presented expert testimony regarding the public safety benefits of the CLI, MDM, and microstamping requirements. Special Agent

---

[11] The Supreme Court has also warned against understating the burden a preliminary injunction would have on the public interest, which is exactly what Plaintiffs do here by failing to address the point at all. *See Winter*, 555 U.S. at 24, 30; *Baird*, 2022 WL 17542432, at *6-7.

Supervisor Salvador Gonzalez testified that CLIs and MDMs enhance public safety by helping to prevent accidental discharges of a semiautomatic pistol and that such devices are to be used as a complement, rather than a substitute, to one's firearms training.  PI Day1 Tr. 190-91, 194, 197, 202, 218, 233-34.  Defendant also presented three studies demonstrating that CLIs and MDMs could prevent accidental shootings.  Def.'s Ex. 12 at 17 (finding a CLI could have prevent 23 percent of the studied accidental shooting deaths, including two cases where minors killed a sibling or themselves); PI Day1 Tr. 202-03 (CLIs, MDMs, and firing pin blocks could have prevented one third of studied accidental shootings); PI Day1 Tr. 204-05 (a CLI could have prevented 20 percent of studied accidental shootings while MDMs could have prevented 4 percent).  Moreover, the most recent bill to amend the UHA contained a legislative finding that described how the rate of accidental shooting deaths in the State decreased by two-thirds in 2014 to 2018—after CLIs and MDMs were required—compared to 1996 to 2000—before they were required.  Assemb. B. 2847, 2019-2020 Leg. (Cal. 2022).  Collectively, this evidence reflects the public safety benefits of CLIs and MDMs, which *Pena* had already recognized.  *See* 898 F.3d at 980; *id.* at 988 (Bybee, J., concurring in part).

As to microstamping, Defendant's expert witness testified that microstamping would help law enforcement to more quickly identify a semiautomatic pistol used in a shooting compared to current investigative methods, which requires locating the pistol and not just the cartridges.  PI Day1 Tr. 208-10.  For example, prompt identification could identify a serial shooter more quickly, thereby saving lives.  *Id.* at 209.  This testimony is consistent with *Pena*, which credited legislative history reflecting that of all California homicides, more than 60 percent are committed with handguns and no arrests are made in about 45 percent.  889 F.3d at 982.  Because the "only evidence at the crime scene may be spent cartridges," the Ninth Circuit called microstamping a "real-world solution" to a "real-world problem."  *Id.*  And it is Plaintiffs' prolonged litigation, and manufacturers' reluctance to make

microstamping commercially available in response, that delays the addition of pistols with microstamping technology.  *See id.* at 982.

Plaintiffs minimize microstamping's public safety benefit because, they assert, most firearms used in shootings are stolen.  At the outset, this is irrelevant because identifying the pistol's owner is still an investigate lead.  PI Day1 Tr. 208.  Moreover, in a February 1, 2023 report on crime gun tracing by the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), the firearm type subject to the microstamping requirement, pistols, constituted 58.5 percent of traced crime guns in California from 2017 to 2021, more than the other firearm types combined.  Req. for Judicial Notice, Ex.30, at 46.  California also had one of the lowest percentages of crime guns traced to a purchaser from 2017 to 2021, just 61.9 percent.  *Id.* at 3-4.  Microstamping could help improve the state's crime gun tracing rate.  The report also found that, of the crime guns traced in California, the last known purchaser and possessor of the crime gun were the same person for 14.9 percent, or 21,410, of the guns.  *Id.* at 23, 26, 50.  The last known purchaser and possessor were different for 60.3 percent, or 86,505, of the traced crime guns.[12]  *Id.*  For both categories, microstamping would "aid[] law enforcement efforts to solve and deter shootings, homicides, and other gun-related crimes," as the Legislature intended.  Assemb. B. 2847, 2019-2020 Leg. (Cal. 2022).

Plaintiffs presented no evidence that the balance of equities and public interest weigh in their favor, and Defendant presented evidence that the public safety benefits of the challenged requirements far outweigh any burdens here.  That alone is adequate to deny Plaintiffs their requested preliminary injunction.

## CONCLUSION

The Court should deny Plaintiffs' Motion for Preliminary Injunction.

---

[12] The possessor could still be the owner in these situations if the "last known purchaser" sold the firearm to the possessor and documentation of that sale was not available to the ATF.  Req. for Judicial Notice, Ex. 29 at 2, Ex. 30 at 23.

Dated:  February 24, 2023

Respectfully submitted,

ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
GABRIELLE D. BOUTIN
S. CLINTON WOODS
Deputy Attorneys General


*/s/ Charles J. Sarosy*
CHARLES J. SAROSY
Deputy Attorney General
*Attorneys for Rob Bonta, in his official*
*capacity as Attorney General of the*
*State of California*

SA2022303421
43586258.docx

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Defendants, certifies that this brief contains 6,999 words, which:

X complies with the word limit of L.R. 11-6.1.

__ complies with the word limit set by court order dated ___.

Dated:  February 24, 2023                    Respectfully submitted,

ROB BONTA
Attorney General of California


/s/ Charles J. Sarosy
CHARLES J. SAROSY
Deputy Attorney General
*Attorney for Rob Bonta, in his official*
*capacity as Attorney General of the*
*State of California*

# CERTIFICATE OF SERVICE

Case Name:  **_Boland, Lance, et al. v. Robert_**          No.  **8:22-cv-01421-CJC-ADS**
            **_Bonta, et al._**

I hereby certify that on February 24, 2023, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

1. **DEFENDANT'S FIRST CLOSING BRIEF FOLLOWING EVIDENTIARY HEARING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

2. **REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF DEFENDANT'S FIRST CLOSING BRIEF FOLLOWING EVIDENTIARY HEARING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION WITH EXHIBITS 29-30**

3. **DECLARATION OF SALVADOR GONZALEZ IN SUPPORT OF DEFENDANT'S FIRST CLOSING BRIEF FOLLOWING EVIDENTIARY HEARING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

4. **DECLARATION OF SAUL CORNELL IN SUPPORT OF DEFENDANT'S FIRST CLOSING BRIEF FOLLOWING EVIDENTIARY HEARING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION WITH EXHIBIT 31**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on February 24, 2023, at San Francisco, California.

K. Figueroa-Lee
Declarant                                                              Signature

SA2022303421
43586168.docx