Rob Bonta
Attorney General of California
Mark R. Beckington
Supervising Deputy Attorney General
Robert L. Meyerhoff, SBN 298196
Gabrielle D. Boutin, SBN 267308
S. Clinton Woods, SBN 246054
Charles J. Sarosy, SBN 302439
Deputy Attorneys General
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-6053
  Fax: (916) 324-8835
  E-mail: Clint.Woods@doj.ca.gov
*Attorneys for Rob Bonta, in his official capacity as*
*Attorney General of the State of California*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| **LANCE BOLAND et al.,** <br><br> Plaintiffs, <br><br> v. <br><br> **ROB BONTA, IN HIS OFFICIAL CAPACITY AS ATTORNEY GENERAL OF THE STATE OF CALIFORNIA, ET AL.,** <br><br> Defendants | Case No. 8:22-cv-01421-CJC-ADS <br><br> **DECLARATION OF SAUL CORNELL IN SUPPORT OF DEFENDANT'S FIRST CLOSING BRIEF FOLLOWING EVIDENTIARY HEARING ON PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION** <br><br> Courtroom: 9 B <br> Judge: Hon. Cormac J. Carney <br> Trial Date: None set <br> Action Filed: August 1, 2022 |

I, Saul Cornell, declare that the following is true and correct:

1. I have been asked by the Office of the Attorney General for the State of California to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular focus on how the Founding

era understood the right to bear arms, as well as the understanding of the right to

bear arms held at the time of the ratification of the Fourteenth Amendment to the

United States Constitution.  In *N.Y. State Rifle & Pistol Association, Inc. v. Bruen*,

the U.S. Supreme Court underscored that text, history, and tradition are the

foundation of modern Second Amendment jurisprudence.  This modality of

constitutional analysis requires that courts analyze history and evaluate the

connections between modern gun laws and earlier approaches to firearms regulation

in the American past.  My report explores these issues in some detail.  Finally, I

have been asked to evaluate the statute at issue in this case, particularly regarding

its connection to the tradition of firearms regulation in American legal history.

2.     This declaration is based on my own personal knowledge and

experience, and if I am called to testify as a witness, I could and would testify

competently to the truth of the matters discussed in this declaration.

## BACKGROUND AND QUALIFICATIONS

3.     I am the Paul and Diane Guenther Chair in American History at

Fordham University.  The Guenther Chair is one of three endowed chairs in the

history department at Fordham and the only one in American history.  In addition to

teaching constitutional history at Fordham University to undergraduates and

graduate students, I teach constitutional law at Fordham Law School.  I have been a

Senior Visiting research scholar on the faculty of Yale Law School, the University

of Connecticut Law School, and Benjamin Cardozo Law School.  I have given

invited lectures, presented papers at faculty workshops, and participated in

conferences on the topic of the Second Amendment and the history of gun

regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA

Law School, the University of Pennsylvania Law School, Columbia Law School,

Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.[1]

4.  My writings on the Second Amendment and gun regulation have been widely cited by state and federal courts, including the majority and dissenting opinions in *Bruen*.[2]  My scholarship on this topic has appeared in leading law reviews and top peer-reviewed legal history journals.  I authored the chapter on the right to bear arms in *The Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3]  Thus, my expertise not only includes the history of gun regulation and the right to keep and bear arms, but also extends to American legal and constitutional history broadly defined.  I have provided expert witness testimony in *Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, No. 14-cv-02850 (D. Colo.); *Chambers, v. City of Boulder*, No. 2018 CV 30581 (Colo. D. Ct., Boulder Cty.), *Zeleny v. Newsom*, No. 14-cv-02850 (N.D. Cal.), and *Miller v. Smith*, No. 2018-cv-3085 (C.D. Ill.); *Jones v. Bonta*, 3:19-cv-01226-L-AHG (S.D. Cal.); *Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.); *Worth v. Harrington,* No. 21-cv-1348 (D. Minn.); *Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal.); *Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal.); *Rupp v. Bonta*, No. 8:17-cv-00746-JLS-JDE (C.D. Cal.); and *Nat'l Assoc. for Gun Rights, et al., v. Campbell*, No. 1:22-cv-11431-FDS (D. Mass.).

---

[1] For a full *curriculum vitae* listing relevant invited and scholarly presentations, *see* Defendant's Exhibit 23, already entered into evidence.

[2] *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022).

[3] Saul Cornell, *The Right to Bear Arms, in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System, in* 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

## RETENTION AND COMPENSATION

5.      I am being compensated for services performed in the above-entitled case at an hourly rate of $500 for reviewing materials, participating in meetings, and preparing reports; $750 per hour for depositions and court appearances; and an additional $100 per hour for travel time.  My compensation is not contingent on the results of my analysis or the substance of any testimony.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

6.      The opinion I provide in this report is based on my review of the amended complaint filed in this lawsuit, my review of the local ordinances at issue in this lawsuit, my education, expertise, and research in the field of legal history. The opinions contained herein are made pursuant to a reasonable degree of professional certainty.

## SUMMARY OF OPINIONS

7.      Understanding text, history, and tradition require a sophisticated grasp of historical context. One must canvass the relevant primary sources, secondary literature, and jurisprudence to arrive at an understanding of the scope of permissible regulation consistent with the Second Amendment's original understanding.

8.      It is impossible to understand the meaning and scope of Second Amendment protections without understanding the way Americans in the Founding era approached legal questions and rights claims.  In contrast to most modern lawyers, the members of the First Congress who wrote the words of the Second Amendment and the American people who enacted the text into law were well schooled in English common law ideas.  Not every feature of English common law survived the American Revolution, but there were important continuities between English law and the common law in America.[4]  Each of the new states, either by

---

[4] William B. Stoebuck, *Reception of English Common Law in the American*

statute or judicial decision, adopted multiple aspects of the common law, focusing primarily on those features of English law that had been in effect in the English colonies for generations.[5]  No legal principle was more important to the common law than the concept of the peace.[6]  As one early American justice of the peace manual noted:  "the term peace, denotes the condition of the body politic in which no person suffers, or has just cause to fear any injury."[7]  Blackstone, a leading source of early American views about English law, opined that the common law "hath ever had a special care and regard for the conservation of the peace; for peace is the very end and foundation of civil society."[8]

9.      In *Bruen*, Justice Kavanaugh reiterated *Heller*'s invocation of Blackstone's authority as a guide to how early Americans understood their inheritance from England. Specifically, Justice Kavanaugh stated in unambiguous terms that there was a "well established historical tradition of prohibiting the carrying of dangerous and unusual weapons."[9] The dominant understanding of

---

*Colonies*, 10 WM. & MARY L. REV. 393 (1968); MD. CONST. OF 1776, DECLARATION OF RIGHTS, art. III, § 1; Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[5] 9 STATUTES AT LARGE OF PENNSYLVANIA 29-30 (Mitchell & Flanders eds. 1903); FRANCOIS XAVIER MARTIN, A COLLECTION OF STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH-CAROLINA 60–61 (Newbern, 1792); *Commonwealth v. Leach*, 1 Mass. 59 (1804).

[6] LAURA F. EDWARDS, THE PEOPLE AND THEIR PEACE: LEGAL CULTURE AND THE TRANSFORMATION OF INEQUALITY IN THE POST-REVOLUTIONARY SOUTH (University of North Carolina Press, 2009).

[7] JOSEPH BACKUS, THE JUSTICE OF THE PEACE 23 (1816).

[8] 1 WILLIAM BLACKSTONE, COMMENTARIES *349.

[9] *District of Columbia v. Heller*, 554 U.S. 570, 626−627 (2008), and n. 26. Blackstone and Hawkins, two of the most influential English legal writers consulted by the Founding generation, described these types of limits in slightly different terms.  The two different formulations related to weapons described as dangerous and unusual in one case and sometimes as dangerous or unusual in the other instance, see Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J.

the Second Amendment and its state constitutional analogues at the time of their adoption in the Founding period forged an indissoluble link between the right to keep and bear arms with the goal of preserving the peace.[10]

10.    "Constitutional rights," Justice Scalia wrote in *Heller*, "are enshrined with the scope they were thought to have when the people adopted them."[11] Included in this right was the most basic right of all: the right of the people to regulate their own internal police.  Although modern lawyers and jurists are accustomed to thinking of state police power, the Founding generation viewed this concept as a right, not a power.[12]  The first state constitutions clearly articulated such a right — including it alongside more familiar rights such as the right to bear arms.[13]  Pennsylvania's Constitution framed this estimable right succinctly:  "That

1695134 (2012).  It is also possible that the phrase was an example of an archaic grammatical and rhetorical form hendiadys; see Samuel Bray, *'Necessary AND Proper' and 'Cruel AND Unusual': Hendiadys in the Constitution*, 102 VIRGINIA L. REV. 687 (2016).

[10] On Founding-era conceptions of liberty, *see* JOHN J. ZUBLY, THE LAW OF LIBERTY (1775).  The modern terminology to describe this concept is "ordered liberty."  *See Palko v. Connecticut*, 302 U.S. 319, 325 (1937).  For a more recent elaboration of the concept, *see generally* JAMES E. FLEMING & LINDA C. MCCLAIN, ORDERED LIBERTY: RIGHTS, RESPONSIBILITIES, AND VIRTUES (Harvard University Press, 2013).  On Justice Cardozo and the ideal of ordered liberty, see *Palko v. Connecticut*, 302 U.S, 319, 325 (1937); John T. Noonan, Jr., *Ordered Liberty: Cardozo and the Constitution*, 1 CARDOZO L. REV. 257 (1979); Jud Campbell, *Judicial Review, and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[11] *Heller*, 554 U.S. at 634–35; William J. Novak*, Common Regulation: Legal Origins of State Power in America,* 45 HASTINGS L.J. 1061, 1081–83 (1994); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution,* 20 J. POL'Y HIST. 47 (2008).

[12] On the transformation of the Founding era's ideas about a "police right" into the more familiar concept of "police power," *See generally* Aaron T. Knapp, *The Judicialization of Police*, 2 CRITICAL ANALYSIS OF L. 64 (2015); *see also* MARKUS DIRK DUBBER, THE POLICE POWER: PATRIARCHY AND THE FOUNDATIONS OF AMERICAN GOVERNMENT (2005); Christopher Tomlins, *Necessities of State: Police, Sovereignty, and the Constitution*, 20 J. OF POL'Y HIST. 47 (2008).

[13] PA. CONST. of 1776, ch. I, art. III; MD. DECLARATION OF RIGHTS, art. IV

the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same." Thus, if Justice Scalia's rule applies to the scope of the right to bear arms, it must also apply to the scope of the right of the people to regulate their internal police, a point that Chief Justice Roberts and Justice Kavanaugh have each asserted in their interpretations of *Heller* and subsequent jurisprudence. The history of gun regulation in the decades after the right to bear arms was codified in both the first state constitutions and the federal bill of rights underscores this important point.

