C.D. Michel – SBN 144258
cmichel@michellawyers.com
Joshua Robert Dale – SBN 209942
jdale@michellawyers.com
Sean Brady – SBN 262007
sbrady@michellawyers.com
Alexander A. Frank – SBN 311718
afrank@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445

Attorneys for Plaintiffs Lance Boland, Mario
Santellan, Reno May, Jerome Schammel, and
California Rifle & Pistol Association,
Incorporated

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| LANCE BOLAND, an individual; MARIO SANTELLAN, an individual; RENO MAY, an individual; JEROME SCHAMMEL, an individual; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>    Plaintiffs,<br><br>    v.<br><br>ROBERT BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,<br><br>    Defendants. | Case No. 8:22-cv-01421-CJC(ADSx)<br><br>**PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

# TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................................i

Table of Authorities ...............................................................................................ii

SUPPLEMENTAL MEMORANDUM ......................................................................1

1.   INTRODUCTION .......................................................................................1

2.   DIFFERING APPROACHES TO *BRUEN* IN THE FEDERAL COURTS..............2

   A.   The One-Step Approach...................................................................2

   B.   Properly Reasoned Two-Step Cases ...............................................3

   B.   Poorly Reasoned Two-Step Cases ..................................................4

3.   *Heller*'s Plain Language requires the Broad Approach ...........................6

4.   Embracing a Narrow Standard in the first step Will Nullify *Bruen* and Reinstate an Outcome-Determinative Interest-Balancing Approach...........................................7

5.   The Historical Approach Will Not Nullify the state's ability to regulate firearms..10

6.   The State FailS to Marshal Evidence of Historical Regulatory traditions on par with the UHA's CLI, MDM, and MICROSTAMPING requirements ..............................14

   A.   *Bruen's* Instructions for the Historical Inquiry .................................14

   B.   The Strict-Historical Approach Applies Here Because The CLI, MDM, and Microstamping Requirements Address Longstanding Problems .............................16

   C.   Loaded Storage Laws, Gun Power Storage Laws, and Stamping-Proofing Laws Are Not Regulatory Ancestors of the UHA ....................................17

7.   The *Winter* Factors Counsel in Favor of Granting Preliminary Relief ....................18

CONCLUSION.......................................................................................................21

CERTIFICATE OF COMPLIANCE........................................................................22

CERTIFICATE OF SERVICE .................................................................................23

---

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baird v. Bonta*,
   No. 2:19-cv-00617-KJM-AC,
   2022 U.S. Dist. LEXIS 221461 (E.D. Cal. Dec. 7, 2022) ............................................ 20

*Caetano v. Massachusetts*,
   577 U.S. 411 (2016) ....................................................................................... 5, 6, 9

*Def. Distributed v. Bonta*,
   No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839 (C.D. Cal. Oct. 21,
   2022) ................................................................................................................... 4, 5

*Friedman v. City of Highland Park*,
   784 F.3d 406 (7th Cir. 2015) ................................................................................ 8

*Jackson v. City and Cty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) .............................................................................. 13

*Miller v. Smith*,
   No. 22-1482, 2023 U.S. App. LEXIS 1506 (7th Cir. Jan. 20, 2023) .......................... 3

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
   142 S. Ct. 2111 (2022) ............................................................................... *passim*

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*,
   No. 22-cv-00501-BLF, 2022 U.S. Dist. LEXIS 138385 (N.D. Cal. Aug. 3, 2022) ....... 8

*NYSRPA v. Cuomo*,
   804 F.3d 242 (2nd Cir. 2015) ................................................................................ 8

*Ocean State Tactical, LLC v. Rhode Island*,
   No. 22-CV-246JJM-PAS, 2022 U.S. Dist.
   LEXIS 227097 (D.R.I. Dec. 14, 2022) ………………………………………4, 5

*Or. Firearms Fed'n, Inc. v. Brown*,
   No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391 (D. Or. Dec. 6, 2022) ........ 4, 5

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

*Range v. AG United States*,
53 F.4th 262 (3d Cir. 2022), *vacated and reh'g granted,* 2023 U.S. App. LEXIS 1061 (3d Cir., Jan. 6, 2023) ....................................................................................... 2

*Silvester v. Harris*,
843 F.3d 816 (9th Cir. 2016) ................................................................................ 13

*United States v. Carrero*,
No. 2:22-CR-00030, 2022 U.S. Dist. LEXIS 188707, 2022 WL 9348792 (D. Utah Oct. 14, 2022) ........................................................................................................... 4

*United States v. Chovan*,
735 F.3d 1127 (9th Cir. 2013) ................................................................................ 8

*United States v. Coombes*,
No. 22-CR-00189-GKF, 2022 U.S. Dist. LEXIS 170323 (N.D. Okla. Sep. 21, 2022) . 3

*United States v. Gonzalez*,
No. 22-1242, 2022 U.S. App. LEXIS 26532 (7th Cir. Sep. 22, 2022) ........................ 3

*United States v. Gray*,
No. 22-cr-00247-CNS, 2022 U.S. Dist. LEXIS 205149 (D. Colo. Nov. 10, 2022) ....... 4

*United States v. Kays*,
No. CR-22-40-D, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519 (W.D. Okla. Aug. 29, 2022) ........................................................................................................ 4

*United States v. Marzzarella*,
614 F.3d 85 (3d Cir. 2010) ................................................................................... 11

*Wilson v. Lynch*,
835 F.3d 1083 (9th Cir. 2016) .............................................................................. 13

*Worman v. Healey*,
922 F.3d 26 (1st Cir. 2019) .................................................................................... 8

**Statutes**

18 U.S.C. section 922(g)(1) ............................................................................... 2, 4

California Penal Code Section 31910 .................................................................... 22

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

1

**Other Authorities**

2

Senate Bill 377 ...................................................................................................21

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

8:22-cv-01421-CJC(ADSx)

# SUPPLEMENTAL MEMORANDUM

## 1. INTRODUCTION

At the conclusion of evidentiary hearing and oral argument on January 24, 2023, the Court ordered the parties to submit supplemental briefing addressing how to apply *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022) to Plaintiffs' motion to preliminarily enjoin the UHA's CLI, MDM, and microstamping requirements.

