C.D. Michel – SBN 144258
cmichel@michellawyers.com
Joshua Robert Dale – SBN 209942
jdale@michellawyers.com
Sean A. Brady – SBN 262007
sbrady@michellawyers.com
Alexander A. Frank – SBN 311718
afrank@michellawyers.com
Konstadinos T. Moros – SBN 306610
kmoros@michellawyers.com
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445

Attorneys for Plaintiffs Lance Boland, Mario Santellan, Reno May, Jerome Schammel, and California Rifle & Pistol Association, Incorporated

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| LANCE BOLAND, an individual; MARIO SANTELLAN, an individual; RENO MAY, an individual; JEROME SCHAMMEL, an individual; CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation;<br><br>　　　　　　Plaintiff,<br><br>　　v.<br><br>ROBERT BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10<br>　　　　　　Defendants. | Case No. 8:22-cv-01421-CJC(ADSx)<br><br>**PLAINTIFFS' REBUTTAL BRIEF IN RESPONSE TO THE STATE'S SUPPLEMENTAL POST MPI BRIEFING (ECF NO. 56)** |

# PLAINTIFFS' REBUTTAL BRIEF

## INTRODUCTION

As predicted, the State advances the incorrect minimalist version of the predicate inquiry, which necessarily insulates any firearm law that leaves the core right intact from constitutional scrutiny. Although it disclaimed this argument at the hearing, the State now plainly asserts there is no "penumbra" to the plain text. Not so.

There can be no reasonable dispute that the Second Amendment's plain text covers the conduct here. Plaintiffs seek to shop in the retail marketplace for the most modern offerings within the most common and *only* expressly constitutionally protected firearm category. The State's argument that this does not implicate the plain text flouts *Heller* and relies solely on a few egregiously wrong post-*Bruen* district court decisions, which likewise flout not only *Heller*, but also *Bruen* and other nationwide authorities that protect the "penumbra" of activities beyond the core right.

The State also seeks to shoehorn this case into an unjustifiably broad analogical-historical track, and out of the strict-historical track where it belongs, because the UHA clearly cannot survive strict historical scrutiny. This Court should refuse. Regardless, the laws that the State presents satisfy neither approach. Its effort to define the analogical standard so broadly that virtually any historical firearm regulation could be an analogue is not faithful to *Bruen*. Plaintiffs are thus likely to succeed on the merits. And because their requested injunction poses no true risk of public harm, this Court should issue it.

## I. The State's Approach to Defining the Individual Conduct is Wrong

The State argues that in "delineating the proposed conduct, it would be unhelpful to do so at a general level, such as 'purchasing or possessing a handgun," and that the "proposed conduct must be specifically defined and be conduct that the challenged law actually prohibits." Def's. Closing. Br. ("D.B."), ECF No. 26, at 7. However, *Bruen* does not support the State's narrow definition. *Bruen* did not define the conduct at issue there as carrying a firearm in public without showing a special reason, or otherwise endorse a narrow interpretation. It defined it as "carrying handguns publicly for self-defense."

1  *Bruen*, 142 S. Ct. at 2134. Moreover, *Bruen* supports a broad construction because the
2  Second Amendment's scope is supposed to be determined under historical scrutiny, not
3  by preventing its application out-of-hand.

4  Here, the State offers two formulations. The first is "to purchase off-Roster
5  semiautomatic pistols without a CLI, MDM, or microstamping that are available for
6  purchase in other states." D.B. at 7. The State's second version is Plaintiffs "desire to
7  purchase a specific semiautomatic pistol without certain public safety features." *Id*.

8  Regardless, any legitimate formulation of the conduct at issue here cannot avoid
9  acknowledging that it involves lawfully acquiring *handguns*, which is the only firearm
10 hardware category that the Supreme Court has deemed protected. As this Court said, "I
11 take from your papers and from what I heard today, you're basically saying these
12 requirements are preventing a citizen, a law-abiding citizen from acquiring a new state-
13 of-the-art semiautomatic handgun…so you're left with the old models. You know, that
14 has my attention. That seems significant." T.R. Jan. 24, at 64. The Court is right. It is at
15 least significant enough to satisfy the predicate inquiry and trigger historical scrutiny.