11. In the years following the adoption of the Second Amendment and its state analogues, firearm regulation increased. Indeed, the individual states exercised their police powers to address longstanding issues and novel problems created by firearms in American society. Over the eighteenth and nineteenth century, American regulation increased with the advancement of firearm technology, from the manufacturing, storage, and sale of gunpowder, to regulating where firearms and other dangerous weapons cannot be carried.

## I.  THE HISTORICAL INQUIRY REQUIRED BY *BRUEN, MCDONALD,* AND *HELLER*

12. The United States Supreme Court's decisions in *Heller*, *McDonald*,[14] and *Bruen* have directed courts to look to text, history, and tradition when evaluating the scope of permissible firearms regulation under the Second Amendment. In another case involving historical determinations, Justice Thomas, the author of the majority opinion in *Bruen*, has noted that judges must avoid approaching history, text, and tradition with an "ahistorical literalism."[15] Legal

---

(1776); N.C. DECLARATION OF RIGHTS, art. I, § 3 (1776); and VT. DECLARATION OF RIGHTS, art. V (1777).

[14] *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

[15] *Franchise Tax Board of California v. Hyatt*, 139 S. Ct. 1485, 1498 (2019) (Thomas, J.) (criticizing "ahistorical literalism").

texts must not be read in a decontextualized fashion detached from the web of historical meaning that made them comprehensible to Americans living in the past. Similarly, a mechanistic strategy of digital searching for historical gun laws would be incapable of answering the historical inquiries required under *Bruen*.  Instead, understanding the public meaning of constitutional texts requires a solid grasp of the relevant historical contexts—how firearms technology has changed, how consumer demand has waxed and waned, and how the people, acting through their representatives, respond to societal ills created by those changes.[16]

13.    Moreover, as *Bruen* makes clear, history neither imposes "a regulatory straightjacket nor a regulatory blank check."[17]   The Court acknowledged that when novel problems created by firearms are issue the analysis must reflect this fact: "other cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach."  *Bruen* differentiates between cases in which contested regulations are responses to long standing problems and situations in which modern regulations address novel problems with no clear historical analogues from the Founding era or the era of the Fourteenth Amendment. Finally, as *Bruen* makes clear a more "nuanced" approach is required to understand the nature of the problems early gun laws sought to remediate and the potential burden they posed for the exercise of self-defense.

14.    In the years between *Heller* and *Bruen*, historical scholarship has expanded our understanding of the history of arms regulation in the Anglo-American legal tradition, but much more work needs to be done to fill out this picture.[18]   Indeed, such research is still ongoing: new materials continue to emerge;

---

[16] S*ee* Jonathan Gienapp, *Historicism and Holism: Failures of Originalist Translation*, 84 FORDHAM L. REV. 935 (2015).

[17] *Bruen*, 142 S. Ct. 2111.

[18] Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 L. & CONTEMP. PROBS. 1 (2017).

and since *Bruen* was decided, additional evidence about the history of regulation has surfaced and new scholarship interpreting it has appeared in leading law reviews and other scholarly venues.[19]

15.    As Justice Scalia noted in *Heller*, and Justice Thomas reiterated in *Bruen*, the original Second Amendment was a result of interest balancing undertaken by the people themselves in framing the federal Constitution and the Bill of Rights.  *Bruen*, 142 S. Ct. at 2131; *Heller*, 554 U.S. at 635.  Although "free-standing balancing" by judges is precluded by *Heller*, the plain meaning of the text recognizes a role for regulation explicitly and further asserts that actions inimical to a free state fall outside of the scope of the right instantiated in the text.[20]  Thus, from its outset, the Second Amendment recognizes both the right to keep and bear arms and the right of the people to regulate arms to promote the goals of preserving a free state.  Although rights and regulation are often cast as antithetical in the modern gun debate, the Founding generation saw the two goals as complimentary.

16.    Comparing the language of the Constitution's first two amendments and their different structures and word choice makes this point crystal clear.  The First Amendment prohibits "abridging" the rights it protects.  In standard American English in the Founding era, to "abridge" meant to "reduce."  Thus, the First Amendment prohibits a diminishment of the rights it protects.  The Second Amendment's language employs a very different term, requiring that the right to bear arms not be "infringed."[21]  In Founding-era American English, the word

---

[19] *Symposium — The 2nd Amendment at the Supreme Court: "700 Years Of History" and the Modern Effects of Guns in Public*, 55 U.C. DAVIS L. REV. 2495 (2022); NEW HISTORIES OF GUN RIGHTS AND REGULATION: ESSAYS ON THE PLACE OF GUNS IN AMERICAN LAW AND SOCIETY (Joseph Blocher, Jacob D. Charles & Darrell A.H. Miller eds., forthcoming 2023).

[20] *Heller* at 635.

[21] The distinction emerges clearly in a discussion of natural law and the law of nations in an influential treatise on international law much esteemed by the Founding generation:  "Princes who infringe the law of nations, commit as great a

"infringement" meant to "violate" or "destroy."  In short, when read with the Founding era's interpretive assumptions and legal definitions in mind, the two Amendments set up radically different frameworks for evaluating the rights they enshrined in constitutional text.  Members of the Founding generation would have understood that the legislature could regulate the *conduct* protected by the Second Amendment and comparable state arms bearing provisions as long as such regulations did not destroy the underlying *right*.  An exclusive focus on rights and a disparagement of regulation is thus antithetical to the plain meaning of the text of the Second Amendment.

17.    John Burn, author of an influential eighteenth-century legal dictionary, illustrated the concept of infringement in the context of his discussion of violations of rights protected by the common law.  Liberty, according to Burns, was not identical to that "wild and savage liberty" of the state of nature.  True liberty, by contrast, only existed when individuals created civil society and enacted laws and regulations that promoted *ordered* liberty.  Regulation was the indispensable correlate of rights in Founding era constitutionalism.[22]

18.    Similarly, Nathan Bailey's *Dictionarium Britannicum* (1730) defined "abridge" as to "shorten," while "infringe" was defined as to "break a law."[23]  And his 1763 *New Universal Dictionary* repeats the definition of "abridge" as "shorten" and "infringe" as "to break a law, custom, or privilege."[24]  Samuel Johnson's

---

crime as private people, who violate the law of nature," J.J. BURLAMAQUI, THE PRINCIPLES OF NATURAL LAW (Thomas Nugent trans., 1753) at 201.  This book was among those included in the list of important texts Congress needed to procure, *see* Report on Books for Congress, [23 January] 1783," *Founders Online*, National Archives, https://founders.archives.gov/documents/Madison/01-06-02-0031.

[22] *Liberty,* A NEW LAW DICTIONARY (1792) *See  also,* Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31, 32–33 (2020)

[23] *Abridge*, DICTIONARIUM BRITANNICUM (1730).

[24] *Abridge*, NEW UNIVERSAL DICTIONARY (1763).

*Dictionary of the English Language* (1755) defines "infringe" as "to violate; to break laws or contracts" or "to destroy; to hinder."[25]  Johnson's definition of "abridge" was "to shorten" and "to diminish" or "to deprive of."[26]   And Noah Webster's *An American Dictionary of the English Language* (1828) largely repeats Johnson's definitions of "infringe" and "abridge."[27]  Although today the two terms are conflated by some, the meanings of abridge and infringe were and remain distinct. The Founding generation was far more nuanced in distinguishing between the differences between these two terms.

19.    For the framers, ratifiers, and other relevant legal actors in the Founding era, robust regulation was not understood to be an "infringement" of the right to bear arms, but rather the necessary foundation for the proper exercise of that right as required by the concept of ordered liberty.[28]  As one patriotic revolutionary era orator observed, almost a decade after the adoption of the Constitution:  "True liberty consists, not in having *no government*, not in a *destitution of all law*, but in our having an equal voice in the formation and execution of the laws, according as they effect [*sic*] our persons and property."[29]

---

[25] *Infringe*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[26] *Abridge*, DICTIONARY OF THE ENGLISH LANGUAGE (1755).

[27] *Abridge*, *Infringe*, AN AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828).

[28] Dan Edelstein, *Early-Modern Rights Regimes: A Genealogy of Revolutionary Rights*, 3 CRITICAL ANALYSIS L. 221, 233–34 (2016).  *See generally* GERALD LEONARD & SAUL CORNELL, THE PARTISAN REPUBLIC: DEMOCRACY, EXCLUSION, AND THE FALL OF THE FOUNDERS' CONSTITUTION, 1780s–1830s, at 2; Victoria Kahn, *Early Modern Rights Talk*, 13 YALE J.L. & HUMAN. 391 (2001) (discussing how the early modern language of rights incorporated aspects of natural rights and other philosophical traditions); Joseph Postell, *Regulation During the American Founding: Achieving Liberalism and Republicanism*, 5 AM. POL. THOUGHT 80 (2016) (examining the importance of regulation to Founding political and constitutional thought).

[29] Joseph Russell, *An Oration; Pronounced in Princeton, Massachusetts, on the Anniversary of American Independence, July 4, 1799*, at 7 (July 4, 1799), (text available in the Evans Early American Imprint Collection) (emphasis in original).

By allowing individuals to participate in politics and enact laws aimed at promoting the health, safety, and well-being of the people, liberty flourished.[30]

20.     The key insight derived from taking the Founding era conception of rights seriously and applying the original understanding of the Founding era's conception of liberty is the recognition that regulation and liberty are both hard wired into the Amendment's text. The inclusion of rights guarantees in constitutional texts was not meant to place them beyond the scope of legislative control.  "The point of retaining natural rights," originalist scholar Jud Campbell reminds us "was not to make certain aspects of natural liberty immune from governmental regulation.  Rather, retained natural rights were aspects of natural liberty that could be restricted only with just cause and only with consent of the body politic."[31]  Rather than limit rights, regulation was the essential means of preserving rights, including self-defense.[32]  In fact, without robust regulation of

---

[30] *See generally* QUENTIN SKINNER, LIBERTY BEFORE LIBERALISM (1998) (examining neo-Roman theories of free citizens and how it impacted the development of political theory in England); THE NATURE OF RIGHTS AT THE AMERICAN FOUNDING AND BEYOND (Barry Alan Shain ed., 2007) (discussing how the Founding generation approached rights, including the republican model of protecting rights by representation).

[31] Jud Campbell, *The Invention of First Amendment Federalism*, 97 TEX. L. REV. 517, 527 (2019) (emphasis in original). *See generally* Saul Cornell, *Half Cocked: The Persistence of Anachronism and Presentism in the Academic Debate Over the Second Amendment*, 106 J. OF CRIM. L. AND CRIMINOLOGY 203, 206 (2016) *s* (noting that the Second Amendment was not understood in terms of the simple dichotomies that have shaped modern debate over the right to bear arms).