Post-*Bruen* decisions from the circuit and district courts indicate that there is confusion about how to apply it. Some courts interpret *Bruen* to require a one-step historical inquiry test. Others interpret it to establish a two-step test, with a predicate first-step inquiry into whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. Which approach is correct is admittedly unclear. What is clear is that resolving this question is unnecessary for deciding this matter.

Even assuming that *Bruen* establishes a two-step test, the Second Amendment's plain text undeniably covers acquiring handguns—particularly the most popular models in the nation—which the UHA precludes. Handguns are the one firearm category that the Supreme Court has expressly deemed protected. Whether the State may ban acquisition of a vast portion of the options available in the broader national handgun marketplace, without at least implicating the Second Amendment's plain text, is not a close call. Indeed, holding this does not implicate the plain text would not only gut the Second Amendment and give the government license to ban all arms one-by-one, but would also undermine the *Bruen* Court's revitalization of *Heller's* history based test.

Prior to *Bruen*, state defendants routinely persuaded courts throughout the nation that so long as a firearm restriction does not *destroy* an individual's ability to exercise armed self-defense, the Second Amendment bends the knee to the state's police power under an "interest-balancing" framework. This approach artificially confined the Second Amendment's scope in contravention of *Heller*. In response, the *Bruen* court expressly and unequivocally rejected that approach. *Bruen*, 142 S. Ct. at 2127.

Despite *Bruen's* clear rejection, the State attempts to resurrect that interest-

1

balancing framework by smuggling it into *Bruen*'s test. Specifically, the State asks this Court to construe when the "Second Amendment's plain text covers an individual's conduct" so narrowly that effectively all conduct beyond *Heller's* central holding fails the predicate question and thus bypasses the rigorous history and tradition inquiry. This narrow interpretation of *Bruen* essentially converts the *new* and broad question of whether "the Second Amendment's plain text covers an individual's conduct" to the *old* and narrow question of how severe is the burden that the law imposes on the individual's ability to exercise the "core" Second Amendment right to armed self-defense. That interpretation is flat out wrong. *Bruen* is clear that the burden on the right is relevant *only* in the historical inquiry, not in the predicate inquiry.

## 2.   DIFFERING APPROACHES TO *BRUEN* IN THE FEDERAL COURTS

Since the Supreme Court decided *Bruen*, applications of its holding generally fall into two categories: one-step or two-step. One-step courts subject all laws directly involving firearms to the historical inquiry test. Two-step courts interpret *Bruen* as establishing a predicate inquiry that asks if the "Second Amendment's plain text covers an individual's conduct" to determine whether historical analysis is required.

### A.   The One-Step Approach

A *per curiam* panel of the Third Circuit found that *Bruen* established a one-step test that focuses solely on whether a regulation that involves firearms survives historical scrutiny. *Range v. AG United States*, 53 F.4th 262 (3d Cir. 2022), *vacated and reh'g granted,* 2023 U.S. App. LEXIS 1061 (3d Cir., Jan. 6, 2023). *Range* involved a challenge to 18 U.S.C. section 922(g)(1), which prohibits felons from possessing firearms. *Id.*

The *Range* court stated, "[b]efore *Bruen*, we analyzed Second Amendment challenges under a two-part test that was eventually adopted by most of our sister Circuits. [citations omitted]. *Id.*, at 270. "*Bruen*, however, abrogated [the] two-step inquiry and directed the federal courts, **in a single step**, to look to the Second Amendment's text and 'the Nation's historical tradition of firearm regulation'." *Id.*, (bold added) citing *Bruen*, 142 S. Ct. at 2126.

2

1     A Seventh Circuit panel also interpreted *Bruen* to establish a one-step historical

2  inquiry test. *Miller v. Smith*, No. 22-1482, 2023 U.S. App. LEXIS 1506 (7th Cir. Jan. 20,

3  2023). *Miller* involved a challenge to a law that regulates how foster parents may possess

4  and store firearms and ammunition in their home. *Id*. The court's opinion reversing and

5  remanding for further proceedings states that "means-end scrutiny does not apply in the

6  Second Amendment context" and that *Bruen* requires "courts to assess whether modern

7  firearms regulations are consistent with the Second Amendment's text and historical

8  understanding." *Id*. Another Seventh Circuit panel reasoned that "[t]here [referring to

9  *Bruen*], the Court held that, when assessing the constitutionality of a firearms regulation,

10 the question is **only** whether the restriction is consistent with "the historical tradition that

11 delimits the outer bounds of the right to keep and bear arms." *United States v. Gonzalez*,

12 No. 22-1242, 2022 U.S. App. LEXIS 26532 (7th Cir. Sep. 22, 2022) (bold added).

13    So at least three federal circuit court panels have interpreted *Bruen* to establish a

14 one-step, history-focused test that does not require a predicate inquiry into whether the

15 Second Amendment's plain text covers the conduct at issue.

16    **B.     Properly Reasoned Two-Step Cases**

17    Two-step courts embrace either a properly broad or incorrectly narrow approach to

18 the first step. A handful of decisions applying a two-step approach illustrate what a good-

19 faith application of the predicate inquiry looks like. For example, in *United States v.*

20 *Coombes*, No. 22-CR-00189-GKF, 2022 U.S. Dist. LEXIS 170323 (N.D. Okla. Sep. 21,

21 2022), a challenge to the federal felon prohibition statute, the court reasoned that "the

22 Glock .45 caliber pistol constitutes an "arm" within the Second Amendment's

23 protection." *Id*. "Thus, the Second Amendment presumptively protects Mr. Coombes'

24 conduct." *Id*. The court then upheld the felon prohibition under historical scrutiny. *Id*.