16 **II.    The State's Predicate Inquiry Argument is a Work of Fiction, Not Law**

17 As Plaintiffs predicted, the State doubles-down on the minimalist approach,
18 contending that the predicate inquiry is "whether the regulation at issue prevents any
19 "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes." D.B. at 3; T.R.
20 Jan. 24, at 102-03. That is wrong. The predicate inquiry is "whether the Second
21 Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126.
22 "*Prevent*" is the State speaking, not the Supreme Court.

23 *Bruen*'s predicate inquiry does not ask whether the law at issue *prevents* exercising
24 the core right. At oral argument, Plaintiffs contended that the State's argument is that
25 only complete destructions of the core right raise a Second Amendment issue. The State
26 protested that characterization. T.R. Jan. 24, at 56, 106. But there is no
27 mischaracterization. The State now expressly contends that a law must *prevent* (i.e.,
28 destroy) the core right to fall within the Second Amendment's text.

Indeed, the State's hyper-textualist interpretation of the Second Amendment is that the words "keep" and "bear" exist in a hermetic vacuum where none of the obvious conduct that is required to keep or bear arms implicates the plain text. This is flatly wrong. If there is no "penumbra" of activities, then the only type of law that could implicate the plain text would be a total destruction of the ability to keep or bear arms. T.R. Jan. 24, at 106. This is an incorrect and frivolous argument.

It is well established that conduct necessary to exercise constitutionally protected rights (i.e., in the "penumbra") is also protected. "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise…The right to keep and bear arms, for example, 'implies a corresponding right to obtain the bullets necessary to use them'" *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring) (citing *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014)). Otherwise, governments could nullify constitutional rights too easily. Imagine a city granting a permit to protest in a park on the edge of town, then prohibiting vehicle travel on roads to the park. The State would say that raises no constitutional question, because there is no penumbra protecting the ability to travel to parks in vehicles.

This is not hyperbole. Some courts, like in *Defense Distributed*, have endorsed this anti-penumbral approach to the Second Amendment. The State cites that dreadfully reasoned opinion for its rejection of a "penumbra" of rights incident to the plain text that might cover arms acquisition, to support its argument that freezing California's handgun market to its already artificially-constricted 2013 era offerings is not a Second Amendment issue. D.B. at 4, T.R. Jan. 24, at 105. But this opinion flouts a nationwide weight of authority, and this Court should reject its approach.

To be sure, the argument that the Second Amendment does not protect acquiring firearms is completely invalid. *See, e.g. Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense "wouldn't mean much" without the ability to acquire arms."); *Ezell v. City of Chi.*, 651

F.3d 684, 704 (7th Cir. 2011) ("The right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use…Several passages in *Heller* support this understanding."); *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair.").[1]

But instead of engaging with legal reality, the State attempts to take the anti-penumbral approach to new heights by arguing that *Heller* does not protect *semiautomatic* handguns at all. D.B. at 8; T.R. Jan. 24, at 101. The State contends that "*Heller's* general reference to handguns, which also include revolvers and nonsemiautomatic pistols, does not establish that any and all semiautomatic pistols—particularly those without public safety features—are covered by the Second Amendment's plain text." D.B. at 8. So the State is saying that *Heller* would tolerate prohibiting semiautomatic handguns because people could still buy revolvers. But under this frivolous reasoning, the State could ban revolvers too by pointing to flintlock dueling pistols like the one Burr used to shoot Hamilton remaining available. The State may call that hyperbole but cannot identify the logical flaw, because there is none.

*Heller* will simply not tolerate this. *Heller* established that the Second Amendment protects the types of firearms that Americans commonly own for self-defense, which include handguns. 554 U.S. at 625. This is not dicta, is not qualified, and means that all common handguns are protected. *Heller* also establishes that the State cannot ban some arms because others remain available. *Id*. at 629. The State's favorite dicta from *Heller* regarding "presumptively lawful commercial regulations" and that the Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," does not overrule *Heller's* holdings, and must be

---

[1] *See also Jones v. Bonta*, 34 F.4 th 704, 716 (9th Cir. 2022), *vacated on reh'g*, 2022 WL 4090307; *Duncan v. Becerra*, 742 F. App'x 218, 221 (9th Cir 2018); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir 2014); *Drummond v. Robinson Twp.*, 9 F.4th 217, 224, 227-28 (3d Cir. 2021).

reconciled with *Heller's* categorical *protection* of handguns. Nothing in *Heller* approves banning a significant and ever-growing number of models within the most popular category of handguns because other models and types remain available. The State's insistence that it may claw back protected categories of firearms is as sorely mistaken as its insistence that doing does so not implicate the Second Amendment.