[32] See Jud Campbell, *Judicial Review and the Enumeration of Rights,* 15 GEO. J.L. & PUB. POL'Y 569, 576–77 (2017).  Campbell's work is paradigm-shifting, and demonstrates that Justice Scalia's unsubstantiated claim in *Heller* that the inclusion of the Second Amendment in the Bill of Rights placed certain forms of regulation out of bounds is totally anachronistic.  This claim has no foundation in Founding-era constitutional thought, but reflects the contentious modern debate between Justice Black and Justice Frankfurter over judicial balancing, on Scalia's debt to this modern debate, *see generally* SAUL CORNELL, THE POLICE POWER AND THE AUTHORITY TO REGULATE FIREARMS IN EARLY AMERICA 1–2 (2021), https://www.brennancenter.org/sites/default/files/2021-06/Cornell_final.pdf

arms, it would have been impossible to implement the Second Amendment and its
state analogues.  Mustering the militia required keeping track of who had weapons
and included the authority to inspect those weapons and fine individuals who failed
to store them safely and keep them in good working order.[33]  The individual states
also imposed loyalty oaths, disarming those who refused to take such oaths.  No
state imposed a similar oath as pre-requisite to the exercise of First Amendment-
type liberties.  Thus, some forms of prior restraint, impermissible in the case of
expressive freedoms protected by the First Amendment or comparable state
provisions, were understood by the Founding generation to be perfectly consistent
with the constitutional right to keep and bear arms.[34]

21.    In keeping with the clear public meaning of the Second Amendment's
text and comparable state provisions, early American governments enacted laws to
preserve the rights of law-abiding citizens to keep and bear arms and promote the
equally vital goals of promoting public safety.   The proper metric for deciding if
such laws were constitutional was and remains the same today: whether a
regulation infringes on the core right protected by the Second Amendment. [35]

## II.   FROM MUSKETS TO PISTOLS: CHANGE AND CONTINUITY IN EARLY AMERICAN FIREARMS REGULATION

22.    Guns have been regulated from the dawn of American history.[36]  At the
time *Heller* was decided, there was little scholarship on the history of gun

[https://perma.cc/J6QD-4YXG] and Joseph Blocher, *Response: Rights as Trumps of What?*, 132 HARV. L. REV. 120, 123 (2019).

[33] H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS, OR, HOW THE SECOND AMENDMENT FELL SILENT 150 (2002).

[34] Saul Cornell, *Commonplace or Anachronism: The Standard Model, the Second Amendment, and the Problem of History in Contemporary Constitutional Theory* 16 CONSTITUTIONAL COMMENTARY 988 (1999).

[35] Saul Cornell and Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004).

[36] Robert J. Spitzer, *Gun Law History in the United States and Second*

regulation and a paucity of quality scholarship on early American gun culture.[37] Fortunately, a burgeoning body of scholarship has illuminated both topics, deepening scholarly understanding of the relevant contexts needed to implement *Bruen*'s framework.[38]

23.     The common law that Americans inherited from England always acknowledged that the right of self-defense was not unlimited but existed within a well-delineated jurisprudential framework.  The entire body of the common law was designed to preserve the peace and the right of self-defense existed within this larger framework.[39]  Statutory law, both in England and America functioned to further secure the peace and public safety.  Given these indisputable facts, the Supreme Court correctly noted, the right to keep and bear arms was never understood to prevent government from enacting a broad range of regulations to promote the peace and maintain public safety.[40]  To deny such an authority would be to convert the Constitution into a suicide pact and not a charter of government. In keeping with this principle, the Second Amendment and its state analogues were understood to enhance the concept of ordered liberty, not undermine it.[41]

24.     *Bruen*'s methodology requires judges to distinguish between the relevant history necessary to understand early American constitutional texts and a series of myths about guns and regulation that were created by later generations to

---

*Amendment Rights*, 80 L. & CONTEMP. PROBS. 55 (2017).

[37] *Id.*

[38] Ruben & Miller, *supra* note 18, at 1.

[39] Saul Cornell, *The Right to Keep and Carry Arms in Anglo-American Law: Preserving Liberty and Keeping the Peace*, 80 L. & CONTEMP. PROBS. 11 (2017).

[40] *McDonald*, 561 U.S. at 785 (noting "'[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment'").

[41] *See generally* Saul Cornell, *The Long Arc Of Arms Regulation In Public: From Surety To Permitting*, 1328-1928, 55 U.C. DAVIS L. REV. 2547 (2022)

sell novels, movies, and guns themselves.[42]  Unfortunately, many of these myths
continue to cloud legal discussions of American gun policy and Second
Amendment jurisprudence.[43]

25.    Although it is hard for many modern Americans to grasp, there was no
comparable societal ill to the modern gun violence problem for Americans to solve
in the era of the Second Amendment.  A combination of factors, including the
nature of firearms technology and the realities of living life in small, face-to-face,
and mostly homogenous rural communities that typified many parts of early
America, militated against the development of such a problem. In contrast to
modern America, homicide was not the problem that government firearm policy
needed to address at the time of the Second Amendment.[44]

26.    The surviving data from New England is particularly rich and has
allowed scholars to formulate a much better understanding of the dynamics of early
American gun policy and relate it to early American gun culture.[45]  Levels of gun
violence among those of white European ancestry in the era of the Second
Amendment were relatively low compared to modern America.  These low levels of
violence among persons of European ancestry contrasted with the high levels of

---

[42] PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF
AMERICAN GUN CULTURE (2016).

[43] RICHARD SLOTKIN, GUNFIGHTER NATION: THE MYTH OF THE FRONTIER IN
TWENTIETH-CENTURY AMERICA (1993); JOAN BURBICK, GUN SHOW NATION: GUN
CULTURE AND AMERICAN DEMOCRACY (2006).

[44] RANDOLPH ROTH, AMERICAN HOMICIDE 56, 315 (2009).

[45] It is important to recognize that there were profound regional differences in
early America.  See JACK P. GREENE, PURSUITS OF HAPPINESS: THE SOCIAL
DEVELOPMENT OF EARLY MODERN BRITISH COLONIES AND THE FORMATION OF
AMERICAN CULTURE (1988).  These differences also had important consequences
for the evolution of American law.  See generally David Thomas Konig,
Regionalism in Early American Law, in 1 THE CAMBRIDGE HISTORY OF LAW IN
AMERICA 144 (Michael Grossberg & Christopher Tomlins eds., 2008).

violence involving the tribal populations of the region.  The data presented in Figure 1 is based on the pioneering research of Ohio State historian Randolph Roth. It captures one of the essential facts necessary to understand what fears motivated American gun policy in the era of the Second Amendment.  The pressing problem Americans faced at the time of the Second Amendment was that citizens were reluctant to purchase military style weapons which were relatively expensive and had little utility in a rural society.  Americans were far better armed than their British ancestors, but the guns most Americans owned and desired were those most useful for life in an agrarian society: fowling pieces and light hunting muskets.[46] Killing pests and hunting birds were the main concern of farmers, and their choice of firearm reflected these basic facts of life.  Nobody bayoneted turkeys, and pistols were of limited utility for anyone outside of a small elite group of wealthy, powerful, and influential men who needed these weapons if they were forced to face an opponent on the field of honor in a duel, as the tragic fate of Alexander Hamilton so vividly illustrates.[47]

27.    Limits in Founding-era firearms technology also militated against the use of guns as effective tools of interpersonal violence in this period.  Eighteenth-century muzzle-loading weapons, especially muskets, took too long to load and were therefore seldom used to commit crimes.  Nor was keeping guns loaded a viable option because the black powder used in these weapons was not only corrosive, but it attracted moisture like a sponge.  Indeed, the iconic image of rifles and muskets hung over the mantle place in early American homes was not primarily a function of aesthetics or the potent symbolism of the hearth, as many today

[46] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America, in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

[47] Joanne B. Freeman, AFFAIRS OF HONOR: NATIONAL POLITICS IN THE NEW REPUBLIC (2001).

assume.  As historian Roth notes: "black powder's hygroscopic, it absorbs water, it corrodes your barrel, you can't keep it loaded.  Why do they always show the gun over the fireplace?  Because that's the warmest, driest place in the house."[48] Similar problems also limited the utility of muzzle-loading pistols as practical tools for self-defense or criminal offenses.  Indeed, at the time of the Second Amendment, over 90% of the weapons owned by Americans were long guns, not pistols.[49]

**Figure 1**



Figure 2.3  Unrelated-adult homicide rates in New England by race, 1677–1797 (per 100,000 persons per year).

28.    As Roth's data makes clear, there was not a serious homicide problem looming over debates about the Second Amendment.  Nor were guns the primary weapon of choice for those with evil intent during this period.[50]  The skill and time required to load and fire flintlock muzzle loading black powder weapons meant that

---

[48] Randolph Roth, Transcript: *Why is the United States the Most Homicidal in the Affluent World*, NATIONAL INSTITUTE OF JUSTICE (Dec. 1, 2013), https://nij.ojp.gov/media/video/24061#transcript--0.

[49] Sweeney, *supra* note 46.

[50] HAAG, *supra* note 42.

these types of firearms were less likely to be used in crimes of passion. The preference for storing them unloaded also meant they posed fewer dangers to children from accidental discharge.

29.     In short, the Founding generation did not confront a gun violence problem similar in nature or scope to the ills that plague modern America.  Rather, they faced a different, but no less serious problem: American reluctance to purchase the type of weapons needed to effectively arm their militias. Despite repeated efforts to exhort and legislate to promote this goal, many states were failing to adequately equip the militia with suitable firearms that could withstand the rigors of the type of close-quarters hand-to-hand combat required by military tactics.  A gun had to be able to receive a bayonet and serve as a bludgeon if necessary.  The light-weight guns favored by the overwhelmingly rural population of early America were well designed to put food on the table and rid fields of vermin, but were not well suited to eighteenth-century ground wars.  When the U.S. government surveyed the state of the militia's preparedness shortly after Jefferson took office in 1800, the problem had not been solved.  Although Massachusetts boasted above 80% of its militia armed with military quality weapons, many of the southern states lagged far behind, with Virginia and North Carolina hovering at about less than half the militia properly armed.[51]

30.     As a result, the government took an active role in encouraging the manufacturing of arms and had a vested interest in determining what types of weapons would be produced.[52]  The American firearms industry in its infancy was thus largely dependent on government contracts and subsidies.

---

[51] Sweeney, *supra* note 46.

[52] Lindsay Schakenbach Regele, *A Different Constitutionality for Gun Regulation*, 46 HASTINGS CONST. L.Q. 523, 524 (2019); Andrew J. B. Fagal, *American Arms Manufacturing and the Onset of the War of 1812*, 87 NEW ENG. Q. 526, 526 (2014).