25    Several other Tenth Circuit cases have essentially duplicated *Coombes'* two-step

26 approach and found that while the Second Amendment's text covered a felon's desire to

27 possess firearms, historical scrutiny established the prohibition's constitutionality. *See*

28 *United States v. Carrero*, No. 2:22-CR-00030, 2022 U.S. Dist. LEXIS 188707, 2022 WL

3

9348792, at *1 (D. Utah Oct. 14, 2022) (finding § 922(g)(1) constitutional post-*Bruen*); *United States v. Kays*, No. CR-22-40-D, 2022 U.S. Dist. LEXIS 154929, 2022 WL 3718519, at *2 (W.D. Okla. Aug. 29, 2022) (finding § 922(g)(8) and § 922(n) constitutional and denying the defendant's motion to dismiss the indictment); *United States v. Gray*, No. 22-cr-00247-CNS, 2022 U.S. Dist. LEXIS 205149 (D. Colo. Nov. 10, 2022) (finding 18 U.S.C. § 922(g)(1) constitutional post-*Bruen*).

These two-step courts all applied a good-faith, broad interpretation of when the "Second Amendment's plain text covers an individual's conduct." The plaintiffs in all these cases were *people* who sought to *keep* and *bear* firearms (usually handguns). On that straightforward and common-sense basis, the courts found that the first step was met, then performed the historical inquiry and upheld the prohibitions.

Importantly, these courts did not reason that the plaintiffs' assertion of a Second Amendment right was categorically invalid because they were felons. Post-*Heller*, courts routinely rejected challenges to the felon prohibition statute, citing *Heller*'s language that felon prohibitions are "presumptively" lawful regulations. *Heller*, 554 U.S. at 626-27. But these post-*Bruen* courts honored *Bruen*'s command to conduct the historical analysis, and illustrate that *Heller's* "presumptively lawful" language does not establish any categorical regulatory safe-harbors.

## B.   Poorly Reasoned Two-Step Cases

Three recent decisions stand out for their flatly incorrect and unjustifiably narrow interpretations of the predicate inquiry. These cases are *Or. Firearms Fed'n, Inc. v. Brown*, No. 2:22-cv-01815-IM, 2022 U.S. Dist. LEXIS 219391 (D. Or. Dec. 6, 2022), *Ocean State Tactical, LLC v. Rhode Island*, No. 22-CV-246 JJM-PAS, 2022 U.S. Dist. LEXIS 227097 (D.R.I. Dec. 14, 2022), and *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 U.S. Dist. LEXIS 195839 (C.D. Cal. Oct. 21, 2022).

*Brown* involved a motion to preliminarily enjoin Measure 114, an Oregon law that requires prospective gun owners to obtain a permit and prohibits the purchase and use of magazines that can accept more than ten rounds of ammunition. *Brown*, at *2. The *Brown*

4

court stated that "[u]nder *Bruen*, the first step in assessing whether a regulation violates the Second Amendment is to determine whether the plain text of the Second Amendment covers the conduct regulated by the challenged law." *Id*. at *23.

In concluding that it does not, the *Brown* court reasoned that the plaintiffs "have not shown that the magazines restricted by Measure 114 are *necessary* to the use of firearms for lawful purposes such as self-defense. Therefore, Plaintiffs have failed to show that magazines capable of accepting more than ten rounds of ammunition are covered by the plain text of the Second Amendment." *Id*. at *25 (italics added). But such rationale—that the Second Amendment's plain text covers an individual's conduct *only if* that conduct is *necessary* to exercise self-defense—is unsupportable. Neither *Bruen, Heller, Caetano,* nor *McDonald* supports it, and as explained below, instruct the opposite.

*Ocean State Tactical*, also a "large capacity magazine" case, evinces the same problem. Despite acknowledging that "[i]n *Bruen*, the Supreme Court bluntly cast aside [the interest balancing approach]," the court inexplicably reasoned that "[t]his Court's focus, therefore, must be on whether the LCM Ban unduly impairs the right of an individual to engage in self-defense." *Ocean State Tactical*, at *27. The court then reasoned that because "a firearm does not need a magazine containing more than ten rounds to be useful," and because magazines are not "arms," the Second Amendment's plain text does not cover them. *Id*. at *30. Again, "need" is not the test.

Finally, *Defense Distributed* involved a motion to preliminarily enjoin a California statute that prohibits everyone but federal firearms license holders from accessing any computerized numerical code ("CNC") milling machine "that has a sole or primary purpose of manufacturing firearms." *Def. Distributed*, at *2. The court conducted no historical analysis, reasoning that the Second Amendment's plain text does not cover the right to acquire or manufacture firearms, and expressly rejected any notion that the Second Amendment necessarily extends to a "penumbra" of activities necessary to excise the keeping and bearing of arms. *Id*. at *9.

These three cases exemplify the minimalist approach that the State advocates here

5

that incorrectly interprets *Bruen*'s question of when "the Second Amendment's plain text covers an individual's conduct" to be the same as asking whether an individual's ability to exercise self-defense remains intact notwithstanding the law at issue. This is incorrect because it converts *Bruen's* predicate inquiry into the former, and now defunct, burden-on-the-core-interest question. This approach essentially presumes that *Heller* and *Bruen* established the full and final scope of the Second Amendment, leaving all other firearm-related conduct subordinate to the State's police power. That is patently wrong.

### 3.  *HELLER*'S PLAIN LANGUAGE REQUIRES THE BROAD APPROACH

*Heller* expressly disclaimed establishing the full and final scope of what conduct the Second Amendment protects, but also reassured that the historical approach would not foreclose the government's regulatory power: "[a]lthough we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions…." *Heller*, 554 U.S. at 626. *Heller* further recognized that the Second Amendment protects firearm related conduct beyond self-defense for other "*traditionally lawful purposes*" and establishes that the Second Amendment protects arms that are "typically possessed by law-abiding citizens for lawful purposes." *Id*. at 625, 627. Moreover, "*Heller* defined the 'Arms' *covered* by the Second Amendment to include "'any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another.'" *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (Alito, J., concurring) (italics in original). And *Heller* provides that the Second Amendment "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.