     Nor is the State's re-framing of the conduct as commercial rather than individual conduct availing. The distinction is immaterial. The argument that "nothing in the UHA prohibits the possession of off-Roster pistols" and that the "UHA provisions at issue here merely specify certain features that a semiautomatic pistol must have" grossly understates the UHA's impact. D.B. at 8. Indeed, not a single semiautomatic handgun has been added to the roster since May 2013 (when the microstamping provision became operative) that is not a cosmetically similar version of a grandfathered handgun. D.B. at 9-10. And while some people can sometimes source an off-roster firearm in the secondary market at a steep markup, the UHA prevents the vast majority of people from obtaining them. It thus denies people access to common firearms that have desirable and important safety features like complete ambidexterity and grip size configurability. T.R. Jan. 23, at 25, 233. So the UHA's impact is hardly de minimis; it froze the semiautomatic handgun market to its May 2013 offerings. Thus, the State's argument that this does not "*implicate* an individual's right of possession" is hard to countenance. D.B. at 9.

     At oral argument, the Court posed a hypothetical to the State, asking how the analysis under *Bruen* would unfold if California allowed only BB guns. T.R. Jan. 24, at 122-123. In the hypothetical, all the grandfathered handguns remain available, and the law enforcement exception is still applicable. *Id*. The State acknowledged that "yes, the plain text would cover that and you would move [to step two]." *Id*. at 123. When the Court asked counsel to explain why "in that hypothetical, step one is satisfied, but in this case, these three are not?[,]" the State said it is because new revolvers are being added to the roster because CLI, MDM, and microstamping do not apply to them. *Id*. So the State's argument is that whereas the BB gun law would foreclose all new handguns, the

1  UHA at least allows for some new revolvers to trickle into the market. That is proof that
2  the State's approach assumes that it can ban semiautomatic handguns and thus the UHA
3  does not offend the Second Amendment. The State is wrong on both scores.

### III. CLI, MDM, and Microstamping Fail Historical Scrutiny

The State argues that if Plaintiffs' conduct is within the plain text, analogical scrutiny applies because the UHA targets purportedly novel concerns. D.B. at 11. But the concerns are not novel. The State's main argument for the purported novelty is that semiautomatic handguns pose a risk of accidental discharge unknown in the past. *Id.* But that risk is not unique to modern semiautomatic firearms. D.B. at 11. Firearm makers incorporated CLIs as early as the 1860s and the State admits it was a concern then. T.R. Jan. 23, at 12-14; Declaration of Saul Cornell, ECF No. 56-3, at ¶44. Yet, lawmakers tellingly never required them, until the UHA. Thus, CLI and MDM target longstanding concerns, and strict-historical scrutiny applies. *Bruen*, 142 S. Ct. at 2131.

### A. There is No Historical Regulatory Tradition to Uphold CLI and MDM

The State cites the same three categories of purportedly on-point and well-subscribed regulations that it did at the hearing (proving laws, inspection laws, and storage laws) and contends that they "share the same '*how*' (imposing conditions on commercial gun sales) and the same '*why*' (ensuring the safety and functionality of commercially sold firearms) as the UHA's CLI and MDM requirements." D.B. at 14.

As an initial matter, the State identifies proving and inspection laws for barrels from only two states – Massachusetts and Maine, and gunpowder inspection laws from four states. D.B. at 13. That does not show the well-subscribed representative tradition needed to satisfy *Bruen*. Aside from that issue, *Bruen* does not allow the State to define the "*how*" this vaguely, even under the analogical approach. "Courts should not uphold every modern law that remotely resembles a historical analogue…." 142 S. Ct. at 2133 (citations omitted). "Imposing conditions on commercial gun sales" is so vague and broad that it reveals practically nothing. Much closer scrutiny is required.

That closer scrutiny reveals that the *hows* do not match. Proving and inspection

laws, whether for barrels or gunpowder, are quality verification laws meant to ensure that barrels and gunpowder are fit for their intended purpose. Cornell Decl., ECF No. 56-3, at ¶35. They are not feature requirements. They require verification of quality *as designed* and manufactured, and do not mandate inclusion of specific technological features.

Compare that with the UHA, which imposes the CLI and MDM features as supposed safety-aids of last resort that might prevent a user's negligent discharge. Confirming a product is of sufficient quality to safely operate (something the general public likely could not do) is vastly different from requiring features to potentially prevent users from committing errors (particularly those that *everyone* who touches a firearm should already know how to prevent). So although the CLI, MDM, proving and inspection laws all could be characterized from a vague and general perspective as commercial conditions, *how* they function reveals clear material differences.