31.     One important form of government regulation of the firearms industry, a practice that began in the era of the Second Amendment and persisted throughout the nineteenth century included inspection of weapons and Government-imposed safety standards on the firearms industry.  Indeed, without such interventions it is likely that the industry would never have survived.  The danger posed by defective arms, or poorly manufactured ones could be catastrophic.  A burst barrel of a musket or fowling piece could turn a firearm into a pipe bomb, maiming or killing an unfortunate user.

32.     In 1805 Massachusetts enacted a law requiring all guns to be inspected before they could be sold in the Commonwealth.[53]  As stated in the law's preamble, the law's purpose was to prevent harm to residents from the sale of unsafe firearms.  The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels.  The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance.  If the firearm passed inspection, then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured.  Only firearms that passed inspection and were stamped could be sold, and the sale of firearms without a stamp was subject to a fine.  The standards that all muskets and pistols had to meet to pass inspection were updated in 1814.[54]

_____

[53] 1804 Mass. Acts. 111, ch. 81, "An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth."

[54] 1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This Commonwealth," ch. 192, § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the same shall be stocked, be proved by the person appointed according to the provisions of an act . . . . . . ."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the

33.     Maine imposed a similar requirement on firearms in 1821,  and continued the practice through the end of the century.[55]  Similar to the Massachusetts proving law, the Maine law required the governor to appoint inspectors of firearms who would then ensure that firearms met certain safety standards and stamped prior to their sale.  The Maine and Massachusetts laws persisted throughout the nineteenth century.[56]

34.     The federal armory in Springfield, Massachusetts began producing muskets in 1794.  The presence of the armory served as a spur to innovation among local gun smiths.  In fact, this confluence of factors helped Western Massachusetts become the leading small arms producer in America on the eve of the War of 1812.  The Springfield armory, a federal entity, was governed by federal law (not Massachusetts law) but it nonetheless extensively scrutinized and inspected all arms made at its facilities and any arms produced by local gunsmiths under government contract.  This quality of these weapons, literally being stamped with government approval, made these guns particularly valuable in the civilian arms market when government surplus guns were sold to consumers.[57]  Federal weapons not made in Massachusetts were also stamped to discourage theft.  In 1776, George Washington ordered all Continental Army firearms stamped with an insignia: "U.S.XIII."  Government marked weapons in this fashion to make it easier to identify cases where arms were being illegally sold in a secondary market to private individuals.[58]

barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.")

[55] "An Act to Provide for  the Proof of Fire Arms," 2 Laws State of Maine (1821) at 685-6.

[56] 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873).

[57] Lindsay Schakenbach Regele, MANUFACTURING ADVANTAGE: WAR, THE STATE, AND THE ORIGINS OF AMERICAN INDUSTRY, 1776–1848 (2019) at 63-65.

[58] E. Wayne Carp's TO STARVE THE ARMY AT PLEASURE:

In 1780, George Washington also ordered that the Continental Army ensure all gun barrels were sufficiently proved to avoid buying poor quality guns.[59]

35.     Stamping and marking firearms to help government keep track of weapons and enforce manufacturing standards were practices well known to the Founding generation.  These types of policies were understood at the time of the Second Amendment and its various state analogs to be perfectly consistent with the right to keep and bear arms.

36.     The market for firearms in early America shared very few features with the contemporary world of firearms commerce.  Today's Americans have a myriad of choices of the type and style of weapon when they wish to acquire a firearm.  Gun shows, gun supermarkets, and internet sales are a few of the many ways Americans acquire firearms today.  Although estimates vary, it is likely that there are now more guns than people in contemporary America.

37.     Early America firearms production in the era of the Second Amendment, in contrast, was dominated by artisan production.  Local gun smiths, not big box stores such as Walmart, were responsible for selling most firearms. Most sellers and buyers of firearms in early America were members of the same community.  Moreover, given the nature of eighteenth-century firearms technology gun owners needed to maintain an on-going relationship with their local gun smith to keep their guns in good working order.  The informal ties of kin and community that defined the close-knit communities of early American meant that individuals

_____

CONTINENTAL ARMY ADMINISTRATION AND AMERICAN POLITICAL CULTURE, 1775-1783 (1984) at 66-67.

[59] Letter from George Washington to Henry Knox (Nov. 30, 1780) *in* The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, *ed.*) ("I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. ... Lee charges Mr. Deane[']s Agent with purchasing.")

were effectively vetted and monitored by their neighbors in ways that share little with the largely anonymous world of modern firearms commerce. [60]

38.    The calculus of individual self-defense changed dramatically in the decades following the adoption of the Second Amendment.[61]  The early decades of the nineteenth century witnessed a revolution in the production and marketing of guns.[62]  The same technological changes and economic forces that made wooden clocks and other consumer goods such as Currier and Ives prints common items in many homes also transformed American gun culture.[63]  These same changes also made handguns and a gruesome assortment of deadly knives, including the dreaded Bowie knife, more common.  The culmination of this gradual evolution in both firearms and ammunition technology was the development of Samuel Colt's pistols around the time of the Mexican-American War.[64]  Economic transformation was accompanied by a host of profound social changes that gave rise to America's first gun violence crisis.  As cheaper, more dependable, and easily concealable handguns proliferated in large numbers, Americans, particularly southerners, began sporting them with alarming regularity.  The change in behavior was most noticeable in the case of handguns. [65]

---

[60] Scott Paul Gordon, *The Ambitions of William Henry*, 136 PENNSYLVANIA MAGAZINE OF HISTORY AND BIOGRAPHY  253 (2012). Pennsylvania was one of the main regions of early American gunsmithing, M.L. Brown, FIREARMS IN COLONIAL AMERICA: THE IMPACT ON HISTORY AND TECHNOLOGY, 1492-1792 (1980).

[61] Cornell, *supra* note 3, at 745.

[62] Lindsay Schakenbach Regele, *Industrial Manifest Destiny: American Firearms Manufacturing and Antebellum Expansion*, 93 BUS. HIST. REV. 57 (2018).

[63] Sean Wilentz, *Society, Politics, and the Market Revolution*, in THE NEW AMERICAN HISTORY (Eric Foner ed., 1990).

[64] WILLIAM N. HOSLEY, COLT: THE MAKING OF AN AMERICAN LEGEND (1st ed. 1996).

[65] Cornell, *supra* note 3, at 716.

39.     The response of states to the emergence of new firearms that threatened the peace was more regulation.  When faced with changes in technology and consumer behavior, as well as novel threats to public safety, the individual states enacted laws to address these problems.  In every instance apart from a few outlier cases in the Slave South, courts upheld such limits on the unfettered exercise a right to keep and bear arms.  The primary limit identified by courts in evaluating such laws was the threshold question about infringement: whether the law negated the ability to act in self-defense.[66]  In keeping with the clear imperative hard-wired into the Second Amendment, states singled out weapons that posed a particular danger for regulation or prohibition.  Responding in this fashion was entirely consistent with Founding-era conceptions of ordered liberty and the Second Amendment.

### III.   THE POLICE POWER AND FIREARMS REGULATION

40.     The 1776 Pennsylvania Constitution, the first revolutionary constitution to assert a right to bear arms, preceded the assertion of this right by affirming a more basic rights claim: "That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same."[67]  The phrase "internal police" had already become common, particularly in laws establishing towns and defining the scope of their legislative authority.[68]  By

---

[66] On southern gun rights exceptionalism, see Eric M. Ruben & Saul Cornell, *Firearms Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121, 128 (2015).

[67] PA. CONST. OF 1776, Ch. I, art iii.

[68] For other examples of constitutional language similar to Pennsylvania's provision, N.C. CONST. OF 1776, DECLARATION OF RIGHTS, art. II; VT. CONST. OF 1777, DECLARATION OF RIGHTS, art. IV.  For other examples of this usage, *see* An Act Incorporating the residents residing within limits therein mentioned, *in* 2 NEW YORK LAWS 158 (1785) (establishing the town of Hudson, NY); An Act to incorporate the Town of Marietta, *in* LAWS PASSED IN THE TERRITORY NORTHWEST OF THE RIVER OHIO 29 (1791).  For later examples, *see* 1 STATUTES OF THE STATE OF NEW JERSEY 561 (rev. ed. 1847); 1 SUPPLEMENTS TO THE REVISED STATUTES. LAWS OF THE COMMONWEALTH OF MASSACHUSETTS, PASSED SUBSEQUENTLY TO THE

the early nineteenth century, the term "police" was a fixture in American law.[69] Thus, an 1832 American encyclopedia confidently asserted that police, "in the common acceptation of the word, in the U. States and England, is applied to the municipal rules, institutions and officers provided for maintaining order, cleanliness &c."[70]  The Founding era's conception of a basic police right located in legislatures was transmuted during the Marshall Court's era into the judicial doctrine of the police power and would become a fixture in American law.

41.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared among states, local municipalities, and the federal government when it was legislating conduct on federal land and in buildings.[71]  The adoption of the Constitution and the Bill of Rights did not deprive states of their police powers.  Indeed, if it had, the Constitution would not have been ratified and there would be no Second Amendment today.  Ratification was only possible because Federalists offered Anti-Federalists strong assurances that nothing about the new government threatened the traditional scope of the individual state's police power authority, including the authority to regulate guns and gun powder.[72]

42.     Federalists and Anti-Federalists bitterly disagreed over many legal issues, but this one point of accord was incontrovertible.  Brutus, a leading Anti-Federalist, emphatically declared that "[I]t ought to be left to the state governments

---

REVISED STATUTES: 1836 TO 1849, INCLUSIVE 413 (Theron Metcalf & Luther S. Cushing, eds. 1849).

[69] ERNST FREUND, THE POLICE POWER: PUBLIC POLICY AND CONSTITUTIONAL RIGHTS 2, n.2 (1904).

[70] 10 ENCYCLOPEDIA AMERICANA 214 new edition (Francis Lieber ed.).

[71] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).

[72] Saul Cornell, THE OTHER FOUNDERS: ANTIFEDERALISM AND THE DISSENTING TRADITION IN AMERICA, 1788-1828 (1999).

to provide for the protection and defence [sic]of the citizen against the hand of private violence, and the wrongs done or attempted by individuals to each other . . . ."[73]  Federalist Tench Coxe concurred, asserting that: "[t]he states will regulate and administer the criminal law, exclusively of Congress."  States, he assured the American people during ratification, would continue to legislate on all matters related to the police power "such as unlicensed public houses, nuisances, and many other things of the like nature."[74]  State police power authority was at its pinnacle in matters relating to guns or gun powder.[75]

43.    Every aspect of the manufacture, sale, and storage of gun powder was regulated due to the substance's dangerous potential to detonate if exposed to fire or heat.  Firearms were also subject to a wide range of regulations, including laws pertaining to the manufacture, sale, and storage of weapons.[76]

44.    Thus, Massachusetts enacted a law that prohibited storing a loaded weapon in a home, a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb.[77]  New York City even granted broad power to the government to search for gun powder and transfer powder to the public magazine for safe storage:

> it shall and may be lawful for the mayor or recorder, or any two
> Alderman of the said city, upon application made by any inhabitant or
> inhabitants of the said city, and upon his or their making oath of

---

[73] Brutus, *Essays of Brutus VII*, reprinted in 2 THE COMPLETE ANTIFEDERALIST 358, 400–05 (Herbert J. Storing ed., 1981).