The direct consequence of this language, at bare minimum, is that laws that restrict what firearms an individual may acquire trigger the historical scrutiny that *Heller* and *Bruen* "demand." *Bruen*, 142 S. Ct. at 2118. So the minimalist interpretation that the Second Amendment protects only the core right to keep *an* operable handgun for self-defense, and that any restriction that preserves that right is beyond the Second

Amendment's reach, contradicts *Heller's* plain language. Indeed, if the Court takes the minimalist view that the only individual conduct that is covered is what is minimally sufficient for an individual to exercise self-defense with *some* handgun, then it is hard to imagine what laws, short of a flat ban on exercising that right, would ever see historical scrutiny. Since that cannot be correct under *Heller* or *Bruen*, the broad approach is right.

**4.  EMBRACING A NARROW STANDARD IN THE FIRST STEP WILL NULLIFY *BRUEN* AND REINSTATE AN OUTCOME-DETERMINATIVE INTEREST-BALANCING APPROACH**

The *Heller* Court unmistakably clarified that the Second Amendment's scope includes more than just the specific conduct addressed in its opinion's holding, and established a history and tradition approach to discovering that scope. In his *Heller* dissent, Justice Breyer argued that an interest-balancing approach more deferential to the state's police power would better facilitate addressing gun violence. *Heller*, 554 U.S. at 634. Inexplicably, courts embraced Breyer's framework over the majority's history-and-tradition approach. *Bruen*, 142 S. Ct. at 2126. They imported interest balancing norms from First Amendment caselaw and consistently found that so long as a gun law did not destroy a person's right to self-defense in the home, the law was a valid exercise of state police power. These courts interpreted *Heller* as establishing the full and final scope of the Second Amendment: so long as a person may possess a functional handgun in the home for self-defense, all other conduct is subordinate to the state's police power.

*Bruen* sought to end this perversion of *Heller*. Indeed, *Bruen* expressly provides that the interest balancing approach to Second Amendment questions is "one step too many," and recapitulates *Heller's* history and tradition approach. *Bruen*, 142 S. Ct. at 2127. *Bruen* also clearly announced that assessing the burden on the core right can help with identifying historical analogues only; not in answering the predicate inquiry.[1]

_____

[1] *See Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-00501-BLF, 2022 U.S. Dist. LEXIS 138385, at *26-27 (N.D. Cal. Aug. 3, 2022) ("To the extent *Bruen* accounts for the degree to which

"While we do not now provide an exhaustive survey of the features that render regulations relevantly similar under the Second Amendment, we do think that *Heller* and *McDonald* point toward at least two metrics: *how* and *why* the regulations burden a law-abiding citizens' right to armed self-defense." *Bruen*, 142 S. Ct. at 2133 (italics added).

So the major hazard here that this Court should recognize is that narrowly interpreting when "the Second Amendment's plain text covers an individual's conduct" misreads *Bruen* and will work no differently than how the burden-on-the-core-right determination under the first step of the pre-*Bruen* framework was exploited to undermine Second Amendment rights. Under the pre-*Bruen* standard, courts would ask whether the subject law implicated the Second Amendment by asking how closely to the core exercise of self-defense the law in question reached, and would then decide what level of scrutiny to apply based on that determination. *See, e.g., United States v. Chovan*, 735 F.3d 1127, at 1138 (9th Cir. 2013). If the subject law imposed a severe burden on the ability to exercise armed self-defense, it would be subject to strict scrutiny. If it imposed less than a severe burden, courts would apply intermediate scrutiny. *Id*.

But because restrictions on hardware (i.e., types of arms) like the UHA never entirely strip anyone of the ability to own *some* form of firearm for self-defense, courts would nearly always find the burden not severe, apply intermediate scrutiny, and uphold the law.[2] The rationale was always the same: because the self-defense right remained undestroyed, the state's police power determinations are entitled to deference.

In a hardware-question case like this one, the minimalist interpretation of what conduct is covered under the plain text produces the exact same outcome as asking how

---

Plaintiffs' Second Amendment rights have been burdened, that analysis would occur under the "historical tradition" prong of the *Bruen* framework.")

[2] *See, e.g., Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) (upholding assault weapons ban because the law "leaves residents with many self-defense options."); *NYSRPA v. Cuomo*, 804 F.3d 242 (2nd Cir. 2015) (upholding assault weapons ban under intermediate scrutiny); *Worman v. Healey*, 922 F.3d 26 (1st Cir. 2019) (upholding assault weapons ban under intermediate scrutiny).

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

close a law comes to burdening the core self-defense right because it is essentially the same question. And by fashioning *Bruen's* predicate inquiry so narrowly that no gun law short of a ban on the core right will ever pass, and thus never see the historical inquiry, it produces an outcome-determinative result every time. It would allow the government to define the scope of the right in the first step of a test that is supposed to be applied holistically to define the scope of the right. That cannot be right. Otherwise governments could short-circuit *Bruen* and prevent the Second Amendment from ever protecting the right to do anything more than own *some* operable handgun for self-defense and conceal-carry it in *some* public places if licensed to do so.

Asking whether "the Second Amendment's plain text covers an individual's conduct" is a very different question than asking what burden a law imposes on an individual's ability to exercise armed self-defense. The State treats these questions like they are the same and applies them indistinguishably. But they are not the same. So the State's argument that the Second Amendment is irrelevant here because an individual's ability to use a firearm for self-defense remains intact notwithstanding the UHA is untenable. Indeed, "[i]t is no answer to say…that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629. "The right to bear other weapons is 'no answer' to a ban on the possession of protected arms." *Caetano*, 577 U.S. at 421 (Alito, J., concurring).

It simply cannot be that the Supreme Court intended for *Bruen* to be applied indistinguishably from the standard that its opinion expressly and emphatically repudiated, as the State argues. Reasoning that the plain text does not cover an individual's conduct because the subject law leaves the core right intact not only flatly misreads *Bruen*, but creates an exception to *Bruen's* command to apply historical analysis that would swallow both *Bruen* and *Heller's* core holdings. Indeed, it would preclude *Bruen's* historical analysis from ever being applied and would thus insulate all hardware questions short of flat bans on all arms from review. That cannot be correct.