Furthermore, whereas the State's characterization of proving and inspection laws as commercial conditions is reasonable, the State's characterization of loaded firearm and gunpowder storage prohibition laws as "commercial regulations" is plainly wrong. Those laws regulated how a person stores firearms or gunpowder already purchased and thus were not commercial *sale* regulations. Thus the *how* of the storage laws is not at all analogous to the CLI and MDM feature requirements.

The State's argument that CLI, MDM and the proving, inspection, and storage regulations share the "*why*" of "ensuring safety and functionality of commercially sold firearms" is wrong because that also construes the *why* question far too broadly. D.B. at 14. The reasons must be identified with more specificity. Here, the reason for proving, stamping, and inspection of firearms and gunpowder was to make sure firearms sold to the public would not blow up in their hands when intentionally fired. Cornell Decl., ECF No. 56-3, ¶31. While the reason for the loaded storage laws was decreasing risk of accidental discharge (*id.* at ¶44), and the reason for gunpowder storage laws was fire risk and explosion (*id.* at ¶43). So there are three *whys* for these laws: verifying quality and functionality, mitigating accidental discharge risk, and mitigating fire risk.

Verifying quality and functionality has nothing to do with CLI and MDM. If anything, these laws could be analogous to the UHA's firing test and drop safety test that Plaintiffs do not challenge here. And the State does not even attempt to argue that CLI and MDM are meant to decrease fire risk. On the other hand, accidental discharge was a concern in the past and is a concern today. Cornell Decl., ECF No. 56-3 at ¶44. So the *why* for CLI and MDM is the same as the *why* for the historical loaded storage prohibition laws that the State found, but not the others. Thus, the State must justify CLI and MDM under strict-historical scrutiny.

Even though the *why* for the loaded firearm storage laws is a match with CLI and MDM, the *how* does not match at all. These historical laws prohibited a person from storing a firearm in loaded condition, whereas CLI and MDM are *features* requirements meant to forestall negligent mistakes, not *behavior* requirements. A law that requires people to lock-up their firearms when not in use might be a more reasonable modern comparison, but a law that mandates features clearly is not. But most importantly, loaded storage prohibition laws are invalid because they amount to a destruction of the core right. *Heller*, 554 U.S. at 630. So the extent of the burden could never be justified today. Thus, as a matter of law and logic, the State's proving, stamping, inspection, and storage laws do not satisfy historical scrutiny and thus cannot save CLI or MDM.

### B. Microstamping Fails Historical Scrutiny

The State relies on *Pena* to argue that microstamping is the modern-day equivalent of firearm serialization. D.B. at 15. It also relies on *United States v. Holton*, a post-*Bruen* case that upheld serialization under analogical scrutiny. No. 3:21-CR-0482-B, 2022 U.S. Dist. LEXIS 200327 (N.D. Tex. Nov. 3, 2022) These arguments are unpersuasive.

First, the State's position regarding historical concerns is contradictory. While claiming that microstamping's purpose is investigating homicide, which was not a ratification era concern (D.B. at 12), it also argues that keeping firearms out of the wrong hands and controlling and tracing firearms motivated purported ratification era serialization. D.B. at 6, 15. And while firearm homicide may not have been as prevalent