[74] Tench Coxe, A Freeman, *Pa. Gazette*, Jan. 23, 1788, reprinted in FRIENDS OF THE CONSTITUTION: WRITINGS OF THE "OTHER" FEDERALISTS 82 (Colleen A. Sheehan & Gary L. McDowell eds., 1998).

[75] CORNELL, *supra* note 34.

[76] Cornell and DeDino, *supra* note 35; public carry by contrast was limited by common law and criminal statutes, see, Cornell, *supra* note 39.

[77] Act of Mar. 1, 1783, ch. XIII, 1783 Mass. Acts 37, An Act in Addition to the Several Acts Already Made for the Prudent Storage of Gun Powder within the Town of Boston, § 2.

reasonable cause of suspicion (of the sufficiency of which the said mayor or recorder, or Aldermen, is and are to be the judge or judges) to issue his or their warrant or warrants, under his or their hand and seal, or hands and seals for searching for such gun powder, in the day time, in any building or place whatsoever.[78]

45.     New Hampshire further enacted a law in 1825 penalizing the sale or offer to sell "by retail any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common."[79]

46.     Other examples of state laws delegating authority to local governments to regulate the sale of gunpowder for public safety include but are not limited to:

    a.  1845 Iowa Laws 119, An Act to Incorporate and Establish the City of Dubuque, chap 123, § 12 (delegating authority to cities "to regulate by ordinance the keeping and sale of gunpowder within the city");

    b.  An Act Incorporating the Cities of Hartford, New Haven, New London, Norwich and Middletown, 1836 Conn. Acts 105 (Reg. Sess.), chap. 1, § 20 (delegating authority to "prohibit[] and regulat[e] the bringing in, and conveying out" of gunpowder);

    c.  An Act to Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, and to Amend the Same, 1847 Ind. Acts 93, chap 61, § 8,  pt. 4 (delegating authority "[t]o regulate and license, or provide by ordinance for regulating and licensing . . . the keepers of gunpowder").[80]

---

[78] An Act to Prevent the Storing of Gun Powder, within in Certain Parts of New York City,  2 LAWS OF THE STATE OF NEW-YORK, COMPRISING THE CONSTITUTION, AND THE ACTS OF THE LEGISLATURE, SINCE THE REVOLUTION, FROM THE FIRST TO THE FIFTEENTH SESSION, INCLUSIVE at 191-2 (Thomas Greenleaf, ed., 1792).

[79] 1825 N.H. Laws 74, ch. 61, § 5.

[80] *See also* Survey of Relevant Historical Analogues at Exhibit 31, filed

47.    The purpose of these gunpowder regulations was to promote public safety.  Early American governments recognized the danger posed by gun powder and regulated every aspect of its production, sale, and storage.  Early American governments also regulated shooting galleries for similar reasons.[81]

48.    There were also "proving" laws that required the inspection of gunpowder. In 1809, Massachusetts established requirements for the quality and composition of gunpowder; authorized the appointment of provers to inspect gunpowder before it was placed in any public magazine; required provers to place gunpowder that passed inspection in casks marked with the inspector's initials; authorized inspectors to mark as "condemned" gunpowder that failed inspection; and forbade the sale of gunpowder that was marked condemned or that had not yet passed inspection.[82]  Four other states, including Rhode Island, New Jersey, New Hampshire, and Pennsylvania, adopted similar gunpowder inspection laws in the late eighteenth and early nineteenth centuries.[83]

---

concurrently with this declaration.

[81] John C. White, Digest of the Laws and Ordinances of the Parish of East Feliciana, Adopted by the Police Jury of the Parish Page 80 (1848); Ordinances and Joint Resolutions of the City of San Francisco; Together with a List of the Officers of the City and County, and Rules and Orders of the Common Council Page 220 (1854); Chas. Ben. Darwin, Ordinances of the City of Burlington, with Head Notes and an Analytic Index Page 149-150 (1856) ; Rhode Island: 1851 R.I. Pub. Laws 9, An Act In Amendment Of An Act Entitled An Act Relating To Theatrical Exhibitions And Places Of Amusement, §§ 1-2; Samuel Ames, The Revised Statutes of the State of Rhode Island and Providence Plantations: To Which are Prefixed, The Constitutions of the United States and of the State Page 204-205(1857); William H. Bridges, Digest of the Charters and Ordinances of the City of Memphis, Together with the Acts of the Legislature Relating to the City, with an Appendix Page 148-149 (1863*); Henry Jefferson Leovy, The Laws and General Ordinances of the City of New Orleans, Together with the Acts of the Legislature, Decisions of the Supreme Court. And Constitutional Provisions Relating to the City Government. Revised and Digested, Pursuant to an Order of the Common Council. New Edition Page 257 (1870); Exh. 31*.

[82] 1808 Mass. Acts 444, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder.

[83] 1776 R.I. Pub. Laws 25 (Oct. Sess.); 1776-77 N.J. Laws 6-7, ch. 6; 1820 N.H. Laws 274, ch. 25; 1794 Pa. Laws 764, ch. 337; Exh. 31.

49.     The application of the police power to firearms and ammunition was singled out as the quintessential example of state police power by Chief Justice John Marshall in his 1827 discussion of laws regulating gun powder in *Brown v. Maryland.*[84]  This was so even though gunpowder was essential to the operation of firearms at that time and gun powder regulations necessarily affected the ability of gun owners to use firearms for self-defense, even inside the home.

50.     A slow process of judicializing this concept of police, transforming the Founding era's idea of a "police right" into a judicially enforceable concept of the "police power" occurred beginning with the Marshall Court and continuing with the Taney Court.[85]

51.     Nor was Chief Justice John Marshall unique in highlighting the centrality of this idea to American law.[86]  The ubiquity of the police power framework for evaluating the constitutionality of legislation regarding firearms reflected the centrality of this approach to nearly every question of municipal legislation touching health or public safety in early America.[87]  Massachusetts

---

[84] 25 U.S. (12 Wheat.) 419, 442-43 (1827) ("The power to direct the removal of gunpowder is a branch of the police power").

[85] Eras of Supreme Court history are typically defined by the tenure of the Chief Justice. The Marshall Court Period covered the years 1801-1835. For a brief overview, *see* "The Marshall Court, 1801-1835", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-court-history-of-the-courts-the-marshall-court-1801-1835/. The Taney Court period covered the years 1836-1864**.** See "The Taney Court, 1836-1864", SUPREME COURT HISTORICAL SOCIETY (last visited Oct. 5, 2022), https://supremecourthistory.org/history-of-the-court-history-of-the-courts/history-of-the-courts-history-of-the-courts-the-taney-court-1836-1864/**.**

[86] In the extensive notes he added as editor of the 12th edition of James Kent's classic *Commentaries an American Law*, Oliver Wendell Holmes, Jr., wrote that regulation of firearms was the *locus classicus* of the police power. *See* 2 JAMES KENT COMMENTARIES ON AMERICAN LAW (340) 464 n.2 (Oliver Wendell Holmes, Jr., ed. 12 ed. 1873).

[87] FREUND, *supra* note 69, at 2, n.2 (1904). WILLIAM J. NOVAK, THE PEOPLE'S WELFARE: LAW AND REGULATION IN NINETEENTH-CENTURY AMERICA (1996); Christopher Tomlins, *To Improve the State and Condition of Man: The Power to*

Judge Lemuel Shaw, one of the most celebrated state jurists of the pre-Civil War era elaborated this point in his influential 1851 opinion in *Commonwealth v. Alger,* a decision that became a foundational text for lawyers, judges, and legislators looking for guidance on the meaning and scope of the police power.  Shaw described the police power in the following manner:

> [T]he power vested in the legislature by the constitution, to make, ordain and establish all manner of wholesome and reasonable laws, statutes and ordinances, either with penalties or without, not repugnant to the constitution, as they shall judge to be for the good and welfare of the commonwealth, and of the subjects of the same. It is much easier to perceive and realize the existence and sources of this power, than to mark its boundaries, or prescribe limits to its exercise.  There are many cases in which such a power is exercised by all well-ordered governments, and where its fitness is so obvious, that all well regulated minds will regard it as reasonable. Such are the laws to prohibit the use of warehouses for the storage of gunpowder.[88]

52.     In short, there was unanimous agreement among leading antebellum jurists, at both the federal and state level, that the regulation of arms and gun powder was at the core of the police power enjoyed by legislatures.  Indeed, the scope of government power to regulate, prohibit, and inspect gunpowder has been among the most far reaching of any exercise of the police power throughout American history.[89]  A Maine law enacted in 1821 authorized town officials to enter any building in town to search for gun powder:

> Be it further enacted, That it shall, and may be lawful for any one or more of the selectmen of any town to enter any building, or other place, in such town, to search for gun powder, which they may have

---

*Police and the History of American Governance*, 53 BUFF. L. REV. 1215 (2005); DUBBER, *supra* note 12; GARY GERSTLE, LIBERTY AND COERCION: THE PARADOX OF AMERICAN GOVERNMENT, FROM THE FOUNDING TO THE PRESENT (Princeton Univ. Press, 2015).

[88] *Commonwealth v. Alger*, 61 Mass. (7 Cush.) 53 (1851).  For another good discussion of how state jurisprudence treated the concept, *see Thorpe v. Rutland*, 27 Vt. 140, 149 (1855).

[89] CORNELL, THE POLICE POWER, *supra* note 32.

reason to suppose to be concealed or kept, contrary to the rules and
regulations which shall be established in such town, according to the
provisions of this Act, first having obtained a search warrant therefore
according to law.[90]

53.    No jurisdiction enumerated the full contours of the police power they

possessed in a single text or in a single statute or ordinance.  Rather, it was well

understood that the exercise of this power would need to adapt to changing

circumstances and new challenges as they emerged.  This conception of law was

familiar to most early American lawyers and judges who had been schooled in

common law modes of thinking and analysis.[91]  Throughout the long sweep of

Anglo-American legal history, government applications of the police power were

marked by flexibility, allowing local communities to adapt to changing

circumstances and craft appropriate legislation to deal with the shifting challenges

they faced.[92]  This vision of the police power was articulated forcefully by the

Supreme Court in the License Cases when Justice McClean wrote this about the

scope of state police power:

> It is not susceptible of an exact limitation, but must be exercised under
> the changing exigencies of society. In the progress of population, of
> wealth, and of civilization, new and vicious indulgences spring up, which
> require restraints that can only be imposed by new legislative power.
> When this power shall be exerted, how far it shall be carried, and where it
> shall cease, must mainly depend upon the evil to be remedied.[93]

54.    One of the most important early American gun-related cases discussed

in *Heller*, *State v. Reid*, offers an excellent illustration of the way police power

jurisprudence was used by antebellum judges to adjudicate claims about gun rights

---

[90] 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the
Safe Keeping of Gun Powder, chap. 25, § 5.