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

## 5.   THE HISTORICAL APPROACH WILL NOT NULLIFY THE STATE'S ABILITY TO REGULATE FIREARMS

Correctly (i.e., broadly) interpreting *Bruen's* textual predicate inquiry will not nullify all gun laws. The Supreme Court was not being disingenuous in stating that its rule does not impose a "regulatory straitjacket," as its detractors allege. *Bruen*, 142 S. Ct. at 2133. The "Second Amendment's plain text" will not necessarily "cover an individual's conduct" in every instance where a regulation impacts firearms. And even when the plain text unmistakably covers an individual's conduct, that conduct may not survive historical scrutiny, as the felon-in-possession decisions cited above illustrate.

Additionally, the State's argument that *Heller's* language about "presumptively lawful" commercial regulatory measures supports the minimalist approach is simply untenable.[3] *Heller*, 554 U.S. at 626-27. That language cannot properly justify prohibiting all firearms related activity except the bare minimum necessary to conduct armed self-defense. The proper interpretation of *Heller's* "*presumptively*" lawful measures language requires nothing more than recognizing what *presumptively* means. It does not mean *conclusively*. *Heller* did not hold that there are broad categories of regulations that are wholesale exempt from historical scrutiny. The *Heller* court—in dicta—merely said that modern laws that designate "sensitive" places where firearm possession can be restricted, that bar felons and the mentally ill from possessing firearms, and that regulate commerce in arms would *presumptively* survive the historical inquiry test that *Heller* established. *Id*.

In his dissent in *Pena v. Lindley*, the pre-*Bruen* challenge to the UHA litigated

---

[3] Courts recognized this pre-*Bruen*. For example, the Third Circuit reasoned that "[c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment under this reading. *Heller* endorsed "laws imposing conditions and qualifications on the commercial sale of firearms." 128 S. Ct. at 2817. In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*." *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010).

under the interest-balancing standard, Judge Bybee endeavored to "offer a roadmap to deciding what conduct falls outside of the Second Amendment's protection." *Id*. 898 F.3d 969, 1002 (9th Cir. 2018) (Bybee, J., dissenting). In so doing, he provides a cogent explanation of why the Second Amendment's plain text covers the conduct that the UHA interferes with, and why the historical approach does not foreclose firearm regulation.

Noting that the majority "assumed without deciding" that "the microstamping requirement burdens conduct protected under the Second Amendment," Judge Bybee reasoned that "[b]ecause a state can also prevail on a Second Amendment claim at step 1 by establishing that the Amendment is not implicated," "I must address the threshold question of whether microstamping implicates the Second Amendment." *Id*. at 1002.

Judge Bybee highlighted that "in *Heller*, the Supreme Court identified three categories of regulatory measures that we may presume to be consistent with the historical scope of the Second Amendment," . . . "the Court, however, did not elaborate on these enumerated categories, their intricacies, or their justifications, and instead left that for another time." *Id*. One of these categories is "laws imposing conditions and qualifications on the commercial sale of arms." *Id*.

 "[T]here are two important questions that must be answered about these enumerated categories." *Id*. "First, does 'presumptively lawful' mean 'conclusively lawful'? That is, is a law falling within these three categories subject to a rebuttable or an irrebuttable presumption of lawfulness? Second, what is the scope of each of these categories?" *Id*. He then discussed various approaches to the first question in the circuit courts, noting that courts were uncertain whether *Heller* said that these three categories were per se beyond the Second Amendment's scope or said that these categories implicated the Second Amendment but would surely survive historical scrutiny. *Id*.

Judge Bybee continued, "I think that the most natural reading of 'presumptively lawful' is exactly what it says: a law within the enumerated categories carries a presumption of lawfulness. But it must be a presumption that is subject to rebuttal." *Id*. at 1006. He added that the "Supreme Court introduced the enumerated categories with the

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

assumption that these restrictions are " 'longstanding'," which suggests that the court believed those examples would be validated under *Heller's* historical approach and not because they were beyond the Second Amendment's protection. *Id.,* citing *Heller*, 554 U.S. at 626.

Regarding the question about the scope of "commercial regulations," Judge Bybee noted that the phrase "is not so familiar, narrow, or well defined." *Id*. at 1007. "This opaqueness probably explains why in several cases we have assumed without deciding that a given regulation burdened conduct protected by the Second Amendment in the face of an argument that it fell into this sales exception. In each case we avoided having to parse the category by upholding the restriction under intermediate scrutiny." *Id*. [4]

He continued, "[b]ecause the category is not self-explanatory, I have to start from a slightly different premise: the Supreme Court in *Heller* could not have meant that anything that *could* be *characterized* as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny." *Id*., (italics in original). "At minimum, the Court must have meant that rules of general applicability do not violate the Second Amendment just because they place conditions on commercial sales, including sales of handguns used for self-defense." *Id*. He added that such location and time laws would likely be constitutional, but of course, might be subject to abuse that would raise constitutional issues.[5] *Id*.

However, Judge Bybee reasoned that "the question of *what* can be sold to qualified

---

[4] Judge Bybee referenced three examples: *Silvester v. Harris*, 843 F.3d 816, 827-29 (9th Cir. 2016) (assuming a ten-day waiting period on the purchase of a firearm burdened conduct protected by the Second Amendment and applying intermediate scrutiny); *Wilson v. Lynch*, 835 F.3d 1083, 1092 (9th Cir. 2016) (applying intermediate scrutiny to a regulation prohibiting possessors of medical marijuana card from buying firearms); *Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014) (applying intermediate scrutiny to a ban on the sale of hollow-point ammunition)

[5] *Bruen* vindicated Judge Bybee's view, noting that carry-license regimes cannot be "put toward abusive ends" and may be subject to challenge "where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry." *Bruen*, 142 S. Ct. at 2191 n.9.