1  in the late 1700s as today, by 1868 handgun firearm violence was commonplace. Cornell
2  Decl., ECF No. 56-3, at ¶38. So the State has admitted that the strict historical approach
3  applies because the historical concern is a match.
4     But neither *Pena* nor *Holton* supports the State's serialization theory. *Pena* is
5  simply bad law post *Bruen*, and *Holton's* curt and superficial application of analogical
6  scrutiny, and conclusory finding that serialization is akin to historical "registration and
7  taxation requirements" is very questionable and no model for how the post *Bruen*
8  historical scrutiny should be applied. *Holton*, at *11.
9     Most importantly, serialization is not a legitimate counterpart to microstamping
10 because it is not *relevantly* similar to it. To be "relevantly similar," "historical regulations
11 must impose a comparable burden on the right of armed self-defense," both in terms of
12 "how and why the regulations burden" the right. *Bruen*, 142 S. Ct. at 2133. While
13 serialization imposes no cognizable burden at all, microstamping's burden and impact are
14 enormous. Indeed, microstamping fails even the more lenient analogical standard because
15 *how* and *why* the UHA burdens the right is not at all comparable to serialization.
16    Although stamping alphanumeric sequences on metallic objects has probably
17 existed for centuries, the State offers no clear evidence that firearm serialization is a long-
18 standing statutorily required practice. That is what the court in *United States v. Price*
19 found. No. 2:22-cr-00097, 2022 U.S. Dist. LEXIS 186571 (S.D. W. Va. Oct. 12, 2022)
20 (striking down federal serialization under historical scrutiny). Indeed, the only purported
21 evidence of serialization the State presents is a continental army order issued by George
22 Washington to mark muskets as army property, and an 1805 Massachusetts law directing
23 barrel provers to mark proved guns with their initials. ECF No. 56-3, Def's. Ex. 31, at 2,
24 4. So the State has failed to identify plausible analogues. Moreover, though serialization
25 imposes absolutely no burden on 21st century arms markers, has no impact on how
26 firearms function, has no impact on the retail firearms marketplace, and thus no impact
27 on the right, none of that is true of microstamping.
28    Microstamping involves using sophisticated micro-laser technology to co-opt a

9
PLAINTIFFS' REBUTTAL BRIEF

gun's firing pin—a tiny component designed and intended solely to strike and ignite a cartridge's primer—to make it reliably transfer an alphanumeric marking to a primer as it strikes it. The impact of requiring arms makers to implement this un-proven technology is that California's semiautomatic handgun market is frozen to its May 2013 offerings while the rest of the country shops in a marketplace that continually evolves and features products that become more ergonomic, durable, reliable, affordable, and ironically, safer. So the burden that microstamping imposes is extraordinary compared to ordinary serialization and is thus not "comparably justified." *Bruen*, 142 S. Ct. at 2133. No other State's handgun market looks like California's. The UHA's unconstitutional feature requirements are the reason why.

### IV.  The Winter Analysis Favors Plaintiffs Because There is No Risk of Harm

The State's *Winter* argument boils down to "three studies demonstrating that CLIs and MDMs *could* prevent accidental shootings." D.B. at 19 (italics added). Not that they *have*, but that they *could*, as these were *prospective*-looking studies. Whereas Plaintiffs presented a UC Davis study that found no discernable difference in accidental firearm injuries. Frank Decl., ECF No. 57-1, Ex. 1. Thus the State has not presented evidence that "reflects the public safety benefits of CLIs and MDMs." *Id*. Furthermore, none of the microstamping data matters one iota because there are no guns with microstamping available for sale anywhere in the world. Lastly, the fact that *every* semiautomatic handgun currently on the roster is a grandfathered item that would otherwise be "unsafe" under the UHA's operative requirements shows that the State's harm argument is legal fiction, not objective fact.

### CONCLUSION

The UHA's CLI, MDM, and microstamping prevent Plaintiffs from buying common handguns. That satisfies the predicate inquiry and triggers historical scrutiny that the State fails to satisfy. There is no historical regulatory tradition sufficient to save CLI, MDM, and microstamping. These requirements should be preliminarily enjoined.

Dated: March 10, 2023   MICHEL & ASSOCIATES, P.C.

/s/C.D. Michel
C.D. Michel
*Counsel for Plaintiffs*

PLAINITFFS' REBUTTAL BRIEF

# CERTIFICATE OF SERVICE

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

Case Name: *Boland, et al. v. Bonta*

Case No.: 8:22-cv-01421-CJC(ADSx)

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, am a citizen of the United States and am at least eighteen years of age. My business address is 180 East Ocean Boulevard, Suite 200, Long Beach, California 90802.

    I am not a party to the above-entitled action. I have caused service of:

**PLAINTIFFS' REBUTTAL BRIEF IN RESPONSE TO THE STATE'S SUPPLEMENTAL POST MPI BRIEFING (ECF NO. 56)**

on the following party by electronically filing the foregoing with the Clerk of the District Court using its ECF System, which electronically notifies them.

Robert L. Meyerhoff, Deputy Attorney General
robert.meyerhoff@doj.ca.gov
Gabrielle D. Boutin
Gabrielle.Boutin@doj.ca.gov
Charles J. Sarosy
charles.sarosy@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013-1230

    I declare under penalty of perjury that the foregoing is true and correct.

Executed March 10, 2023.

*Christina Castron*
Christina Castron