[91] KUNAL M. PARKER, COMMON LAW HISTORY, AND DEMOCRACY IN
AMERICA, 190-1900: LEGAL THOUGHT BEFORE MODERNISM (2013).

[92] William J. Novak, *A State of Legislatures*, 40 POLITY 340 (2008).

[93] *License Cases (Thurlow v. Massachusetts; Fletcher v. Rhode Island; Peirce
v. New Hampshire),* 5 How. (46 U.S.) 504, 592 (1847).

and the right of the people to regulate.[94]  The case is a classic example of antebellum police power jurisprudence.  The Supreme Court of Alabama evaluated the statute by focusing on the scope of state police power authority over guns.  "The terms in which this provision is phrased," the court noted, "leave with the Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[95]  In the court's view, the regulation of arms was at the very core of state police power.[96]  The judicial determination was straightforward: was the challenged law a legitimate exercise of the police power or not?

## IV.  RECONSTRUCTION AND THE EXPANSION OF STATE POLICE POWER TO REGULATE FIREARMS (1863-1877)

55.    Founding-era constitutions treated the right of the people to regulate their internal police separately from the equally important right of the people to bear arms.  These two rights were separate in the Founding era but were mutually reinforcing: both rights were exercised in a manner that furthered the goal of ordered liberty.  Reconstruction-era constitutions adopted a new textual formulation of the connection between these two formerly distinct rights, fusing the two together as one single constitutional principle.  This change reflected two profound transformations in American politics and law between 1776 and 1868.  First, the judicial concept of police power gradually usurped the older notion of a police right grounded in the idea of popular sovereignty.  As a result, state constitutions no

---

[94] *See State* v. *Reid,* 1 Ala. 612, 612 (1840).

[95] *Id.* at 616.

[96] Apart from rare outlier decisions, such as *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90, 92 (1822) courts employed a police power framework to adjudicate claims about the scope of state power to regulate arms.  For a useful discussion of *Bliss* in terms of the police power, *see* FREUND, *supra* note 69, at 91.

longer included positive affirmations of a police right.  Secondly, the constitutional
"mischief to be remedied" had changed as well.[97]  Constitution writers in the era of
the American Revolution feared powerful standing armies and sought to entrench
civilian control of the military.  By contrast, constitution writers in the era of the
Fourteenth Amendment were no longer haunted by the specter of tyrannical Stuart
Kings using their standing army to oppress American colonists.  In place of these
ancient fears, a new apprehension stalked Americans: the proliferation of especially
dangerous weapons and the societal harms they caused.[98]

56.    The new language state constitutions employed to describe the right to
bear arms enacted during Reconstruction responded to these changed circumstances
by adopting a new formulation of the venerable right codified in 1776, linking the
right to bear arms inextricably with the states broad police power to regulate
conduct to promote health and public safety.[99]  For example, the 1868 Texas
Constitution included new language that underscored the indissoluble connection
that Anglo-American law had long recognized between the right to keep and bear
arms and regulation of guns.  "Every person shall have the right to keep and bear
arms, in the lawful defence of himself or the government, under such regulations as

[97] The mischief rule was first advanced in *Heydon's Case*, (1584) 76 Eng.
Rep. 637 (KB) — the legal principle that the meaning of a legal text was shaped by
an understanding of the state of the common law prior to its enactment and the
mischief that the common law had failed to address and legislation had intended to
remedy — continued to shape Anglo-American views of statutory construction, and
legal interpretation more generally, well into the nineteenth century.  For
Blackstone's articulation of the rule, see 1 BLACKSTONE, *supra* note 8, at *61.  The
relevance of common law modes of statutory construction to interpreting
antebellum law, including the mischief rule, is clearly articulated in 1 ZEPHANIAH
SWIFT, A DIGEST OF THE LAWS OF THE STATE OF CONNECTICUT 11 (New Haven, S.
Converse 1822).  For a modern scholarly discussion of the rule, *see* Samuel L.
Bray, *The Mischief Rule*, 109 GEO. L.J. 967, 970 (2021).

[98] *See McDonald*, 561 U.S. at 767–68.

[99] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth
Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War
America*, 55 U.C. DAVIS L. REV. 65 (2022).

the Legislature may prescribe."[100]  Texas was not an outlier in this regard.  Sixteen state constitutions adopted during this period employed similarly expansive language.[101]  Millions of Americans living in the newly organized western states and newly reconstructed states of the former confederacy adopted constitutional provisions that reflected this new formulation of the right to bear arms.  Thus, millions of Americans were living under constitutional regimes that acknowledged that the individual states' police power authority over firearms was at its apogee when regulating guns.[102]

57.     This expansion of regulation was entirely consistent with the Fourteenth Amendment's emphasis on the protection of rights and the need to regulate conduct that threatened the hard-won freedoms of recently free people of the South and their Republican allies.  The goals of Reconstruction were therefore intimately tied to the passage and enforcement of racially neutral gun regulations.[103]

58.     Reconstruction ushered in profound changes in American law, but it did not fundamentally alter the antebellum legal view that a states' police powers were rooted in the people's right to make laws to protect the peace and promote public safety.  Nor did Reconstruction challenge the notion that these powers were at their zenith when dealing with guns and gun powder.  In fact, the Republicans who wrote the Fourteenth Amendment were among the most ardent champions of

---

[100] TEX. CONST. OF 1868, Art. I, § 13; for similarly expansive constitutional provision enacted after the Civil War, see IDAHO CONST. OF 1889, art. I, § 11 ("The people have the right to bear arms for their security and defense; but the legislature shall regulate the exercise of this right by law."); UTAH CONST OF 1896, art. I, § 6 ("[T]he people have the right to bear arms for their security and defense, but the legislature may regulate the exercise of this right by law.").

[101] Cornell, supra note 99, at 75–76.

[102] Id.

[103] ERIC FONER, THE SECOND FOUNDING: HOW THE CIVIL WAR AND RECONSTRUCTION REMADE THE CONSTITUTION (2019); Brennan Gardner Rivas, Enforcement of Public Carry Restrictions: Texas as a Case Study, 55 U.C. DAVIS L. REV. 2603 (2022).

an expansive view of state police power.  As heirs to the antebellum Whig vision of
a well-regulated society, Reconstruction-era Republicans used government power
aggressively to protect the rights of recently freed slaves and promote their vision
of ordered liberty.[104]

59.    Indeed, the passage of the Fourteenth Amendment was premised on the
notion that the individual states would not lose their police power authority to the
federal government.  The author of Section One of the Fourteenth Amendment,
John Bingham, reassured voters that the states would continue to bear the primary
responsibility for "local administration and personal security."[105]  As long as state
and local laws were racially neutral and favored no person over any other, the
people themselves, acting through their representatives, were free to enact
reasonable measures necessary to promote public safety and further the common
good.[106]

60.    It would be difficult to understate the impact of this new paradigm for
gun regulation on post-Civil War legislation.  Across the nation legislatures took
advantage of the new formulation of the right to bear arms included in state
constitutions and enacted a staggering range of new laws to regulate arms.  Indeed,
the number of laws enacted skyrocketed, increasing by over four hundred percent

---

[104] Robert J. Kaczorowski, *Congress's Power to Enforce Fourteenth
Amendment Rights: Lessons from Federal Remedies the Framers Enacted*, 42
HARV. J. ON LEGIS. 187 (2005); Christopher Tomlins, *To Improve the State and
Condition of Man: The Power to Police and the History of American Governance*
53 BUFFALO L. REV. 1215 (20052006).

[105] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867), as
quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of
the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L.
REV. 1043, 1058 (2010).

[106] For a discussion of how the courts wrestled with the meaning of the
Amendment, *see* WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM
POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

from antebellum levels.[107]  Not only did the number of laws increase, but the number of states and localities passing such laws also expanded.[108]

61.     Henry Campbell Black, the author of *Black's Law Dictionary*, described the police power as "inalienable" and echoed the view of a long line of jurists who noted that the scope of the power was not easily defined and the determination of its limits was best left to courts on a case-by-case basis.[109]  Indeed, even the most ardent critics of the police power, such as conservative legal scholar Christopher G. Tiedeman, acknowledged that "police power of the State extends to the protection of the lives, limbs, health, comfort and quiet of all persons, and the protection of all property within the State."[110]

62.     In keeping with the larger goals of Reconstruction, Republicans sought to protect the rights of African Americans to bear arms but were equally insistent on enacting strong racially neutral regulations aimed at public safety.  Violence directed against African Americans, particularly the campaign of terror orchestrated by white supremacist para-military groups prompted Republican dominated legislatures in the Reconstruction South to pass a range of racially neutral gun regulations.[111]  The racially neutral gun laws enacted by Republicans were in part a reaction to the discriminatory black codes passed by neo-confederate legislatures earlier in Reconstruction.  The Black Codes violated the Second Amendment, but

---

[107] *See* Spitzer, *supra* note 36, at 59–61 tbl. 1.

[108] *Id.*

[109] HENRY CAMPBELL BLACK, HANDBOOK OF CONSTITUTIONAL LAW, 334–344 (2d ed., 1897).

[110] CHRISTOPHER G. TIEDEMAN, A TREATISE ON THE LIMITATIONS OF THE POLICE POWER IN THE UNITED STATES 4–5 (1886) (citing *Thorpe v. Rutland R.R.*, 27 Vt. 140, 149-50 (1854)).

[111] Mark Anthony Frassetto, *The Law and Politics of Firearms Regulation in Reconstruction Texas*, 4 TEX. A&M L. REV. 95, 113–17 (2016); Brennan G. Rivas, *An Unequal Right to Bear Arms: State Weapons Laws and White Supremacy in Texas, 1836-1900*, 121 SOUTHWESTERN QUARTERLY 284 (2020).

1   the wave of firearms legislation passed by Republican controlled state legislatures

2   in the South were consciously crafted to honor the Second Amendment and protect

3   individuals from gun violence.[112]

4        63.     The laws enacted during Reconstruction underscore the fact that robust

5   regulation of firearms during Reconstruction was not a novel application of the

6   police power, but an expansion and continuation of antebellum practices. Moreover,

7   these efforts illustrated a point beyond dispute: the flexibility inherent in police

8   power regulations of guns.  American states had regulated arms since the dawn of

9   the republic and Reconstruction simply renewed America's commitment to the idea

10  of well-regulated liberty.