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

8:22-cv-01421-CJC(ADSx)

buyers at an appropriate location and time comes much closer to the core of the Second Amendment." *Id.*, (italics in original). "What may be sold (to anyone) fairly goes to the content of the Second Amendment right to acquire the arms that we may keep and bear for our defense. A law that permits only the commercial sale of water pistols and Nerf guns is not what the Second Amendment guaranteed." *Id*.

Judge Bybee then "turn[ed] to the question of whether the microstamping requirement burdens conduct protected by the Second Amendment." *Id.* at 1010. He reasoned that "…the microstamping requirement restricts the supply of weapons available in the first place—and that surely is a burden on the right of self-defense." *Id*. "I am thus unwilling to assume that California's restriction on the types of arms that can be sold commercially is so plainly a condition and qualification that is 'presumptively lawful' and thus immune from any Second Amendment inquiry. Whatever the contours of the commercial sales category, *Heller* cannot mean that the State can ban the sales of arms—whether it does so directly or indirectly by imposing conditions on features that commercially sold firearms must possess." *Id*.

To summarize, Judge Bybee reasoned that because the UHA materially affects *what* firearms may be bought and sold, it implicates the Second Amendment. This common-sense reasoning is how the predicate textual inquiry should be conducted post *Bruen*. To be sure, common-sense dictates that the Second Amendment's plain text covers the conduct at issue here. The UHA impacts an individual's keeping and bearing of arms because it imposes marketplace restrictions that make the marketplace for handguns in California significantly smaller, and therefore *very* different than the marketplace in every other state. Indeed, industry expert Salam Fatohi testified that the UHA precludes licensed California dealers from offering the most popular handguns in the rest of country and that dealers in other states hardly sell handguns on California's roster because they are antiquated. Transcript of Oral Argument ("T.R.") Jan. 23, 70, 79. That is not trivial. That is a significant intrusion into the marketplace where people acquire the handguns they keep for self-defense and other lawful purposes. And *Heller*,

13

*McDonald,* and *Bruen* firmly establish that handguns are a protected hardware. So Plaintiffs here do not seek to "keep and carry any weapon whatsoever in any manner and for whatever purpose[;]" they merely seek to select from the same range of handgun options as Americans in almost every other state. *Heller*, 554 U.S. at 626. In other words, they ask that handguns not become for Californians what automobiles are to Cubans.

Thus, the Second Amendment's plain text covers the individual conduct that the UHA obstructs— acquiring handguns—and shifts the burden to the State to show that the UHA's CLI, MDM, and microstamping requirements are modern day iterations of longstanding regulatory traditions. The State fails to meet this burden.

## 6. THE STATE FAILS TO MARSHAL EVIDENCE OF HISTORICAL REGULATORY TRADITIONS ON PAR WITH THE UHA'S CLI, MDM, AND MICROSTAMPING REQUIREMENTS

The State is unable to meet its burden of showing that the UHA's CLI, MDM, and microstamping requirements are the modern-day iterations of historical regulatory traditions. The laws the State presents do not pass muster under either approach to the historical inquiry that *Bruen* authorizes, even the more lenient one.

### A. *Bruen's* Instructions for the Historical Inquiry

*Bruen* does not establish a factors or elements test. Instead, it provides a few key guidelines. Arguably, the most important guideline is that a handful of purportedly similar laws is insufficient. The State must show that the historical tradition is truly "well-established" and represents an accepted and *widespread* regulatory consensus. The Court was weary of "endorsing outliers that our ancestors never would have accepted," and clearly demanded that the State offer more than a few examples. *Bruen*, 142 S. Ct. at 2133. So to pass muster there should essentially be no doubt that the regulation was widespread, common, and reflected genuine consensus.

Next, the court explained that in situations where a law addresses "a general societal problem that has persisted since the 18th century," this historical inquiry would be "fairly straightforward." *Id*. at 2131. "When a challenged regulation addresses a general

14

societal problem that has persisted since the 18th century, the lack of a *distinctly* similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Id.*, (italics added). So if the harm that the modern law is intended to address existed back then, the historical laws need to practically mirror the modern law.

On the other hand, when modern laws involve "unprecedented societal concerns or dramatic technological changes," the Court authorized "a more nuanced approach" to the historical inquiry. *Id.* at 2132. In that situation, *Bruen* authorizes "reasoning by analogy," to show that a modern law is "relevantly similar" to a "well-established and representative historical analogue," and need not be "a historical *twin*." *Id.* at 2133 (italics in original). In that situation, key issues for courts to consider are "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.*

So there are two analytical approaches. Where the concern that the modern law is meant to address existed during the ratification era, states need to find effectively identical regulations from that era. This is the strict-historical approach. Where the challenged law addresses a novel problem or technology, the State can meet its burden with evidence of an established tradition of analogically similar regulations. This is the analogical-historical approach. Analogies are relevant in the latter approach only.

*Bruen* also established that the relevant period to look to is the ratification era and shortly thereafter. There is some debate about whether the ratification of the 14th Amendment in 1868 makes that period as relevant for the historical analysis, which the majority opinion addresses, and Justice Coney-Barrett wrote separately about in her concurrence. *Bruen*, 142 S. Ct. at 2163 (Barrett, J., concurring). This issue is not relevant here because the State fails to marshal any evidence from that era. T.R. Jan. 24, 16.

**B.** **The Strict-Historical Approach Applies Here Because The CLI, MDM, and Microstamping Requirements Address Longstanding Problems**

Here, the State cannot rely on analogies and must meet the strict-historical standard because the UHA requirements at issue seek to address age-old issues. The CLI and MDM requirements are designed to address accidental firearm discharge and microstamping is meant to help authorities investigate crime. T.R. Jan. 23, 186, 208, 239. Neither are "unprecedented social concerns," or implicate "dramatic technological changes." T.R. Jan. 24, at 135-136. Accidental firearm discharge is not unique to modern semiautomatic handguns and was a concern in the late 1700s, which the State's own exhibits indicate.[6] T.R. Jan. 23, at 265-266, Def.'s Ex. No. 24. Indeed, the record shows that firearm manufacturers adopted CLIs as early as the 1860s. T.R. Jan. 23, at 12-14. And gun crime was an issue since at least the early 19th century. T.R. Jan. 23, 302-303.