11       64.     Another important change relevant to understanding firearms

12  regulation in the Reconstruction era derives from changes in firearms technology,

13  specifically the profoundly increased lethality of weapons manufactured at that

14  time.  By the ratification of the Fourteenth Amendment, firearms became more

15  deadly, lighter, easier to use, more accurate, and required far less training to be

16  effective than did the muskets of the eighteenth century.  Although comparisons of

17  weapons from different eras is inherently subjective, one effort to compile a

18  comparative lethality index for military weapons is instructive.  Military historian

19  and defense analyst Trevor DuPuy's theoretical lethality index captures the

20  exponential growth in the lethality of battlefield firearms between the era of the

21  Second Amendment and the Fourteenth and beyond.  Of course, the lethality index,

22  an intellectual construct developed to compare weapons on the battlefield offers an

23  imperfect gauge for the increased lethality of modern weapons in a civilian context.

24  The improvements associated with weapons in the Civil War era were significant,

25         [112] *See* Darrell A. H. Miller, *Peruta, The Home-Bound Second Amendment,*

26  *and Fractal Originalism,* 127 HARV. L. REV. 238, 241 (2014); *see also* Robert J.
    Kaczorowski, *Congress's Power to Enforce Fourteenth Amendment Rights:*

27  *Lessons from Federal Remedies the Framers Enacted*, 42 HARV. J. ON LEGIS. 187,
    205 (2005) (discussing Republican use of federal power to further their aims,

28  including to enforce the Fourteenth Amendment).

**Dupuy's Theoretical Lethality Index[74]**

| Weapon | TLI |
|---|---|
| Sword, pike, etc. | 23 |
| Longbow | 36 |
| 17th c. musket | 19 |
| 18th c. flintlock | 43 |
| Early 19th c. rifle | 36 |
| Mid-19th c. rifle/conoidal bullet | 102 |
| Late 19th c. breech-loading rifle | 153 |
| Springfield Model 1903 rifle (magazine) | 495 |
| World War I machine gun | 3,463 |
| World War II machine gun | 4,973 |

but they pale in comparison to the carnage that that modern semi-automatic weapons can inflict in densely populated areas and sensitive places.  Nevertheless, Depuy's innovative and useful scale, designed for battlefield comparisons invariably understates the increase in the level of  destruction today's weapons can inflict upon a civilian population. [113]The expansion of gun laws after the Civil War, in part, reflects the improvements in firearms lethality and their wider availability to the civilian population. The ease of use of these weapons compared to earlier firearms also increased their popularity.  The rise of easily concealed weapons, especially pocket pistols, contributed to rising urban crime and violence.  The expansion of arms in the post-Civil War era made these and other arms more readily available for use in crimes of violence so states and localities enacted laws to regulate the baneful consequences of arms proliferation.[114]

## V.   *BRUEN*'S FRAMEWORK AND THE SCOPE OF PERMISSIBLE REGULATION

65.    The power to regulate and in some cases prohibit dangerous or unusual weapons has always been central to the police power authority of states and localities.[115]

---

[113] Darrell Miller and Jennifer Tucker, *Common Use Lineage, and Lethality* 55 U.C DAVIS. L. REV 2495, 2509 (2022).

[114] Cornell, *supra* note 99.

[115] Spitzer, *supra* note 36.

37

66.     Political scientist Robert Spitzer's overview of the history of firearms regulation underscores a basic point about American law: "The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted."[116]  States and localities have regulated arms and ammunition since the earliest days of the American Republic.  The statutes at issue in this case are analogous to a long-established tradition of firearms regulation in America, beginning in the colonial period and stretching across time to the present.  This venerable tradition of using police power authority to craft specific laws to meet shifting challenges has continued to the present day.[117]  The adaptability of state and local police power provided the flexibility governments needed to deal with the problems created by changes in firearms technology and gun culture.

---

[116] *Id.*

[117] GERSTLE, *supra* note 87.

1

2

3    I declare under penalty of perjury that the foregoing is true and correct.

4        Executed on February  23 2023 at Palo Alto, California.

5

6                          *Saul Cornell*
                    _____

7                              Saul Cornell

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# DEFENDANT'S EXHIBIT 31

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| **Founding Era to the Civil War** | | | | |
| 1757-68 | Maryland | *Md. Acts 53, An Act Prohibiting All Trade With The Indians, For The Time Therin Mentioned, § 3[1]* | That it shall not be lawful for any person or persons within this Province, to sell or give to any Indian Woman or Child, any gunpowder, shot, or lead, whatsoever, nor to any Indian Man within this province, more than the quantity of one pound of gunpowder and six pounds of shot or lead, at any one time, and not those, or lesser quantities of powder or lead oftener than once in Six months, under the Penalty of Five Pounds Current Money for every pound of gunpowder. | Gunpowder |

---

[1] Laws such as this which were based on race, nationality, or enslaved status were enacted before ratification of the Thirteenth and Fourteenth Amendments, are morally repugnant, and would obviously be unconstitutional today.  They are provided only as evidence of a regulatory tradition that the courts have already recognized.  The Attorney General in no way condones laws that target certain groups on the basis of race, gender, nationality, or other protected characteristic, but these laws are part of the history of the Second Amendment and may be relevant to determining the traditions that define its scope, even if they are inconsistent with other constitutional guarantees.  *See New York State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2150-2151 (2022) (citing *Dred Scott v. Sandford*, 19 How. 393 (1857) (enslaved party)).  Reference to a particular historical analogue does not endorse the analogue's *application* in the past.  Rather, it can confirm the *existence* of the doctrine and corresponding limitation on the Second Amendment right.  *See* William Baude & Stephen E. Sachs, *Originalism & the Law of the Past*, 37 L. & Hist. Rev. 809, 813 (2019) ("Present law typically gives force to past *doctrine*, not to that doctrine's role in past society."); *see also* Adam Winkler, *Racist Gun Laws and the Second Amendment*, 135 Harv. L. Rev. F. 537, 539 (2022) ("Yet there will arise situations in which even a racially discriminatory gun law of the past might provide *some* basis for recognizing that lawmakers have a degree of regulatory authority over guns.")

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| 1775 | New Hampshire | *8 Documents and Records Relating to the State of New Hampshire During the Period of the American Revolution from 1776-1783 at 15-16 (Nathaniel Bouton ed. 1874), Jan. 12, 1775.* | Requiring each firearm sold in the colony to possess certain specifications and pass inspection involving the safe firing of the gun | Firearm proving |
| 1775 | Maryland | *Resolution of the Maryland Council of Safety, August 19, 1775* | Approving purchase of muskets with detailed manufacturing specifications and requiring that they be proved before purchase | Firearm proving |
| 1775 | Pennsylvania | *Resolution of the Pennsylvania Committee on Safety, Oct. 27, 1775, Col. Rec. Penn. 10:383* | Requiring that all muskets be "proved" prior to purchase | Firearm proving |
| 1776 | New Jersey | *"Act for the Inspection of Gunpowder", 1776-1777, N.J. Laws 6, ch. 6* | Required the inspection of gunpowder prior to sale, and appointed state inspectors to "mark" lots that passed inspection. | Gunpowder |
| 1776 | Rhode Island | *"An Act for the Inspection of Gunpowder Manufactured Within This State" 1776 R.I. Public Laws 25 (Oct. Session)* | Requiring that before gunpowder could be sold it needed to pass inspection or adhere to certain safety standards | Gunpowder |
| 1776 | Continental Army | E. Wayne Carp's To Starve The Army At Pleasure: Continental Army Administration And American Political Culture, 1775-1783 (1984) at 66-67 | George Washington ordered all Continental Army firearms stamped with an insignia: "U.S.XIII." in order to make it easier to identify cases where arms were being | Firearm proving |

2

**Boland, Lance, et al. v. Robert Bonta, et al.**, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | | illegally sold in a secondary market to private individuals | |
| 1780 | Continental Army | *Letter from George Washington to Henry Knox (Nov. 30, 1780), in The Writings of George Washington from the Original Manuscript Sources 1745-1799 (John C. Fitzpatrick, ed.)* | "I think it will be best for you to give orders to the Officer superintending the Laboratory to have the Barrels sufficiently proved before they are delivered to Mr. Buel, as I suspect that they are most of them of the trash kind which Mr. ... Lee charges Mr. Deane[']s Agent with purchasing." | Firearm proving |
| 1794 | Pennsylvania | *Pa. Laws 764, An Act Providing For The Inspection Of Gunpowder chap. 337* | Whereas gun-powder imported from abroad, and manufactured within this state, have frequently been found to vary much in its strength, and sometimes of inferior qualities, and its defects not discovered until brought into actual use : and whereas the modes herefore rules to prove the force thereof have been found uncertain and variable; and whereas Joseph Leacock, of the city of Philadelphia, hath invented an engine, called a pendulum powder proof, with a graduated arch and catch pall, by which it is conceived that the force of gunpowder | Gunpowder |

**Boland, Lance, et al. v. Robert Bonta, et al.**, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | | may be proved by experiment, and the article reduced to certain and uniform standards of strength, whereby the manufacture may be advanced towards ultimate perfection, and the purchaser and consumer protected against fraud and imposition. | |
| 1805 | Massachusetts | *1804 Mass. Acts. 111, ch. 81, An Act to Provide for the Proof of Fire Arms Manufactured Within this Commonwealth.* | To prevent harm to residents from the sale of unsafe firearms. The law required the appointment of inspectors, up to two per county, who would "prove," i.e. test and inspect, all musket barrels and pistol barrels. The law detailed the manner in which these inspections were to be conducted, which included testing the firearm to ensure it would not fail and that it could carry a shot over a certain distance. If the firearm passed inspection, then the inspector would stamp it with the inspector's initials and the year onto the barrel so that the stamp could not be erased or disfigured. | Firearm proving |
| 1811 | New Hampshire | *N.H. Laws 74, An Act To Regulate The Keeping And Selling,* | That if any person or persons shall sell or offer for sale by retail | Gunpowder |

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | *And Transporting Of Gunpowder, chap. 61, § 5* | any gunpowder in any highway, or in any street, lane, or alley, or on any wharf, or on parade or common, such person so offending shall forfeit and pay for each and every offense a sum not more than five dollars nor less than one dollar, to be recovered and applied as aforesaid. | |
| 1811 | New Jersey | *N.J. Laws 300, An Act To Regulate Gun Powder Manufactories And Magazines Within This State* | No person or persons whatsoever shall be permitted within this state to erect or establish or cause to be erected or established any manufactory which shall be actually employed in manufacturing gun powder either by himself or any other person, either on his own land or another, within the distance of a quarter of a mile from any dwelling house, barn or out house, without the consent under hand and seal of all and every the owner or owners of such dwelling house. | Gunpowder |
| 1814 | Massachusetts | *1814 Mass. Acts 464, An Act In Addition To An Act, Entitled "An Act To Provide For The Proof Of Fire Arms, Manufactured Within This* | § 1 ("All musket barrels and pistol barrels, manufactured within this Commonwealth, shall, before the same shall be sold, and before the | Firearm proving |