Thus, there is nothing unprecedented and novel about these issues, and the State must therefore find historical laws that are *distinctly* similar to the UHA's CLI, MDM, and microstamping requirements. It must show a tradition of statutes from the ratification era that required arms-makers to equip their firearms with technological features intended to decrease the risk of accidental discharge and to identify a firearm's owner, as a condition for their sale to the public. No regulation the State identifies did that.

To be sure, the State has failed to show evidence of distinctly similar laws, let alone that such laws were "well-established." The best the State can do is an unrepresentative and highly generalized trio of regulations, discussed in detail below, that are more distinguishable than "relevantly similar." *Bruen*, 142 S. Ct. at 2132. This high

---

[6] *See also* Declaration of Saul Cornell submitted in the *Renna v. Bonta* matter, a challenge to the UHA pending in the Southern District, explaining that accidental discharge was the purpose of those regulations. Declaration of Alexander A. Frank in Support of Supplemental Briefing, Ex. 3, at 18, ¶ 28. The State filed this declaration on January 27, 2023 (three days after the MPI hearing in this matter) and it ostensibly contradicts Cornell's testimony before this Court that he needs more time to do a thorough historical review. T.R. Jan 23, 278-79.

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM
8:22-cv-01421-CJC(ADSx)

level of generality in comparing laws is insufficient under *Bruen*. The State simply fails to find *any* law, let alone a representative set, that establishes a tradition mirroring the UHA's requirements.

### C.   Loaded Storage Laws, Gun Power Storage Laws, and Stamping-Proofing Laws Are Not Regulatory Ancestors of the UHA

First, the State contends that laws that prohibited storing loaded firearms in homes is analogous to the UHA. But such laws are clearly not *distinctly* nor analogously similar. They may share the goal of preventing accidental discharge, but *how* they attempt to do that is dissimilar. These laws simply prohibited storing a firearm in loaded condition and did not impose any technological requirements on firearms. Even under the more forgiving analogical-historical approach, this is far off the mark. More importantly, laws that prohibit keeping a firearm in loaded condition are per se invalid under *Heller*[7], which declared unconstitutional a law that required firearms stored at home be disassembled. 554 U.S. at 628. *Heller* held that such laws make firearms completely unusable in a self-defense emergency and destroy the core right to self-defense. *Id*. Thus, storage laws do not help the State here one bit.

The second category of laws is gunpower-storage prohibitions. These laws clearly do not satisfy either standard. First, the *why* behind these laws is completely different. The concern that motivated these laws was fire-safety, not accidental firearm discharge or even firearm violence.[8] And the State has not argued that firearms without CLI, MDM, or microstamping pose a fire hazard. Second, *how* these laws regulated bears no similarity. These laws simply prohibited people from stockpiling an excessive quantity of gunpowder (usually more than 28-30 pounds) in their homes. T.R. Jan. 23, 152. They did not make a qualitative legal distinction between safe versus unsafe types of gunpowder.

---

[7] Cornell acknowledged this at the hearing. T.R. Jan. 23, 304.

[8] Cornell cites and attaches numerous examples of gunpowder storage laws which reveal they were fire safety measures and not firearm-violence measures. Frank Decl., Ex. 3.

The last category is barrel proofing and stamping laws. The State's expert, Dr. Saul Cornell, acknowledged that such laws were rare beyond Massachusetts where the famed Springfield Armory is located, and acknowledges that the Springfield Armory was exempt from the law.[9] So *ab initio*, it fails under both the strict and analogical approaches because it was the only law of its kind and is therefore an "outlier." *Bruen*, 142 S. Ct. at 2133. But, assuming *arguendo* that proofing and stamping laws were widely-enacted, the State admitted (and the Court indicated its agreement) that these laws are not analogous to the CLI, MDM, or microstamping requirements, despite potentially being analogous to other UHA requirements that Plaintiffs do *not* seek to preliminarily enjoin – firing reliability and drop safety. T.R. Jan. 24, 136-37, 142. Indeed, proofing and stamping is about signaling a barrel's quality, not imposing technological requirements meant to decrease the risk of accidental discharge or identify a firearm's owner for investigation purposes. T.R. Jan. 23, 267-269, 303, 144. These laws were about ensuring that the barrel—the part of a firearm that conducts the projectile and receives the high-pressure and high-temperature flow of combusting gunpowder—is fit for that important purpose, not for preventing user-error. T.R. Jan. 23, 153.

In sum, the State has not marshaled any persuasive evidence of historical laws to satisfy either the strict or the analogical approach. None of these laws function the way the UHA's CLI, MDM, and microstamping laws do. They are more dissimilar than similar, and therefore do not show the necessary historical regulatory tradition.

## 7.    THE *WINTER* FACTORS COUNSEL IN FAVOR OF GRANTING PRELIMINARY RELIEF

The State acknowledges that interest balancing in post *Bruen* Second Amendment cases is invalid. T.R. Jan. 24, at 126. However, the State argues that even if Plaintiffs have shown a likelihood of success, *Winter* nevertheless requires interest balancing in

---

[9] Cornell acknowledges this in his *Renna* declaration. Frank Decl., Ex 3.

this preliminary injunction context. *Id*. On the other side, Plaintiffs argue that where a plaintiff shows a likelihood of success in a fundamental rights context, the balance of the *Winter* analysis is determinatively deferential to the liberty interest at stake.

The State relies on an MPI order issued in a recent Second Amendment case in California, *Baird v. Bonta*, No. 2:19-cv-00617-KJM-AC, 2022 U.S. Dist. LEXIS 221461 (E.D. Cal. Dec. 7, 2022), to support its argument that preliminary relief is not appropriate here. But *Baird* is inapposite and distinguishable.