5

**Boland, Lance, et al. v. Robert Bonta, et al., No. 8:22-cv-01421-CJC-ADS**
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | *Commonwealth," ch. 192,* | same shall be stocked, be proved by the person appointed according to the provisions of an act . . .. . .."); § 2 ("That if any person of persons, from and after the passing of this act, shall manufacture, within this Commonwealth, any musket or pistol, or shall sell and deliver, or shall knowingly purchase any musket or pistol, without having the barrels first proved according to the provisions of the first section of this act, marked and stamped according the provisions of the first section of the act.") | |
| 1820 | New Hampshire | *N.H. Laws 274, An Act To Provide For The Appointment Of Inspectors And Regulating The Manufacture Of Gunpowder, chap XXV, §§ 1-9* | The Governor is herby authorized to appoint an inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state § 2. And be it further enacted that from and after the first day of July next, all gunpowder which shall be manufactured within this estate shall be composed of the following proportions and quality of materials. . . § 3. It shall be the duty of each of said inspectors | Gunpowder |

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | | to inspect examine and prove all gunpowder which after the first day of July shall not be deposited at any public powder magazine, or manufactory of this state. . . § 4: No gunpowder within this state shall be considered to be of proof unless one ounce thereof, placed in a chamber of a four inch howitzer and elevated so as to form an angle of forty five degrees with the horizon, will, upon being fired throw a twelve pound shot seventy five yards at the lease. § 5: When ever any of said inspectors shall discover any gunpowder, deposited at any public powder magazine, or any other place within this state, which is not well manufactured or which is composed of impure materials . . . the inspector in such case, shall mark each cask containing such impure ill manufactured or deficient gunpowder. § 6. If any person shall knowingly sell any condemned gunpowder . . . every such person, so offending , shall forfeit and pay not less | |

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | | than two hundred dollars nor more than five hundred dollars. . . § 7. Each inspector . . . be shown to the faithful and impartial discharge of the duties of his office, and each inspector one cent for each pound gunpowder, by him examined inspected and proved § 8. That if any manufacturer of gunpowder meant to be sold inspected . . . shall forfeit . . . not less than two dollars . . . § That if any person with within this state . . shall knowingly . . . shall forfeit not less than 5 dollars nor more than 500 dollars. | |
| 1821 | Maine | 1821 Laws of the State of Maine 685-86, vol. 2, § 3, An Act to Provide for the Proof of Fire Arms. | Required the governor to appoint inspectors of firearms who would then ensure that firearms met certain safety standards and stamped prior to their sale. | Firearm Proving |
| 1836 | Connecticut | Acts 105 (Reg. Sess.) An Act Incorporating The Cities of Hartford, New Haven, New London, Norwich and Middletown, chap. 1, § 20 | Relative to prohibiting and regulating the bringing in, and conveying out, or storing of gunpowder in said cities. | Gunpowder |
| 1845 | Iowa | *Iowa Laws 119, An Act to Incorporate and Establish the City of* | They shall have power from time to time to make and publish all such laws and | Gunpowder |

**Boland, Lance, et al. v. Robert Bonta, et al., No. 8:22-cv-01421-CJC-ADS**
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | *Dubuque, chap 123, § 12* | ordinances as to them shall seem necessary to provide for the safety, preserve health, promote the prosperity and improve the morals, order, comfort and convenience of said city, and the inhabitants thereof, to impose fines, forfeitures and penalties on all persons offending against the laws and ordinances of said city, and provide for the prosecution, recovery and collection thereof, and shall have power to regulate by ordinance the keeping and sale of gunpowder within the city. | |
| 1847 | Indiana | *Ind. Acts 93, An Act To Reduce the Law Incorporating the City of Madison, and the Several Acts Amendatory thereto Into One Act, And To Amend the Same, chap 61, § 8, pt. 4* | To regulate and license, or provide by ordinance for regulating and licensing for the keepers of gunpowder and other explosive compounds. | Gunpowder |
| 1849 | Ohio | *Ohio Laws 408, An Act To Incorporate The Town Of Ripley In The County Of Brown, § 4* | That the said town council of Ripley shall have power to ordain and establish laws and ordinances . . . to regulate the sale of gunpowder therein. | Gunpowder |
| 1859 | Massachusetts | 1 The General Statutes of the Commonwealth of Massachusetts: Enacted December 28, | Renewing and updating firearm proving and gunpowder safety inspection laws | Firearm proving |

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | 1859, to Take Effect June 1, 1860 (2d ed., William A. Richardson & George P. Sanger, eds.) 255 (1873) | | |
| 1865 | Vermont | *Vt. Acts & Resolves 213, An Act To Amend An Act Entitled "An Act To Incorporate The Village Of Rutland,:" Approved November 15, 1847, § 10* | …and said fire wardens may inspect the manner of manufacturing and keeping gun-powder, lime, ashes, matches, lights, fire-works of all kinds, and other combustibles, . . . and said fire-wardens may , if they deem the same to be dangerous, order the persons manufacturing and keeping such gun powder . . . in what manner to manufacture and keep the same. | Gunpowder |
| 1867-68 | Tennessee | *Tenn. Pub. Acts 26, An Act To Amend The Charter Of The City Of Memphis, And For Other Purposes, pt. 20* | To provide for the prevention and extinguishment of fires . . . to regulate and prevent carrying on manufactures dangerous in causing or producing fire . . . | Gunpowder |
| **Reconstruction Era and Post-14th Amendment to 1899** | | | | |
| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
| 1866 | New Jersey | *1886 N.J. Laws 358, An Act To Regulate The Manufacture And Storage Of Gun Powder, Dynamite And Other Explosive, § 1* | No person or persons or corporations shall after the passage of this act, be permitted within this state to erect, have or maintain, or cause to | Gunpowder |

10

**Boland, Lance, et al. v. Robert Bonta, et al.**, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | | be erected, had or maintained any establishment, storehouse or building in which in which shall be manufactured, stored or kept any gun powder, blasting powder, dualin, dynamite, forcite, giant powder, nitro-glycerine, or any powder or materials of which nitro-glycerine is an essential ingredient or forms a component part, or any other explosive within the distance of one thousand feet from any public road… | |
| 1869 | Nebraska | *Neb. Laws 53, An Act To Incorporate Cities Of The First Class In The State Of Nebraska, § 47* | The City Council shall have power to license all . . . vendors of gunpowder | Gunpowder |
| 1871 | Maine | The Revised Statutes of the State of Maine, Passed January 25, 1871 326 (1871) | Renewing and updating firearm proving and gunpowder safety inspection laws | Firearm proving |
| 1874 | Kentucky | *Ky. Acts 327, An Act to Revise and Amend the Charter of the City of Newport, § 6* | To prohibit the manufacture of gunpowder or other explosive, dangerous or noxious compounds or substances in said city, and to regulate their sale and storage by license. | Gunpowder |

***Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS**
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| 1883 | California | *Cal. Stat. 156, § 153* | The Municipal Council shall provide by ordinance for the payment into a "Fireman's Charitable Fun" of such city, or city and county, of all moneys received for licenses for the storage, manufacture, or sale of gunpowder, blasting powder, gun cotton, fireworks, nitro-glycerine, dualine, or any explosive oils or compounds, or as a municipal tax upon the same; slao all fines collected in the police court for violations of fire ordinances. | Gunpowder |
| 1885 | Rhode Island | *R.I. Pub. Laws 6, An Act In Amendment Of And in Addition To Chapter 242 Of The Public Statutes, Entitles "Of Offenses Against Private Property." § 1* | Every person who shall knowingly deliver or cause to be delivered to any person or carrier any box, can or other package of nitro-glycerine, gunpowder, naptha or other equally explosive material, not marked with a plain and legible label describing its contents, or who shall remove or cause to be removed any such label or mark shall be fined not more than ten thousand dollars or imprisoned not more than five years. | Gunpowder |

**Boland, Lance, et al. v. Robert Bonta, et al.**, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| 1889 | Ohio | *Ohio Laws 164, An Act To Amend Section 2669 Of The Revised Statutes, As Amended April 22, 1885, § 2669* | The council of the city or village may provide by ordinance for licensing all exhibiters of shows or performances of any kind, not prohibited by law, hawkers, peddlers, auctioneers of horses and other animals on the highways or public grounds of the corporation, vendors of gun powder and other explosives, taverns and houses of public entertainment, and hucksters in the public streets or markets, and in granting such license, may extract and receive such sum of money as it may think reasonable… | Gunpowder |
| 1890 | Oklahoma | *Okla. Sess. Laws 447, Crime and Punishment, § 24* | Every person guilty of making or keeping gunpowder or saltpeter within any city or village, in any quantity of manner such as is prohibited by law or by and ordinance of said city or village, in consequence whereof any explosion occurs whereby any human being is killed, is guilty of manslaughter. | Gunpowder |

*Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| 1890 | Oklahoma | *Okla. Sess. Laws 474, Crime and Punishment, § 4* | Every person who makes or keeps gunpowder or saltpeter within any city or village, and every person who carries gunpowder through the streets thereof, in any quantity or manner such as is prohibited by law, or by any ordinance of such city or village, is guilty of a misdemeanor. | Gunpowder |
| 1891 | New Hampshire | *N.H. Laws 332, Safe-keeping Of Gunpowder And Other Explosives, § 7* | If any person shall carry from town to town, or from place to place, any gunpowder for the purpose of peddling or selling it by retail in quantities less than twenty-five pounds, or shall sell, or offer to sell by retail, any gunpowder in any highway or street, or on any wharf, parade, or common, or if any person shall sell or deal out any gunpowder in the night time, between sunset and sunrise, he shall forfeit for each offense a sum not more than five dollars. | Gunpowder |
| 1895 | Nebraska | *Neb. Laws 233, Statutes Relating To The government Of The City Of Lincoln, § 17* | No person shall keep, sell, or give away any gunpowder or guncotton in any quantity without permission in writing signed by the Chief of | Gunpowder |

***Boland, Lance, et al. v. Robert Bonta, et al.*, No. 8:22-cv-01421-CJC-ADS**
**Survey of Relevant Historical Analogues (Pre-Founding – 1899)**

| Year of Enactment | Jurisdiction | Citation | Description of Regulation | Subject of Regulation |
|---|---|---|---|---|
| | | | Fire Department and City Clerk, and sealed with the corporate seal, under a penalty of twenty-five dollars for every offense: Provided, any person may keep for his own defense a quantity of gunpowder or guncotton not exceeding one pound. | |
| 1899 | Tennessee | *Tenn. Pub. Acts 327, An Act To Repeal The Charter Of The Town Of Waverly, In Humphreys county, And to Incorporate Said Town And Define Its Rights, Powers, etc., § 10* | To regulate, restrain, or prevent the carrying on of manufactories dangerous in causing or producing fires, and to prevent and suppress the sale of firearms, fireworks, Roman candles, crackers, sky rockets, etc., and toy pistols. | Gunpowder |