The *Baird* plaintiffs sought to preliminarily enjoin California's prohibition of "open" carrying firearms in public, meaning carrying a visibly exposed firearm. *Id*. at *2. The court denied the injunction, stating that it "is not necessary to decide whether California's Penal Code restricts conduct within the Second Amendment's plain text under *Bruen* or whether the challenged Penal Code sections are within the nation's historical tradition of firearms regulation." *Id*. at *15.

Instead, the court based its decision entirely on its finding that the plaintiffs "have not shown the balance of harms and public interest favor a preliminary injunction." *Id*. The court reasoned that because *Bruen* established a right to carry a *concealed* firearm, and because enjoining California from enforcing its open carry prohibition would take away the State's "primary" means of limiting public handgun carry to law-abiding citizens and would allow someone ineligible for a carry permit to "circumvent the state's laws by carrying the same gun openly," the harm to the State simply outweighed the harm to the plaintiffs who could simply obtain concealed carry permits. *Id*.

But the situation here is nowhere near *Baird* because there is no colorable argument that there is any true risk of harm to the state's interests. Two key facts cut right through the State's argument that harm looms if the Court enjoins the CLI, MDM, and microstamping requirements. First, California law currently allows people to acquire off-

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM

roster handguns that lack these features in the secondary market.[10] This belies any argument that these guns are truly unsafe for public consumption. Second, nearly every semiautomatic handgun on the roster is a "grandfathered" gun that lacks CLI and MDM (roughly 36[11] SKUs of over 800 guns have CLI and MDM and none has microstamping). Indeed, the State does not even issue CLI and MDM equipped firearms to its own agents. T.R. Jan. 23, 243. And California's largest peace officer's lobby, which represents over 70,000 police officers, agrees there is no good reason why regular citizens should not have access to the same handguns its officers do. See Declaration of Brian D. Marvel, ¶6. Thus, the State's purported harms of granting preliminary relief here are wholly illusory.

Indeed, of the 832 handguns on the roster as of February 13, 2023, only 36 of those (4%) are semiautomatics equipped with a CLI and an MDM.[12] For there to be any merit to the argument that this small number of handguns with CLIs and MDMs are responsible for a decrease in accidental firearm injuries and deaths in California, the State should prove it with evidence. And even if such evidence could favor the State's argument,[13] it would only perhaps lean in favor of not *preliminarily*[14] enjoining the CLI and MDM requirements only. And the State cannot argue that it risks losing any benefit if microstamping is enjoined because it was never implemented in the first place.

Thus, there really is no strong public safety interest here to balance against the injury to the constitutional liberty interest. The State's argument that Plaintiffs face no harm here because they are free to use the handguns they have already acquired for self-

---

[10] On February 9, 2023, ostensibly in reaction to this litigation, state senator Nancy Skinner introduced Senate Bill 377, which would eliminate the exemption for law enforcement personnel to purchase (and then sell) off-roster handguns. S.B. 377, 2023 Reg. Sess. (Cal. 2023). Frank Decl., Ex. 2.
[11] DOJ Agent Sal Gonzalez testified that there are roughly 32 on the roster. T.R. Jan. 23, 179.
[12] 24 of these 36 models are variants of the Smith & Wesson M&P9 Shield. 6 of these models are variants of the Sig Sauer P226. 4 models are variants of the Ruger LC380, and 2 are variants of the Sig Sauer P238. Thus, the 36 "models" represent immaterial variations of only 4 distinct models.
[13] It likely does not. A UC Davis research study concluded that for the 2005 to 2015 period, unintentional non-fatal firearm "injuries remained relatively stable" in California. Frank Decl., Ex. 1.
[14] It would be irrelevant in the *permanent* injunction context because interest balancing is irrelevant there under *Bruen.*

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM
8:22-cv-01421-CJC(ADSx)

defense, and may acquire handguns listed on the roster, wholly ignores that an intrusion into a Constitutional right can and should be rectified with preliminary relief.

## CONCLUSION

The Second Amendment's plain text covers Plaintiffs' desire to buy common use, currently off-roster handguns in the retail marketplace. This triggers strict-historical scrutiny that the State fails to meet. And because there is no true risk of harm if the Court enjoins the CLI, MDM, and microstamping requirements, the Court should preliminarily enjoin California Penal Code Section 31910, subd. (b)(4), (b)(5), (b)(6), and (b)(7)[15] pending the resolution of Plaintiffs' efforts to permanently enjoin them.

Dated: February 24, 2023               MICHEL & ASSOCIATES, P.C.


                                       /s/C.D. Michel
                                       C.D. Michel
                                       *Counsel for Plaintiffs*

---

[15] Subdivision (b)(7) is the provision that requires the DOJ to remove three on-roster guns for every handgun added that has all three features (CLI, MDM, and Microstamping). Because this subdivision's provisions can only be operative if those three features are legally operative, it must necessarily fall with the subdivisions that impose those three features if they are enjoined.

21

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM
8:22-cv-01421-CJC(ADSx)

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Incorporated, certifies that this brief contains 7,419, words, which complies with the word limit of L.R. 11-6.1.

Dated: February 24, 2023                    MICHEL & ASSOCIATES, P.C.


                                            /s/C.D. Michel
                                            C.D. Michel
                                            *Counsel for Plaintiffs*

PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM
8:22-cv-01421-CJC(ADSx)

# **CERTIFICATE OF SERVICE**

IN THE UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Boland, et al. v. Bonta*

Case No.:     8:22-cv-01421-CJC(ADSx)

IT IS HEREBY CERTIFIED THAT:

  I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

  I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' POST-HEARING SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

  Robert L. Meyerhoff, Deputy Attorney General
  robert.meyerhoff@doj.ca.gov
  Gabrielle D. Boutin
  Gabrielle.Boutin@doj.ca.gov
  Charles J. Sarosy
  charles.sarosy@doj.ca.gov
  300 South Spring Street, Suite 1702
  Los Angeles, CA 90013-1230

  I declare under penalty of perjury that the foregoing is true and correct.

Executed February 24, 2023.

Christina Castron

---